## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| COLUMBUS LIFE INSURANCE COMPANY,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>WILMINGTON TRUST, N.A., as Securities Intermediary,<br><br>　　　　Defendant. | No. 1:20-cv-00735-MN-JLH |
| COLUMBUS LIFE INSURANCE COMPANY,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>WILMINGTON TRUST, N.A., as Securities Intermediary,<br><br>　　　　Defendant. | No. 1:20-cv-00736-MN-JLH |

**PLAINTIFF COLUMBUS LIFE INSURANCE COMPANY'S
CONCISE STATEMENT OF UNDISPUTED FACTS IN
<u>SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiff Columbus Life Insurance Company ("Columbus Life") submits this Concise Statement of Undisputed Facts in Support of its Motion for Summary Judgment.

**A.    The KDI STOLI Program**

1. In the early 2000s, Bart Kavanaugh designed the KDI Program, which created hundreds of multi-million dollar insurance policies on the lives of seniors. **Ex. A** at 23:23-24:10, 34:3-35:10, 52:5-53:12. Kavanaugh ran the KDI Program through a series of entities he owned and controlled.[1] *Id.* at 7:16-9:5, 35:19-50:8.

2. To find seniors willing to lend themselves to the transaction, Kavanaugh recruited Ed Leisher, who in turn recruited a network of insurance brokers, such as Mark Goodman of First Financial Resources ("FFR") in Naples, Florida, who had access to pools of seniors meeting KDI's investment profile. **Ex. B** ¶¶ 4-8; **Ex. C** at 40:20-41:9; **Ex. D** at 25:12-23.

3. The concept was to induce seniors with "medical impairments" and "excess insurance capacity," meaning "a senior's ability to qualify for insurance coverage in excess of what that senior wanted or needed for their estate plan," into allowing insurance and possibly annuities to be taken out on their lives in exchange for a small portion of the life policy's death benefit possibly being shared with their estates post mortem. **Ex. B** ¶¶ 4, 6, 11-12 **Ex. C** at 23-24.

4. The policies were funded at issuance using non-recourse loans from Kavanaugh's Carmel Group to trusts created on forms provided by Kavanaugh. **Ex. D** at 38:2-18, 49:6-17, 69:6-19; **Ex. E** at 43:7-44:5, 46:3-5, 47:14-21, 49:9-50:6. The trusts were administered by a corporate trustee, CTC of Delaware (CTC"), that was selected, directed, and paid for by Kavanaugh. *Id*.

---

[1] Those entities included: South Bay Partners; Columbus Circle Capital, LLLP; Carmel Group, LLC; Ardsley Group, LLC; BBZ, Inc.; KDI Service, LLP; East End Partners; French Cap Consulting; Pacific Partners; and Charter Life Insurance Company. **Ex. A** at 7:16-9:5, 35:19-50:8. Collectively, Mr. Kavanaugh and these entities will be referred to as either "Kavanaugh" or the "Kavanaugh Organization."

5. The seniors had no liability to repay these non-recourse loans, nor did they actually pay any of the policies' premiums. **Ex. A** at 35:4-10; **Ex. C** at 29:16-22; **Ex. D** at 38:2-14; **Ex. E** at 29:3-18; **Ex. F** at 124:21-125:12.

6. Every aspect of the policies being taken out were also selected—not by the seniors—but by Kavanaugh; indeed, the entire transaction was carried out on boilerplate forms created by Kavanaugh—most of which the seniors were not even required to sign. **Ex. B** ¶ 8; **Ex. C** at 60:21-61:14, 64:7-65:12; **Ex. E** at 49:9-20, 97:1-98:17; **Ex. G** ¶ 7(b); **Ex. H** ¶ 7(b).

7. The funder also retained the right to buy annuities on the seniors, not for the seniors' benefit, but rather for the funder's benefit. **Ex. G** ¶¶ 2, 8; **Ex. H** ¶¶ 2, 8. The idea was that the funder might at some point buy oversized annuities for itself that generated more cash than the insurance cost to maintain. **Ex. A** at 113:16-21, 115:3-13; **Ex. E** at 204:9-19. As with the life insurance, the seniors were not allowed to select which annuities, if any, might be bought on their lives, and any annuity benefit went, not to seniors, but to investors.[2] **Ex. G** ¶ 7(b); **Ex. H** ¶ 7(b).

8. The trusts to which the policies were issued retained the right to sell the trusts' beneficial interests and thus to indirectly sell the policies themselves. **Ex. I** §§ 3.1(a), 3.2(b); **Ex. J** §§ 3.1(a), 3.2(b).

9. When a death benefit was paid to a trust, the trustee was supposed to distribute it according to a specific payment waterfall. **Ex. G** § 8(b); **Ex. H** § 8(b). First, the trust was to repay the funder for the premiums with interest. **Ex. G** § 8(b); **Ex. H** § 8(b). Then, the trust was to make a "Scheduled Death Benefit" payment in an amount set forth on the schedule attached to the

---

[2] At his deposition, Kavanaugh's representative (Patrick Shanley) was clear that to the extent annuities would have been bought, they would have been bought by an entity created by the funder with its own money for its own benefit and that neither the insureds nor the trusts bearing their names were ever intended to borrow money to buy any annuities. **Ex. A** at 71:19-72:21.

Participation Agreement to the owner of the trust's beneficial interest certificate, which at the inception of the transaction was the insured, subject to availability of funds. **Ex. G** §§ 8(b), 9(a); **Ex. H** §§ 8(b), 9(a); **Ex. I** § 3.1(a); **Ex. J** § 3.1(a). Finally, the trust was to pay all of the death benefit leftover to the funder. **Ex. G** § 8(b); **Ex. H** § 8(b); **Ex. K** at 618; **Ex. L** at 18683.

**B.    The Ardsley Tranche**

10.    When Kavanaugh first launched KDI, the money to fund the premiums came from AI Credit, a subsidiary of AIG. **Ex. A** at 51:3-14, 67:17-20. AI Credit lent it to Kavanaugh's Ardsley Group, which lent it to the trusts. *Id.* at 51:3-14. AI Credit also provided funds to Ardsley to buy annuities on the seniors for AI Credit's benefit. *Id.* at 50:9-51:14.

**C.    The Concordia Tranche**

11.    In late 2003, AI Credit declined to fund additional policies, but Kavanaugh wanted to create more, so it decided to fund policies itself. *Id.* at 70:2-13, 168:16-169:21.

12.    Kavanaugh created Columbus Circle Capital to lend funds from within the Kavanaugh Organization to Carmel Group, which would then lend money to newly-formed trusts bearing seniors' names to create new policies. *Id.* at 35:24-37:14; **Ex. M** at 3312-14.

13.    Less than a year after the Concordia Tranche policies were put in force, Kavanaugh decided to accelerate all of the loans and arrange for the sale of the policies to ABC Viaticals. **Ex. A** at 82:13-85:4; 120:16-121:4; **Ex. N**.

14.    The insureds were told the loans were in default and they needed to sell their residual interest in the policies to Columbus Circle or immediately cause the trusts to repay the loans and assume liability for paying premiums going forward. **Ex. O**; **Ex. P**; **Ex. Q**.

**D.    Kavanaugh Manufactures $11 Million Of STOLI On Janet Cohen's Life, Including The $5 Million STOLI Policy At Issue Here**

15.    In the late 1990s, Janet Cohen was in her early 70s and living with her husband in Florida. **Ex. F** at 25:15-25, 32:7-33:24, 35:18-23, 50:14-17. During this time, Cohen worked with

3

her estate planning attorney, George Wilson, and insurance professionals at FFR, such as Mark Goodman, to plan for the efficient passing of her assets upon her death. **Ex. B** ¶¶ 9-10; **Ex. R** ¶¶ 1-2. As part of that estate planning, Cohen, in consultation with her advisors, determined that she needed $6.1 million in life insurance coverage; as a consequence, a $3 million Transamerica policy and a $3.1 million Manulife policy were obtained for her in or around 1999 for which Cohen actually paid the premiums. **Ex. R** ¶¶ 2, 11.

16. Then, around 2003, Goodman solicited Cohen to participate in the Ardsley Tranche of the KDI Program. **Ex. B** ¶¶ 11-12; **Ex. R** ¶¶ 3-5. Having agreed to participate, a $6 million policy insuring Cohen's life was taken out from American General. **Ex. A** at 63:19-64:8. This policy was funded by AI Credit. *Id.* at 51:3-15.

17. About a year later, in early 2004, Goodman reached back out to Cohen, soliciting her to participate in the Concordia Tranche. **Ex. R** ¶¶ 5-6. Goodman pitched it to her as a way to make extra money for her family by selling her excess insurance capacity to investors. *Id*.

18. Cohen was persuaded to participate because she would not have to pay any money out-of-pocket (other than a nominal $1,000 participation fee) and because her family might get some cash out of it. **Ex. R** ¶ 6.

19. No estate planning analysis was conducted in connection with these KDI policies. **Ex. R** ¶ 11.

20. On August 2, 2004, Cohen signed a boilerplate document called the Participation Agreement. **Ex. G**. The agreement provided that Cohen was "not permitted to select the lenders, the issuers or type of life insurance policies, or the issuers or type of annuity policies, to change the lenders, the life insurance policies or the annuity policies, [or] to own directly own" them. *Id.* § 7(b). The agreement also provided that a trust bearing Cohen's name would be created to own

the policy insuring her life; that the funder would fund the premium on that policy through a loan to that trust; and that upon Cohen's death, the policy's death benefit would first be used to repay the funder with interest; then to pay the trust's beneficiary (Cohen herself, meaning her estate) a relatively small portion of the death benefit, referred to as the "Scheduled Death Benefit";[3] and that the rest of the death benefit would be used to pay the trust's "obligations," which, as explained below, meant that the remainder of the death benefit would also be paid to the funder. *Id.* § 8(b).

21. The agreement further stated that "under no circumstances" was Cohen permitted to "receive a distribution from the Trust of a portion of the death benefits from the life insurance policies on the life of [Cohen] that is greater than [Cohen's] allocable scheduled death benefit as set forth on the attached schedule" and that Cohen might get nothing. *Id.* §§ 8(b), 9(a). Along with signing this document, Cohen was required to pay a "nominal" $1,000 fee, which was never used to pay premiums or any other expenses and which instead sat in an account until it was refunded to Cohen a year or so later. **Ex. B** ¶ 11; **Ex. E** at 195:3-197:14.

22. That same day, a Trust Agreement was executed creating the Janet Cohen Family 2004 Delaware Trust (the "Cohen Trust"), a Delaware statutory trust. **Ex. I.** Cohen did not sign this document; rather, it was executed solely by Halpern on behalf of CTC as trustee. *Id.* at 18131. Halpern never met with or spoke to Cohen, and never did any estate planning for her. **Ex. E** at 43:10-44:5, 147:9-22. Its purpose was limited to buying and maintaining life policies on Cohen, executing KDI program documentation, and distributing death benefits. **Ex. I** at 18113-14.

23. On August 2, 2004, an application for a $5 million life insurance policy from Columbus Life ("Cohen Policy") was executed by Cohen (as insured), Leisher (as broker), and

---

[3] At inception the Scheduled Death Benefit was ■■■■■■ and was set to increase over time before capping out at ■■■■■■, if Cohen lived to be 95. **Ex. G** at 18102.

Eaddy (on behalf of CTC, as trustee of the Cohen Trust, as owner) in Delaware. **Ex. S** at 932. Despite being signed by both Cohen and Leisher, however, every feature of the prospective policy was selected by Kavanaugh. **Ex. C** at 132:12-18; **Ex. I** § 7(b). The Cohen Trust was identified as its prospective owner and beneficiary. **Ex. S** at 930-31, 935. Despite serving as the Cohen Policy's writing agent, Leisher testified that he never met Cohen or conducted any estate planning or other analysis to determine whether she needed it. **Ex. C** at 129:5-7.

24. Although Cohen was Goodman's client, Leisher and Kavanaugh were listed as the brokers to whom the commission should be paid. **Ex. S** at 935. Subject to a side-agreement, Leisher and Kavanaugh agreed to share roughly 25% of those commissions with Goodman; Goodman agreed to substantially reduce his commission in this way "because of the reality that without Mr. Kavanaugh's program (and the non-recourse funding it provided), none of these policies would have been taken out to begin with, and 25% of something is obviously better than 100% of nothing." **Ex. B** ¶ 13. Leisher, the writing agent, likewise explained why he agreed to share his commission with Kavanaugh: "He who has the gold controls." **Ex. C** at 71:16-72:10.

25. On August 6, 2004, a Master Funding Agreement was executed. **Ex. K**. Cohen did not sign this document; rather it was signed by Halpern (as trustee of the Cohen Trust) and by Halpern (as Manager of Kavanaugh's Carmel Group). *Id.* at 624.

26. Through this agreement, Carmel agreed to fund the premiums needed to incept and maintain the Cohen Policy on a non-recourse basis, meaning Cohen had no liability to repay these premiums. **Ex. A** at 35:4-10; **Ex. C** at 29:16-30:5; **Ex. D** at 38:2-18; **Ex. E** at 29:3-18, 170:8-19; **Ex. F** at 36:19-37:9, 125:9-12.

> **NONRECOURSE BY LENDER**. Notwithstanding anything to the contrary contained herein, neither Lender nor any other person succeeding to the interests of Lender hereunder shall have any recourse, in law or equity to any assets of any person or entity acting as trustee or manager of

>   Borrower (including but not limited to [CTC]) or any beneficiary of Borrower with respect to payments due under this Funding Agreement or any other liability or obligation hereunder.

**Ex. K** at 621.

27.  The Master Funding Agreement also contained a "Death Benefit Sweep" provision, which provided as follows:

>   **<u>DEATH BENEFIT SWEEP.</u>** On the date of death of any person insured under the Life Policy, the Borrower shall pay to the Lender, in addition to the principal and accrued interest due under this Funding Agreement, an amount equal to (a) the "Life Policy death benefit" (defined as the aggregate death benefits paid or payable on the Life Policy) reduced by the "scheduled death benefit" (as defined in the Borrower's Participation Agreement), minus (b) the total principal amount outstanding under this Funding Agreement, and accrued interest thereon, paid to Lender on the Maturity Date; but not less than zero. The obligations of the Borrower under this "Death Benefit Sweep" section will continue notwithstanding the payment of all interest and principal hereunder.

**Ex. K** at 618.

28.  The sum and substance of this "Death Benefit Sweep" provision meant that all of the Cohen Policy's leftover death benefit—after Kavanaugh was repaid with interest and Cohen's estate was paid the Scheduled Death Benefit—would also be paid to Kavanaugh. **Ex. C** at 143:14-144:4; **Ex. E** at 170:24-172:21; *see generally* **Ex. U** § (V)(A). That same day, the Cohen Trust collaterally assigned the Cohen Policy to Kavanaugh's Columbus Circle. **Ex. V**.

29.  The same day, a Servicing Agreement was executed. **Ex. W**. Cohen did not sign this document; rather it was signed by Halpern (as trustee of the Cohen Trust) and Mr. Kavanaugh on behalf of KDI Service LLP. *Id.* at 18146-47. The agreement appointed Kavanaugh's KDI Service as the "Servicer" to direct the Cohen Trust's trustee, manage the Cohen Policy, pay the Cohen Trust's expenses. *Id.* §§ I(1)-(4); *id.* at 18149.

30.  That same day, Columbus Life issued the Cohen Policy to the Cohen Trust and received a wire transfer of $17,408.51 from Betty Saks (Mr. Kavanaugh's wife) to put the Cohen

Policy in force. **Ex. T** at 862, 872; **Ex. X**.

31. At the moment of the Cohen Policy's inception, the premium funder, Kavanaugh, was entitled to ▮ of the Cohen Policy's death benefit. **Ex. E** at 172:13-174:7; **Ex. G** §§ 8(b), 9(a); *id.* at 18102; **Ex. K** at 618; **Ex. U** § (V)(A).

32. Sometime over the next two months, Kavanaugh reduced Cohen's Scheduled Death Benefit, which increased Kavanaugh's ownership stake in the Cohen Policy's death benefit to ▮. **Ex. Y**; **Ex. Z** at 8264. Thus, had Cohen died within the first year, Kavanaugh stood to receive ▮ of the Cohen Policy's $5 million death benefit. **Ex. E** at 165:11-22, 172:13-174:7; **Ex. G** §§ 8(b), 9(a); *id.* at 18102; **Ex. K** at 618; **Ex. Z** at 8264; **Ex. U** at 18-19.

33. After the Cohen Policy was effected, Kavanaugh's BBZ Inc. sought and received quotes for the purchase of annuities on Cohen's life. **Ex. AA** at 2551-53, 2560-65. But, ultimately, no annuities on Cohen were ever purchased. **Ex. A** at 150:10-12.

**E.  Kavanaugh Manufactures $6 Million Of STOLI On Anthony Romano's Life, Including The $5 Million STOLI Policy At Issue Here.**

34. In 2004, Goodman encouraged another of his clients to participate in the Concordia Tranche of the KDI Program—82-year-old Anthony Romano. **Ex. D** at 27:21-24. As with Cohen, Goodman had already prepared Romano's estate plan and had already helped Romano buy the insurance he needed for that plan; Goodman pitched the KDI Program to Romano as a "risk-free way to . . . take what, to [Romano], was a nominal amount of money, a thousand dollars, and turn it into a larger amount in exchange for giving away [his] future insurability that [he] had already determined [he] did not need." **Ex. B** ¶ 11.

35. Indeed, Romano would not have participated if he had had to pay any the premiums himself and was only persuaded to participate because the transaction was presented to him as a risk-free way to make some money by selling his future insurability to Kavanaugh. *Id.* ¶ 12.

8

36. On June 24, 2004, Romano executed a Participation Agreement substantively identical to the one signed by Cohen; thus it provided, *inter alia* that (i) Romano was not allowed to choose the policies that would be taken out on his life; (ii) when death benefits were ultimately paid to the Romano Trust, they would be used to repay the funder for the premiums with interest, pay the trust's beneficiary (Romano himself i.e., his estate) the "Scheduled Death Benefit";[4] and that the rest of the death benefit would be used to pay the trust's "obligations," which due to the Master Funding Agreement's "Death Benefit Sweep" provision meant that the remainder of the death benefit would also be paid to Kavanaugh; and (iii) Romano could never receive more than the Scheduled Death Benefit and he might ultimately get nothing. **Ex. H** § 8(b).

37. Romano was required to fund the trust's account with a "nominal" $1,000, which was never used to pay premium and which instead simply sat in the trust's account until it was refunded to Romano less than a year later. **Ex. B** ¶ 11; **Ex. E** at 136:10-20, 137:17-139:24.

38. That same day, a Trust Agreement substantively identical to the Cohen Trust Agreement was executed creating the Romano Family Delaware Trust (the "Romano Trust"), a Delaware statutory trust. **Ex. J**. Romano did not sign this document; rather it was executed by Halpern, on behalf of CTC, as trustee. *Id.* at 18653. Halpern never met or spoke with Romano, and never did any estate planning for Romano; in fact, he and CTC were selected, directed, and paid for—not by Romano—but by Kavanaugh. **Ex. E** at 43:10-44:5, 87:18-88:5.

39. That same day, an application for a $5 million life insurance policy from Columbus Life (the "Romano Policy") was executed by Romano (as insured), Leisher (as broker), and Halpern (as trustee of the Romano Trust as owner) in Delaware. **Ex. BB** at 2181. The Romano

---

[4] At inception the Scheduled Death Benefit was ▬▬▬ and was set to increase over time before capping out at ▬▬▬, if Romano lived to be 98. **Ex. H** at 18624.

9

Trust was identified as its prospective owner and beneficiary. *Id*. Every feature of the prospective policy was selected by Kavanaugh; Leisher never met or communicated with Romano and never conducted any estate planning or other analysis to determine if he needed it; and commissions were split amongst Goodman (25%), Leisher (35%), and Kavanaugh (40%). *Id.* at 2182; **Ex. B ¶ 13**; **Ex. C** at 81:19-82:14, 90:13-8; **Ex. H** § 7(b); **Ex. BB** at 2182.

40. On June 30, 2004, a Master Funding Agreement substantively identical to the Cohen Master Funding Agreement was executed. **Ex. L**. Romano did not sign this document; rather, it was signed by Halpern (as trustee of the Romano Trust) and by his CTC colleague, Eaddy (as Manager of Kavanaugh's Carmel Group). *Id.* at 18689.

41. As with the Cohen transaction, this was a non-recourse loan that Romano had no liability to repay. *Id.* at 18686 ("NONRECOURSE BY LENDER"); **Ex. A** at 35:4-10; **Ex. C** at 29:16-30:5; **Ex. D** at 38:2-18; **Ex. E** at 29:3-18, 113:9-23.

42. The Romano Master Funding Agreement also contained the same "Death Benefit Sweep" provision contained in the Cohen Master Funding Agreement. **Ex. C** at 109:8-110:4; **Ex. E** at 114:23-116:13; **Ex. L** at 18683 ("DEATH BENEFIT SWEEP"); *see generally* **Ex. DD** § (V)(A).

43. That same day, the Romano Trust collaterally assigned the Romano Policy to Kavanaugh's Columbus Circle. **Ex. EE**.

44. That same day, a Servicing Agreement substantively identical to the Cohen Servicing Agreement was executed. **Ex. FF**. Romano did not sign this document; rather, it was executed by Halpern (as trustee of the Romano Trust) and Kavanaugh (on behalf of KDI Service). *Id.* at 18694-95. As with the Cohen transaction, Kavanaugh's KDI Service was appointed to direct

10

the Romano Trust, manage the Romano Policy, and pay the Romano Trust's expenses. *Id.* §§ I(1)-(4); *id.* at 18691.

45.     That same day, Columbus Life issued the Romano Policy to the Romano Trust and received a wire for $51,842.02 from a Kavanaugh Organization bank account, to put the Romano Policy in force. **Ex. CC** at 341; **Ex. GG**.

46.     At the moment of the Romano Policy's inception, the premium funder, Kavanaugh, was entitled to ▇ of the Romano Policy's death benefit. **Ex. E** at 114:24-116:13; **Ex. H** §§ 8(b), 9(a); *id.* at 18624; **Ex. L** at 18683; **Ex. DD** § (V)(A).

47.     Shortly after the Romano Policy was effected, another policy on Romano was created through the KDI Program and issued to the Romano Trust, a $1 million policy issued by American General Life Insurance Company.[5] **Ex. HH**; **Ex. II**.

48.     Sometime thereafter, the Scheduled Death Benefits were consolidated to reflect the combined $6 million of coverage, but Kavanaugh's percentage share of the aggregate death benefit (▇ in year one) remained the same. **Ex. H** at 18624; **Ex. JJ** at 8399.

49.     Had Romano died at any point after the Scheduled Death Benefit was revised, Kavanaugh stood to receive ▇▇▇ of the Romano Policies' aggregate $6 million death benefit. **Ex. E** at 114:5-116:13; **Ex. H** §§ 8(b), 9(a); **Ex. L** at 18683; **Ex. JJ** at 8399; **Ex. DD** at 18-19.

50.     After the Romano Policies were effected, Kavanaugh's BBZ Inc. sought and received quotes for the purchase of over-sized annuities on Romano's life. **Ex. A** at 92:16-20, 106:14-22, 107:17-21. In actuality, no annuities were ever purchased. *Id.* at 150:10-12.

---

[5] Together, the Romano Policy and the $1 million American General Romano Policy are referred to as the "Romano Policies."

11

**F.     Kavanaugh Fails To Secure Long-Term Financing And Elects To Cause The Policies To Be Sold Less Than A Year After They Were Issued.**

51.     The long-term financing deal never materialized, and Kavanaugh declined to continue funding the policies in the Concordia Tranche (including the Cohen Policy and Romano Policies (collectively, the "Policies")). **Ex. A** at 83:10-84:16. Kavanaugh found a buyer for all of the Concordia policies (including the Policies) in ABC Viaticals. *Id.* at 84:14-85:8.

52.     On or around April 14, 2005, Kavanaugh notified the Romano Trust and Cohen Trust that the loans were in default and that they would either have to start paying premiums without Kavanaugh's funding or sell their beneficial interest certificates to Kavanaugh. *Id.* at 117:13-19, 156:4-13; **Ex. O**; **Ex. Q**; **Ex. P**.

53.     On April 21, 2005, Kavanaugh's Columbus Circle agreed to sell to ABC Viaticals almost all of the Concordia Policies (including the Policies). **Ex. N**. In the days that followed, both Romano and Cohen authorized the Trusts to sell the Policies to Columbus Circle. **Ex. P**; **Ex. Q**.

54.     The Cohen Trust sold the Cohen Policy to Columbus Circle for ████████ ████████████████████████████████████████████████████. **Ex. A** at 160:17-161:14; **Ex. F** at 97:2-11; **Ex. P** at 10-11; **Ex. Z**. Columbus Circle turned around and sold the Cohen Policy to ABC Viaticals for ███████. **Ex. KK** at 15891.

55.     The Romano Trust sold the Romano Policies to Columbus Circle for ████████ ████████████████████████████████████████████████████████. **Ex. A** at 132:4-11; **Ex. Q** at 890-91; **Ex. JJ**. Columbus Circle turned around and sold the Romano Policies to ABC Viaticals for ███████. **Ex. A** at 145:2-16; **Ex. KK** at 15891.

56.     Shortly thereafter, it appears ABC Viaticals sold the Policies to an entity called The Settlement Group, which in late 2008 sold the Policies to the Orca Trust, which held the Policies through various Orca-related entities before, in 2016, defaulting on a loan from Delta Lloyd that

12

was collateralized by a portfolio of ▮ policies (including the Policies) (the "Orca Portfolio"), causing Delta Lloyd to foreclose on this portfolio and put it up for auction. **Ex. LL** at 33, 38-42.

**G.    Blackstone Buys The Policies In 2016 Knowing They Had STOLI Problems.**

57.    The Blackstone Group is one of the world's largest investment managers with over $881 billion of assets under management. **Ex. MM** at 61:24-62:8. One of the asset classes it invests in is high-face value life insurance policies insuring the lives of seniors, which its subsidiary, Blackstone Tactical Opportunities Advisors LLC, manages through a constellation of overseas special purpose vehicles referred to collectively as "Viva." *Id.* at 56:14-57:24, 62:9-21; **Ex. NN** at 103, 194-96, 255, 265, 325.

58.    In 2016, Viva, a sophisticated investor with the knowledge and experience necessary to evaluate the risks inherent in buying large portfolios of life insurance policies, was provided with the opportunity to bid on the Orca Portfolio. **Ex. MM** at 61:8-14. Viva's pre-acquisition factual investigation consisted solely of reviewing whatever documents the seller put in a "Data Room." *Id.* at 123:14-127:17, 128:9-133:3, 134:3-135:18.

59.    Although documents in that Data Room referenced the existence of the Participation Agreements, the Trust Agreements, and the Master Funding Agreements for the Policies, Viva did not try to obtain copies of these documents. *Id.* at 128:9-133:3, 134:3-135:18.

60.    Although Viva knew the Policies had been procured through premium financing— and although Viva knew that such policies were considered "manufactured," not "natural," and potential STOLI—Viva did not try to determine whether the financing was non-recourse (a known sign of potential STOLI) or whether the Insureds actually paid the premium. *Id.* at 131:17-132:14, 135:6-18, 154:21-155:3, 170:13-171:15, 177:24-178:1, 181:18-182:23; **Ex. RR**.

61.    Although Viva knew that an investor owning a policy's death benefit at inception, either directly or through a side-agreement, would make it STOLI, Viva concedes that it did not

13

try to determine whether any such side-agreement existed for the Policies and that "[i]n no situation would [they] have evaluated the relationship between the insured and the beneficiary" at inception to determine if the Policies were issued with insurable interests. **Ex. MM** at 42:2-11, 44:10-19, 49:10-51:7, 53:10-25, 170:13-173:22, 176:24-177:16.

62. A leading trade organization for the investor market, to which Blackstone belongs, the Institutional Longevity Markets Association, has longstanding "minimum" diligence guidelines instructing, *inter alia*, that investors should interview insureds and gather information from the involved insurance professionals to determine, among other things, how premiums were funded, whether the policies were taken out pursuant to financial inducements, and whether investors owned or were intended to own the policies' death benefits. **Ex. SS** at Ex. D. Viva concedes, however, that prior to buying the Orca Portfolio, it did not even try to contact the insureds, their advisors, the involved insurance professionals, the trustees of the trusts, or the premium lenders. *Compare* **Exhibit SS**, ILMA's Life Settlement Provider Best Practices, Dec. 2010 Ex. D, *with* **Ex. MM** at 98:13-99:2, 177:24-178:10, 179:1-182:23. In fact, Viva concedes that it did not follow ILMA's "minimum" diligence standards. **Ex. MM** at 254:9-18, 255:2-17.

63. During this period of diligence, the seller told Viva it could not make any representations as to any of the policies in the Orca Portfolio. **Ex. TT** ¶ 7(a). The seller's servicing agent, Maple Life, went even further, expressly carving the Cohen and Romano Policies *out of* the representations it was willing to give for other policies in the portfolio. **Ex. UU** at 66-68, 72, 76, 138. Maple Life expressly declined to represent that the Policies were enforceable. *Id*.

64. ███████████████████████████████████████
███████████████████████████████████████
███████████████ **Ex. TT** Nos. 3-5. ███████████

14

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████ **Ex. MM** at 215:12-217:13. ███████

██████████████████████████████████████████████████████████████████████

█████████ *Id.* at 94:7-95:23; **Ex. VV** No. 6.

65.   ██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ **Ex. VV**

Nos. 4-5. ████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

█████████████ **Ex. MM** at 88:11-17; **Ex. RR**.


Dated April 29, 2022

                                                          Respectfully submitted,

                                                        */s/ Donald L. Gouge, Jr.*
                                                        Donald L. Gouge, Jr. (No.
                                                        DONALD L. GOUGE, JR., LLC
                                                        800 N. King Street, Suite 303
                                                        Wilmington, Delaware 19801
                                                        (302) 658-1800, Ext. 1

                                                        COZEN O'CONNOR
                                                        Michael J. Miller (*pro hac vice*)
                                                        Joseph M. Kelleher (*pro hac vice*)
                                                        Charles J. Vinicombe (*pro hac vice*)
                                                        Philip J. Farinella (*pro hac vice*)
                                                        1650 Market St., Suite 2800
                                                        Philadelphia, PA 19103
                                                        *Attorneys for Plaintiff,*
                                                        *Columbus Life Insurance Company*

## CERTIFICATE OF SERVICE

I, Donald L. Gouge, Jr., do hereby certify that on this 29th day of April, 2022, a copy of the within Plaintiff Columbus Life Insurance Company's Concise Statement of Undisputed Facts in Support of Motion for Summary Judgment was filed via CM/ECF and served on all counsel of record.


Dated: April 29, 2022                                    */s/ Donald L. Gouge, Jr.*
                                                          Donald L. Gouge, Jr. (#2234)