**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| COLUMBUS LIFE INSURANCE COMPANY,<br><br>        Plaintiff,<br><br>        v.<br><br>WILMINGTON TRUST, N.A., as Securities Intermediary,<br><br>        Defendant. | No. 1:20-cv-00735-MN-JLH |
| COLUMBUS LIFE INSURANCE COMPANY,<br><br>        Plaintiff,<br><br>        v.<br><br>WILMINGTON TRUST, N.A., as Securities Intermediary,<br><br>        Defendant. | No. 1:20-cv-00736-MN-JLH |

**BRIEF IN SUPPORT OF COLUMBUS LIFE INSURANCE COMPANY'S
MOTION FOR SUMMARY JUDGMENT**

<u>**TABLE OF CONTENTS**</u>

**Page**

I.    NATURE AND STAGE OF PROCEEDINGS ...................................................... 1

II.    SUMMARY OF THE ARGUMENT ................................................................ 2

III.    STATEMENT OF FACTS ............................................................................ 3

  A.    The Emergence Of Modern STOLI Schemes .................................................. 3

  B.    The KDI STOLI Program ........................................................................... 4

    1.    The Ardsley Tranche.......................................................................... 6

    2.    The Concordia Tranche........................................................................ 7

  C.    Kavanaugh Manufactures $11 Million Of STOLI On Janet Cohen's Life,
         Including The $5 Million STOLI Policy At Issue Here. ................................... 8

  D.    Kavanaugh Manufactures $6 Million Of STOLI On Anthony Romano's Life,
         Including The $5 Million STOLI Policy At Issue Here. ................................... 14

  E.    Kavanaugh Fails To Secure Long-Term Financing And Elects To Cause
         The Policies To Be Sold Less Than A Year After They Were Issued............................ 18

  F.    Blackstone Buys The Policies In 2016 Knowing They Had STOLI Problems. .............. 20

IV.    ARGUMENT ......................................................................................... 24

  A.    The Policies Are Illegal Human Life Wagers............................................... 24

    1.    The Policies Lack Insurable Interest Because Kavanaugh Funded Them
           And Owned Most Of Their Death Benefits At Inception. ........................... 25

    2.    The Policies Lack Insurable Interest Because They Were Not Taken Out
           In Good Faith For A Bona Fide Insurance Purpose. .................................. 33

  B.    No Affirmative Defense Is Capable Of Breathing Life Into These Policies. ................ 35

  C.    Wilmington Trust's Premium Refund Claim, Which It Is Bringing On Behalf
         Of Its Principal, Viva, Must Fail.............................................................. 36

  D.    Wilmington Trust's Bad Faith Claim Fails.................................................. 42

V.    CONCLUSION................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*AIG Consolidated Derivitive Litig. v. Smith*,
    976 A.2d 872 (Del. Ch. 2009)..................................................................36

*Arch Ins. Co. v. Murdock*,
    2019 WL 19132536 (Del. Super. Ct. May 1, 2009) .................................44

*Balt. Life Ins. Co. v. Floyd*,
    91 A. 653 (Del. 1914) ..............................................................................24

*Bennett v. USAA Cas. Ins. Co.*,
    158 A.3d 877 (Del. 2017) .........................................................................44

*Brighthouse Life Ins. Co. v. Geronta Funding*,
    2019 WL 8198323 (Del. Super. Ct. Mar. 4, 2019) ("*Seck I*") .................36

*Brighthouse Life Ins. Co. v. Geronta Funding*,
    2019 WL 8198324 (Del. Super. Ct. Mar. 14, 2019) ("*Seck II*")............37

*Brighthouse Life Ins. Co. v. Geronta Funding*,
    207 A.3d 579 (Del. 2019) ("*Seck III*")....................................................37

*Brighthouse Life Ins. Co. v. Geronta Funding*,
    2022 WL 4080672 (Del. Super. Ct. Aug. 20, 2021) ("*Seck IV*") …………………..……38, 39

*Cammack v. Lewis*,
    82 U.S. 643 (1872)....................................................................................29

*Debakey v. Raytheon Serv.*,
    2000 WL 1273317 (Del. Ch. Aug. 25, 2000) ..........................................40

*Della v. Diamond*,
    8 Storey 465 (Del. 1965)......................................................................36, 41

*Dunlap v. State Farm Fire & Cas. Co.*,
    878 A.2d 434 (Del. 2005) .........................................................................42

*Encite v. Soni*,
    2008 WL 2973015 (Del. Ch. Aug. 1, 2008) ............................................42

*Estate of Malkin v. Wells Fargo*,
    379 F. Supp. 3d 1263 (S.D. Fla. 2019), *aff'd in relevant part*, 998 F.3d 1186
    (11th Cir. 2021) ("*Estate of Malkin*") .................................................21, 30

*Grigsby v. Russell*,
    222 U.S. 149 (1911)..................................................................................29

*Interim Healthcare v. Spherion*,
    884 A.2d 513, 551 (Del. Super. Ct. 2005), *aff'd*, 886 A.2d 1278 (Del. 2005) .......................40

*Justofin v. Metro. Life Ins.*,
    2002 WL 31375779 (E.D. Pa. Oct. 22, 2002)..........................................................42

*Lavastone Capital v. Estate of Berland*,
    266 A.3d 964 (Del. 2021) ("*Berland*") .................................................... *passim*

*PHL Variable Ins. Co. v Price Dawe 2006 Ins. Tr.*,
    28 A.3d 1068 (Del. 2011) ("*Price Dawe*") .................................................... *passim*

*Siner v. Am. Gen. Fin.*,
    2004 WL 2441185 (E.D. Pa. Oct. 28, 2004)............................................................37

*Stella v. W.S.F.S.*,
    1993 WL 138697 (Del. Super. Ct. 1993) ...............................................................37

*Sun Life v. U.S. Bank*,
    2016 WL 161598 (S.D. Fla. Jan. 14, 2016), *aff'd on all issues except interest*,
    693 F. App'x 838 (11th Cir. 2017) ("*Malkin*")..............................................21, 30, 42

*Sun Life v. U.S. Bank*,
    369 F. Supp. 3d 601 (D. Del. 2019), *recon. denied*, 2019 WL 2052352 (D.
    Del. May 9, 2019) ("*Sol*")..........................................................................21, 30, 31

*Sun Life v. Wells Fargo*,
    238 N.J. 157 (2019) ("*Bergman*")......................................................................37

*Sun Life v. Wilmington Tr.*,
    2022 WL 179008 (Del. Super. Ct. Jan. 12, 2022) ("*Frankel & DeBourbon*").................20, 30

*U.S. Bank v. Sun Life*,
    2016 WL 8116141 (E.D.N.Y. Aug. 30, 2016), *adopted*, 2017 WL 347449
    (E.D.N.Y. 2017) ("*Van de Wetering*").........................................................21, 30, 31

*U.S. v. Carpenter*,
    190 F. Supp. 3d 260 (D. Conn. June 6, 2016), *aff'd*, 801 F. App'x 1 (2d Cir.
    2020) .......................................................................................................21

*VGS v. Castiel*,
    2004 WL 876032 (Del. Ch. Apr. 22, 2004) ...........................................................40

*Warnock v. Davis*,
    104 U.S. 775 (1881)....................................................................................29

**Statutes & Bills**

18 Del. C. § 2704 ............................................................................................ *passim*

26 U.S.C. § 2042 .................................................................................................. 35

Del. S.B. 220, 146th Gen. Assem. (2012) ............................................................ 41

Del. H.B. 87, 147th Gen. Assem. (2013) ............................................................. 41

Del. S.B. 71, Amendment 1, 148th Gen. Assem. (2015) ..................................... 41

Del. S. Res., 148th Gen. Assem. (2016) .............................................................. 42

**Other Authorities**

Andre S. Blaze & Julian Movsesian, *Consider Premium Financing in Life Ins.
    Evaluations* ................................................................................................ 26, 27

1 J. Story, Commentaries on Equity Jurisprudence § 300 .................................. 36

Restatement (Second) of Contracts § 180 ........................................................... 36

Restatement (Second) of Contracts § 198 ........................................................ 36, 40

## I.    NATURE AND STAGE OF PROCEEDINGS

These cases are about two $5 million stranger-originated life insurance ("STOLI") policies procured on the lives of two senior citizens, Janet Cohen and Anthony Romano (the "Policies"), by investors for investors. Although STOLI comes in many shapes and sizes, the form of STOLI at issue here is what Justice Oliver Wendell Holmes explained long ago was the "strongest" form of human life wagering; that is, where a policy is "taken out for the purpose of allowing a stranger association to pay the premiums and receive the greater part of the benefit, and [the policy is] assigned to [the stranger] at once." That is precisely what happened here: The premium funder structured the transactions so that it owned 90% of the Policies' death benefits at inception and agreed to pay a small portion of that death benefit to the seniors' estates upon their deaths in exchange for them allowing their lives to be wagered upon. Not only is this one of the strongest forms of STOLI known to the common law, but it violates the Delaware Constitution and the literal language of Delaware's Insurable Interest Statute, 18 Del. § 2704(a). Indeed, Wilmington Trust itself—through the same attorneys who represent it here—recently conceded to the Delaware Superior Court that facts like those at issue here render policies void under Delaware law.

Because the Policies lack insurable interest, Columbus Life filed suit against their record owner, seeking a declaration that the Policies are void *ab initio*. In response, Wilmington Trust does not seek a declaration that the Policies are valid or supported by insurable interest. Instead, it asserts counterclaims, which seek (i) a declaration that it is entitled to a "refund" of all premiums ever paid on the Policies regardless of who paid them; and (ii) damages for Columbus Life's alleged breach of the covenant of good faith and fair dealing. But, as explained below, Wilmington Trust should be denied any form of relief because its principal, Viva, the real owner of the Policies,

██████████████████████████████████████████████████

████████████████████████████████████████ Under Delaware law, an informed

buyer like Viva is not entitled to a return of performance made under an illegal agreement. If courts

were to afford such relief, it would send a clear message to downstream investors like Viva to keep

buying policies with known insurable interest issues, which would, in turn, send a loud message

to upstream STOLI promoters to keep churning STOLI because downstream money will buy it.

Courts should not award relief under illegal agreements where, as here, doing so would frustrate

the public policy rendering the agreement unenforceable in the first place.

## II.     SUMMARY OF THE ARGUMENT

1.     The Policies are void *ab initio* for lack of insurable interest because a third party

(Kavanaugh) used Cohen and Romano (the "Insureds") as instruments to acquire a contractual

right to ████ of the Policies' death benefits at inception. Kavanaugh procured the Policies by

paying the premiums needed to originate them through non-recourse "loans" to nominally-funded,

sham trusts created by Kavanaugh and administered by trustees selected, directed, and paid for by

Kavanaugh. Neither Insured ever had any liability to repay these "loans" and neither actually paid

any premium. Nor did the Policies ever serve any bona fide insurance purpose; instead, they were

taken out on seniors who had no dependents, were not key persons in any business, and whose

estate plans were already completed. The transactions violate Delaware's Constitution and

insurable interest statute, 18 Del. C. § 2704(a), and are, in the words of the United States Supreme

Court, the "strongest" form of human life wagering known to the common law, and thus, Columbus

Life is entitled to a declaration that they are void *ab initio* for lack of insurable interest.

2.     Wilmington Trust's premium refund claim must fail because Viva concedes ██

██████████████████████████████████████████████████

████████████████████████████████████

Viva also concedes that it elected not to investigate the Policies' origination facts—declining to even call the Insureds, their advisors, the trustees, or the lender to determine who really paid the premiums or who was really entitled to the Policies' death benefits at inception—and that it did not even follow the "minimum" diligence guidelines of its own trade organization. A party who enters an agreement void *ab initio* as against public policy is not entitled to a return of performance made under that agreement especially where, as here, it knew that the agreement had public policy problems, failed to alert its counterparty as to its concerns, willfully blinded itself to the facts, and entered into the agreement anyway in the hopes of profiting by not getting caught.

3.      Wilmington Trust's bad faith claim fails because the Policies are void *ab initio* for lack of an insurable interest and thus those Policies (including any implied covenants) never came into existence. But even if the Policies were not deemed void *ab initio* for lack of insurable interest, the bad faith claim would still fail because Columbus Life had a more than reasonable basis to challenge them; in fact, the evidence shows that Columbus Life pays an extraordinarily high percentage of death claims made to it, including almost all of the policies it has flagged internally as possessing some high-level indicia of possible STOLI. Indeed, Columbus Life only challenges policies on insurable interest grounds that it believes it can definitely prove are STOLI.

## III.    STATEMENT OF FACTS

### A.    The Emergence Of Modern STOLI Schemes

Since the advent of insurance hundreds of years ago, speculators have attempted to use it to wager on human life. *PHL Variable Ins. Co. v Price Dawe 2006 Ins. Tr.*, 28 A.3d 1068, 1069 (Del. 2011) ("*Price Dawe*"). The doctrine of insurable interest developed in response to this speculation as a way to prevent life insurance from being perverted into a mechanism to wager on the lives of human beings and profit from their deaths. *Id.* In recent years, a legitimate and highly-


regulated market developed through which investors acquire legitimately-procured life insurance policies from owners who, due to changes in life circumstances, no longer require the protection those policies were taken out to provide. *Id.* In the mid-2000s, however, investor demand for these life policies substantially increased; whereas, the supply of existing, legitimately-issued policies did not. *Id.* at 1170. STOLI promoters sought to solve this supply problem by "generating" thousands of new policies for investors through "STOLI schemes" designed "to feign technical compliance with insurable interest statutes." *Id.* at 1063, 1170, 1074. In so doing, they crossed the line between legitimate investment and illegal human life wagering. *Id.* at 1069-70.

### B.   The KDI STOLI Program

In the early 2000s, Bart Kavanaugh designed a program called KDI to create hundreds of multi-million dollar insurance policies on the lives of hand-picked seniors—not to serve any legitimate insurance need of the seniors—but rather for the benefit of Kavanaugh and his associates. **Exhibit A**, Dep. of South Bay Partners at 23:23-24:10, 34:3-35:10, 52:5-53:12, 66:3-17, 69:5-13; **Exhibit B**, Decl. of M. Goodman ¶¶ 4-12. The KDI Program was run by Kavanaugh through a series of entities he owned and controlled.[1] **Ex. A** at 7:16-9:5, 35:19-50:8. To find seniors willing to lend themselves to the transaction, Kavanaugh recruited Ed Leisher, a D.C.-based broker-general-agent, who in turn recruited a network of insurance brokers, such as Mark Goodman of First Financial Resources in Naples, Florida, who had access to pools of seniors meeting KDI's investment profile. **Ex. B** ¶¶ 4-8; **Exhibit C**, Dep. of E. Leisher at 40:20-41:9. The concept was to induce seniors with "medical impairments" and "excess insurance capacity,"

---

[1] Those entities included: South Bay Partners; Columbus Circle Capital, LLLP; Carmel Group, LLC; Ardsley Group, LLC; BBZ, Inc.; KDI Service, LLP; East End Partners; French Cap Consulting; Pacific Partners; and Charter Life Insurance Company. **Ex. A** at 7:16-9:5, 35:19-50:8. These entities, along with Mr. Kavanaugh himself, will be referred to collectively in this brief as "Kavanaugh" or the "Kavanaugh Organization."

meaning "a senior's ability to qualify for insurance coverage in excess of what that senior wanted or needed for their estate plan," into allowing insurance and possibly annuities to be taken out on their lives in exchange for a small portion of the life policy's death benefit possibly being shared with their estates post mortem. **Ex. B ¶¶** 4, 6, 11-12 **Ex. C** at 23-24.

The policies were created using non-recourse loans from Kavanaugh's Carmel Group to trusts created by Kavanaugh and administered by a corporate trustee, CTC of Delaware (CTC"),[2] that was selected, directed, and paid for—not by the seniors—but by Kavanaugh. **Exhibit D**, Dep. of M. Goodman at 38:2-18, 49:6-17, 69:6-19; **Exhibit E**, Dep. of A. Halpern at 43:7-44:5, 46:3-5, 47:14-21, 49:9-50:6. All of the witnesses agree that the seniors had no liability to repay these loans and that none of the seniors actually paid any of the policies' premiums, loan expenses, or trustee fees. **Ex. A** at 35:4-10; **Ex. C** at 29:16-22; **Ex. D** at 38:2-14; **Ex. E** at 29:3-18; **Exhibit F**, Dep. of G. Wilson at 124:21-125:12. The particular policies being taken out (including their details such as the issuing carriers, product types, riders, options, face values, etc.) were also selected—not by the seniors—but by Kavanaugh. **Ex. C** at 60:21-61:14; **Ex. E** at 97:1-98:17; **Exhibit G**, Participation Agreement (Cohen), ¶ 7(b); **Exhibit H**, Participation Agreement (Romano), ¶ 7(b). Indeed, the entire transaction was carried out on boilerplate forms created by Kavanaugh—most of which the seniors were not even required to sign—without any substantial involvement of the seniors. **Ex. B ¶**8; **Ex. C** at 64:7-65:12; **Ex. E** at 49:9-20.

Kavanaugh also retained the right to buy annuities on the seniors, not for the benefit of the seniors, but rather for the benefit of the funder. **Ex. G ¶¶** 2, 8; **Ex. H ¶¶** 2, 8. The idea was that the funder might at some point buy oversized annuities for itself that generated more cash than the

---

[2] CTC's corporate trust department consisted of two people, Alan Halpern and Robert Eaddy, and the KDI Program accounted for roughly one third of its business. **Ex. E** at 24:5-22, 63:8-16.

insurance cost to maintain, thereby allowing the funder to benefit from an arbitrage play on the insureds' lives. **Ex. A** at 113:16-21, 115:3-13; **Ex. E** at 204:9-19. As with the life insurance, the seniors were not allowed to select which annuities, if any, might be bought on their lives, and any annuity benefit went, not to the seniors, but to the investors.[3] **Ex. G** ¶ 7(b); **Ex. H** ¶ 7(b).

The trusts to which the policies were issued retained the right to sell the trusts' beneficial interests and thus to indirectly sell the policies themselves. **Exhibit I**, Trust Agreement (Cohen), §§ 3.1(a), 3.2(b); **Exhibit J**, Trust Agreement (Romano), §§ 3.1(a), 3.2(b). When a senior passed, and a death benefit was paid to a trust, the trustee was supposed to distribute the death benefit according to a specific payment waterfall. **Ex. G** § 8(b); **Ex. H** § 8(b). First, the trust was to repay the funder for the premiums with interest. **Ex. G** § 8(b); **Ex. H** § 8(b). Then, the trust was to make a "Scheduled Death Benefit" payment in an amount set forth on the schedule attached to the Participation Agreement to the owner of the trust's beneficial interest certificate, which at the inception of the transaction was the insured, subject to availability of funds. **Ex. G** §§ 8(b), 9(a)**; Ex. H** §§ 8(b), 9(a); **Ex. I** § 3.1(a); **Ex. J** § 3.1(a). Finally, the trust was to pay all of the death benefit leftover to the funder. **Ex. G** § 8(b); **Ex. H** § 8(b); **Exhibit K**, Master Funding Agreement (Cohen) at 618[4] ("Death Benefit Sweep"); **Exhibit L,** Master Funding Agreement (Romano) at 18683 ("Death Benefit Sweep"). In this way, the premium funder (Kavanaugh) bought the right to almost all of a given policy's death benefit before that policy was even effected.

### 1.    The Ardsley Tranche

When Kavanaugh first launched KDI, the money to fund the premium came from AI

---

[3] At his deposition, Kavanaugh's representative (Patrick Shanley) was clear that to the extent annuities would have been bought, they would have been bought by an entity created by the funder with its own money for its own benefit and that neither the insureds nor the trusts bearing their names were ever intended to borrow money to buy any annuities. **Ex. A** at 71:19-72:21.

[4] Where possible, all pin-cites to pages are to the applicable bates label with leading zeros omitted.

Credit, a subsidiary of AIG, which lent it to Kavanaugh's Ardsley Group, which lent it to the trusts. **Ex. A** at 51:3-14, 67:17-20. AI Credit also provided funds to Ardsley to buy annuities on the seniors for AI Credit's benefit. **Ex. A** at 50:9-51:14. From late 2002 through late 2003, about 140 policies on the lives of about 116 insureds were created in this manner with an aggregate face value about $825 million. **Ex. A** at 52:17-22, 66:18-67:3. A few years after these policies were created, Kavanaugh's East End Partners offered to buy the insureds' residual interests in them, and did in fact buy about 1/3 of them for less than the Scheduled Death Benefit. **Ex. A** at 53:5-12.

### 2. The Concordia Tranche

Towards the end of 2003, for reasons no witness could explain, AI Credit declined to fund additional policies. **Ex. A** at 168:16-169:21; **Ex. E** at 32:20-35:23. Kavanaugh, however, wanted to create more so Kavanaugh decided to fund the program itself. **Ex. A** at 70:2-13**.** Kavanaugh created Columbus Circle Capital to lend funds from within the Kavanaugh Organization to Kavanaugh's Carmel Group, which would then lend money (at slightly higher interest rates) to newly-formed trusts bearing seniors' names to create new policies. **Ex. A** at 35:24-37:14; **Ex. K** at 617; **Ex. L** at 18682; **Exhibit M**, Promissory Note at 3312-14. According to Kavanaugh, these were intended as "bridge loans" while the Kavanaugh Organization tried to get a long-term funder to step into Carmel's shoes under the Master Funding Agreements to fund the policy premiums on the same terms going forward. **Ex. A** at 35:24-36:10; 70:2-22, 99:21-25, 147:12-16. An entity created by this long-term funder was then intended to potentially buy annuities on the seniors for its own benefit. **Ex. A** at 180:11-19. Throughout 2004, a total of about 45-48 policies were created in this way insuring the lives of 40 insureds. **Ex. A** at 69:5-13.

Kavanaugh never closed a deal with a long-term funder and thus—less than a year after the Concordia Tranche policies were put in force—Kavanaugh decided to put all of the loans into

default and to arrange for the sale of the policies to an investor known as ABC Viaticals.[5] **Ex. A** at 82:13-85:4; 120:16-121:4; **Exhibit N**, Asset Purchase Agreement. Although they did nothing to cause the default, the insureds were told that the loans were in default and that they needed to either sell their residual interest in the policies to Kavanaugh's Columbus Circle Capital or immediately cause the trusts to repay the loans and assume personal liability for paying premiums going forward (which, of course, none of the seniors wanted to do since none of them wanted or needed the policies to begin with). **Exhibit O**, Notice of Loan Default (Romano); **Exhibit P**, Auth. to Sell Tr. Cert. (Cohen); **Exhibit Q**, Auth. to Sell Tr. Cert. (Romano). In this way, all but three of the policies in the Concordia Tranche were sold to ABC Viaticals.[6] **Ex. A** at 85:2-19.

### C. Kavanaugh Manufactures $11 Million Of STOLI On Janet Cohen's Life, Including The $5 Million STOLI Policy At Issue Here.

In the late 1990s, Janet Cohen was a married woman in her late 70s living with her husband in Naples, Florida. **Ex. F** at 25:15-25, 32:7-33:24, 35:18-23, 50:14-17. During this time, Cohen worked with her estate planning attorney, George Wilson, and insurance professionals at First Financial Resources, such as Mark Goodman, to plan for the efficient passing of her assets upon her death (i.e., her estate plan). **Ex. B ¶¶** 9-10; **Ex. F** at 32:7-33:24, 35:18-23, 50:14-17; **Exhibit R**, Decl. of G. Wilson, **¶¶** 1-2. To conduct this estate planning, Cohen's advisors assessed her net worth, the funds she would need to maintain her lifestyle, the estimated tax burden her estate would face upon her death, and strategies to minimize the burden of those anticipated taxes. **Ex. R ¶¶** 2, 11. Having conducted that analysis, Cohen, in consultation with her advisors, determined that she needed $6.1 million in life insurance coverage; as a consequence, a $3 million Transamerica policy

---

[5] ABC Viaticals acquired the policies through an entity called Invest SLPS. **Ex. A** at 84:14-85:8.

[6] The loans on the three policies that were not sold to ABC Viaticals were not paid off by the insureds; rather, they continued to be funded by Kavanaugh. **Ex. A** at 85:9-25.

and a $3.1 million Manulife policy were obtained for her in or around 1999 with her own money paying the premiums. **Ex. R** ¶ 2. These were legitimate policies that Cohen actually paid the premiums for whose death benefits are expected to be paid to her family when she dies. **Ex. R** ¶¶ 2, 11. Having acquired all of the coverage she needed, her advisors considered her estate plan complete. **Ex. B** ¶ 10, 12; **Ex. D** at 35:22-36:10; **Ex. R** ¶¶ 2, 9, 11.

Then, around 2003, Goodman solicited Cohen to participate in the Ardsley Tranche of the KDI Program, which he pitched to her as a way for her or her family to make some "risk-free" money by selling her insurability to an investor. **Ex. B** ¶¶ 11-12; **Ex. R** ¶¶ 3-5. Goodman assured her that she would not have to pay any of the premiums out-of-pocket and that all she would have to do would be to sign some forms. **Ex. R** ¶¶ 3-6, 9. Having agreed to participate, a $6 million policy insuring Cohen's life was taken out from American General Life Insurance Company. **Ex. A** at 63:19-64:8. This policy was funded by AI Credit, and AI Credit owned most of the death benefit at inception. **Ex. A** at 62:9-63:2.

About a year later, in early 2004, Goodman reached back out to Cohen, this time soliciting her to participate in the Concordia Tranche of the KDI Program. **Ex. R** ¶¶ 5-6. Goodman testified that he pitched it to her the same way he pitched it to her the first time: A way to make extra money for her family by selling her excess insurance capacity to investors. **Ex. D** at 28:9-16, 35:22-36:10. Wilson testified Cohen was persuaded to participate because she would not have to pay any money out-of-pocket (other than a nominal $1,000 participation fee) and because her family might get some cash out of it. **Ex. F** at 28:17-29:15, 30:1-4. Unlike the legitimate policies referenced above, no estate planning was conducted in connection with these two KDI policies. **Ex. R** ¶ 11. Instead, Cohen was induced by Goodman's representation that this was a means to make some easy money by allowing an investor to use her insurability. **Ex. F** at 28:17-29:15.

After agreeing to participate, Cohen's medical information was passed along to Leisher to begin the application process. **Ex. B** ¶ 8. On August 2, 2004, Cohen was required to sign a boilerplate document called the Participation Agreement. **Ex. G**. This agreement provided that Cohen was "not permitted to select the lenders, the issuers or type of life insurance policies, or the issuers or type of annuity policies, to change the lenders, the life insurance policies or the annuity policies, [or] to own directly own" them. **Ex. G** § 7(b). The agreement also provided that a trust bearing Cohen's name would be created to own the policy insuring her life; that the funder (Kavanaugh) would fund the premium on that policy through a loan to that trust; and that upon Cohen's death, the policy's death benefit would first be used to repay the funder with interest; then to pay the trust's beneficiary (Cohen herself, meaning her estate) a relatively small portion of the death benefit, referred to as the "Scheduled Death Benefit";[7] and that the rest of the death benefit would be used to pay the trust's "obligations," which, as explained below, meant that the remainder of the death benefit would also be paid to Kavanaugh. **Ex. G** § 8(b). The agreement further stated that "under no circumstances" was Cohen permitted to "receive a distribution from the Trust of a portion of the death benefits from the life insurance policies on the life of [Cohen] that is greater than [Cohen's] allocable scheduled death benefit as set forth on the attached schedule" and that if the trust's obligations were big enough, Cohen would get nothing. **Ex. G** §§ 8(b), 9(a). Along with signing this document, Cohen was required to pay a "nominal" $1,000 fee, which was never used to pay premiums or any other transaction expenses and which instead sat in the Cohen Trust's account until it was refunded to Cohen a year later. **Ex. B** ¶ 11; **Ex. E** at 195:3-197:14.

---

[7] At inception the Scheduled Death Benefit was ███████ and was set to increase over time before capping out at ███████, if Cohen lived to be 95. **Ex. G** at 18102.

10

That same day, a Trust Agreement was executed creating the Janet Cohen Family 2004 Delaware Trust (the "Cohen Trust"), a Delaware statutory trust. **Ex. I.** Cohen did not sign this document; rather, it was executed solely by Halpern on behalf of CTC as trustee. **Ex. I** at 18131. Halpern never met with or spoke to Cohen, and never did any estate planning for her; in fact, he and CTC were selected, directed, and paid for by Kavanaugh. **Ex. E** at 43:10-44:5, 147:9-22. The Cohen Trust's purpose was limited to buying and maintaining life policies on Cohen, executing KDI program documentation, and distributing the policy's death benefit. **Ex. I** at 18113-14.

On August 2, 2004, an application for a $5 million life insurance policy from Columbus Life (the "Cohen Policy") was executed by Cohen (as insured), Leisher (as insurance broker), and Eaddy (on behalf of CTC, as trustee of the Cohen Trust, as owner) in Wilmington, Delaware. **Exhibit S**, Insurance Application (Cohen), at 932. Despite being signed by both Cohen and Leisher, however, every feature of the prospective policy (e.g., the type of product offered by Columbus Life, the face amount, the death benefit option, the accelerated death benefit plus rider, and no lapse guarantee) was selected by Kavanaugh. **Ex. C** at 132:12-18; **Ex. I** § 7(b). The Cohen Policy's purpose was listed as "personal and family protection," and the Cohen Trust was identified as its prospective owner and beneficiary. **Ex. S** at 930-31, 935.

Despite serving as the Cohen Policy's writing agent, Leisher testified that he never met Cohen or conducted any estate planning or other analysis to determine whether she needed it. **Ex. C** at 129:5-7. Moreover, although Cohen was Goodman's client, Leisher and Kavanaugh were listed on the application as the brokers to whom the insurance commissions should be paid. **Ex. S** at 935. Subject to a side-agreement, Leisher and Kavanaugh agreed to share roughly 25% of those commissions with Goodman, and according to Goodman, he agreed to substantially reduce the commissions he would have otherwise made for placing a policy of his size "because of the reality

that without Mr. Kavanaugh's program (and the non-recourse funding it provided), none of these policies would have been taken out to begin with, and 25% of something is obviously better than 100% of nothing." **Ex. B** ¶ 13. Leisher, the writing agent, likewise explained why he agreed to share his commission with Kavanaugh: "He who has the gold controls."[8] **Ex. C** at 71:16-72:10.

On August 6, 2004, a Master Funding Agreement was executed. **Ex. K**. Cohen did not sign this document; rather it was signed by Halpern (as trustee of the Cohen Trust) and by Halpern (as Manager of Kavanaugh's Carmel Group). **Ex. K** at 624. Through this agreement, Carmel agreed to fund the premiums needed to incept and maintain the Cohen Policy on a non-recourse basis, meaning Cohen never had any liability to repay these premiums. **Ex. A** at 35:4-10; **Ex. C** at 29:16-30:5; **Ex. D** at 38:2-18; **Ex. E** at 29:3-18, 170:8-19; **Ex. F** at 36:19-37:9, 125:9-12.

> **NONRECOURSE BY LENDER**. Notwithstanding anything to the contrary contained herein, neither Lender nor any other person succeeding to the interests of Lender hereunder shall have any recourse, in law or equity to any assets of any person or entity acting as trustee or manager of Borrower (including but not limited to [CTC]) or any beneficiary of Borrower with respect to payments due under this Funding Agreement or any other liability or obligation hereunder.

**Ex. K** at 621. The Master Funding Agreement also contained a "Death Benefit Sweep" provision, which provided as follows:

> **DEATH BENEFIT SWEEP.**  On the date of death of any person insured under the Life Policy, the Borrower shall pay to the Lender, in addition to the principal and accrued interest due under this Funding Agreement, an amount equal to (a) the "Life Policy death benefit" (defined as the aggregate death benefits paid or payable on the Life Policy) reduced by the "scheduled death benefit" (as defined in the Borrower's Participation Agreement), minus (b) the total principal amount outstanding under this Funding Agreement, and accrued interest thereon, paid to Lender on the Maturity Date; but not less than zero. The obligations of the Borrower under this

---

[8] The Cohen Policy's annual planned premium was $208,900 or $17,408.51 per month. **Exhibit T**, Ins. Policy (Cohen) at 862-63.

> "Death Benefit Sweep" section will continue notwithstanding the payment of all interest and principal hereunder.

**Ex. K** at 618. The sum and substance of this "Death Benefit  Sweep" provision meant that all of the Cohen Policy's leftover death benefit—after Kavanaugh was repaid the premium with interest and Cohen's estate was paid the Scheduled Death Benefit—would also be paid to Kavanaugh. **Ex. C** at 143:14-144:4; **Ex. E** at 170:24-172:21; *see generally* **Exhibit U**, Exp. Rpt. of D. Colnago (Cohen), § (V)(A). That same day, the Cohen Trust collaterally assigned the Cohen Policy to Kavanaugh's Columbus Circle Capital. **Exhibit V**, Policy Collateral Assignment (Cohen).

Also that same day, a Servicing Agreement was executed. **Exhibit W**, Servicing Agreement (Cohen). Cohen did not sign this document; rather it was signed by Halpern (as trustee of the Cohen Trust) and Mr. Kavanaugh on behalf of KDI Service LLP ("KDI Service"). **Ex. W** at 18146-47. The Servicing Agreement appointed Kavanaugh's KDI Service as the "Servicer" to direct the Cohen Trust's trustee and to manage the Cohen Policy and prohibited the Cohen Trust's trustee from buying or selling the Cohen Policy, except to the extent directed by Kavanaugh. **Ex. W** §§ I(1)-(4). Through this agreement, Kavanaugh's KDI Service agreed to pay the Cohen Trust's trustee fees and to reimburse the Cohen Trust for any "out-of-pocket" expenses.[9] **Ex. W** at 18149.

That same day, Columbus Life issued the Cohen Policy to the Cohen Trust and received a wire transfer of $17,408.51 from Betty Saks (Mr. Kavanaugh's wife) to put the Cohen Policy in force. **Ex. T** at 862, 872; **Exhibit X**, Initial Premium (Cohen). At this point—the moment of the Cohen Policy's inception—the premium funder, Kavanaugh, owned ███ of its death benefit. **Ex. E** at 172:13-174:7; **Ex. G** §§ 8(b), 9(a); *id.* at 18102; **Ex. K** at 618; *see generally* **Ex. U** § (V)(A).

---

[9] The Cohen Trust agreed to pay KDI Service ██████ a year, which the Cohen Trust would receive from Carmel Group. **Ex. K** at 618; **Ex. W** Art. II ¶ 1. The ██████ thus made a can trip from Kavanaugh's Carmel Group through the Cohen Trust back to Kavanaugh's KDI Service.

Sometime over the next two months, Kavanaugh reduced Cohen's Scheduled Death Benefit, which increased Kavanaugh's ownership stake in the Cohen Policy's death benefit to ██. **Exhibit Y**, Email from C. Revkin to A. Halpern; **Exhibit Z**, Final Scheduled Death Benefit (Cohen), at 8264. Thus, had Cohen died within the first year, Kavanaugh stood to receive $ ███ $ ███████ of the Cohen Policy's $5 million death benefit. **Ex. E** at 165:11-22, 172:13-174:7; **Ex. E** §§ 8(b), 9(a); *id.* at 18102; **Ex. K** at 618; **Ex. Z** at 8264; *see generally* **Ex. U** at 18-19.

After the Cohen Policy was effected, Kavanaugh's BBZ Inc. sought and received quotes for annuities on Cohen's life. **Exhibit AA**, South Bay Spreadsheet, at 2551-53, 2560-65. The annuities applied for were over-sized and would have generated monthly payments in excess of the monthly life insurance premiums on the Cohen Policy (so investors could use Cohen to run an arbitrage); would not have begun generating cash until a year after they were bought; and contained a provision that would have required the annuity issuer to refund the annuity purchase price to the buyer if Cohen died in the first year after the Cohen Policy was issued. **Ex. A** at 92:16-20, 106:14-22, 107:17-21. In actuality, no annuities on Cohen were ever bought. **Ex. A** at 150:10-12.

### D.     Kavanaugh Manufactures $6 Million Of STOLI On Anthony Romano's Life, Including The $5 Million STOLI Policy At Issue Here.

In 2004, Goodman encouraged another of his clients to participate in the Concordia Tranche of the KDI Program—82-year old Anthony Romano. **Ex. D** at 27:21-24. As with Cohen, Goodman had already prepared Romano's estate plan and had already helped Romano buy the insurance he needed for that plan; Goodman pitched the KDI Program to Romano as a "risk-free way to . . . take what, to [Romano], was a nominal amount of money, a thousand dollars, and turn it into a larger amount in exchange for giving away [his] future insurability that [he] had already determined [he] did not need." **Ex. D** at 28:5-29:3-9, 143:3-18. Indeed, Romano would not have participated if he had had to pay any of the premiums himself and was only persuaded to participate

because the transaction was presented to him as a risk-free way to make some money by selling his future insurability to Kavanaugh. **Ex. D** at 28:17-29:9. After agreeing to participate, Romano's medical information was passed along to Leisher to begin the application process. **Ex. B** ¶ 8.

On June 24, 2004, Romano executed a Participation Agreement substantively identical to the one signed by Cohen; thus it provided, *inter alia* that (i) Romano was not allowed to choose the policies that would be taken out on his life; (ii) when death benefits were ultimately paid to the Romano Trust, they would be used to repay the funder for the premiums with interest, pay the trust's beneficiary (Romano himself i.e., his estate) the "Scheduled Death Benefit";[10] and that the rest of the death benefit would be used to pay the trust's "obligations," which due to the Master Funding Agreement's "Death Benefit Sweep" provision meant that the remainder of the death benefit would also be paid to Kavanaugh; and (iii) Romano could never receive more than the Scheduled Death Benefit and he might ultimately get nothing. **Ex. H** § 8(b). As with Cohen, Romano was required to fund the trust's account with a "nominal" $1,000, which was never used to pay premium or any other expense and which instead simply sat in the trust's account until it was refunded to Romano less than a year later. **Ex. B** ¶ 11; **Ex. E** at 136:10-20, 137:17-139:24.

That same day, a Trust Agreement substantively identical to the Cohen Trust Agreement was executed creating the Romano Family Delaware Trust (the "Romano Trust"), a Delaware statutory trust. **Ex. J**. Romano did not sign this document; rather it was executed by Halpern, on behalf of CTC, as trustee. **Ex. J** at 18653. Halpern never met or spoke with Romano, and never did any estate planning for Romano; in fact, he and CTC were selected, directed, and paid for— not by Romano—but by Kavanaugh. **Ex. E** at 43:10-44:5, 87:18-88:5.

---

[10] At inception the Scheduled Death Benefit was $████ and was set to increase over time before capping out at $████, if Romano lived to be 98. **Ex. G** at 18102.

That same day, an application for a $5 million life insurance policy from Columbus Life (the "Romano Policy") was executed by Romano (as insured), Leisher (as broker), and Halpern (as trustee of the Romano Trust as owner) in Wilmington, Delaware. **Exhibit BB**, Ins. Application (Romano), at 2181. The policy's purpose was listed as "personal and family protection," and the Romano Trust was identified as its prospective owner and beneficiary. **Ex. BB** at 2181. As with the Cohen transaction, every feature of the prospective policy (e.g., type of insurance product, face amount, death benefit option, accelerated death benefit plus rider, and no lapse guarantee) was selected by Kavanaugh; Leisher never met or communicated with Romano and never conducted any estate planning or other analysis to determine if he needed it; and the commissions were split amongst Goodman (25%), Leisher (35%), and Kavanaugh (40%), out of recognition that, without Kavanaugh paying the premium, the policies would not exist, and no one would make anything.[11] **Ex. B** ¶ 13; **Ex. C** at 81:19-82:14, 90:13-8; **Ex. H** § 7(b); **Ex. BB** at 2182.

On June 30, 2004, a Master Funding Agreement substantively identical to the Cohen Master Funding Agreement was executed. **Ex. L**. Romano did not sign this document; rather, it was signed by Halpern (as trustee of the Romano Trust) and by his CTC colleague, Eaddy (as Manager of Kavanaugh's Carmel Group). **Ex. L** at 18689. As with the Cohen transaction, this was a non-recourse loan that Romano had no liability to repay. **Ex. L** at 18686 ("NONRECOURSE BY LENDER"); **Ex. A** at 35:4-10; **Ex. C** at 29:16-30:5; **Ex. D** at 38:2-18; **Ex. E** at 29:3-18, 113:9-23. The Romano Master Funding Agreement also contained the same "Death Benefit Sweep" provision contained in the Cohen Master Funding Agreement, the sum and substance of which meant that all of the Romano Policy's death benefit left over after Kavanaugh was repaid the

---

[11] The Romano Policy's annual planned premium was $311,052.12 or $25,921.01 per month. **Exhibit CC**, Romano Policy, at 330.

premium with interest and Romano's estate was paid the Scheduled Death Benefit would also be paid to Kavanaugh. **Ex. C** at 109:8-110:4; **Ex. E** at 114:23-116:13; **Ex. L** at 18683 ("DEATH BENEFIT SWEEP"); *see generally* **Exhibit DD**, Exp. Rpt. of D. Colnago (Romano), § (V)(A). That same day, the Romano Trust collaterally assigned the Romano Policy to Kavanaugh's Columbus Circle Capital. **Exhibit EE**, Policy Collateral Assignment (Romano).

Also that same day, a Servicing Agreement substantively identical to the Cohen Servicing Agreement was executed. **Exhibit FF,** Servicing Agreement (Romano). Romano did not sign this document; rather, it was executed by Halpern (as trustee of the Romano Trust) and Mr. Kavanaugh (on behalf of KDI Service). **Ex. FF** at 18694-95. As with the Cohen transaction, Kavanaugh's KDI Service was appointed to direct the Romano Trust and manage the Romano Policy. **Ex. FF** § I(1)-(4). Through this agreement, KDI Service also agreed to pay the Romano Trust's trustee fees and to reimburse it for any "out-of-pocket" expenses.[12] **Ex. FF** at 18691.

That same day, Columbus Life issued the Romano Policy to the Romano Trust and received a wire for $51,842.02 from a bank account owned by the Kavanaugh Organization, to put the Romano Policy in force. **Ex. CC** at 341; **Exhibit GG**, Initial Premium (Romano). At this point in time—the moment of the Romano Policy's inception—the funder, Kavanaugh, owned ███ of the Romano Policy's death benefit. **Ex. E** at 114:24-116:13; **Ex. H** §§ 8(b), 9(a); *id.* at 18624; **Ex. L** at 18683; *see generally* **Ex. DD** § (V)(A).

Shortly after the Romano Policy was effected, another policy on Romano was created through the KDI Program and issued to the Romano Trust, a $1 million policy issued by American

---

[12] The Romano Trust agreed to pay KDI Service ███ a year, which the Romano Trust would receive from Carmel Group. **Ex. L** at 18683; **Ex. FF** Art. II ¶ 1. The ███ thus made a can trip from Kavanaugh's Carmel Group through the Romano Trust back to Kavanaugh's KDI Service.

General Life Insurance Company.[13] **Exhibit HH,** Am. Gen. App.; **Exhibit II**, Am. Gen. Policy Assign. Sometime after the Romano Policies were effected, the Scheduled Death Benefits were consolidated to reflect the combined $6 million of coverage, but Kavanaugh's percentage share of the aggregate death benefit (███ in year one) remained the same; thus, had Romano died at any point in year one, Kavanaugh stood to receive $███ of the Romano Policies' aggregate $6 million death benefit. **Ex. E** at 114:5-116:13; **Ex. H** §§ 8(b), 9(a); *id.* at 18624; **Ex. L** at 18683; **Exhibit JJ**, Final Sched. Death Benefit (Romano), at 8399; *see generally* **Ex. DD** at 18-19.

After the Romano Policies were effected, Kavanaugh's BBZ Inc. sought and received quotes for the purchase of over-sized annuities on Romano's life so investors could use Romano to run an arbitrage; as with the Cohen transaction, these potential annuities on Romano would not have begun generating cash until a year after they were bought and would have required the annuity issuer to refund the annuity purchase price to the buyer if Romano had died in the first year after the Romano Policy was issued. **Ex. A** at 92:16-20, 106:14-22, 107:17-21. In actuality, no annuities on Romano were ever purchased. **Ex. A** at 150:10-12.

### E.    Kavanaugh Fails To Secure Long-Term Financing And Elects To Cause The Policies To Be Sold Less Than A Year After They Were Issued.

For reasons no witness was willing to explain, Kavanaugh did not ultimately agree to any long-term financing and decided he did not want to continue funding the policies in the Concordia Tranche (including the Cohen Policy and Romano Policy (collectively, the "Policies")) itself. **Ex. A** at 83:10-84:16. As a consequence, Kavanaugh proceeded to find a buyer for all of the Concordia Tranche policies (including the Policies) in ABC Viaticals. **Ex. A** at 84:14-85:8.

---

[13] Together the $5 million Columbus Life Romano Policy and the $1 million American General Romano Policy will be referred to as the "Romano Policies."

On or around April 14, 2005, Kavanaugh notified the Romano and Cohen Trusts (the "Trusts") that the loans were in default—even though neither Cohen or Romano did anything to cause default—and that they would either have to start paying premiums without Kavanaugh's money or sell their beneficial interest certificates to Kavanaugh. **Ex. A** at 117:13-19, 156:4-13; **Ex. O**; **Ex. Q**; **Ex. P**. On April 21, 2005, Kavanaugh's Columbus Circle Capital agreed to sell to ABC Viaticals almost all of the Concordia Policies, including the Policies. **Ex. N**. In the days that followed, both Romano and Cohen authorized the Trusts to sell the Policies to Columbus Circle Capital. **Ex. P**; **Ex. Q**. The Cohen Trust sold the Cohen Policy to Columbus Circle Capital for ███████████████████████████████████████████████████████████████ ████████████████████████. **Ex. A** at 160:17-161:14; **Ex. F** at 97:2-11 (testifying that Cohen didn't even consider keeping the policy because she "didn't want to pay for any more insurance"); **Ex. P** at 10-11; **Ex. Z**. Columbus Circle Capital turned around and sold the Cohen Policy to ABC Viaticals for ██████. **Exhibit KK**, Policy Sale Spreadsheet, at 15891. The Romano Trust sold the Romano Policies to Columbus Circle Capital for ████████████████████████████████████ ███████████████████████████████████████████████████████████████. **Ex. A** at 132:4-11; **Ex. Q** at 890-91; **Ex. JJ**. Columbus Circle Capital turned around and sold the Romano Policies to ABC Viaticals for ██████. **Ex. A** at 145:2-16; **Ex. KK** at 15891.

Shortly thereafter, it appears ABC Viaticals sold the Policies to an entity called The Settlement Group, which in late 2008 sold the Policies to the Orca Trust, which held the Policies through various Orca-related entities before, in 2016, defaulting on a loan from Delta Lloyd that was collateralized by a portfolio of ██ policies, including the Policies, with an aggregate face value of ████████████ (the "Orca Portfolio"), causing Delta Lloyd to foreclose on the Orca Portfolio and put it up for public auction. **Exhibit LL**, Project Willem Info. Summary, at 33, 38-42.

**F.      Blackstone Buys The Policies In 2016 Knowing They Had STOLI Problems.**

The Blackstone Group is one of the world's largest alternative investment managers with over $881 billion of assets under management. **Exhibit MM**, Viva/Blackstone/Preston Dep., at 61:24-62:8. One of the asset classes it invests in is high-face value life policies insuring the lives of seniors, which is managed by Blackstone Tactical Opportunities Advisors LLC, a subsidiary of the Blackstone Group. **Ex. MM** at 62:9-21. Blackstone entered this space in 2014 and holds its life insurance investments through a constellation of overseas special purpose vehicles referred to collectively as "Viva," which owns about 1,950 policies with a value of over $2.5 billion. **Ex. MM** at 56:14-57:24; **Exhibit NN,** Viva Annual Financial Rpts., at 103, 194-96, 255, 265, 325.

Viva's business model involves acquiring large portfolios of life policies that were created by and for investors at a discount. One of Viva's first acquisitions was the ESF-QIF Portfolio that contained 162 of the "riskiest kind of" policies created through a now-notorious STOLI program known as "LPC" with an aggregate face value of nearly $1.13 billion. **Exhibit OO**, *Blackstone Pays $100M for Life Settlement Portfolio*, The Deal: Life Settlements, Oct. 27, 2014. The Delaware Superior Court recently acknowledged that LPC was running a STOLI program, declaring two policies (with total face of $19 million) procured by LPC—and later bought by Viva through Wilmington Trust—void *ab initio* human life wagers. *Sun Life v. Wilmington Tr.*, 2022 WL 179008, at *11 (Del. Super. Ct. Jan. 12, 2022) ("*Frankel & DeBourbon*").

Another early Viva acquisition was the Monarch Portfolio that contained about 100 polices with an aggregate face value of about $800 million that were previously owned by Caldwell Life Strategies. **Exhibit PP,** *Blackstone Said to Have Bought Royal Bank of Scotland Portfolio for $385M*, The Deal: Life Settlements, Nov. 6, 2015. These policies were created as part of a massive criminal STOLI conspiracy by "recruit[ing] older persons to act as straw insureds" for the purpose

of "resale in the life settlement market." *U.S. v. Carpenter*, 190 F. Supp. 3d 260, 263-64, 275, 278-80 (D. Conn. June 6, 2016), *aff'd*, 801 F. App'x 1 (2d Cir. 2020).

Other Viva acquisitions include several tranches of the AIG Portfolio that contained policies manufactured by a notorious STOLI promoter known as Coventry through a short-term, non-recourse premium finance scheme. **Ex. NN** at 236; **Exhibit QQ**, *Court's Voiding of AIG Policy Raises Questions About Blackstone's Purchase*, The Deal: Life Settlements, Feb. 8, 2017. These Coventry-procured policies are routinely held to be illegal human life wagers under Delaware law. *See, e.g.*, *Sun Life v. U.S. Bank*, 2016 WL 161598 (S.D. Fla. Jan. 14, 2016), *aff'd on all substantive issues*, 693 F. App'x 838 (11th Cir. 2017); ("*Malkin*"); *U.S. Bank v. Sun Life*, 2016 WL 8116141 (E.D.N.Y. Aug. 30, 2016), *adopted*, 2017 WL 347449 (E.D.N.Y. 2017) ("*Van de Wetering*"); *Sun Life v. U.S. Bank*, 369 F. Supp. 3d 601 (D. Del. 2019), *recon. denied*, 2019 WL 2052352 (D. Del. May 9, 2019) ("*Sol*"); *Estate of Malkin v. Wells Fargo*, 379 F. Supp. 3d 1263 (S.D. Fla. 2019), *aff'd on this issue*, 998 F.3d 1186 (11th Cir. 2021) ("*Estate of Malkin*").

In 2016, Viva—a sophisticated investor that concedes it had the knowledge and experience necessary to evaluate the risks inherent in buying large portfolios of life insurance policies on the lives of strangers—was provided with the opportunity to bid on the Orca Portfolio. **Ex. MM** at 61:8-14. Viva's pre-acquisition diligence was almost non-existent and consisted solely of reviewing whatever documents the seller, Delta Lloyd, happened to put in a "Data Room." **Ex. MM** at 123:14-127:17, 128:9-129:9, 130:21-133:3, 134:3-135:18. In this regard,

- Although documents in that Data Room referenced the existence of the Participation Agreements, the Trust Agreements, and the Master Funding Agreements for the Cohen and Romano Policies, Viva did not try to obtain copies of these documents. **Ex. MM** at 128:9-129:9, 130:21-133:3, 134:3-135:18.

- Although Viva knew that the Policies had been procured through premium finance—and although Viva's Investment Advisor knew that such policies were "manufactured," not "natural," and potential STOLI—Viva did not try to determine whether the financing was non-recourse (which was known to be associated with STOLI) or whether the Insureds

actually paid any premium. **Ex. MM** at 131:17-132:14, 135:6-18, 154:21-155:3, 170:13-171:15, 177:24-178:1, 181:18-182:23; **Exhibit RR**, Preston Ventures Website: Timeline.

- Although Viva knew that an investor owning a policy's death benefit at inception, including through a side-agreement, would render it void, Viva concedes it did not try to determine whether any side-agreement existed for the Policies and that "[i]n no situation would [they] have evaluated the relationship between the insured and the beneficiary" at inception to determine if the beneficiary had an insurable interest in the life of the insured. **Ex. MM** at 42:2-11, 44:10-19, 49:10-51:7, 53:10-25, 170:13-173:22, 176:24-177:16.

- Although a leading trade organization for the investor market, the Institutional Longevity Markets Association[14] ("ILMA"), has longstanding "minimum" diligence guidelines that, *inter alia*, state that investors should, among other things, interview the insureds and obtain information from the involved insurance professionals to determine how premiums were funded, whether the policies were taken out pursuant to financial inducements, and whether investors owned or were intended to own the policy's death benefits, Viva concedes that prior to buying the Orca Portfolio, it did not even try to contact the insureds, their advisors, the involved insurance professionals, the trustees of the trusts, or the premium lenders. *Compare* **Exhibit SS**, ILMA's Life Settlement Provider Best Practices, Dec. 2010 Ex. D, *with* **Ex. MM** at 98:13-99:2, 177:24-178:10, 179:1-182:23. In fact, Viva concedes that it did not follow ILMA's "minimum" diligence standards. **Ex. MM** at 254:9-18, 255:2-17.

- Although Viva does not know for sure whether Viva had this information in its possession prior to buying the Policies, it is indisputable that, in 2010, years after Columbus Life underwrote the Policies, a potential buyer of the Cohen Policy sued the Orca Trust and publically alleged that the Cohen Policy was STOLI and therefore void *ab initio*. **Ex. MM** at 191:10-192:4, 196:10-197:16; *see Erwin, in his capacity as Trustee of the Orca LS I Tr. v. Fin. Life Servs., LLC*, No. 8:09-cv-1463 (C.D. Cal. Apr. 21, 2010), ECF No. 42.

Moreover, during this period of diligence (or lack thereof), Delta Lloyd told Viva it could not make any representations as to any of the policies in the Orca Portfolio, and the seller's servicing agent, Maple Life, went even farther, expressly carving the Cohen and Romano Policies *out of* the representations it was willing to give for other policies in the Orca Portfolio, declining to represent, among other things, that the Policies were enforceable. **Exhibit TT**, Bill of Sale Between Delta Lloyd and Viva, ¶ 7(a); **Exhibit UU,** MapleLife Diligence Certif. at 66-68, 72, 76, 138.

---

[14] Blackstone is a member of ILMA, and the attorneys at Schulte Roth, who conducted Viva's pre-acquisition insurable interest analysis, Tom Weinberger and Boris Ziser, have long served as ILMA's outside general counsel. *See, e.g.*, Br. of ILMA, *Price Dawe*, No. 174, 2011 (Del. 2011) (Trans. ID 38312090) (submitted on behalf of ILMA by Attorneys Weinberger and Ziser).

After doing essentially no diligence, 

**Exhibit VV**, Viva's Interrogatory Responses, Nos. 3-5. After coming to this conclusion, Viva elected not to bring these concerns to Columbus Life's attention or to ask Columbus Life if it would release any potential claims it might have. **Ex. MM** at 215:12-19, 216:1-25, 217:4-13.

**Ex. VV** No. 6; **Ex. MM** at 94:7-95:23.

**Ex. VV** Nos. 4-5. Although Viva has (improperly, in Columbus Life's view) asserted privilege over the details of its insurable interest analysis; the assumptions that went into it; and the (negative, at least) components of the aforementioned business interests analysis,

**Ex. VV** Nos. 4-6; **Ex. MM** at 88:11-17; **Ex. RR**. That is, Viva elected to buy and pay premium on the Policies because Viva believed these human life wagers were a profitable, no-risk proposition, even if it got caught.[16]

---

[15] Viva concedes that it is paying Wilmington Trust's legal bills in this matter and that it directs Wilmington Trust's litigation activities and decisions. **Ex. MM** at 258:5-20.

[16] Since acquiring the Policies, Viva has paid approximately $2,072,201 in premium on the Cohen Policy and approximately $2,051,287 in premium on the Romano Policy. **Exhibit WW**, Wilmington Trust's Interrogatory Resps., at No. 2.

## IV.    ARGUMENT

### A.    The Policies Are Illegal Human Life Wagers.

Delaware's Constitution prohibits gambling, and its common law has long provided that "a person having no insurable interest in the life of another shall not be permitted to speculate on such life," and that when they do, the policies are illegal human life wagers. *Balt. Life Ins. Co. v. Floyd*, 91 A. 653, 656 (Del. 1914). In 1968, Delaware's Insurable Interest Statute, 18 Del. C. § 2704, codified this prohibition on human life wagering. In 2011, the Delaware Supreme Court's seminal *Price Dawe* decision clarified that (i) STOLI is "a fraud on the court"; (ii) investors cannot use seniors to "generate" polices for investors; (iii) policies must be procured in "good faith" for a "bona fide" insurance purpose, not as a "cover for a wager"; and (iv) insurers can challenge STOLI at any time. 28 A.3d at 1068 n.25, 1070-73. And in 2021, the Delaware Supreme Court forcefully re-affirmed *Price Dawe*'s analytical framework as against STOLI investors' attempts to upend it in *Lavastone Capital v. Estate of Berland*, 266 A.3d 964 (Del. 2021) ("*Berland*").

18 Del. C. § 2704 ("Section 2704") "supports the fundamental concept against wagering contracts," "serves the substantive goal of preventing speculation on human life," and requires a valid insurable interest to exist at a life policy's inception. *Price Dawe*, 28 A.3d at 1072 n.54, 1074. This requirement cannot be evaded through clever schemes; thus, "a third party cannot use the insured as a means or instrumentality to procure a policy that, when issued, would otherwise lack an insurable interest." *Id*. at 1074; *see id.* at 1071 ("Phoenix and ACLI also argue that ignoring intent would result in an illogical triumph of form over substance that would completely undermine the policy goals behind the insurable interest requirement. We agree."). Thus, when a policy is procured or caused to be procured by investors for investors, the insurable interest requirement is violated. *Id.* at 1075, 1071 n.47 (citing *Grigsby v. Russell*, 222 U.S. 149, 155 (1911) (policies obtained using insured "as a cloak to what is, in its inception, a wager" are void)).

24

Because "STOLI schemes are created to feign technical compliance with insurable interest statutes," courts must "scrutinize the circumstances under which the policy was issued and determine who in fact procured or effected the policy." *Id.* at 1074-76. If an investor procured the policy by paying the premium, it lacks insurable interest. *Id.* at 1070 ("Virtually all jurisdictions . . . still prohibit third parties from creating life insurance policies for the benefit of those who have no relationship to the insured. These policies, commonly known as 'stranger originated life insurance,' or STOLI, lack an insurable interest and are thus an illegal wager on human life."); *id.* at 1076 ("The relevant inquiry is who procured the policy and whether or not that person meets the insurable interest requirements."). If, on the other hand, an insured procured the policy by "actually paying the premiums," the policy may be valid, so long as it was "taken out in good faith" for a "legitimate insurance purpose such as estate planning." *Price Dawe*, 28 A.3d at 1071 n.47, 1072, 1074, 1075, 1075 n.76, 1076, 1078; *Berland*, 266 A.3d at 972.

### 1.    The Policies Lack Insurable Interest Because Kavanaugh Funded Them And Owned Most Of Their Death Benefits At Inception.

The Delaware Supreme Court made clear in *Price Dawe* that "a literal reading of [Section 2704(a)] would permit wagering contracts, which are prohibited by the Delaware Constitution," and that, as a consequence, "Section 2704(a) requires more than just technical compliance at the time of issuance." 28 A.3d at 1070, 1074. But the transactions at issue here are so highly improper that they do not even technically comply with the literal language of Section 2704(a). To be clear, Section 2704(a) prohibits third parties from "procur[ing] or caus[ing] to be procured any insurance contract upon the life . . . of another individual unless the benefits under such contract are payable to the individual insured or his or her personal representative or to a person having, at the time when such contract was made, an insurable interest in the individual insured." 18 Del. C. § 2704(a).

"To determine who procured the policy, we look at who pays the premiums." *Price Dawe*, 28 A.3d at 1075. Where, as here, the premiums to originate the policy were paid through a premium finance loan, the question is whether the insured bore the "financial liability for obtaining the policy" and actually paid meaningful premium expense. *Berland*, 266 A.3d at 972. "If the use of nonrecourse funding allows the insured—individually or as settlor or grantor of a trust—to obtain the policy 'without actually paying the premiums,' then the requirements of §§ 2704(a) and (c)(5) are not met." *Id.*; *see id.* (explaining that the use of non-recourse premium financing can be "evidence of an impermissible STOLI scheme, especially where the use of a nonrecourse loan means that a third party, and not the insured, bears the entire financial liability for obtaining the policy."); *see also id.* at n.27 (citing Andre S. Blaze & Julian Movsesian, *Consider Premium Financing in Life Ins. Evaluations*, 38 Est. Plan. 30 (2011)) ("Lavastone's argument that 'Delaware law permits an insured to use premium financing to pay policy premium' glosses over the fact that the use of premium financing does not always result in the insured incurring no expense.").

The Policies were not funded through the sorts of premium finance loans that the Delaware Supreme Court sanctioned in *Berland*[17]; to the contrary, the record is clear that the Insureds never

---

[17] In *Berland*, the Delaware Supreme Court cited approvingly to an article describing an example of a presumptively legitimate premium financing strategy that is poles apart from the transactions at issue here. 266 A.3d at 972, n.25, n.27, 973, n.33 (citing Andre S. Blaze & Julian Movsesian, *Consider Premium Financing in Life Ins. Evaluations*, 38 Est. Plan. 30 (2011)). The transaction discussed in that article was part of an *actual* estate plan thoughtfully tailored to *specific* tax needs. It involved the insureds (i) gifting an initial $1 million *from their own pockets* to seed an irrevocable trust for the benefit of their family; (ii) gifting year-over-year cash payments of $60,000, *again from their own pockets*, to further fund the trust; (iii) having the trust borrow an amount sufficient to pay premium on a life insurance policy; and then (iv) having the trust *pay the annual interest charge* on that loan *from the cash gifted to the trust by the insureds*. Andre S. Blaze & Julian Movsesian, *Consider Premium Financing in Life Ins. Evaluations*, 38 Est. Plan. 30, 31-33(2011). The strategy was to minimize the estate taxes the insureds expected to pay upon their deaths (by utilizing a trust set up to keep the proceeds *outside* of the insureds' taxable estates) and to minimize gift taxes (by allowing the insureds to give the full value of the gift exclusion each year), while the policy was funded through a loan, which other than interest charges, would not

had any liability to repay these loans, and the Insureds never actually paid a penny in premium. All of the program's expenses—including the Policies' premiums—were paid, not by Cohen or Romano, but rather by Kavanaugh. Indeed, although the Insureds were required to cut a check for $1,000 to participate in the program (a sum which Goodman confirmed was "nominal" to them), this was a form-over-substance requirement. To be clear, these nominal contributions were never actually used to pay premium (or any other expense for that matter) and instead simply sat in the Trusts' accounts until being refunded to the Insureds dollar-for-dollar less than a year later when the Policies were sold to ABC Viaticals. Because neither Cohen nor Romano ever paid, or were liable to pay, the Policies' premiums, the Insureds did not procure the Policies.

On top of the fact that Kavanaugh procured the Policies, and although the Policies' nominal beneficiaries at inception were the Cohen and Romano Trusts (the "Trusts"), respectively, it is undeniable that prior to inception, Kavanaugh, a stranger to the Insureds, had already secured a contractual right to ▮ of the Policies' death benefits through the Master Funding Agreement's "Death Benefit Sweep" provisions, making Kavanaugh the Policies' true beneficiary at inception. The portions of the death benefits owned by Kavanaugh are shaded in blue in the diagrams below.

---

count against that exclusion. *Id.* at 31-34. The transactions at issue here are nothing like that. The Insureds did not actually pay any premium expense, nor did they make payments to the Trusts to fund premiums or pay interest on the loan. Also, as noted above, the Insureds retained ownership over the Trusts, meaning any benefits paid to those Trusts would have been *included* in their taxable estates. And, of course, no actual estate planning analysis was ever even conducted for the Policies, and they were never part of any actual estate plan. In sum, unlike the transaction discussed approvingly in *Berland*—where *seniors paid* substantial premium expense as part of a *real estate plan* designed to use life insurance to address *real tax needs*—the transactions here used *investor money* for the sole purpose of generating policies *for investors*—they were, in a word, STOLI.

**Cohen Death Benefit Diagram[18]**



**Romano Death Benefit Diagram[19]**



Thus, even though more than mere technical compliance is needed to satisfy Section 2704(a), the

Policies here trip right out of the gate and fail to even feign technical compliance with the statute.

---

[18] **Ex. U** at 31.

[19] **Ex. DD** at 32.

In fact, the transactions at issue here are precisely what the United States Supreme Court in *Grigsby v. Russell* described as the "strongest" case of illegal human life wagering, being those cases where a policy is "taken out for the purpose of allowing a stranger association to pay the premiums and receive the greater part of the benefit, and [the policy is] assigned to [the stranger] at once." 222 U.S. 149, 156 (1911) (Holmes, J.); *see also Warnock v. Davis*, 104 U.S. 775, 782 (1881) (transaction was human life wager where, in exchange for paying the initial and subsequent premiums, a third party received a pre-issuance assignment of a 90% share of the policy's death benefit with the remaining 10% of the death benefit going to insured's widow); *Cammack v. Lewis*, 82 U.S. 643, 647-48 (1872) (holding that third-party assignee created a "sheer wagering policy" where he received a pre-inception assignment of two-thirds of a $3,000 policy's death benefit and then paid all of the premiums need to trigger and maintain coverage and that this conclusion "is not diminished by the fact that [the third party] was only to get $2,000 out of the $3,000" with the balance going to the insured's widow).[20] In fact, what Kavanaugh did was even worse than anything the Supreme Court ever considered because the human life wagering here was done on a massive scale, using almost 200 seniors as tools to create wagering policies for investors.

To be clear, the facts that exist in this case are rare for modern STOLI cases; indeed, most modern STOLI promoters were clever enough to try to feign technical compliance by structuring their transaction so that investors only obtained a legal entitlement to the death benefit sometime *after* inception. Thus, in case-after-case, modern STOLI investors *concede* that a policy *would be STOLI* if—as here—a third party funded the premium and owned the death benefit at inception.[21]

---

[20] The Delaware Supreme Court's insurable interest decisions quote from the U.S. Supreme Court decisions in *Grigsby* and *Warnock* favorably and discuss them as reflective of Delaware law. *See, e.g.*, *Price Dawe*, 28 A.3d at 1069 n. 31, 1073 n. 59; *Berland*, 266 A.3d at 968 n. 3.

[21] Modern STOLI investors then proceed to argue that their policies are *different* because their STOLI promoters were clever enough to proceed through less formal and less obvious means. Of

In fact, Wilmington Trust itself—through the same attorneys who represent it here—recently made

this very same concession in the *Frankel* & *DeBourbon* cases in Delaware Superior Court.

> THE COURT: Well, how about a situation in which there is—and I know you dispute, but this is hypothetical—there is an agreement to immediately or very shortly thereafter reimburse those funds. Do you think that's consistent with the holding and the spirit of *Price Dawe* that you can circumvent the requirement that says, well, it's invalidated if the investor loans the funds but we'll reimburse them quickly so we won't have loaned you the funds. Do you think that is a distinction, or is it a distinction without a difference?

> MR. DAVIS: If that were the case—and we think the facts don't support it—we think that that would invalidate the policy. So if LPCH bound itself before the issuance of the policy to reimburse Mr. Frankel, you write the check and we will write a check to you when we're required to do that, *that would be a prearranged situation, pre-issuance, where the investor is, in fact, indirectly providing the funds and there is a pre-arranged agreement that the investor will get the policy*. We don't think the facts support that at all, Your Honor, but *if those were the facts, that would be consistent with an invalid policy under the spirit of Price Dawe*.

Mot. for S.J. H'rg Tr. at 20:19-21:20, *Sun Life v. Wilmington Tr.*, 2022 WL 179008 (Del. Super.

Ct. Oct. 14, 2021), attached as **Exhibit XX** (emphasis added) ("*Frankel/DeBourbon*"). What

Wilmington Trust told Judge Johnston was "invalid" STOLI in *Frankel/DeBourbon* is

fundamentally the same as what we have here: A third party funding the Policies pursuant to a pre-

arranged agreement at inception that entitled that third party to most of the Policies' death benefits.

　　If past is prologue, Wilmington Trust may argue that Cohen and Romano should be deemed

to have procured the Policies themselves because they consented to the transaction and signed the

---

course, these form-over-substance arguments invariably fail under Delaware law; a pre-existing agreement like the one Kavanaugh had here is *sufficient* to prove STOLI, but it is not *necessary*. *See, e.g.*, *Price Dawe*, 28 A.3d at 1064 (third party did not obtain ownership of STOLI policy until roughly two months after issuance); *Berland*, 266 A.3d at 967 (third party did not obtain ownership of STOLI policy until more than two years after issuance); *Frankel/DeBourbon*, 2022 WL 179008, at *11 (policies void for lack of insurable interest where investor did not obtain ownership of policies until a few days or weeks after inception); *Sol*, 369 F. Supp. 3d at 615-16 (policy void for lack of insurable interest where investor did not obtain ownership of policies until several years after issuance); *Malkin*, 2016 WL 161598, at *7 (same); *Van de Wetering*, 2016 WL 8116141, at *7 (same); *Est. of Malkin*, 998 F.3d at 1196 (same).

applications. But such an argument does not take *Price Dawe* and *Berland* seriously because Cohen and Romano never actually paid, or were liable to pay, any premium. *Price Dawe*, 28 A.3d at 1076 (who procured policy is who paid premium to effect it); *Berland*, 266 A.3d at 972-73 (insured did not procure if insured did not actually pay premium); *accord Sol*, 369 F. Supp. 3d at 611 ("[T]he non-recourse nature of the loan meant that neither [the insured] nor [the borrowing trust] had an 'obligation to repay' sufficient to support a conclusion that [the insured] actually 'procured the Policy.'"); *Van de Wetering*, 2016 WL 8116141, at *17 (third party procured where insured "did not pay any of the premiums on the Policy"; "had no financial risk under the terms of the non-recourse loan"; and "was under no obligation to repay the loan to [funder], which paid all of the premiums and acquired the Policy."). Moreover, not only did Kavanaugh fund the premium, but Kavanaugh also chose the Insureds; created the Trusts; selected, directed, and paid the trustees; selected which policies to obtain; and received a contractual entitlement to most of their death benefits at inception. There is no disputed fact on these issues, and putting this evidence to a jury is unnecessary because no rational juror could conclude that the Insureds procured the Policies.

Wilmington Trust also appears prepared to argue that Section 2704(a) was technically satisfied because Kavanaugh somehow obtained an insurable interest in the Insureds' lives by obtaining their consent to potentially buy annuities on their lives on the entirely speculative theory that those annuities might have—had they actually been bought—generated—at some point in the future—more monthly income than the Policies required in premium. Not so. Delaware law requires an insurable interest "at the time when such contract was made," meaning the analysis's focus is "the moment the life insurance contract becomes effective." *Price Dawe*, 28 A.3d at 1074; 18 Del. C. § 2704(a). And, as relevant here, Delaware defines insurable interest as "a lawful and substantial economic interest in having the life . . . of the individual continue, as distinguished

from an interest which would arise only by, or would be enhanced in value by, the death . . . of the individual insured." 18 Del. C. 2704(c)(2). Here, at inception, no annuities had been bought—in fact, none were ever bought—and thus Kavanaugh's "financial interest" was not in the Insureds living, but in them dying, because as soon they did, Kavanaugh stood to make millions.

Because the annuities did not exist at inception (and, in fact, never existed), they are irrelevant. But even if they had been bought, they would not confer insurable interest. To be clear, there are no Delaware cases allowing an investor to *manufacture* a financial interest in a stranger's life for the sole purpose of allowing it to then procure insurance on that life—let alone cases saying that an investor can wager on human life so long as it hedges its bet with another speculative financial product like an annuity. Hedging a bet does not make a bet any less of a bet; in fact, hedging bets is what gamblers do. But, in any event, the specific annuities being considered here featured deferred payment streams, meaning they would not begin to pay until a year *after* they were bought, and featured premium refund provisions, meaning if the Insureds had died during that first year, the annuity issuer would have *refunded* Kavanaugh its entire purchase price. **Ex. A** at 106:10-107:21, 152:9-21, 154:8-14. These features substantially enhanced, not lessened, Kavanaugh's financial interest in the Insureds dying quickly. Thus, had these annuities actually been obtained, they would *not* have created an insurable interest in favor of Kavanaugh and would have only further highlighted the reality that Kavanaugh was wagering on the Insureds' lives.

Wilmington Trust may also try to argue that the Policies technically satisfied Section 2704(a) because the Policies' death benefits were nominally owned by the Trusts inception (even though Kavanaugh, through a side-agreement, actually owned █████), and that this somehow means there is insurable interest through Section 2704(c)(5). But the Delaware Supreme Court has been clear that (i) "[p]arties cannot use section 2704(c)(5) to do indirectly what 2704(a) clearly prohibits

parties from doing directly," meaning Delaware's insurable interest rules relating to trust-owned policies also "require[] more than just technical compliance with section 2704(a)"; (ii) the policy must still be taken out "in good faith" and not as a "cover for a wagering policy"; and (iii) "[t]he insured, as settlor or grantor, must both create and initially fund the trust corpus," which "requirement is not satisfied if the trust is created through nominal funding as a mere formality." *Price Dawe*, 28 A.3d at 1078; *Berland*, 266 A.3d at 971 n22.

Here, any argument that Kavanaugh was somehow not the Policies' true beneficiary at inception because the death benefits might first have been funneled through the Trusts before going to Kavanaugh is precisely the sort of "form over substance" argument Delaware law rejects. *Price Dawe*, 28 A.3d at 1071. After all, the Trusts were shams. Kavanaugh, not the Insureds, created the Trusts; Kavanaugh, not the Insureds, chose the content of the Trust Agreements; Kavanaugh, not the Insureds, selected, directed, and paid the trustee; Kavanaugh, not the Insureds, decided which life insurance policies those Trusts would apply for, including the carriers, face amounts, specific insurance products, riders, and options; Kavanaugh, not the Insureds, funded the premiums, which payments Kavanaugh made directly to Columbus Life, not even bothering to first launder the money through the Trusts' accounts; and as discussed, although the Insureds were required to fund the Trusts with a nominal $1,000 payment, that money never did anything other than sit in the Trusts' accounts and get refunded to the Insureds in connection with the Policies' sale less than a year later. The Trusts were a farce, nominally funded to give the false appearance of propriety, but in actuality existing solely to allow Kavanaugh to control and effect human life wagers.

### 2.    The Policies Lack Insurable Interest Because They Were Not Taken Out In Good Faith For A Bona Fide Insurance Purpose.

To the extent the Court finds, as it should, that Kavanaugh procured the Policies by paying the premium needed to incept them, there is no need to question whether the Policies were taken

out for a legitimate insurance purpose; indeed, that question only becomes relevant if the court finds, as it should not, that Cohen and Romano took out the Policies themselves. *See, e.g.*, *Price Dawe*, 28 A.3d at 1076 ("The relevant inquiry is who procured the policy and whether or not that person meets the insurable interest requirements."); *id.* at 1075; *Berland*, 266 A.3d at 972 ("If the use of nonrecourse funding allows the insured—individually or as settlor or grantor of a trust—to obtain the policy 'without actually paying the premiums,' then the requirements of §§ 2704(a) and (c)(5) are not met."); *Price Dawe*, 28 A.3d at 1075 ("An insured's right to take out a policy is not unqualified. That right is limited to bona fide sales of that policy taken out in good faith.").

But even if this element were considered, no rational juror could conclude that the Policies were taken out in "good faith" for a "legitimate insurance purpose." *Berland*, 266 A.3d at 972-73. As Goodman confirmed, neither Policy ever existed to protect against any risk and thus neither ever served any "bona fide" insurance purpose. Indeed, when the Policies were taken out in 2004, neither Insured had dependent children; both were retired and not key persons in a business; and there is no evidence that either Policy was taken out to minimize any expected future estate taxes. Instead, the record shows that the Insureds sold their excess insurability to Kavanaugh in exchange for Kavanaugh's agreement to pay the premium and give them a small part of the benefit.

Although Wilmington Trust appears prepared to argue that the Policies were taken out for estate planning, there is zero evidence of this. As a threshold matter, Goodman's unrebutted testimony is that by the time of these transactions, the Insureds already had all of the insurance they needed for estate planning purposes. Goodman's testimony in this regard is corroborated by the testimony of Cohen's actual estate planning attorney, George Wilson, who testified that Cohen

already had all of the insurance she needed to minimize estate taxes, and that the Cohen Policy at issue here was not taken out as part of any estate or tax analysis.[22]

And, of course, the transactions were not even structured the way they would have needed to have been had they ever been intended to serve any actual estate planning purpose. To minimize estate tax, an insured cannot maintain "incidents of ownership" over a policy's death benefit; otherwise, those benefits are includable in her taxable estate. 26 U.S.C. § 2042(2); **Ex. F** at 18:11-21:19. Here, although the Trust Agreements purport to make the Trusts irrevocable, this was merely window dressing because the Insureds themselves were at all relevant times the Trusts' *owners and beneficiaries*, meaning if any benefits were ever paid, they would hit the Insureds' taxable estates and the proceeds would not serve any tax minimization purpose whatsoever. 26 U.S.C. § 2042(2) **Ex. F** at 18:11-21:19; **Exhibit YY**, Exp. Rpt. of L. Rybka, at 41. On this record, no rational juror could conclude that the Policies ever served any "legitimate insurance purpose" or that the Insureds ever had any "bona fide short-term need" for them; to the contrary, no rational juror could fail to conclude that the Policies were taken out in bad faith as covers for wagers.

**B.    No Affirmative Defense Is Capable Of Breathing Life Into These Policies.**

This Court has already correctly stricken as legally insufficient the affirmative defenses Wilmington Trust pled to try to enforce the Policies if they were determined to be STOLI. D.I. 84; D.I. 86; *Price Dawe*, 28 A.3d at 1067 ("A court may never enforce agreements void *ab initio*, no

---

[22] Wilmington Trust may cite to a two-paragraph declaration of Sam Romano, but due to being produced by Wilmington Trust after the close of discovery, the parties did not get the opportunity to take his deposition. That said, it is clear Sam Romano has no first-hand knowledge of the Romano Policies, the Concordia Program, or anything else of relevance to these matters. Indeed, Sam Romano admits that while his father told him he purchased *a* policy, his father "did not discuss the details" of the purported policy, including the issuing carrier, face amount, or beneficiary(ies). Aside from being inadmissible, this two-paragraph statement is apropos of nothing.

matter what the intentions of the parties."). Thus, because no rational juror could possibly conclude

that the Policies were supported by insurable interest, the Policies should be declared void *ab initio*.

### C.    Wilmington Trust's Premium Refund Claim, Which It Is Bringing On Behalf Of Its Principal, Viva, Must Fail.

The Delaware Supreme Court has long held that parties to illegal agreements that are void

*ab initio* as against public policy should ordinarily be left where they are found without any relief

to any extent. *Della v. Diamond*, 8 Storey 465, 469 (Del. 1965) ("***Ordinarily***, . . . ***neither party***

***has a remedy to any extent against the other***.") (emphasis added). The exception is where a

claimant proves it was excusably ignorant of the facts giving rise to the contract's illegality; is in

a class of persons the public policy at issue was designed to protect; or was tricked into the illegal

contract. *Brighthouse Life Ins. Co. v. Geronta Funding*, 2019 WL 8198323, at *2-3 (Del. Super.

Ct. Mar. 4, 2019) ("*Seck I*") (citing Restatement (Second) of Contracts § 198),[23] *cert. denied*, 2019

---

[23] Section 198(a) provides that "a party has a claim in restitution for performance that he has rendered under or in return for a promise that is unenforceable on grounds of public policy if he was excusably ignorant of the facts . . . in the absence of which the promise would be enforceable." The comments to Section 198 explain that "[w]hether ignorance is excusable is governed by the same considerations that apply under the rule stated in § 180." *Id.* cmt. a. The comments to § 180 explain that "good faith is expected on the part of the party who claims ignorance and he cannot blind his eyes because he does not wish to see." *Id.* § 180 cmt. a. The comments further explain "the matter of which he is ignorant must not be one as to which he is expected to have knowledge because of his expertise or relation to the transaction." *Id.* Section 198(b) provides that "a party has a claim in restitution for performance that he has rendered under or in return for a promise that is unenforceable on grounds of public policy if . . . he was not equally in the wrong with the promisor." The comments clarify that this exception is typically only applied "in two types of cases." *Id.* cmt. b. The first is where "the claimant is regarded as being less in the wrong because the public policy is intended to protect persons of the class in which he belongs and, as a member of that protected class, he is regarded as less culpable." *Id.* The second is where "the claimant is regarded as being less in the wrong because he has been the victim of misrepresentation or oppression practiced on him by the other party." *Id.*; *accord AIG Consol. Deriv. Litig. v. Smith*, 976 A.2d 872, 883, 883 n.23 (Del. Ch. 2009) (a party is considered not *in pari delicto* "in certain discrete circumstances" such as where party induced to illegality through duress or where public policy protects him) (citing 1 J. Story, Commentaries on Equity Jurisprudence § 300 (identifying, in substance, the same types of cases described in Section 198 Comment (b))).

WL 8198324, at *2-3 (Del. Super. Ct. Mar. 14, 2019) ("*Seck II*"), *appeal refused* 207 A.3d 579 (Del. 2019) ("*Seck III*"). This is consistent with the law of sister states like New Jersey whose supreme court recently held that where a life insurance policy is found to lack insurable interest, the factors relevant to the STOLI investor's premium refund claim include whether the investor had "knowledge of the illicit scheme" and/or "ignored red flags," observing that the "typical case in which this rule is applied is when one party acts under compulsion of the other," such as "one who has been induced by fraud, coercion, or undue influence to convey property in fraud of creditors." *Sun Life v. Wells Fargo*, 238 N.J. 157, 190 (2019) ("*Bergman*"). Because a STOLI *investor* will never be in the class of persons the insurable interest rules were designed to protect—and because one cannot be duped into paying for an illegal wager if one was aware of the policy's insurable interest problems—Wilmington Trust's premium refund claim fails, unless it can prove that Viva was reasonably unaware of the Policies' insurable interest problems, which it cannot do.

First, ██████████████████████████████████████████████████

███████████████████████████████████████ This alone should be fatal to Viva's premium refund claim. As Delaware and other courts have recognized, it is particularly appropriate to refuse relief under an agreement violating public policy where awarding relief would frustrate the public policy giving rise to the illegality in the first place. Here, as *Price Dawe* recognizes, STOLI is a market-driven problem: STOLI promoters only create STOLI to satisfy the demand of downstream investors like Viva. 28 A.3d at 1069-70. If downstream STOLI investors like Viva are refunded premium or otherwise made whole when they get caught knowingly buying and perpetuating human life wagers, they will continue buying policies they know have insurable interest problems, which in turn, will send a loud message upstream to would-be STOLI promoters to keep generating STOLI. *See, e.g.*, *Stella v. W.S.F.S.*, 1993 WL 138697, at *9-10 (Del. Super.

Ct. 1993) (explaining that refusing to provide restitution under illegal contract is particularly appropriate where it would dis-incentivize undesirable conduct); *Siner v. Am. Gen. Fin.*, 2004 WL 2441185, at *10-11 (E.D. Pa. Oct. 28, 2004) (refusing to provide restitution under illegal contract and explaining that "[t]his remedy will also force purchasers of bad debt to scrutinize the underlying transaction prior to making a decision to buy such debt, thereby placing additional pressure on the original creditor to follow both federal and state law during the formation and execution of the relevant contract").

Because the question of whether to award performance under an agreement violating public policy ultimately comes down to whether doing so would further or frustrate that public policy, Viva's decision to buy the Policies knowing their insurable interest problems is dispositive. There is also nothing inequitable about this result. To be clear, Viva concedes that it *could* have bid solely on the policies in the Orca Portfolio that it did *not* think had insurable interest issues, but that Viva dismissed that out of hand because it believed such a bid would not be successful. **Ex. MM** at 206:3-25. Viva also concedes that it *could have* elected to bring its insurable interest concerns to Columbus Life's attention prior to buying the Policies in an attempt to resolve them, but that Viva dismissed that option *solely on principle*, feeling it simply was not Viva's "burden" to ask those questions. **Ex. MM** at 215:12-19, 216:1-25, 217:4-13, 240:21-241:3; *see Seck*, 2021 WL 4080672 (Del. Super. Ct. Aug. 20, 2021) ("*Seck IV*") (denying premium refund to STOLI investor, except as to premiums investor paid *after* it brought its insurable interest concerns to insurer).

Indeed, instead of declining to buy the Policies or bringing its insurable interest concerns to Columbus Life's attention, Viva concedes ███████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████ **Ex. MM** at 87:11-90:11, 94:7-95:23, 97:11-98:10, 119:19-120:18, 121:5-19, 176:24-177:16. This line of analysis is precisely the sort of thinking the Delaware Supreme Court's rule in *Della* was designed to prevent.

Viva is likely to argue that although it concluded that the Policies carried "some" insurable interest risk, it did not actually know *for sure* that the Policies lacked insurable interest. But Viva cannot hide behind this subjective, self-serving assertion, particularly where it has simultaneously refused to disclose the details of its insurable interest analysis. **Ex. VV** Nos. 4-5. This argument is also completely disingenuous where, as here, Viva did almost no factual investigation into the Policies' origination whatsoever. Indeed, Viva concedes it did not even try to call the insureds,[24] their advisors, the trustees, the insurance brokers, or the lenders; did not even try to obtain the core transaction documents it knew existed; did not follow its own trade organization's "minimum" diligence guidelines; and did not even try to determine facts it concedes were key, such as whether the Insureds actually paid premium or whether there was a side-agreement entitling an investor to the death benefits at inception. *See Seck IV*, 2021 WL 4080672, at *19-20, 22, 24 (denying premium refund to STOLI investor who, among other things, did not bother to conduct any factual

---

[24] At its deposition, Viva tried to make the lame excuse that the reason Viva did not try to call any of the insureds prior to paying ████████████ for the Orca Portfolio is that Viva supposedly did not have their phone numbers. Setting aside the absurdity of this assertion—phone numbers are typically publically available and making 80 or so phone calls to confirm key facts prior to electing to spend ████████████ would have been a *de minimis* expense—Viva's own documents show that it did possess Romano and Cohen's (and Cohen's attorney, Wilson's) phone numbers during the diligence period, facts which Viva's corporate representative was ultimately forced to concede. **Ex. MM** at 178:12-182:1; **Exhibit ZZ**, LexServ Spreadsheet, at 1124-26.

investigation into the policy's bona fides until after acquiring it). It is axiomatic that a party seeking relief under an agreement violating public policy cannot blind its eyes because it does not wish to see. *See, e.g.*, *Interim Healthcare v. Spherion*, 884 A.2d 513, 551 n.305 (Del. Super. 2005), *aff'd*, 886 A.2d 1278 (Del. 2005) (Table) ("Delaware courts do not rescue disappointed buyers from circumstances that would have been guarded against through normal due diligence and negotiated contractual protections."); *VGS v. Castiel*, 2004 WL 876032, at *6 (Del. Ch. Apr. 22, 2004) (sophisticated investor's failure to recognize importance of contract made available during due diligence diminished plaintiff's fraud and breach of contract claim); *Debakey v. Raytheon Serv.*, 2000 WL 1273317, at *26-28 (Del. Ch. Aug. 25, 2000) (finding party's "cost-benefit analysis" that "less-than-careful job of diligence would suffice" was a decision it was "free to make," but that it must "live with its consequences"); *see generally* Restatement (Second) of Contracts § 198 cmt. a. ("Whether ignorance is excusable is governed by the same considerations that apply under the rule stated in § 180."); *id.* § 180 cmt. a. (explaining that "good faith is expected on the part of the party who claims ignorance and he cannot blind his eyes because he does not wish to see).

Because the facts are terrible for Wilmington Trust, it argues that they don't matter and that it is entitled—as a matter of law—to an automatic refund, not only of the premium it paid, but also of the premium paid by its predecessors (i.e., the premium Viva did *not* pay) without having to prove anything. This court has already expressed skepticism of this argument, stating, when faced with it on the pleadings in a related STOLI case: "I don't think that I need to decide at this stage the question of whether premium payments are an automatic remedy, although I doubt that they are." **Exhibit AAA**, *Snyder* H'rg Tr., at 5:19-22. And for good reason: An automatic refund is inconsistent with Delaware's longstanding principle that, "ordinarily," parties to a contract violating public policy are left where they are found *without* any relief. *Della*, 8 Storey at 469.

40

Although *Della* was not a STOLI case—it was an illegal liquor case—the court did not limit the principle set forth therein to liquor cases, nor is there any reason for this Court to do so now.

The reality is that investors like Viva (and their proxies like Wilmington Trust) have long known that *Price Dawe*'s holding that STOLI policies are not merely voidable—but rather are void *ab initio*—is fatal to their automatic premium refund argument. After all, this is why investors (and their *amici*) fought so hard in *Price Dawe* to persuade the Delaware Supreme Court to hold that STOLI policies were merely void*able* and why, ten years later, ILMA, on behalf of STOLI investors, fought so hard (as *amici*) in *Berland* to try to get the Delaware Supreme Court to reverse *Price Dawe*'s holding in this regard. *See Price Dawe*, 28 A.3d at 1065, 1067 (rejecting investor argument that STOLI policies are merely voidable and spending an entire section "Distinguishing between void and voidable contracts"); *Berland*, 266 A.3d at 970 (rejecting ILMA's invitation "to 'reexamine *Price Dawe*'s holding that policies that violate § 2704(a) are void' and to hold that they are merely "voidable"). And it is why—starting in 2012 shortly after *Price Dawe* was issued—the STOLI industry lobbied the Delaware General Assembly year-after-year to adopt legislation implementing various forms of automatic STOLI premium refund rules. *See, e.g.*, Del. S.B. 220, 146th Gen. Assem. (2012) (proposing automatic premium return for insurable interest cases except to original wrongdoers); Del. H.B. 87, 147th Gen. Assem. (2013) (same except without interest); Del. S.B. 71, Amendment 1, 148th Gen. Assem. (2015) (same, but only from insurers having filed five insurable interest suits in Delaware in a single year). But none of those bills ever passed, and the Delaware Department of Insurance also declined to recommend them when it was asked to consider what rules, if any, were needed in this area. *See* Del. S. Res., 148th Gen. Assem. (2016); **Exhibit BBB,** DOI Rep. to Del. Sen., at 24.

### D.      Wilmington Trust's Bad Faith Claim Fails.

Wilmington Trust's Counterclaim for breach of the implied covenant of good faith and fair dealing and bad faith is not viable because (i) the Policies are void *ab initio* human life wagers; and (ii) Columbus Life had more than a reasonable justification for challenging them.

Wilmington Trust's bad faith claim is based, as it must be, on the assumption that the Policies are valid and that an implied covenant of good faith and fair dealing consequently is implied under such contracts. In this regard, Wilmington Trust alleges that (i) the implied covenant "underlies all contractual obligations" and Columbus "has a legal obligation not to act in bad faith"; (ii) "[t]he Polic[ies] constitutes . . . valid, enforceable written contract[s] that require[s] Columbus Life to pay . . . death benefit[s] to Securities Intermediary" upon the Insureds' deaths; and (iii) "Columbus has failed to deal with Securities Intermediary . . . in good faith by attempting to avoid paying the Polic[ies'] . . . death benefit[s] without any reasonable basis or justification (and in violation of an implied obligation not to do so), and forcing Securities Intermediary . . . to]expend resources in litigation to protect its contractual right to receive the . . . death benefit[s] to which Securities Intermediary will be entitled under the Polic[ies]" upon the Insureds' deaths.

Where, as here, there is no valid contract, no duty of good faith and fair dealing arises and, thus, there cannot be any breach of such a non-existent duty. *See Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) ("the implied covenant [of good faith and fair dealing] attaches to every contract."); *Encite v. Soni*, 2008 WL 2973015, at *12 (Del. Ch. Aug. 1, 2008) (*citing Dunlap* and recognizing "[t]hat no such covenant [of good faith and fair dealing] can exist in the absence of a contract is the obvious, and logical, corollary to this fundamental proposition"); *Malkin*, 2016 WL 161598, at *20 (applying Delaware law) ("Because there was no contract and, therefore, no breach, there can be no violation of the duty of good faith and fair dealing."); *see also Justofin v. Metro. Life Ins.*, 2002 WL 31375779, at *7 (E.D. Pa. Oct. 22, 2002) (entering

summary judgment for insurer and holding that "as the contract was void *ab initio*, Plaintiffs cannot prevail on the breach of insurance contract claim or the bad faith claim."). The Policies are void *ab initio*; thus, no duty of good faith or fair dealing can be implied; thus, Wilmington Trust's bad faith claim fails as a matter of law.

Moreover, even if the Court were to conclude that there are disputed issues of material fact precluding a summary judgment ruling on the Policies' invalidity, summary judgment should still be entered in Columbus Life's favor on Wilmington Trust's bad faith claim because there is no genuine issue of material fact that Columbus Life had more than reasonable grounds for challenging the Policies' validity—for all the reasons set forth above. In fact, the record establishes that Columbus Life does not arbitrarily challenge policies as STOLI policies and very narrowly limits such challenges to truly egregious and provable STOLI. In this regard, contrary to Wilmington Trust's allegations, Columbus Life's actions in flagging policies as possible life settlement or investor-owned policies based upon very broad STOLI indicators did not reflect any secret intent to challenge the validity of such policies in the future as established by the facts that (i) over the last five years, Columbus Life has paid 10,347 out of 10,934 death claims that it received (over 94%) with only nine (.08%) claims denials and the remainder of claims pending[25]; (ii) Columbus Life has paid more than 97% of the death claims on policies appearing on these lists of possible life settlement/investor-owned policies; and (iii) Columbus Life has been a party to

---

[25] Of the 10,934 death claims received by Columbus Life over that five-year period, it has denied only nine. The remaining 578 claims that have not yet been paid are pending payment. It is not unusual for Columbus Life to have that amount of claims pending payment at any point in time because, on average, Columbus Life roughly receives 200-300 death claims per month, it takes on average 30 days to settle a claim, and some claims may take longer to process because, for example, some claims' requirements are missing—such as claim paperwork being incomplete or not filled out correctly, or delayed receipt of estate or trust documentation. **Exhibit CCC,** Columbus Life's Supp. Resp. to Interrog., No. 6.

very few legal actions in which it brought STOLI challenges—with only nineteen such policies having been subject to such legal challenges. **Ex. CCC** No. 6.

Courts have consistently recognized that summary judgment on bad faith claims is proper where, as here, it is indisputable that an insurer has a reasonable justification for denying liability under a policy. For example, in *Arch Ins. Co. v. Murdock*, the Delaware Superior Court entered summary judgment for an insurer on a policy owner's bad faith claim and explained that the "claimant must show that the insurer lacked reasonable justification to deny the coverage to the insured"; that "the relevant question is whether at the time that the insurer denied liability, there existed a set of facts or circumstances known to the insurer which created a bona fide dispute and therefore a meritorious defense to the insurer's liability"; and that "the question of bad faith refusal to pay should not be submitted to the jury unless it appears that the insurer did not have reasonable grounds for relying upon its defense to liability." 2019 WL 19132536, at *6 (Del. Super. Ct. May 1, 2009); s*ee Bennett v. USAA Cas. Ins. Co.*, 158 A.3d 877, 4 (Del. 2017) (table) (insured "failed to raise a material fact for consideration by the jury on their bad faith claim"). For all these reasons, Wilmington Trust's bad faith claim must fail.[26]

---

[26] Wilmington Trust has also asserted a claim for breach of contract based on the theory that, by filing these lawsuits, Columbus Life has breached the Policies' two-year contestability provision and has breached some supposed implied duty not to "attempt to rescind the valid, in force Polic[ies] without a reasonable justification." This claim must also fail. First, Wilmington Trust's claim based on the Policies' contestability provision was expressly foreclosed by *Price Dawe*, which stated that "an insurer can challenge the enforceability of a life insurance contract after the incontestability period where a lack of insurable interest voids the contract." 28 A.3d at 1068. Second, Wilmington Trust cites no authority for any implied duty not to rescind separate and apart from its allegation that there was an implied duty to act in good faith. Thus, this aspect of the breach of contract claim fails for the same reasons (discussed above) that its bad faith claim fails: There was no contract (and thus no implied duties), and, in any event, Columbus Life's decision to challenge the Policies in court was more than reasonably justified.

## V.    CONCLUSION

For the reasons set forth above, Columbus Life respectfully requests that this Court grant its motion for summary judgment, declare the Policies void *ab initio* for lack of insurable interest, and dismiss with prejudice all of Wilmington Trust's remaining counterclaims.


Dated April 29, 2022


Respectfully submitted,


*/s/ Donald L. Gouge, Jr.*
Donald L. Gouge, Jr. (No.
DONALD L. GOUGE, JR., LLC
800 N. King Street, Suite 303
Wilmington, Delaware 19801
(302) 658-1800, Ext. 1

COZEN O'CONNOR
Michael J. Miller (*pro hac vice*)
Joseph M. Kelleher (*pro hac vice*)
Charles J. Vinicombe (*pro hac vice*)
Philip J. Farinella (*pro hac vice*)
1650 Market St., Suite 2800
Philadelphia, PA 19103
*Attorneys for Plaintiff,*
*Columbus Life Insurance Company*

## <u>CERTIFICATE OF SERVICE</u>

I, Donald L. Gouge, Jr., do hereby certify that on this 29th day of April, 2022, a copy of the within Plaintiff Columbus Life Insurance Company's Opening Brief in Support of Motion for Summary Judgment was filed via CM/ECF and served on all counsel of record.

Dated: April 29, 2022                         <u>*/s/ Donald L. Gouge, Jr.*</u>
                                              Donald L. Gouge, Jr. (#2234)