# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

COLUMBUS LIFE INSURANCE
COMPANY,

       Plaintiff,

    v.

WILMINGTON TRUST, N.A., as
Securities Intermediary,

       Defendant.

_____

WILMINGTON TRUST, N.A., as
Securities Intermediary,

       Counterclaim-Plaintiff,

    v.

COLUMBUS LIFE INSURANCE
COMPANY,

       Counterclaim-Defendant.

No. 1:20-cv-00735-JLH
No. 1:20-cv-00736-JLH

PUBLIC VERSION OF D.I. 141
FILED MAY 13, 2022

---

## WILMINGTON TRUST, N.A., AS SECURITIES INTERMEDIARY'S CONSOLIDATED OPENING BRIEF IN SUPPORT OF ITS <u>MOTION FOR SUMMARY JUDGMENT</u>

Harry S. Davis
Robert E. Griffin
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, NY  10022
(212) 756-2000

Aislinn K. Affinito
SCHULTE ROTH & ZABEL LLP
901 Fifteenth Street, NW, Suite 800
Washington, DC  2005
(202) 729-7470

Date:  April 29, 2022

John M. Seaman (#3868)
Samuel D. Cordle (#6717)
ABRAMS & BAYLISS LLP
20 Montchanin Road, Suite 200
Wilmington, Delaware  19807
(302) 778-1000
seaman@abramsbayliss.com
cordle@abramsbayliss.com

*Attorneys for Defendant and Counterclaim-Plaintiff Wilmington Trust, National Association, as Securities Intermediary*

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ............................................................................1

II.     STATEMENT OF FACTS ..................................................................................5

      A.    The KDI/Concordia Program................................................................5

      B.    Columbus Learns the Key Facts Regarding the KDI/Concordia Program in 2003 and 2004................................................................................9

      C.    Cohen and Romano Sell Their Policies in 2004 ................................13

      D.    Columbus Continues to Analyze the KDI/Concordia Program in 2005...............14

      E.    Columbus Investigates the KDI/Concordia Program in 2005. ............15

      F.    Columbus Flags the Policies on STOLI Lists from 2006 Through 2014. ............19

      G.    Columbus Acknowledges Six Ownership and Beneficiary Changes, and Consistently Represents that the Policies are Active, In-Force Policies. .............21

      H.    Columbus Hires Cozen, and Conducts a Second Investigation Into the KDI/Concordia Policies in 2019 and 2020. ...........................................23

      I.    Viva Acquires the Policies 12 Years After the Policies' Inception. .....................25

III.    ARGUMENT .......................................................................................28

      A.    Securities Intermediary Is Entitled to an Automatic Return of Premiums. ...........28

      B.    Securities Intermediary Is Entitled to a Return of Premiums Under the Restatement (Second) of Contracts §§ 197–198....................................33

            1.    Section 197:  Disproportionate Forfeiture ...............................33

            2.    Section 198(a):  Excusable Ignorance......................................35

            3.    Section 198(b):  Comparative Culpability ................................36

      C.    Securities Intermediary is Entitled to a Return of Premiums Under Different Restatement Provisions that Were Not Considered by Seck. ................................40

            1.    Section 199(b) of the Restatement (Second) of Contracts.........................41

            2.    Section 32 of the Restatement (Third) of Unjust Enrichment and Restitution. .................................41

D.    Securities Intermediary Is Entitled to a Return of All Premiums Paid to Columbus Plus Prejudgment Interest........................................................43

1.    Securities Intermediary Is Entitled to a Return of All Premiums Paid to Columbus—Not Only the Premiums Paid by Viva. .............................43

2.    Securities Intermediary Is Entitled to Prejudgment Interest. ....................45

IV.    CONCLUSION.................................................................................................45

**TABLE OF AUTHORITIES**

**Cases**     **Page(s)**

*Boling v. Prospect Funding Holdings, LLC*,
  324 F. Supp. 3d 887 (W.D. Ky. 2018) ...................................................................33

*Brighthouse Life Ins. Co. v. Geronta Funding*,
  2019 WL 8198323 (Del. Super. Ct. Mar. 4, 2019) ..................................3, 31, 32, 37

*Brighthouse Life Ins. Co. v. Geronta Funding*,
  2019 WL 8198324 (Del. Super. Ct. Mar. 14, 2019) .............................................31

*Brighthouse Life Ins. Co. v. Geronta Funding*,
  2021 WL 4080672 (Del. Super. Aug. 20, 2021) (appeal docketed) ................................32, 35

*Columbus Life Ins. Co. v. Wilmington Trust, N.A.*,
  2021 WL 1820573 (D. Del. May 5, 2021) .................................................31, 37, 42

*Della v. Diamond*,
  210 A.2d 847 (Del. 1965) .................................................................30

*Jackson Nat. Life Ins. Co. v. Kennedy*,
  741 A.2d 377 (Del. Ch. 1999) ...........................................................41

*Lavastone Capital LLC v. Estate of Berland*,
  266 A.3d 964 (Del. 2021) ...............................................................7, 8

*Lincoln Nat'l Life Ins. Co. v. Snyder*,
  722 F. Supp. 2d 546 (D. Del. 2010) ................................................... *passim*

*Norton v. Poplos*,
  443 A.2d 1 (Del. 1982) .................................................................30

*PHL Variable Ins. Co. v. Chong Son Pak Life Ins. Tr.*,
  2012 WL 13201401 (D. Del. July 25, 2012) .........................................28, 32

*PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Tr.*,
  28 A.3d 1059 (Del. 2011) .............................................................. *passim*

*PHL Variable Ins. Co. v. Virginia L. Lankow Life Ins. Tr.*,
  2012 WL 13201402 (D. Del. July 25, 2012) .........................................28, 32

*Principal Life Ins. Co. v. Lawrence Rucker 2007 Ins. Tr.*,
  774 F. Supp. 2d 674 (D. Del. 2011) .................................................. *passim*

*San Antonio Fire & Police Pension Fund v. Bradbury*,
  2010 WL 4273171 (Del. Ch. Oct. 28, 2010) .........................................44

*Segovia v. Equities First Holdings, LLC*,
2008 WL 2251218 (Del. Super. Ct. May 30, 2008) (unpublished) ..........................2, 6, 29, 43

*Sun Life Assur. Co. of Can. v. Berck*,
719 F. Supp. 2d 410 (D. Del. 2010)................................................................. *passim*

*Sun Life Assur. Co. of Can. v. U.S. Bank Nat'l Ass'n*,
2016 WL 161598 (S.D. Fla. Jan. 16, 2016), *aff'd in relevant part*,
693 Fed. App'x 838 (11th Cir. 2017) .......................................................... *passim*

*Sun Life Assur. Co. of Can. v. U.S. Bank Nat'l Ass'n*,
2016 WL 3948059 (S.D. Fla. June 9, 2016), *aff'd in relevant part*,
693 Fed. App'x 838 (11th Cir. June 12, 2017) ..................................................44

*Sun Life Assur. Co. of Can. v. U.S. Bank Nat'l Ass'n*,
2019 WL 8353393 (D. Del. Dec. 30, 2019).................................................... *passim*

*Sun Life Assur. Co. Can. v. U.S. Bank Nat'l Ass'n*,
369 F. Supp. 3d 601 (D. Del. 2019)...................................................................6

*Sun Life Assur. Co. of Can. v. Wilmington Tr., Nat'l Ass'n*,
2022 WL 179008 (Del. Super. Ct. Jan. 12, 2022) ........................................ *passim*

*Sun Life Assurance Co. of Can. v. Wilmington Tr. N.A.*,
(Del. Super. Ct. Nov. 10, 2020) (Johnston, J.).................................................31

*Telecomms. Law Prof'ls PLLC v. T-Mobile US, Inc.*,
2015 WL 13159051 (D.D.C. Jan. 12, 2015)......................................................33

*U.S. Bank Nat'l Ass'n v. Sun Life Assur. Co. of Can.*,
2016 WL 8116141 (E.D.N.Y. Aug. 30, 2016), report and recommendation
adopted, 2017 WL 347449 (E.D.N.Y. Jan. 24, 2017).................................6, 7, 28, 32

*Valeant Pharms. Int'l v. Jerney*,
921 A.2d 732 (Del. Ch. 2007)........................................................................45

**Rules of Procedure, Restatement & Uniform Acts**

5 Couch on Ins. § 69:2 (3d ed. 2021)..............................................................29

U.C.C. § 8-102(a)(14)....................................................................................2

Fed. R. Civ. P. 30(b)(6)..............................................................................1, 27

Restatement (Second) of Contracts § 180...........................................................35

Restatement (Second) of Contracts § 197...................................................... *passim*

Restatement (Second) of Contracts § 198...................................................... *passim*

Restatement (Second) of Contracts § 199(b) ...........................................................................40, 41

Restatement (Third) of Restitution and Unjust Enrichment §54 ...........................................31, 32

Restatement (Third) of Restitution and Unjust Enrichment § 32 ..................................4, 32, 40, 41

**Other Authorities**

Western & Southern Financial Group, 2020 Annual Report at 5,
    https://www.westernsouthern.com/-/media/files/wsfg/2020-annual-report.pdf .....................21

## I.    PRELIMINARY STATEMENT

Columbus Life Insurance Company ("Columbus") has sought, at every turn, to make these cases about the alleged invalidity of two policies issued by Columbus in 2004—a $5 million policy insuring the life of Anthony Romano (the "Romano Policy") and a $5 million policy issuing the life of Janet Cohen (the "Cohen Policy," and together with the Romano Policy, the "Policies"). In doing so, Columbus has sought to deflect attention from its own knowledge—gained 15 years before it filed these cases—of the underlying facts which Columbus contends render the Policies invalid. What these cases are really about, however, is Columbus' unfair, inequitable, and improper effort to keep the benefit of its bargain (by retaining all the premiums it received on the Policies) while avoiding the burden of that agreement (by not paying the Policies' death benefits). Simply put, Columbus wants a windfall.

Given the unique economics of these cases, the only issue this Court needs to decide is whether Columbus can keep *$5,692,951.41* in premiums that it has collected on the $5 million Romano Policy and *$4,653,336.35* in premiums it has collected on the $5 million Cohen Policy (an amount that continues to increase because Ms. Cohen is alive), if the Court declares that the Policies are void *ab initio*. When accounting for pre-judgment interest—which is mandatory under Delaware law—those totals increase to *$9,268,466.59* on the Romano Policy and *$6,661,051.05* on the Cohen Policy. Because Columbus has earned approximately *$15,929,517.60* in premiums plus interest[1] over *18 years* on policies worth a combined *$10 million*, the extent to which the Policies are void *ab initio* such that Columbus does not have to pay the death benefits is irrelevant.

---

[1] This is a conservative calculation that assumes, for simplified purposes, that the interest rate on each premium payment from 2004 to the present is a static 5.75%. The actual pre-judgment interest calculation will depend on the interest rate in place as of the date of each premium payment, which in many instances will be higher than the 5.75% rate that we are presenting solely for illustrative purposes.

Columbus' own Fed. R. Civ. P. 30(b)(6) witness agreed that these cases are "economically irrational" if Columbus has to disgorge all those premiums.

Wilmington Trust, N.A., as Securities Intermediary ("Securities Intermediary")[2] believes there are issues of fact on whether the Policies are valid that preclude summary judgment on policy validity. But litigating validity through trial, and possibly appeal, is not an efficient use of anyone's time and resources. Because the premiums exceed the Policies' death benefits, Securities Intermediary's customer Viva Capital Trust ("Viva") will be, oddly enough, better off financially if Columbus is ordered to return all the premiums rather than pay the death benefits. In light of the unusual economics at play—and in order to promote judicial efficiency—Securities Intermediary will not contest the issue of policy invalidity in these cases, will assume that the Policies are void for purposes of summary judgment motions, and will only ask the Court to adjudicate the question of return of premiums.[3]

Because Columbus cannot retain the $10,346,287.80 in premiums it has received since the inception of these Policies, the Court should grant Securities Intermediary's motion for summary judgment on return of premiums for the following reasons.

*First*, the vast majority of courts applying Delaware law have held that, when a policy is declared void *ab initio*, the insurer must *automatically* return the premiums. Three months ago, Judge Johnston in the Delaware Superior Court reaffirmed this longstanding rule of law, and

---

[2] Securities Intermediary has acted, and continues to act, solely in its capacity as a securities intermediary for a third-party investor. *See* U.C.C. § 8-102(a)(14).

[3] While Securities Intermediary is not contesting policy invalidity in these cases solely because of the peculiar economics, Securities Intermediary (and its client on whose behalf Securities Intermediary owns the Policies) reserve all rights to litigate questions concerning policy validity regarding any and all other policies in future cases (including other policies that arise out of the KDI/Concordia Program or where the insured uses a loan (including a non-recourse loan) to finance premiums.

ordered a carrier to automatically return every nickel in premiums that it collected on two void *ab initio* policies, stressing that the carrier "cannot be absolved from any obligation to pay death benefits *and* yet retain premiums." *Sun Life Assur. Co. of Can. v. Wilmington Tr., Nat'l Ass'n*, 2022 WL 179008, at *14 (Del. Super. Ct. Jan. 12, 2022) ("*De Bourbon/Frankel*"). The rule requiring an automatic return of premiums is necessary "to prevent manifest inequity," *Sun Life Assur. Co. of Can. v. U.S. Bank Nat'l Ass'n*, 2016 WL 161598, at *21 (S.D. Fla. Jan. 14, 2016) ("*Malkin I*"), *aff'd in relevant part*, 693 Fed. App'x 838 (11th Cir. 2017) ("*Malkin III*"), and avoid "incentivizing insurance carriers to bring rescission suits as late as possible, as they continue to collect premiums at no actual risk," *Sun Life Assur. Co. of Can. v. Berck*, 719 F. Supp. 2d 410, 418–419 (D. Del. 2010). Consistent with this precedent, the Court should order Columbus to automatically disgorge all of the premiums it collected on the Policies, without engaging in the fact-intensive analysis that Columbus urges the Court to adopt.

**Second**, to the extent the Court applies the minority rule (at best) in Delaware—and finds that Securities Intermediary must prove that a premium refund is appropriate under the Restatement (Second) of Contracts §§ 197–198—Columbus still must return premiums. There are three independent grounds for a premium refund under Sections 197–198 of the Restatement (Second) of Contracts, which is the test Columbus will ask this Court to apply based on an outlier case called *Brighthouse Life Ins. Co. v. Geronta Funding*, 2019 WL 8198323 (Del. Super. Ct. Mar. 4, 2019) ("*Seck I*"): (1) if refusing to order a premium refund would result in a disproportionate forfeiture, (2) if the policy owner was excusably ignorant of the facts giving rise to the invalidity of the policy, or (3) if the carrier is more culpable than the policy owner.

Under any of those three grounds, the Court should order Columbus Life to disgorge all of

the premiums it received on the Policies.[4]  Columbus knew no later than September 2004 the key facts that it claims render the Policies void *ab initio*, it began publishing anti-stranger-originated life insurance ("STOLI") memos in May 2005, it launched an investigation into the Policies in September 2005, it learned the Policies were controlled by a receiver appointed in connection with a Securities and Exchange Commission enforcement action in 2006, it put the Policies on its STOLI lists in 2006, and it flagged the Policies on a specific STOLI list requested by Columbus' then-President in January 2012.  But rather than file a lawsuit challenging the validity of the Policies from 2004 through 2020, Columbus chose to collect over $10.3 million in premiums from 2004 through the present, it approved six ownership and beneficiary changes, and it repeatedly represented to the Policies' owners—including Securities Intermediary—that the Policy was "in force" and "active."

In contrast, Securities Intermediary's customer Viva—which owns the beneficial interest in the Policies—did not have access to the same information.  Viva bought the Policies in a Uniform Commercial Code ("UCC") auction from a secured lender as part of a portfolio comprised of ██████████████████████████████████ in late 2016—12 years after Columbus began accepting millions of dollars in premiums on the Policies, and well after Columbus learned the salient facts to which Columbus now points in arguing that the Policies are invalid.  Despite its best efforts to do as thorough due diligence as possible, Viva and its investment advisor Preston Ventures LLC ("Preston") did not have access to the same information regarding the Policies—and the program through which they were originated (the "KDI/Concordia

---

[4] The Restatement (Third) of Unjust Enrichment and Restitution—not considered by *Seck*—provides another ground for a return of premiums:  "[C]ontractual performance by a party who does not receive (and cannot compel) the promised counterperformance will frequently result in the unjust enrichment of the recipient and a prima facie entitlement to restitution."  Restatement (Third) of Restitution and Unjust Enrichment § 32, cmt. b.

Program")—that Columbus knew about in 2003-2004 before issuing the Policies, continued to diligence in September 2004 after issuing the Policies, and investigated in September 2005.

*Third*, because Columbus must disgorge the premiums that it collected on the Policies from 2004 through the present, there are two related questions:  (1) whether Columbus must disgorge *only* those premiums that Viva paid on the Policies from 2016 through the present (thereby allowing Columbus to obtain a multi-million dollar windfall), or whether Columbus must disgorge *all* of the premiums that it collected on the Policies from 2004 through the present; and (2) whether Columbus must pay pre-judgment interest.

Regarding the first question, the Court should order Columbus to return to Viva all of the premiums that Columbus collected on the Policies because, among other things, when Viva acquired the Policies in 2016, it also acquired all of the rights in those Policies—including claims to the premiums paid by predecessor owners.  Separately, allowing Columbus to keep premiums from 2004 through 2016 based on the fortuitous event that the Policies traded in the tertiary market for life settlements would permit Columbus to obtain the very type of windfall that Delaware law abhors.  Regarding the second question, the Court should order Columbus to pay pre-judgment interest from the date of each payment, as pre-judgment interest is mandatory under well-established Delaware law.

## II.    STATEMENT OF FACTS

### A.    The KDI/Concordia Program

In 2004, Columbus issued two $5 million life insurance policies, one insuring the life of Janet Cohen (CM5012414U) and one insuring the life of Anthony Romano (CM5011660U).  (Ex. 1 at 000862; Ex. 2 at 00018533.)[5]  Cohen and Romano each obtained their policies through the

---

[5] "Ex. __" refers to the exhibits attached to the Declaration of Robert E. Griffin, dated April 29,

"KDI/Concordia Program."  (Ex. 3 at 41:12–23; Ex. 4 at 18:11–19:5; Ex. 5 at 00018096 (¶1); Ex. 6 at 00018114 (¶2.3(e)); Ex. 8 at 00018618 (¶1); Ex. 9 at 00018636 (¶2.3(e)).)  The KDI/Concordia Program was a plan developed and patented by Bart Kavanaugh that allowed wealthy insureds to take out policies through trusts, and use the combination of non-recourse premium financing and annuity proceeds to pay premiums.  (Ex. 4 at 17:4–18:17, 29:17-30:3; Ex. 11 at 003947-48, 50-58, 61-62; Ex. 13 at 004001 (¶12(d)); Ex. 14 at 181:10–181:22; Ex. 117 at 1, 19; Ex. 118 at 1, 18–19.)

When the insureds passed away, the insured's beneficiary would receive a portion of the death benefit, which ranged from approximately ▮▮▮▮▮▮ of the face amount of the policy depending on when the insured died.  (Ex. 19 at 315:17-317:12; Ex. 13 at 004000 (¶7(a)), 4004-10; Ex. 5 at 00018098 ¶7(a)), 00018102-08; Ex. 8 at 00018620 (¶7(a)), 00018624-30; Ex. 11 at 003958.)  The lender that purchased the annuity and funded the premiums would receive the rest— a payout designed to allow the lender to recover its expenses (including the annuity's purchase price) and make an additional profit for serving as the lender for the program.  (Ex. 14 at 201:9– 207:14, 113:14-114:11; Ex. 11 at 003958, 003961-62; Ex. 4 at 22:1-23:6; Ex. 3 at 134:12-135:11; Ex. 13 at 003999 (¶2), 004000 (¶8), 004025-27 (¶5.2(a)-(c)).)

Columbus' argument that the Policies are void *ab initio* under Delaware law rests on two primary features of the KDI/Concordia Program.

***First***, there is no dispute that the KDI/Concordia Program involved non-recourse premium financing.  Columbus' theory of policy invalidity rests on how certain courts applying Delaware law have found certain policies to be void *ab initio* in situations where the insureds used non-recourse loans to pay premiums.  *See, e.g.*, *Sun Life Assur. Co. Can. v. U.S. Bank Nat'l Ass'n*, 369

---

2022.  When citing to documents produced in these cases, Securities Intermediary will reference only the numerical portions of the Bates stamps.

F. Supp. 3d 601, 617 (D. Del. 2019) ("*Sol I*"); *U.S. Bank Nat'l Ass'n v. Sun Life Assur. Co. of Can.*, 2016 WL 8116141, at *20 (E.D.N.Y. Aug. 30, 2016) ("*Van de Wetering*"); *Sun Life Assur. Co. of Can. v. U.S. Bank Nat'l Ass'n*, 2016 WL 161598, at *21 (S.D. Fla. Jan. 14, 2016) ("*Malkin I*"), *aff'd in part, rev'd in part and remanded*, 693 F. App'x 838 (11th Cir. 2017) ("*Malkin III*"). Most recently, the Delaware Supreme Court held that an insured's use of a non-recourse loan to pay premiums—coupled with the insured's intent to sell the policy—does not render a policy invalid under Delaware law "so long as the use of nonrecourse funding did not allow the insured or his or her trust to obtain the policy 'without actually paying the premiums' and the insured or his or her trust procured or effected the policy in good faith, for a lawful insurance purpose, and not as a cover for a wagering contract." *Lavastone Cap. LLC v. Est. of Berland*, 266 A.3d 964, 966 (Del. 2021) ("*Estate of Berland*").

The KDI/Concordia Program was quite different than the types of non-recourse premium finance programs that courts have reviewed previously. Unlike the insureds in *Sol*, *Van de Wetering*, and *Malkin*, the insureds who procured policies as part of the KDI/Concordia Program did so *without* an eye towards selling them on the secondary market for life insurance. Instead, the point of the KDI/Concordia Program was for the insureds to *retain* policies so their beneficiaries would obtain a percentage of the death benefits. Cohen and Romano only sold the Policies once Kavanaugh was unable to secure the long-term financing necessary to purchase the annuities that would fund the life insurance premiums in the KDI/Concordia Program, as Kavanaugh had done successfully with earlier tranches of the KDI Plan. (Ex. 21 at 004290-91; Ex. 4 at 66:20-67:11, 238:5-238:17, 240:23-241:18; Ex. 14 at 72:22-73:7, 121:5-123:6; Ex. 22 at

004325; Ex. 29 at 0000010-13; Ex. 30 at 000002-5.)[6]

**Second**, there is no dispute that the lender who financed the KDI/Concordia Program was contractually owed a portion of the death benefit.  Under Delaware law, policies are invalid if they constitute "cover[s] for a wagering contract."  *Estate of Berland*, 266 A.3d at 966; *see also PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Tr.*, 28 A.3d 1059, 1075 (Del. 2011) (explaining "if an insured procures a policy as a mere cover for a wager, then the insurable interest requirement is not satisfied," and "if a third party financially induces the insured to procure a life insurance contract with the intent to immediately transfer the policy to a third party, the contract lacks an insurable interest").

Even though the lender—Columbus Circle Capital LLLP ("Columbus Circle"), an entity operated by Kavanaugh—was owed a portion of the death benefit at the inception of the Policies, that does not mean that the insureds who participated in the KDI/Concordia Program were facilitating a "cover for a wagering contract" by Columbus Circle.  As noted above, the purpose of the KDI/Concordia Program was that the insureds' beneficiaries would obtain a portion of the death benefit when the insureds died.  Columbus Circle was owed a percentage of the death benefit because that was its compensation for acting as an interim lender.  (Ex. 4 at 57:5–57:19; Ex. 6 at 00018123 (¶5.2); Ex. 9 at 00018645 (¶5.2); Ex. 14 at 254:22–257:24, 270:15–271:10; Ex. 19 at 315:17–317:12; Ex. 13 at 004000 (¶7(a)), 4004-10.)  Columbus Circle was only providing interim financing until Kavanaugh could secure a long-term institutional lender, and the vast majority of the death benefit owed to the lender was designed to cover the cost of buying the annuity which would fund future premium payments.  (Ex. 3 at 142:13–142:21, Ex. 11 at 003958, 3961; Ex. 14

---

[6] To be clear, Securities Intermediary does not believe that *Sol*, *Van de Wetering*, and *Malkin* were correctly decided as they relate to invalidity, particularly under the Delaware Supreme Court's recent decision in *Estate of Berland*.

at 36:11–37:14, 268:16–269:17; Ex. 21 at 004290; Ex. 23 at 000618; Ex. 24 at 00018683.)

**B.    Columbus Learns the Key Facts Regarding the KDI/Concordia Program in 2003 and 2004**

Columbus did not bring lawsuits challenging the validity of the Policies until May 2020. But Columbus knew the key facts relating to the KDI/Concordia Program, which Columbus claims render the Policies invalid, nearly two decades earlier.

In late 2003 or early 2004, before Columbus issued the Policies, Columbus met with the people responsible for creating and marketing the KDI/Concordia Program, including Kavanaugh and two life insurance producers named Ed Leisher and Amy Holmwood.  (Ex. 4 at 27:12-30:3; Ex. 3 at 33:7–37:4; Ex. 19 at 192:12–194:6.)  Leisher and Holmwood ran a general agency called Potomac, which worked with insurance brokers who had clients interested in the KDI/Concordia Program.  (Ex. 4 at 14:16-16:7, 107:11-107:17; Ex. 19 at 35:18-37:20, 40:20-41:11, 42:4-43:7.) The meeting took place in Columbus' offices, and it involved some of Columbus' most senior executives.  (Ex. 4 at 25:17–30:3; Ex. 3 at 33:7–36:11.)  Holmwood still remembers the meeting vividly, because it was the first time she traveled to an insurance company's headquarters.  (Ex. 4 at 27:12-27:21.)

Columbus no longer has documents reflecting what specifically happened at that late 2003/early 2004 meeting, perhaps because Columbus waited another 17 years to file these lawsuits.  (Ex. 3 at 126:15–128:8, 137:22–138:11.)  But Columbus knows it learned about the KDI/Concordia Program at that meeting, and that this meeting occurred before Columbus issued the Policies (as well as several other policies associated with the KDI/Concordia Program).  (Ex. 3 at 33:7–33:20, 124:23–125:15.)  And significantly, Holmwood—one of the people who attended this meeting—testified that she was 100 percent certain that Columbus was informed during this meeting that the KDI/Concordia Program involved the use of non-recourse premium financing.

9

(Ex. 4 at 27:12–30:3, *see also id.* 95:5–98:3.)[7]

Several months after that meeting in Columbus' office (in the summer of 2004), Columbus issued the Romano Policy, the Cohen Policy, and several other premium financed policies that Columbus knew were associated with the KDI/Concordia Program. (Ex. 1; Ex. 2; Ex. 3 at 75:13–76:25.)  On June 25, 2004, Columbus exchanged emails with one of Leisher and Holmwood's colleagues concerning the "rush cases for KDI," in which Columbus was informed "[t]hese are straight premium finance cases," "the source of the funds … will be the same bank for all of these cases," and "[t]here are additional cases to come, [it's] only these 6 cases where we have the time crunch." (Ex. 25 at 002208; Ex. 3 at 75:13–76:25.)  The email specifically referred to the Romano Policy.  (Ex. 25.)  Hours later, Columbus circulated internal emails reflecting that the Romano Policy should be given "highest priority."  (Ex. 26 at 002211–2212; Ex. 3 at 298:11–299:14.)

Shortly after issuing the Policies, Columbus learned that both Policies had been assigned as loan collateral to Columbus Circle—an entity operated by Kavanaugh.  (Ex. 27; Ex. 28.)  On July 19, 2004 (for Romano) and August 13, 2004 (for Cohen), Columbus wrote to a Columbus Circle affiliate that "[w]e are in receipt of the special Collateral Assignment document, and as requested, have had this document reviewed by our legal staff."  (Ex. 27 at 002251; Ex. 28 at 004216.)  Columbus wrote, "[o]ur attorneys have recommended that we provide you with the attached signed Acknowledgement of Assignment."  (Ex. 27 at 002251; Ex. 28 at 004216.)  Columbus admitted that its attorneys reviewed the "Assignment of Life Insurance Policy as Collateral" contracts for both Policies, which gave Columbus Circle the right to acquire the

---

[7] Columbus testified during its deposition that Columbus was told during the late 2003/early 2004 meeting that the KDI/Concordia Program involved *recourse* loans.  (Ex. 3 at 300:3–301:8.)  Columbus' testimony is contradicted by Holmwood's testimony, and is also inconsistent with how Columbus learned no later than September 2004 that the KDI/Concordia Program involved non-recourse loans.  (*See* p. 11–12 *infra*.)

Policies if the insureds' trusts (which themselves owned the Policies) defaulted on the premium finance loans.  (Ex. 27 at 002257; Ex. 28 at 004222; Ex. 3 at 86:2-89:18, 96:14–97:20, 112:17–118:5.)

To the extent Columbus truly did not know that the Policies involved non-recourse premium financing at this point (it did), any doubt was resolved one month later.  On September 21, 2004, Columbus attended a WebEx meeting with representatives of the KDI/Concordia Program, in which they explained the KDI/Concordia Program to Columbus in detail.  (Ex. 3 at 121:21–157:1; Ex. 11 at 003937-66; Ex. 13 at 003996-4038.)  This was the second time Columbus attended a presentation regarding the KDI/Concordia Program.  (Ex. 3 at 123:3–123:6.)  After the meeting, a Columbus Circle representative emailed Mark Wilkerson—who was then Chief Marketing Officer at Columbus—the PowerPoint that had been presented at the meeting, as well as samples of the types of Participation Agreement and Trust Agreement that insureds had to sign to participate in the KDI/Concordia Program.  (Ex. 11; Ex. 13; Ex. 3 at 120:21–123:6, 146:18–148:19.)  Those materials were then circulated internally at Columbus among its senior executives.  (Ex. 11 at 003937; Ex. 13 at 003995.)  Columbus admitted it knew the contents of the sample Participation and Trust Agreements, and reviewed both documents.  (Ex. 3 at 114:18–157:1.)

The sample Participation Agreement made clear that the KDI/Concordia Program involved premium financing that was non-recourse to the insured.  Section 6 of the Participation Agreement provided that the life insurance policies would be pledged as collateral on the premium finance loans, and "[i]n the event the Trust is unable to fulfill its obligations under the loans and such other agreements, the lenders and such other parties will have the right to obtain ownership of the life insurance policies pledged as security for the loans and such other agreements." (Ex. 13 at 003999-4000.)

Section 12 stated that the loans would be non-recourse to the insureds:

> It is expressly understood and agreed by the parties hereto that …
> (d) *under no circumstances shall the Trustee, the Insured or the Owners be personally liable for the payment of any indebtedness or expenses of the Trust or be liable for any breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trust under this Participation Agreement, the Trust Agreement or any other document*.

(*Id.* at 004001 (emphasis added).)  Holmwood testified that the purpose of Section 12 of the Participation Agreement was that "[i]t's a nonrecourse loan.  And so without that wording in this … document, I don't believe that anyone would have signed this document, because this was a foundational piece of a nonrecourse premium finance transaction." (Ex. 4 at 45:6-10; *see also id.* 44:3–45:10, 149:15–151:5.)  The sample Trust Agreement made the same point—namely, that the trust's owners "*shall not be liable for any liabilities and obligations of the Trust*." (Ex. 13 at 004017 (¶2.6) (emphasis added).)

The Participation Agreement clearly stated that the insured's beneficiary would receive a portion of the policy's death benefit capped at a particular amount depending on when the insured died.  Section 7(a) explained that "[u]nder the Trust Agreement, the Owners shall be entitled to receive, subject to prior liens of lenders and the satisfaction of the obligations of the Trust, the portion of the death benefit allocated to the Owners, as described in the attached schedule (the "scheduled death benefit")." (Ex. 13 at 004000.)  Section 8(b) also provided:

> Under no circumstances can the Owners or any permitted successor(s) or assign(s) of the Owners' beneficial interest in the Trust receive a distribution from the Trust of a portion of the death benefit from the life insurance policies on the life of the Insured that is greater than the Owners' allocable scheduled death benefit as set forth on the attached schedule.

(*Id.* at 004000.)  The Participation Agreement attached a Scheduled Death Benefit chart which showed that the insured's beneficiary would obtain a portion of the death benefit that increased

12

over time.  (*Id.* at 004004.)  For example, if the insured died in year 3, the insured's beneficiary would obtain a ███████████ on a █████ policy, whereas if the insured died in year 16, the insured's beneficiary would obtain a ████████ payout on a ████████ policy.  (*Id.*)

The PowerPoint also left no doubt that the KDI/Concordia Program involved the use of premium financing and that the insured was only entitled to a portion of the death benefit.  (Ex. 11 at 003958-62.)  The PowerPoint showed that the policy's death benefit would be split between the insured's beneficiary and the lender according to a "scheduled death benefit" payout chart, which depended entirely on how long the insured lived.  (*Id.* at 003958.)  For example, in a case involving a ████████ death benefit, if the insured died in Year 3, the insured's beneficiary would receive ████████; if the insured died in Year 15, the insured's beneficiary would receive ████████ (*Id.*) Columbus reviewed this document as well.  (Ex. 3 at 156:16–157:1.)

### C.      Cohen and Romano Sell Their Policies in 2004

Kavanaugh was ultimately unable to secure the long-term financing from an institutional lender that was needed to buy the annuities which were to be used to keep the life insurance policies in force.  (Ex. 21 at 004290-91; Ex. 4 at 66:20–67:11; Ex. 14 at 72:22–73:7; Ex. 4 at 238:5–17, 240:23–241:18.)  Kavanaugh also did not want to provide long-term financing through Columbus Circle, which was only meant to act as an interim lender while Kavanaugh negotiated with institutional banks.  (Ex. 14 at 69:23–70:13, 84:8–85:25; Ex. 21 at 004290-91; Ex. 4 at 66:11– 72:13.)  Because of the inability to obtain long-term financing, the majority (but not all) of the insureds who took out policies as part of the Concordia Plan decided to sell their policies.  (Ex. 14 at 69:23–70:13, 84:8–85:25.)

On April 14, 2005, Cohen and Romano both signed contracts titled "Authorization to Sell Life Insurance Policy to Pay Off Premium Finance Loan," in which they had the option of (1) authorizing Columbus Circle to sell the Policies and using the proceeds to repay the loans, or (2)

repaying Columbus Circle the loan balances and keeping the Policies.  (Ex. 29 at 0000010-13; Ex. 30 at 000002; Ex. 33; Ex. 14 at 84:14–85:19; 121:5–123:6.)  Cohen and Romano both elected to sell their Policies.  (*Id.*)  On April 21, 2005, Columbus Circle entered into a Purchase and Sale Agreement to sell the Policies to Invest SLPS LLC (an entity not affiliated with Columbus Circle or Kavanaugh) alongside dozens of other KDI/Concordia Program policies.  (Ex. 31 at 00000010–11; Ex. 14 at 84:13-85:8.)  Cohen and Romano both profited from the sales of their Policies because the sale proceeds exceeded the loan balance.  (Ex. 93; Ex. 14 at 160:20-163:9, 261:24-262:19.)

### D.    Columbus Continues to Analyze the KDI/Concordia Program in 2005

In May 2005, Columbus began taking steps to address the existence of STOLI policies in its book of business and the market generally, with a focus on premium financed policies.  (Ex. 32.)  In doing so, Columbus informed its producers, among other things, that it would no longer accept policies where insureds used non-recourse loans to pay premiums and were intending to sell the policies.  (Ex. 32; Ex. 34.)  For example, in a May 2005 memo, Columbus wrote that "we wish to make clear our position in not accepting applications taken as a part of a non-recourse premium financing program which may violate insurable interest or other insurance or consumer protection laws."  (Ex. 32 at 000002.)  On July 18, 2005, Columbus wrote "Columbus Life is *not* interested in writing investor-owned type business," and "we are also not interested in business where non-recourse notes make selling the policy to a secondary market maker attractive."  (Ex. 34 at 000014.)

At the same time, Columbus executives were communicating regarding the KDI/Concordia Program.  On May 11, 2005, Columbus recirculated the KDI/Concordia PowerPoint presentation that Columbus' executives had reviewed in September 2004.  (Ex. 35 at 003936-3995.)

14



(Ex. 36 at 0009221-72; Ex. 3 at 180:21–191:9.).

(Ex. 36 at 0009272.)

Columbus focused on how Potomac—Leisher and Holmwood's agency that marketed the KDI/Concordia Program—was connected to a significant percentage of Columbus' policies on elderly individuals.  (*Id.* at 0009239-40, 9242, 9272.)[8]

**E.    Columbus Investigates the KDI/Concordia Program in 2005.**

On August 3, 2005, Columbus received a letter from the Erwin & Johnston LLP law firm, seeking information about the Cohen Policy, the Romano Policy, and several other KDI/Concordia Program policies.  (Ex. 37 at 000306.)  Three weeks later (on August 25, 2005), Columbus responded to Erwin & Johnson that it could not provide the requested information until Erwin & Johnson submitted an application to change the trustee associated with the policies.  (Ex. 38 at 000307.)  On September 7, 2005, the Capital Trust Company of Delaware—the trustee of the Janet Cohen Delaware Trust—submitted forms to Columbus seeking to change the owner and beneficiary on the Cohen Policy to an entity called 70091V Life Settlement Trust, c/o Erwin & Johnson LLP, as Trustee.  (Ex. 39 at 000334, 4239-4241.)

In response, Columbus launched an investigation into policies that were associated with the KDI/Concordia Program, including the Cohen and Romano Policies.

---

[8] There is evidence that Columbus had a meeting with representatives of the KDI/Concordia Program in 2005, but the specifics are not clear 15 years later.  (Ex. 114 at 002245–47; Ex. 21 at 004291; Ex. 4 at 45:15–49:20; Ex. 3 at 193:12–196:5; Ex. 94 at 109:19–111:18.)



(Ex. 40 at 004341-4342.)

(*Id.* at 004342.)

(Ex. 41 at 000311 (emphasis added).)  Columbus testified that "these and other policies" referred to policies that Columbus knew were part of the KDI/Concordia Program, which would include both the Cohen and Romano Policies.  (Ex. 42 at 71:11–73:8.)[9]

What type of insurable interest investigation Columbus conducted 17 years ago with respect to the KDI/Concordia Program has been lost with the passage of time.  One of Columbus' 30(b)(6) witnesses (Robert Noschang) testified that Columbus never completed any insurable interest review.  (Ex. 42 at 73:9–85:12.)  According to Mr. Noschang, Columbus considered doing an insurable interest review, but decided to focus on whether it could rescind policies in the KDI/Concordia Program for undisclosed, in-force insurance coverage in the policy applications.

---

[9] Although Columbus cannot locate the attachment sent with the final September 7, 2005 letter, Columbus has no reason to believe that the final letter contained a list of policies that was different from the draft letter.  (Ex. 3 at 219:18–220:8.)  Accordingly, when Columbus wrote that it was "reviewing insurable interest issues in connection with both attempted transfers and procurement of these and other policies," Columbus was referring to the Cohen Policy (because the Cohen Policy was listed on the attachment) as well as the Romano Policy (because the Romano Policy was one of the KDI/Concordia Program policies).

(*Id.* at 81:5–18.)  Another one of Columbus' 30(b)(6) witnesses (Lisa Fangman) conceded that Columbus conducted an insurable interest review based on the contents of Columbus' September 7, 2005 letter to Erwin & Johnson, but testified that Columbus could not locate any documents evidencing the scope of the review nearly two decades later.  (Ex. 3 at 220:9–223:15, 250:4–251:21.)  Mark Wilkerson—Columbus' former Chief Marketing Officer—remembers Columbus conducted an insurable interest review concerning policies associated with Leisher (one of the KDI/Concordia producers), but has no memory of the specifics of this insurable interest review. (Ex. 94 at 132:16-137:4.)

Significantly, the vast majority of the people who were employed at Columbus Life during the September 2005 time period, and which appear on the relevant emails from this time period, are no longer at Columbus.  (Ex. 3 at 265:2–269:20.)  Columbus also does not necessarily retain its former employees' documents.  (*Id.* at 265:6–269:23, 289:5–289:15.)  Columbus' 30(b)(6) witnesses did not speak with any current or former employees in order to prepare for their depositions; instead, they only met with Columbus' outside counsel and in-house attorney, neither of whom were percipient witnesses to events in 2005.  (Ex. 3 at 25:2–26:6, 210:1–21; Ex. 42 at 18:20–20:2.)

Moreover, in January 2019—approximately one year before Columbus filed these lawsuits and shortly before Columbus began investigating the Policies (for a second time) with its outside counsel—Columbus' parent company Western & Southern Financial Group ("W&S") implemented a company-wide email destruction policy that resulted in the loss of documents created prior to January 2016.  (Ex. 3 at 259:19–260:16; Ex. 43; Ex. 44 at 004455–004458.) According to W&S, one of the benefits was that it would "[r]educe[] litigation and regulatory risk by helping to manage the amount of searchable content as well as the cost associated with

searching emails for these purposes." (Ex. 44 at 004455.) As a result, many documents relating to Columbus' review, or which are otherwise relevant to this litigation, were likely destroyed by Columbus a year before Columbus finally got around to filing this lawsuit because there were only limited circumstances in which they would be retained. (Ex. 3 at 284:8–291:25.)

Regardless of what happened 17 years ago, the documents that remain available demonstrate that between September and December 2005, Columbus undertook an investigation into the KDI/Concordia Program, took steps to rescind a handful of those policies where it believed the insureds had made material misrepresentations, and decided to rescind at least one policy. (Ex. 40 at 004340–42; Ex. 41 at 000311; Ex. 45 at 004382–84; Ex. 46 at 004348–49; Ex. 47 at 004336-39; Ex. 96 at 004343; Ex. 97 at 004335; Ex. 98 at 004344; Ex. 99 at 004385-87; Ex. 3 at 216:20–227:24, 242:18-246:4; Ex. 42 at 59:19–101:19.) During this time period, Columbus wrote to Leisher and Holmwood—the KDI/Concordia producers—making clear Columbus was "further investigating the purpose of insurance disclosed in the application, as well as the patterns and practices related to this and other insurance policies." (Ex. 45 at 004383, 004384; Ex. 46 at 004349; Ex. 3 at 225:7–225:9; Ex. 42 at 88:8-89:18.) Columbus contemplated making phone calls to certain insureds, but Columbus does not know nearly two decades later which of the insureds (if any) Columbus ultimately contacted. (Ex. 47 at 004336-39; Ex. 42 at 91:16-93:21; Ex. 3 at 244:7-245:7.)

During this investigation, Columbus also learned why insureds who participated in the KDI/Concordia Program had decided to sell their policies. Holmwood—a producer associated with the KDI/Concordia Program—sent Columbus a letter explaining why the KDI/Concordia Program had failed. (Ex. 21.) Holmwood told Columbus that the lender they had previously used for earlier tranches of the KDI Plan, AI Credit, was no longer able to provide competitive

financing.  (*Id*. at 004290.)  Holmwood explained that the people running the KDI/Concordia Program had decided to implement a block of policies through interim financing, with the expectation that a different lender would refinance the debt.  (*Id*.)  Once the refinancing efforts failed, the insureds decided to sell the policies to a third-party buyer.  (*Id*. at 004291.)  Holmwood informed Columbus that the insureds never had any intent to sell the polices to an investor at the time they were procured.  (*Id*.)

### F.    Columbus Flags the Policies on STOLI Lists from 2006 Through 2014.

In 2006, Columbus began tracking what it called "potential investor owned/life settlement polices."  (Ex. 48 at 007876.)  Columbus initially tracked these policies on an internal Columbus webpage.  (Ex. 42 at 178:5–18, 179:6–10.)  In December 2010, Columbus began circulating reports via email concerning "Possible Investor Owned / Life Settlement Policies," which flagged both the Cohen and Romano Policies.  (Ex. 49 at 007856, 7863.)  Columbus testified that these reports were designed to capture policies that Columbus believed were potentially STOLI policies or potentially life settlement policies.  (Ex. 42 at 208:1–17.)  Columbus updated these reports regularly from 2010 through 2014, consistently flagging the Cohen and Romano Policies.  (Ex. 50 at 006537, 006544; Ex. 51 at 008989, 008996; Ex. 52 at 004092, 004099; Ex. 53 at 004979, 004986; Ex. 54 at 005378, 005384; Ex. 42 at 246:13-247:3.)  Columbus testified that both Policies were flagged on Columbus' internal webpage at some point between 2006 and December 2010, but it did not know when.  (Ex. 42 at 180:10–21.)

Separately, in January 2012, Columbus' then-president J.J. Miller requested that Columbus prepare a separate report with a different methodology designed to capture STOLI policies more surgically.  (Ex. 55 at 004501; Ex. 42 at 233:3–7, 235:19–22.)  Columbus' search methodology focused on policies issued between 2003 and 2006, with face amounts of $5 million or greater, that were issued on insureds who were older than 70.  (Ex. 55 at 004501.)  Based on that targeted

19

search, Columbus found 69 policies that were in force as of December 31, 2011. (*Id.* at 004502.) Although the STOLI spreadsheet specifically requested by Columbus' president did not include the names of any insureds or policy numbers, Columbus testified that—based on its search criteria—the STOLI report included both the Cohen and Romano Policies. (*Id.* at 004502; Ex. 42 at 232:10-244:6.)

Columbus evidently stopped tracking STOLI policies at the end of 2014. According to one of Columbus' 30(b)(6) witnesses, Columbus believed its STOLI-tracking efforts were not worthwhile because Columbus believed it was "stuck with" policies that were potentially STOLI. (Ex. 42 at 246:13–250:12.) Columbus' testimony, in that regard, gets at one of Columbus' main defenses—namely, the facially absurd proposition that nobody at Columbus knew it was possible to challenge a policy as void *ab initio* after the two-year contestability period until one of Columbus' employees attended a conference in October 2018 and learned about the Delaware Supreme Court's 2011 decision in *Price Dawe* for the first time. (Ex. 85 at 35:11-38:12; Ex. 42 at 254:1–257:15, 263:12–264:11; Ex. 3 at 160:25-161:11.)

There are myriad reasons why that argument strains credulity:

- Columbus' 30(b)(6) witnesses did not speak with anyone at Columbus—current or former employees—in order to prepare for their depositions (Ex. 3 at 25:2–26:6, 210:1–210:21; Ex. 42 at 18:20–20:2);

- One of Columbus' witnesses who was responsible for preparing certain STOLI lists testified that, during the relevant time period, he had no discussions with the majority of the Columbus executives who received the company's STOLI lists about their knowledge of STOLI litigation (Ex. 42 at 250:6–12, 258:2–264:11);

- Columbus has no records reflecting whether it ever contacted outside counsel before 2019 regarding the company's legal rights vis-à-vis STOLI policies (Ex. 3 at 95:12–96:11; Ex. 42 at 112:2–113:4, 158:9–159:11, 163:2–163:13, 260:8–261:12);

- Columbus implemented an email destruction policy in January 2019 that resulted in the loss of emails generated prior to January 2016 (Ex. 44 at 004455–4458; Ex.

                                   3 at 259:19–260:16);

- Columbus has had significant employee turnover over the last 15 years—including at the senior levels—and it does not necessarily retain documents generated by former employees (Ex. 3 at 264:14–269:20, 288:15–291:21).

Even if Columbus' argument were facially plausible—that a sophisticated insurer who was actively tracking STOLI policies from 2006 through 2014, with in-house lawyers, owned by a financial conglomerate with over $5 billion in revenues for 2020,[10] had *no clue whatsoever* that other carriers were bringing STOLI lawsuits until October 2018—it would not matter. As Judge Stark has explained, "[w]ith the release of *Price Dawe*, Sun Life also knew **(or should have known)** that it could invalidate STOLI policies even after the two-year incontestability period." *Sun Life Assur. Co. of Can. v. U.S. Bank Nat'l Ass'n*, 2019 WL 8353393, at *4 (D. Del. Dec. 30, 2019) (emphasis added). The same is true here.

### G.  Columbus Acknowledges Six Ownership and Beneficiary Changes, and Consistently Represents that the Policies are Active, In-Force Policies.

From 2005 through 2019, Columbus did not take any steps to rescind the Policies, file lawsuits regarding the Policies, or notify the Policies' owners that Columbus had questions regarding insurable interest, even though Columbus had, among other things, learned the Policies involved non-recourse premium financing in 2003–2004, started generating anti-STOLI documents in 2005, conducted an internal investigation into the KDI/Concordia Policies in 2005, and began flagging the Policies as potentially STOLI beginning in 2006. Not until July 2019—15 years after Columbus began collecting premiums on the Policies—did Columbus send Securities Intermediary a reservation of rights letter. (Ex. 115; Ex. 116; Ex. 114 at 004542-43, 004546–47.)

        Instead, from 2005 through 2017, Columbus Life approved six separate ownership and

---

[10]  Western & Southern Financial Group, 2020 Annual Report at 5, https://www.westernsouthern.com/-/media/files/wsfg/2020-annual-report.pdf

beneficiary changes on the Policies—including when Securities Intermediary acquired the Policies—never once raising its suspicions regarding the Policies' validity.  (Ex. 42 at 116:19-119:12; Ex. 56; Ex. 57; Exs. 62–71.)  In the process of acknowledging ownership and beneficiary changes, Columbus learned both Policies were under the control of a receiver, after the SEC brought an enforcement action against ABC Viaticals—the entity that beneficially owned the Policies.  (Ex 42 at 154:3-164:12; Ex. 87; Ex. 88; Ex. 89; Ex. 90.)  In January 2009, after learning that the SEC receiver was selling the Policies as part of a court-approved sale process, Columbus approved the ownership and beneficiary changes to Orca LSI Trust.  (Ex. 42 at 154:3-164:12; Ex. 91; Ex. 92.)  And in certain instances, Columbus' in-house attorneys even reviewed the ownership and beneficiary changes.  (Ex. 42 at 130:2-134:10; *see generally* Exs. 101-109.)

In addition to confirming ownership and beneficiary changes six times between 2005 and 2017, Columbus issued annual reports every year on both Policies, which Columbus admitted it only issues for active, in-force life insurance policies.  (Exs. 72–73; Exs. 75–76; Ex. 42 at 271:14–272:1.)  Columbus also issued dozens of verifications of coverage on the Policies over the life of the Policies, in which Columbus constantly represented to the Policy owners that the Policies were "active," "premium paying," and "in force."   (Exs. 77–80; Ex. 42 at 282:7–284:2.)  Columbus also sent out in-force policy illustrations, which Columbus only provides for active, in-force policies.  (Exs. 81–84; Ex. 42 at 302:19–304:17.)  And finally, Columbus has collected over $5,692,951.41 in premiums on the Romano Policy and $4,653,336.35 in premiums on the Cohen Policy from the inception of the Policies through Romano's death in 2022 and through the present for Cohen (who is still alive).  (Declaration of Ryan Harrison, dated April 28, 2022 ("Harrison Decl.") ¶¶ 3, 5; *see also* Exs. 115–116.)

**H.    Columbus Hires Cozen, and Conducts a Second Investigation Into the KDI/Concordia Policies in 2019 and 2020.**

In October 2018, a Columbus assistant vice president named Justin Payne attended a conference which included a marketing presentation on STOLI litigation by Cozen O'Connor—Columbus's counsel in this case.  (Ex. 85 at 28:10–33:16; Ex. 86.)  Columbus recalled that, during the presentation, Cozen explained that the firm had success litigating STOLI cases on behalf of carriers, and that Cozen believed there was an argument that courts would let carriers void policies and keep the premiums.  (*Id.* at 49:16–53:7; Ex. 86 at 006323–31.)

The idea that a carrier could be absolved of its obligation to pay a death benefit and yet keep premiums it collected on those policies was one of the key takeaways from Cozen's marketing presentation for Columbus.    (Ex. 85 at 49:16–66:18; Ex. 86 at CLIC-Cohen&Romano006323–31.)  Columbus admitted that one of the primary drivers in its decision to file these lawsuits is Columbus' belief that it can simultaneously invalidate the Policies, and not pay the $10 million in death benefits, and keep the $10.2 million in premiums it collected over the years on the Policies.  (Ex. at 63:16–67:6.)   In fact, Columbus conceded that these cases are "economically irrational" if it cannot keep premiums.  (Ex. 85 at 60:19–62:2, 154:2–155:8.)

Remarkably, Columbus also testified that the entire company—a wholly owned subsidiary of a $5 billion financial institution with an in-house legal department—learned about the Delaware Supreme Court's **September 2011** decision in *Price Dawe* and other cases involving STOLI policies for first time from Cozen's **October 2018** marketing presentation.  (Ex. 85 at 36:1–36:3; 45:18-48:19.)  Columbus' argument is implausible for the reasons described above, including that Columbus' witness did not consult with any current or former executives at Columbus about whether they knew about *Price Dawe*.  (Ex. 85 at 45:17–46:5.)

About six months after that marketing presentation, Columbus and Cozen began emailing

23

extensively regarding the Cohen Policy, the Romano Policy, other KDI/Concordia Program policies, and other Delaware-issued policies. (Ex. 43.) Columbus testified that the factual bases for these lawsuits were (1) its own documents regarding the Policies (which date back to 2004), (2) an interview with Rita Kluener's daughter (Ms. Kluener was another insured who took out a Columbus policy as part of the KDI/Concordia Program), and (3) discovery that Columbus obtained in the *Kluener* case—a case Columbus filed in the Delaware Superior Court seeking to invalidate Ms. Kluener's policy. (Ex. 85 at 80:2–100:20.) Columbus conceded that there was nothing preventing it from interviewing Ms. Kluener's daughter in 2005 or filing the *Kluener* case in 2005. (Ex. 85 at 128:4–131:6.)

Columbus' 30(b)(6) witness stressed that, in discovery in the *Kluener* case, it received a copy of the "Master Funding Agreement" that Ms. Kluener had entered into with Columbus Circle affiliate Carmel Group LLC ("Carmel Group")—the interim lender operated by Kavanaugh that temporarily financed the KDI/Concordia Program policies. (Ex. 85 at 80:8– 82:22.) Columbus claims it learned, for the very first time, that the KDI/Concordia Program policies involved non-recourse premium finance based on the Master Funding Agreement (Ex. 85 at 80:8–82:22, 89:10–90:20), which itself has a paragraph titled "NONRECOURSE BY LENDER." (Ex. 24 at 00018686; Ex. 23 at 000261.) Columbus claims the Master Funding Agreement supposedly accelerated its efforts to bring other cases concerning KDI/Concordia Program policies, including these cases. (Ex. 85 at 115:212–116:15.)

This argument is as implausible as Columbus' argument that nobody at the $5 billion company knew about the Delaware Supreme Court's September 2011 decision in *Price Dawe* until October 2018, and no rational juror could accept either one. Holmwood testified that she was 100 percent certain that Columbus was informed in early 2003 or early 2004 that the KDI/Concordia

Program involved non-recourse loans.  (*See* p. 12 *supra*.)  Columbus' attorneys reviewed the Assignment of Life Insurance Policy as Collateral contracts in July 2004 (for Romano) and August 2004 (for Cohen), which assigned the Policies as the collateral for the loans.  (*See* p. 10–11 *supra.*) Columbus received a sample Participation Agreement in September 2004 (*see* p. 11–12 *supra*), which stated in Section 12(d) that "under no circumstances shall the Trustee, the Insured or the Owners be personally liable for the payment of any indebtedness or expenses of the Trust or be liable for any breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trust under this Participation Agreement, the Trust Agreement or any other document."  (Ex. 13 at 004001.)  At the same time, Columbus received a copy of a sample Trust Agreement (*see* p. 12 *supra*), which made the same point in Section 2.6 (and Columbus testified that it was aware of its provisions).  (*Id.* at 004017 (¶2.6); Ex. 3 at 155:24–157:1.)

## I.    Viva Acquires the Policies 12 Years After the Policies' Inception.

In October 2016, Viva acquired the Cohen and Romano Policies as part of a portfolio that contained ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ("the Portfolio").  (Ex. 110 at 0000729.)  Viva acquired the Portfolio in a UCC sale, after Delta Lloyd, the lender to the prior Portfolio owner (the Orca Trust), foreclosed on the loan and sold the Portfolio.  (Ex. 111 at 61:10–14.)  Viva's investment adviser, Preston Ventures LLC ("Preston"), and its legal counsel conducted due diligence on the Portfolio on Viva's behalf.  (*Id.* at 63:25–64:5.)  But because the Portfolio was sold in a UCC sale, they only had access to the limited universe of documents made available in the data room.  (*Id.* at 123:14–127:11.)

The documents available in the data room would have included the Policies, Policy applications, HIPAA and medical information, a letter confirming the payoff of the premium finance loan used for the Policies, verifications of coverage and acknowledgments by Columbus, policy illustrations issued by Columbus, confirmation of premium payments, and any information

that would have suggested any issue or challenge to the Policies (had there been any). (*Id.* at
126:10–127:11.) Notably, the information regarding the Policies that was available in the data
room did *not* include the Participation Agreements, the Trust Agreements, or the Master Funding
Agreements, and accordingly, Viva did not have copies of these documents when it acquired the
Policies. (*Id.* at 130:21–131:5; 134:18–135:1.)

Unlike Columbus Life—which had extensive information about the KDI/Concordia
Program during the 2003–2004 time period—Viva and Preston did not know what the
KDI/Concordia Program was, or who Kavanaugh (the creator of the program) was; Viva and
Preston were not even aware of their existence at the time of their pre-acquisition diligence. (Ex.
111 at 166:13-22.) Viva and Preston similarly had no knowledge of who owned or operated
Columbus Circle, the premium finance lender for the Policies. (*Id.* at 165:7-24.) Instead, Viva
and Preston understood merely that, years prior, the Portfolio had been owned by ABC Viaticals,
which had been placed into an SEC receivership. (*Id.* at 187:2-14.) And, in fact, Viva and Preston
took comfort in the fact that the carriers had "not had any sort of negative reactions to these policies
over the decade of time that the policies were owned since" that "very public [SEC] investigation,"
and that at the time of Viva's acquisition, the Portfolio had a 100% payment rate for death benefit
claims. (*Id.* at 188:3–189:2.)

Based on the limited documents that they received in due diligence from the secured lender
running the UCC auction, Viva and Preston understood that the insureds used premium financing
to pay premiums but did not know whether the loans were recourse or non-recourse—that is, they
did not know whether the Insureds had any personal obligation to repay the loans. (Ex. 111 at
13:23–14:3, 131:23–132:3, 135:11–14.) Furthermore, Viva and Preston had no knowledge of the
structure of the KDI/Concordia Program itself, including no knowledge that the insureds used non-

recourse loans to pay premiums or that the lender was entitled to a portion of the death benefit at

the policy's inception.  (Ex. 111 at 166:13-22; 131:23-132:3; 135:11-14; *see generally* 172:22-

173:13 (explaining that Preston cannot speculate as to what it would have recommended had it

known the lender was entitled to a portion of the death benefit).)

Although sellers in UCC sales do not provide representations and warranties,[11] Viva was

able to obtain certain representations and warranties from the servicer to Delta Lloyd for the

Portfolio—Maple Life Analytics, LLC (which had serviced the Portfolio since 2010)—in

perpetuity for the Portfolio, which normally would have been unavailable in a UCC sale.  (Ex. 111

at 118:22–119:3; 144:9–23; 148:3–10; 172:6–7; 198:23–25.)  These representations included that

Maple's diligence/review of the Policies "did not disclose facts or circumstances which, in the

commercially reasonable judgment of [Maple] would raise a material question as to whether the

prima facie terms of the applicable insurable interest laws were met at the time of policy issuance."

(Ex. 112 at Preston-Cohen&Romano A0000066 (Representation #2); A0000072 (Exhibit C);

A0000138 (Schedule 1 to Exhibit C); *see also* Ex. 111 at 203:19-205:23.)  Maple confirmed for

Viva that, having serviced the Portfolio for six years and accumulated the documentation provided,

Maple was "not able to capture any more information than [w]hat was available in the data room."

(Ex. 111 at 172:6-17.)

Per industry standard and Preston's pre-acquisition diligence practice, Preston did not

make calls to insureds or brokers because doing so would have been "fruitless." (Ex. 111 at 185:9–

---

[11] As is standard practice for portfolios sold in a UCC lender foreclosure auctions, the lender and
seller did not provide any representations and warranties.  (Ex. 111 at 140:9–16; 142:20–22).  Orca
(the prior owner from whom Delta Lloyd foreclosed on the Portfolio) also did not provide any
representations or warranties.  (*Id.* at 142:20–22).  Viva also did not receive or request any
insurable interest representation or warranty with respect to the Portfolio, as these types of
representations and warranties are never supplied in any life settlement transaction per current
standard industry practice.  (*Id.* at 142:8–13).

15).  Preston's Rule 30(b)(6) witness explained that Preston did not contact insureds because it would not have been proper to do so until after the acquisition, when the insureds had been made aware of a new owner, as the insureds and their family "ha[d] an obligation [to provide information] only to the existing owner, not some prospective or potential owner."  (*Id.* at 69:20–71:3; 178:1–8; 180:10–18.)  Preston did not attempt to contact the insurance agents originally involved in the policies because the agents "have no incentive to talk to someone about anything that relates to any transactions that they did a decade before."  (*Id.* at 182:18–23.)

## III.    ARGUMENT

### A.    Securities Intermediary Is Entitled to an Automatic Return of Premiums.

Courts applying Delaware law have taken the near-universal position that carriers must *automatically* disgorge premiums if a policy is declared void *ab initio*.  *See Sun Life Assur. Co. of Can. v. Wilmington Tr., N.A.*, 2022 WL 179008, at *13-14 (Del. Super. Ct. Jan. 12, 2022) ("*De Bourbon/Frankel*"); *U.S. Bank Nat'l Ass'n v. Sun Life Assur. Co. of Can.*, 2016 WL 8116141, at *19 (E.D.N.Y. Aug. 30, 2016), *report and recommendation adopted*, 2017 WL 347449 (E.D.N.Y. Jan. 24, 2017) ("*Van de Wetering*"); *Sun Life Assur. Co. of Can. v. U.S. Bank Nat'l Ass'n*, 2016 WL 161598, at *18, *21 (S.D. Fla. Jan. 14, 2016) ("*Malkin I*"), *aff'd in relevant part*, 693 Fed. App'x 838 (11th Cir. 2017) ("*Malkin III*"); *PHL Variable Ins. Co. v. Chong Son Pak Life Ins. Tr.*, 2012 WL 13201401, at *1 (D. Del. July 25, 2012) ("*Pak*"); *PHL Variable Ins. Co. v. Virginia L. Lankow Life Ins. Tr.*, 2012 WL 13201402, at *1 (D. Del. July 25, 2012) ("*Lankow*"); *Principal Life Ins. Co. v. Lawrence Rucker 2007 Ins. Tr.*, 774 F. Supp. 2d 674, 682 (D. Del. 2011) ("*Rucker*"); *Lincoln Nat'l Life Ins. Co. v. Snyder*, 722 F. Supp. 2d 546, 564–65 (D. Del. 2010) ("*Snyder*"); *Sun Life Assur. Co. of Can. v. Berck*, 719 F. Supp. 2d 410, 418–19 (D. Del. 2010) ("*Berck*"); *cf. Sun Life Assur. Co. of Can. v. U.S. Bank Nat'l Ass'n*, 2019 WL 8353393, at *4 (D. Del. Dec. 30, 2019) ("*Sol III*").

28

Most recently (just three months ago), Delaware Superior Court Judge Johnston forcefully endorsed the automatic premium return rule when holding that "[a]s a matter of public policy, it would not be fair for Sun Life to retain all premiums, while never having to pay death benefits as agreed in exchange for receiving premiums," "the Court finds that Sun Life cannot be absolved from any obligations to pay death benefits *and* yet retain premiums," "Sun Life must disgorge premiums," and "[t]he Court finds that premiums cannot be retained where policies are declared invalid." *De Bourbon/Frankel*, 2022 WL 179008, at *13-14.

Judge Johnston's decision in *De Bourbon/Frankel* cited favorably to Judge Robinson's decision 12 years earlier in *Berck*—the first of six cases where this Court has held that carriers cannot keep premiums on void *ab initio* policies. Judge Robinson explained in *Berck* that "[t]he payment … [of] premiums is the consideration for which the insurer agrees to assume the risk specified in the policy." *Berck*, 719 F. Supp. 2d at 418 (quoting 5 Couch on Insurance § 69:2 (3d ed. 1996)). The *Berck* court wrote "[i]f an insurance company could retain premiums while also obtaining rescission of a policy, it would have the undesirable effect of incentivizing insurance companies to bring rescission suits as late as possible, as they continue to collect premiums at no actual risk." *Berck*, 719 F. Supp. 2d at 418–19; *see also, e.g.*, *Malkin I*, 2016 WL 161598, at *21 (policy owners are "entitled to a return of the premiums in order to prevent manifest inequity"); *Snyder*, 722 F. Supp. 2d at 564–65; *Rucker*, 774 F. Supp. 2d at 681–82.

Columbus will likely make several arguments as to why this Court should ignore these powerful precedents. The Court should reject each one.

***First***, Columbus will likely argue that the Delaware Supreme Court's decision in *Price Dawe* that policies lacking insurable interest are void *ab initio* overruled the *Berck* line of cases, which supposedly assumed incorrectly that policies lacking insurable interests are merely

29

voidable.  Columbus is wrong.  In *Berck*, Judge Robinson repeatedly referenced the carrier's argument that the policy was void *ab initio*—not merely voidable—which means the Court's premium ruling had nothing to do with the distinction between void and voidable contracts.  *See Berck*, 719 F. Supp. 2d at 418 (explaining "[i]n the event the Berman Policy is rescinded for being void ab initio, plaintiff seeks to retain some or all of the premiums it obtained from the policy.").  Judge Robinson also made this point in *Rucker*:  "Thus it is clear from *Berck* and *Snyder*, that under Delaware law Principal's argument that it may retain premiums received on the Policy that this court held to be void *ab initio* for lack of an insurable interest at inception necessarily fails." *Rucker*, 774 F. Supp. 2d at 682.

    ***Second***, Columbus will likely argue that the automatic premium refund rule is inconsistent with a phrase it cherry picks from *Della v. Diamond*, 210 A.2d 847 (Del. 1965), where the Delaware Supreme Court stated that, in the context of illegal agreements, "*ordinarily*, we think … neither party has a remedy to any extent against the other." *Id.* at 849 (emphasis added).  But the *Della* Court did not explain what "ordinarily" meant in this context, what circumstances would result in one party having a remedy against another party, or what that remedy would be.  *Della* also did not address a fact pattern remotely like that present here where one party (the carrier) has received full performance and is pointing to the illegality of a contract to be relieved of having to provide any counter-performance whatsoever.  By trying to keep the $10.3 million in premiums on the Policies, Columbus is attempting to enforce one side of a void contract—which *Price Dawe* prohibits.  *See Price Dawe*, 28 A.3d at 1067.

    ***Third***, Columbus may argue that *Berck* and its progeny rest on rescission principles, and it is conceptually impossible to rescind a void *ab initio* contract.  Columbus' argument will probably rely on the Delaware Supreme Court's statement in *Norton v. Poplos*, 443 A.2d 1 (Del. 1982), that

"the equitable remedy of rescission results in abrogation or 'unmaking' of an agreement, and attempts to return the parties to the status quo." *Id.* at 4. From there, Columbus will likely argue that, for void policies, rescission cannot apply because there is no "agreement" to "unmake." This argument fails for many reasons, including that "[r]escission … permits the claimant to reverse a contractual exchange and recover a performance thereunder, without regard to whether the underlying contract would be classified as 'void' from its inception or merely 'subject to avoidance,'" and "[r]escission … may therefore be employed to reverse transfers made under unenforceable or illegal agreements[.]" Restatement (Third) of Restitution and Unjust Enrichment 54, cmt. a & Reporter's Note a.

**Fourth**, Columbus will likely argue that, in *Seck*, Judge Streett rejected *Berck*, *Snyder*, and *Rucker*. *See Seck I*, 2019 WL 8198323, at *3. That argument fares no better. In *De Bourbon/Frankel*, Judge Johnston described *Seck* as an "outlier" that "should be strictly limited to the unique facts in that case" and as "inconsistent with the great weight of authority." Mot. to Compel Hr'g Tr. 45:8-45:21, *Sun Life Assurance Co. of Can. v. Wilmington Trust N.A.*, No. N17C-08-331 (ECF No. 251) (Del. Super. Ct. Nov. 10, 2020) (Johnston, J.). When the *De Bourbon/Frankel* court issued its summary judgment decision on return of premiums, the court did not even cite *Seck*. *See De Bourbon/Frankel*, 2022 WL 179008, at *12-14.[12]

**Finally**, Columbus may assert that this Court already ruled that Securities Intermediary can only recover premiums if it can prove restitution (as opposed to an automatic return of premiums).

---

[12] Even Judge Streett would agree that *Berck*, *Snyder*, and *Rucker* apply here, where Columbus is simultaneously seeking to void the Policies as STOLI and keep the premiums. *See Brighthouse Life Ins. Co. v. Geronta Funding*, 2019 WL 8198324, at *3 (Del. Super. Ct. Mar. 14, 2019) ("*Seck II*") (distinguishing the *Berck* line of cases on the grounds that "[i]n *Snyder* and *Berck* the District Court held that the insurer could not both rescind an insurance policy and retain the premiums," and "*Snyder*, *Berck*, and *Rucker* involved STOLI policies").

*See Columbus Life Ins. Co. v. Wilmington Tr., N.A.*, 2021 WL 1820573, at \*8 (D. Del. May 6, 2021) ("I view the counterclaim as essentially a request for restitution.").  To the extent Columbus makes that argument, Securities Intermediary does not read this Court's motion to dismiss decision so narrowly.  It is true this Court cited the Restatement (Second) of Contracts § 198 and *Seck I*—the test that Columbus will urge this Court to adopt here.  *See id.* at \*8.  But this Court also noted "[t]he Delaware Supreme Court has yet to tell us whether and under what circumstances restitution can be recovered from an insurer when a policy is found to be an illegal STOLI policy," and then cited *Van de Wetering*, *Pak*, *Lankow*, *Rucker*, *Snyder*, and *Berck*—all of which are automatic premium return cases.  *See id.* at \*9.

This Court also cited the Restatement (Third) of Restitution and Unjust Enrichment § 32, *see id.* at \*8, which states "[i]n the context of an illegal contract … contractual performance by a party who does not receive (and cannot compel) the promised counterperformance will frequently result in the unjust enrichment of the recipient and a prima facie entitlement to restitution." Restatement (Third) of Restitution and Unjust Enrichment § 32, cmt. b.  The *Seck* court never considered that newer Restatement provision when endorsing the Restatement (Second) of Contracts §§ 197–198 as the applicable premium test on the unique facts of that case.  And finally, the distinction between rescission and restitution that Columbus will likely draw has become blurred.  As the Restatement (Third) of Restitution and Unjust Enrichment makes clear, "[r]escission is the common, shorthand name for a composite remedy (more fully, "rescission and restitution") that combines the avoidance of a transaction and the mutual restoration of performance thereunder."  Restatement (Third) of Restitution and Unjust Enrichment § 54, cmt. a; *see also id.* ("The object of *rescission* in the *law of restitution* is the reversal of a transfer of property.") (emphasis added)).

**B.      Securities Intermediary Is Entitled to a Return of Premiums Under the Restatement (Second) of Contracts §§ 197–198.**

Even if this Court were to accept *Seck*'s outlier approach, Securities Intermediary is still entitled to a premium refund under Sections 197–198 of the Restatement (Second) of Contracts (relied upon by *Seck*). *See, e.g.*, *Brighthouse Life Ins. Co. v. Geronta Funding*, 2021 WL 4080672, at \*1, n.8, \*24 (Del. Super. Aug. 20, 2021) ("*Seck IV*") (appeal docketed); *Seck I*, 2019 WL 8198323, at \*4.   There are three independent grounds for restitution under the Restatement (Second) of Contracts §§ 197–198:  (1) when refusing to order a premium refund would result in a disproportionate forfeiture; (2) when the policy owner is excusably ignorant of the facts giving rise to the policy's invalidity; or (3) when the carrier is more culpable than the policy owner. Restatement (Second) of Contracts §§ 197–198.  Securities Intermediary is entitled to a premium refund under all three prongs.

**1.      Section 197:  Disproportionate Forfeiture**

Restatement (Second) of Contracts § 197 provides "[e]xcept as stated in §§ 198 and 199, a party has no claim in restitution for performance that he has rendered under or in return for a promise that is unenforceable on grounds of public policy *unless denial of restitution would cause disproportionate forfeiture*."  Restatement (Second) of Contracts § 197 (emphasis added).  The term "forfeiture" refers to "the denial of compensation that results when the obligee loses his right to the agreed exchange after he has relied substantially, as by preparation or performance, on the expectation of that exchange."  *Id*. cmt. b.  Whether a forfeiture is disproportionate "depend[s] on the extent of that denial of compensation as compared with the gravity of the public interest involved and the extent of the contravention [of public policy]."  *Id*.  Certain courts have found disproportionate forfeitures where a party "receives an enormous windfall at no cost whatsoever." *Boling v. Prospect Funding Holdings, LLC,* 324 F. Supp. 3d 887, 895 (W.D. Ky. 2018); *see also*

*Telecomms. Law Prof'ls PLLC v. T-Mobile US, Inc.*, 2015 WL 13159051, at *8 (D.D.C. Jan. 12, 2015) (where party "would forfeit the alleged value of its … services without receiving the benefit … it bargained for with a sophisticated business client").

It is difficult to image a more extreme windfall than what Columbus seeks here: Columbus is asking the Court to let it (1) avoid its obligation to pay $10 million in death benefits on the Policies and (2) keep the $10.3 million in premiums (as of today) that it collected in exchange for agreeing to pay those death benefits. Put differently, Columbus wants this Court to enforce only one side of a void contract. Viva purchased the Policies and all associated rights (including the right to any return of premiums (*see* p. 43–44 *infra*), and Viva has consistently paid premiums to Columbus for the sole purpose of keeping the Policies in force and collecting the death benefits when due. Denying restitution would result in disproportionate forfeiture; Columbus would be able to retain the $10.3 million in premiums paid on the Policies at no cost whatsoever because it does not have to pay the $10 million in death benefits.

Without any credible argument as to why this would not result in a windfall to Columbus, Securities Intermediary expects that Columbus will assert that ordering a premium refund would be bad public policy. But it is not bad public policy for a downstream, tertiary market acquirer— who was not involved in the transaction that gives rise to the policy's illegality—to obtain a return of premiums. Viva invests in life settlements, and *Price Dawe* makes clear that it is perfectly legal to buy and sell policies in the life settlements market. *See Price Dawe*, 28 A.3d at 1069–70 Viva acquired the Policies in 2016, more than 12 years after Columbus began collecting premiums on the Policies, approving ownership and beneficiary changes, and representing that the Policies were in force. (*See* p. 21–22 *supra*.) The bad public policy is what Columbus urges this Court to accept—that Columbus can void the policies, and keep the premiums. *See, e.g., De*

*Bourbon/Frankel*, 2022 WL 179008, at *13 – 14 ("As a matter of public policy, it would not be fair for Sun Life to retain all premiums, while never having to pay death benefits as agreed in exchange for receiving premiums."); *Berck*, 719 F. Supp. at 418–419.

### 2.    Section 198(a):  Excusable Ignorance

Restatement (Second) of Contracts § 198(a) provides that "[a] party has a claim in restitution for performance that he has rendered under or in return for a promise that is unenforceable on grounds of public policy if (a) he was excusably ignorant of the facts or of legislation of a minor character, in the absence of which the promise would be enforceable." Restatement (Second) of Contracts § 198(a).  The Restatement further provides that "[w]hether ignorance is excusable is governed by the same considerations as stated in § 180," which in turn provides "good faith is expected on the part of the party who claims ignorance and he cannot blind his eyes because he does not wish to see."  Restatement (Second) of Contracts § 198(a), cmt. a; Restatement (Second) of Contracts § 180, cmt. a.

No rational juror could find that Viva was anything other than excusably ignorant, and Judge Streett's decision in *Seck* is helpful in understanding why.  In *Seck*, Judge Streett held that the policy owner was *not* excusably ignorant because it had "made the deliberate decision to superficially look at the Seck Policy by solely focusing on whether it was active," and "purposefully ignored the possibility that some of the unexamined policies in the bulk purchase might have been unenforceable."  *Seck IV*, 2021 WL 4080672, at *19. The Seck court described the policy owner's due diligence as "extremely limited" because the policy owner examined only "a small sample of policies (that did not include the Seck Policy)" as part of its due diligence of 189 policies, did not review information in the data room (where information concerning the policies in the portfolio was housed), and sought to verify whether the insureds were alive only after it acquired the policies because "this would allow the [policy owner] to receive death benefits

without having to pay any premiums on any policy where the insured was already deceased." *Id.* at \*20.

None of the facts in *Seck* even come close to the undisputed facts described above. (*See* p. 25–28 *supra*.) For example, Viva—through its investment adviser Preston—reviewed all of the information made available in the UCC foreclosure sale data room, which the Portfolio servicer represented was the total universe of information available to it. (Ex. 111 at 123:14-127:11; 172:6-17.) Viva even went above and beyond normal due diligence, securing representations and warranties from the servicer which are not typically available in a UCC sale. (*Id.* at 118:22-119:3; 144:9-23; 148:3-10.) Although there are documents Viva did not review—such as Participation Agreements and Trust Agreements—that is because the seller did not have those documents, did not put them in the data room, or otherwise make them available to Viva. (*Id.* 130:21-131:5; 134:18-135:1.) And the additional information not collected by Viva included information that— per industry standards—is *never* collected during pre-acquisition due diligence, such as contacting the insureds or the original policy agents directly. (Ex. 111 at 185:9-15; 69:20-71:3; 178:1-8; 180:10-18; 182:18-23.)

### 3.    Section 198(b):  Comparative Culpability

Section 198(b) of the Restatement (Second) of Contracts provides that "[a] party has a claim in restitution for performance that he has rendered under or in return for a promise that is unenforceable on grounds of public policy if … (b) he was not equally in the wrong with the promisor." Restatement (Second) of Contracts § 198(b). There is no doubt that Columbus is more "in the wrong" than Viva.

Judge Stark's decision in *Sol III* is instructive. After Judge Stark ruled that the policy was void *ab initio*, the policy owner prevailed at trial on its promissory estoppel claim. *See Sol III*, 2019 WL 8353393, at \*1. The policy owner and the carrier then litigated whether the proper

measure of damages was expectation damages (*i.e.*, the death benefit), reliance damages (*i.e.*, the premiums paid by the policy owner plus the price the policy owner paid to buy the policy), or restitution damages (*i.e.*, the total premiums received by the carrier since the policy's inception). *See id.* at \*3–4.  In ruling that restitution damages were the correct measure of damages, Judge Stark undertook the equivalent of a Restatement (Second) of Contracts § 198(b) analysis by comparing the policy owner's culpability to the carrier's culpability, and held that the carrier had to return all the premiums that it had collected over the life of the policy to the current policy owner—regardless of whether that policy owner itself had paid the premiums, or if a prior owner of the policy had paid the premiums.  *See id.* at \*4 & n.6.[13]  In doing so, Judge Stark cited *Berck*, *Snyder*, and *Rucker*.  *Id.* at \*4.

In this case, Columbus is clearly more culpable than Viva, just as the carrier was more culpable than the policy owner in *Sol III*.

***Columbus Life.***  Columbus learned the KDI/Concordia Program involved non-recourse premium finance as early as late 2003 or early 2004 when it hosted a meeting with representatives of the KDI/Concordia Program.  (*See* p. 9 *supra*.)  If Columbus did not know that the KDI/Concordia Program involved non-recourse loans at that time, there is no doubt that Columbus learned that information in September 2004, when it received sample Participation and Trust Agreements.  (*See* p. 11–12 *supra*.)  The Participation Agreement stated that the policies would be the collateral for the loans and the insureds would *not* be "personally liable for the payment of any indebtedness of expenses of the Trust."  (Ex. 13 at 004000, 4001.)  That same Participation Agreement made clear that the insured's beneficiary would only obtain roughly ███ of the

---

[13] Both parties cited to Judge Streett's decision in *Seck I* and the Restatement (Second) of Contracts 198 in their post-trial briefs.  (*See Sol*, No. 17-cv-00075, ECF No. 282, at 19; *Sol*, No. 17-cv-00075-LPS, ECF No. 291 at 18, 19; *Sol*, No. 17-cv-00075-LPS, ECF No. 294 at 10.)

death benefit.  (*Id.* at 004000 (¶7(a)), 4004-10.)  The Trust Agreement also stated "the Owners [of the trusts] shall not be liable for any liabilities and obligations of the Trust."  (*Id.* at 004017 (¶2.6).)

Columbus continued to investigate the KDI/Concordia Program in 2005.  At the same time it began publishing anti-STOLI memos, Columbus held a "Senior Summit" meeting where it discussed the KDI/Concordia Program in detail, with a particular focus on how a significant percentage of its policies were linked to Potomac—the agency responsible for marketing the KDI/Concordia Program.  (*See* p. 14–15 *supra*.)  Columbus conducted an internal investigation into the KDI/Concordia Policies in September 2005, and the documents created during this time period show this investigation included an "insurable interest" review.  (*See* p. 15–19 *supra*.)  Although Columbus' 30(b)(6) witnesses tried to distance Columbus from that unambiguous statement in Columbus' September 7, 2005 letter, there is also no dispute that:

- The majority of the people involved in this internal investigation no longer work at Columbus;

- Columbus' 30(b)(6) witnesses did not consult with any current or former employees prior to their depositions;

- Wilkerson—Columbus' former Chief Marketing Officer—recalled that Columbus conducted an insurable interest review of Leisher's policies;

- Over the last 17 years, Columbus has lost evidence because it was controlled by employees who are no longer at the company and because Columbus' parent instituted a document destruction policy that went into effect less than one year before Columbus began filing STOLI lawsuits.

(*See* p. 15–19, *supra*.)

Additionally, Columbus flagged the Policies on its "Possible Investor Owned / Life Settlement Policies" lists beginning in 2006.  (*See* p. 19 *supra*.)  Columbus tracked these policies on an internal webpage through 2010, and then circulated these lists via emails from 2010 through 2014. (*See* p. 19 *supra*.)  Columbus flagged the Policies on a separate STOLI tracking spreadsheet,

which was specifically requested by the then-president of Columbus Life and contained a methodology designed to target those policies that Columbus believed were most likely STOLI. (*See* p. 19–20 *supra*.)

Columbus' 30(b)(6) witness tried to distance Columbus from these STOLI lists as well, arguing (implausibly) that Columbus—the wholly owned subsidiary of a $5 billion financial institution with a sophisticated in-house legal department—had no clue a carrier could challenge the validity of a policy for lack of insurable interest at the same time that it was actively tracking STOLI policies.  (*See* p. 20 *supra*.)  But once again, Columbus' witness did not consult any current or former employees to see what they knew about STOLI litigation during the 2006 through 2014 time period, and there is a serious risk that Columbus' decision to wait until May 2020 to litigate the validity of policies issued in 2004 resulted in the loss and/or destruction of significant documentary evidence.  (*See* p. 20–21 *supra*.)

For the 14-year period from September 2005 (when Columbus told Erwin & Johnson that it was conducting an insurable interest review) through July 2019 (when Columbus sent Securities Intermediary an out-of-nowhere reservation of rights letter), Columbus never once informed any of the Policies' owners that it suspected the Policies were STOLI.  Instead, Columbus approved six ownership and beneficiary changes, sent out Annual Reports every year, and issued countless verifications of coverage—assuring the Policies' owners that the Policies were "active" and "in force."  (*See* p. 21–22 *supra*.)   And most incredibly, Columbus collected ***$10,346,287.80*** in premiums without interest and approximately ***$15,929,517.60*** with interest—either of which exceeds the Policies' combined $10 million in death benefits.  (Harrison Decl. ¶¶3, 5.)[14]   No

---

[14] This calculation assumes a 5.75% interest rate and an April 19, 2021 calculation date.  The actual pre-judgment interest will depend on the interest rate in place at the time of the judgment.

rational juror could conclude that, under a comparative culpability test, Columbus can keep the $10.3 million in premiums if it does not have to pay the $10 million in death benefits.

*Viva.*  Viva did nothing wrong.  Viva acquired the Policies in 2016 as part of a portfolio of ██████████████████ n a tertiary market sale conducted pursuant to the UCC, and indisputably was not involved in the origination of the Policies in 2004.  (*See* p. 25 *supra*.)  Viva conducted the best due diligence possible based on the limited documentation available.  (*See* p. 25–28 *supra*.) For example, Viva reviewed all of the Policy documents available in the data room (which was the total universe of documents available to the Portfolio's seller and provided to prospective buyers) and even obtained unlimited representations and warranties from the Portfolio's servicer that are not typically available in a UCC sale (including that the servicer had not identified any facts or circumstances to suggest the Policies did not comply with applicable insurable interest laws).  (*See id.*)

Viva did not have any knowledge or copies of the KDI/Concordia Program origination documents, such as the Participation Agreement, Trust Agreement, or Master Funding Agreement. (*See* p. 26 *supra*.)   In fact, Viva had no knowledge whatsoever of the existence of the KDI/Concordia Program or Kavanaugh (the creator of the program), and did not know Columbus Circle—the original lender—was associated with Kavanaugh.  (*See* p. 26 *supra*.)  In contrast to Columbus (which knew the KDI/Concordia Program involved non-recourse loans), Viva understood that the insureds used premium financing but did *not* know whether the loans were recourse or non-recourse, or that the lender was entitled to a portion of the death benefit at the policy's inception.  (*See* p. 26 *supra*.)

### C.    Securities Intermediary is Entitled to a Return of Premiums Under Different Restatement Provisions that Were Not Considered by *Seck*.

Restatement (Second) of Contracts §§ 197–198 are not the only potentially applicable

Restatement provisions.  Securities Intermediary (on behalf of Viva) is also entitled to a return of premiums under Section 199(b) of the Restatement (Second) of Contracts and/or Section 32 of the Restatement (Third) of Restitution and Unjust Enrichment—neither of which were considered by *Seck*.

### 1.    Section 199(b) of the Restatement (Second) of Contracts.

Section 199(b) of the Restatement (Second) of Contracts permits restitution when the party seeking rescission "did not engage in serious misconduct and … allowance of the claim would put an end to a continuing situation that is contrary to the public interest."  Restatement (Second) of Contracts § 199(b).  Viva has not engaged in any misconduct, let alone "serious misconduct."  (*See* p. 25–28 *supra*.)  Ordering Columbus to disgorge premiums would also "put an end to a continuing situation that is contrary to the public interest," because courts have made clear that allowing carriers to retain premiums on void *ab initio* policies *is* contrary to public interest.  *See, e.g.*, *De Bourbon/Frankel*, 2022 WL 179008, at *13; *see also Berck*, 719 F. Supp. 2d at 418-19.

### 2.    Section 32 of the Restatement (Third) of Unjust Enrichment and Restitution.

Restatement (Third) of Unjust Enrichment and Restitution § 32 permits restitution under an invalid agreement "as necessary to prevent unjust enrichment, if the allowance of restitution will not defeat or frustrate the policy of the underlying prohibition."  *See* Restatement (Third) of Restitution and Unjust Enrichment § 32(2) (2011).  This more recent Restatement rejects any presumption against restitution on invalid contracts, as well as the adage that courts will "leave the parties to an illegal contract where it finds them."  Restatement (Third) of Restitution and Unjust Enrichment § 32 cmt. b (2011).  The Restatement states that "[i]n the context of an illegal contract … contractual performance by a party who does not receive (and cannot compel) the promised counterperformance will *frequently* result in the unjust enrichment of the recipient and a *prima*

41

*facie entitlement to restitution*." *Id.* (emphasis added).

If Columbus does not have to pay the death benefits on the Policies, Columbus will be unjustly enriched if it can keep the premiums, and Viva is entitled to prima facie restitution.[15] Columbus has been enriched to the tune of 10,346,287.80 in premiums, which balloon to approximately $15,929,517.60 with interest.  (Harrison Decl. ¶¶ 3, 5.)  Viva has been impoverished because it paid ███████ to acquire all rights in the Policies ███████ for the Cohen Policy and ███████ for the Romano Policy—including the right to recover premiums.  (Ex. 110 at 0000716, 0000729, 0000755; *see also* p. 43–44 *infra*.)  Viva paid an additional $5,810,370.38 to keep the Policies in force since 2016—$2,965,305 for the Cohen Policy and $2,845,065.38 for the Romano Policy.  (Harrison Decl. ¶¶ 3, 5.)

There is a clear relationship between Columbus' enrichment and Viva's impoverishment. Viva paid ███████ to acquire all rights in the Policies, and then paid an additional $5,810,370.38 to Columbus to keep the Policies in force.  There is also no justification for allowing Columbus to keep the premiums on policies that are void *ab initio*, particularly when (1) Columbus admitted that these cases are "economically irrational" if it must disgorge all the premiums, (2) Columbus knew the key facts that it now claims render the Policies invalid in the 2003–05 time period, and (3) Columbus sat on the sidelines for nearly two decades collecting millions of dollars in premiums instead of challenging the Policies.  Viva (through Securities Intermediary) has no remedy at law because the contracts under which it performed (the Policies) are purportedly void *ab initio*.  And finally, for the reasons explained above, requiring Columbus to disgorge premiums will not frustrate the public policy underlying Delaware's insurable interest laws.  (*See* p. 34–35 *supra*.)

---

[15] Unjust enrichment requires:  (1) enrichment, (2) impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law.  *Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 393 (Del. Ch. 1999).

     **D.**     **Securities Intermediary Is Entitled to a Return of All Premiums Paid to Columbus Plus Prejudgment Interest.**

          **1.**     **Securities Intermediary Is Entitled to a Return of All Premiums Paid to Columbus—Not Only the Premiums Paid by Viva.**

In its motion to dismiss decision, this Court declined to rule on whether Viva is entitled to all of the premiums that Columbus collected on the Policies, or whether the premium recovery should be limited to premiums paid by Viva. *See Romano*, 2021 WL 1820573, at \*9.  The Court should order Columbus to return all of the premiums it received to Viva.

***First***, the Court should follow *Sol III*.  In *Sol III*, Judge Stark ordered the carrier to return all of the premiums that the carrier had collected over the life of the policy to the policy owner, regardless of whether that policy owner or a predecessor had made the payments. *See Sol III*, 2019 WL 8353393, at \*4.  Judge Stark emphasized that "[w]hile Sun Life argues that FCI is due only those premiums it directly paid ($702,168), it is undisputed that FCI ***purchased all interest in the Policy***, including the right to pursue the return of any premiums that had already been paid on the Policy."  *Sol III*, 2019 WL 8353393, at \*4 n.6 (emphasis added).

The same is true here.  Securities Intermediary (on behalf of Viva) requested in its initial pleadings "a return of all premiums paid to Columbus over the life of the Policy, plus interest."[16]  Securities Intermediary sought this relief because Viva did not pay ▮▮▮▮▮▮▮ to acquire only the Policies.  (Ex. 110 at 0000755.)  Instead, Viva purchased, in relevant part, (1) the Policies, (2) "all right, title and interest" in the Policies, (3) "all rights related to or deriving therefrom," and (4) "all proceeds of any of the foregoing[.]"  (Ex. 110 at 0000729 (Annex A); *id.* 0000716 (selling "all of the Seller's right, title and interest to the Collateral more particularly described in Annex A").)  The Court should order Columbus to disgorge all $10,346,287.80 in premiums that Columbus has

---

[16] (*See Cohen* Dkt. 10 at Prayer for Relief (C), *Romano* Dkt. 10 at Prayer for Relief (C).)

received on the Policies to Securities Intermediary—just as Judge Stark ordered the carrier to
return all of the premiums to the policy owner in *Sol III*.

  **Second**, in cases where courts have expressly limited the policy owner's recovery to the
premiums it paid, the policy owner had sought only that relief in its pleadings.  For example, in
*Malkin I*, the court ordered an automatic return of premiums under Delaware law after holding that
the policy was void *ab initio* in order to prevent "manifest inequity."  *Malkin I*, 2016 WL 161598,
at *18, *21.  In a post-judgment ruling, the court limited the recovery to those premiums that the
current policy owner had paid, on the ground that the policy owner had not pleaded or proved its
entitlement to premiums paid by prior investors.  *See Sun Life Assur. Co. of Can. v. U.S. Bank
Nat'l Ass'n*, 2016 WL 3948059, at *2 (S.D. Fla. June 9, 2016) ("*Malkin II*"), *aff'd in relevant part*,
693 Fed. App'x 838 (11th Cir. June 12, 2017) ("*Malkin III*").  The same concern is not present
here, given that Securities Intermediary (on behalf of Viva) pleaded its entitlement to a full
premium return and Viva purchased the rights to that recovery.

  **Third**, if the Court limited the premium recovery to those premiums that Viva paid rather
than all the premiums Columbus collected, Columbus would obtain the very windfall that
Delaware law abhors.  *See, e.g.*, *San Antonio Fire & Police Pension Fund v. Bradbury*, 2010 WL
4273171, at *12 (Del. Ch. Oct. 28, 2010) ("The Court is mindful that, in making its determination,
the amount of the award should incentivize stockholders (and their attorneys) to file meritorious
lawsuits and prosecute such lawsuits efficiently without generating any unnecessary windfall.").
Of the $10,346,287.80 in premiums that Columbus has collected on the Policies, Viva has paid
$5,810,370.38.  In other words, limiting the premium return to Viva's premiums would generate a
windfall of nearly $5 million to Columbus—without interest.  In fact, Columbus admitted that the
possibility that the Court would limit any recovery to those premiums paid by Viva was critical in

its "cost benefit analysis" of bringing these cases.  (Ex. 85 at 60:19–62:2, 154:2–155:8.)

*Finally*, at the very least, the Court should follow Judge Johnston's decision in *De Bourbon/Frankel*, which ordered the carrier to repay all of the premiums on the policies to the particular parties who made the payments.  *See De Bourbon/Frankel*, 2022 WL 179008, at *14. This will ensure that Columbus does not obtain a windfall.

### 2.    Securities Intermediary Is Entitled to Prejudgment Interest.

As the Eleventh Circuit held in *Malkin III* when applying Delaware law on pre-judgment interest in a return of premiums decision:

> *... But where, as here, the claimant seeks a refund of payments it never should have made, prejudgment interest accrues from the date of the claimant's payments.  See, e.g., Valeant Pharm. Int'l v. Jerney*, 921 A.2d 732, 756 (Del. Ch. 2007) (awarding prejudgment interest from the date that a bonus was wrongfully paid to the defendant executive); *Segovia v. Equities First Holdings, LLC*, C.A. No. 06C-09-149-JRS, 2008 WL 2251218, at *23 (Del. Super. Ct. May 30, 2008) (unpublished) (awarding prejudgment interest from the date that the claimant paid the origination fees being refunded).
>
> Here, U.S. Bank seeks the refund of premium payments that it never should have made because the Policy was void from its inception. *Under these circumstances, prejudgment interest accrues from the date of payment rather than the date on which U.S. Bank demanded the refund.*

*Malkin III*, 693 F. App'x at 841 (emphasis added); *see also Sol III*, 2019 WL 8353393, at *4 (holding that the policy owner "will be awarded prejudgment interest").[17]  The Court should order prejudgment interest in this case as well from the date of each premium payment.

## IV.    CONCLUSION

The Court should grant Securities Intermediary's motion for summary judgment.

---

[17] Although Judge Johnston declined to award prejudgment interest in *De Bourbon/Frankel*, the court made that determination without any briefing from the parties and that issue is on appeal to the Delaware Supreme Court.  *See De Bourbon/Frankel*, 2022 WL 179008, at *14.

OF COUNSEL:

Harry S. Davis
Robert E. Griffin
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, NY  10022
(212) 756-2000

Aislinn K. Affinito
SCHULTE ROTH & ZABEL LLP
901 Fifteenth Street, NW, Suite 800
Washington, DC  2005
(202) 729-7470

Date:  April 29, 2022

/s/ John M. Seaman
John M. Seaman (#3868)
Samuel D. Cordle (#6717)
ABRAMS & BAYLISS LLP
20 Montchanin Road, Suite 200
Wilmington, Delaware  19807
(302) 778-1000
seaman@abramsbayliss.com
cordle@abramsbayliss.com

*Attorneys for Defendant and Counterclaim-Plaintiff Wilmington Trust, National Association, as Securities Intermediary*

46

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| COLUMBUS LIFE INSURANCE COMPANY, | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | No. 1:20-cv-00735-JLH |
| | * | No. 1:20-cv-00736-JLH |
| WILMINGTON TRUST, N.A., as Securities Intermediary, | * | |
| | * | |
| | * | |
| Defendant. | * | |
| ———————————————— | * | |
| WILMINGTON TRUST, N.A., as Securities Intermediary, | * | |
| | * | |
| | * | |
| Counterclaim-Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| COLUMBUS LIFE INSURANCE COMPANY, | * | |
| | * | |
| | * | |
| Counterclaim-Defendant. | * | |
| | * | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 29, 2022, my firm served true and correct copies of the (i) *Wilmington Trust, N.A., as Securities Intermediary's Consolidated Opening Brief in Support of its Motion for Summary Judgment*; (ii) *Declaration of Robert E. Griffin*; (iii) *Declaration of Ryan Harrison*; and (iv) *Statement of Material Facts Not in Dispute of Defendant/Counterclaim-Plaintiff Wilmington Trust, N.A., as Securities Intermediary* upon all counsel of record via CM/ECF.

OF COUNSEL:

Harry S. Davis
Robert E. Griffin
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, NY  10022
(212) 756-2000

Aislinn K. Affinito
SCHULTE ROTH & ZABEL LLP
901 Fifteenth Street, NW, Suite 800
Washington, DC  2005
(202) 729-7470

Dated: April 29, 2022

/s/ John M. Seaman
John M. Seaman (#3868)
Samuel D. Cordle (#6717)
ABRAMS & BAYLISS LLP
20 Montchanin Road, Suite 200
Wilmington, Delaware  19807
(302) 778-1000
seaman@abramsbayliss.com
cordle@abramsbayliss.com

*Attorneys for Defendant and Counterclaim-
Plaintiff Wilmington Trust, National
Association, as Securities Intermediary*