IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| COLUMBUS LIFE INSURANCE COMPANY, | * * * * | |
| Plaintiff, | * * | |
| v. | * * | No. 1:20-cv-00735-JLH |
| | * | No. 1:20-cv-00736-JLH |
| WILMINGTON TRUST, N.A., as Securities Intermediary, | * * * | PUBLIC VERSION OF D.I. 142 |
| | * | FILED MAY 13, 2022 |
| Defendant. | * * | |
| | * | |
| WILMINGTON TRUST, N.A., as Securities Intermediary, | * * * | |
| Counterclaim-Plaintiff, | * * * | |
| v. | * * | |
| COLUMBUS LIFE INSURANCE COMPANY, | * * * | |
| Counterclaim-Defendant. | * * | |

**STATEMENT OF MATERIAL FACTS NOT IN DISPUTE
OF DEFENDANT/COUNTERCLAIM-PLAINTIFF WILMINGTON TRUST, N.A., AS
SECURITIES INTERMEDIARY**

Pursuant to paragraph 9(b) the Rule 16 Scheduling Order (Dkt. 34, *Cohen*; Dkt. 35, *Romano*) and the parties' stipulation ordered by the Court on March 31, 2022, Defendant and Counterclaim-Plaintiff Wilmington Trust, N.A., as Securities Intermediary ("Securities Intermediary") hereby submits the following Statement of Material Facts Not in Dispute in support of its Motion for Summary Judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure as to the Complaint of Plaintiff/Counterclaim-Defendant Columbus Life Insurance Company ("Columbus") and Securities Intermediary's Counterclaims.

A.   **The KDI/Concordia Program**

1.   In 2004, Columbus issued two $5 million life insurance policies, one insuring the life of Janet Cohen (CM5012414U) and one insuring the life of Anthony Romano (CM5011660U) (the "Policies"). (Ex. 1 at 000862; Ex. 2 at 00018533.)[1]

2.   Cohen and Romano each obtained their policies through the "KDI/Concordia Program." (Ex. 3 at 41:12–23; Ex. 4 at 18:11–19:5; Ex. 5 at 00018096 (¶1); Ex. 6 at 00018114 (¶2.3(e)); Ex. 8 at 00018618 (¶1); Ex. 9 at 00018636 (¶2.3(e)).)

3.   The KDI/Concordia Program was a plan developed and patented by Bart Kavanaugh that allowed wealthy insureds to take out life insurance policies through trusts, and use the combination of non-recourse premium financing and the proceeds of an annuity to pay premiums. (Ex. 4 at 17:4–18:17, 29:17–30:3; Ex. 11 at 003947-48, 50-58, 61-62; Ex. 13 at 004001 (¶12(d)); Ex. 14 at 181:10–181:22; Ex. 117 at 1, 19; Ex. 118 at 1, 18–19.)

4.   Under the KDI/Concordia Program, when the insureds passed away, the insured's beneficiary would receive a portion of the death benefit, which ranged from approximately ■ ■ of the face amount of the policy depending on when the insured died. (Ex. 19 at 315:17–317:12; Ex. 13 at 004000 (¶7(a)), 4004–10; Ex. 5 at 00018098 ¶7(a)), 00018102-08; Ex. 8 at 00018620 (¶7(a)), 00018624-30; Ex. 11 at 003958.)

5.   The lender that purchased the annuity and funded the premium payments would receive the rest of the death benefit. (Ex. 14 at 201:9–207:14, 113:14–114:11; Ex. 11 at 003958, 003961–62; Ex. 4 at 22:1–23:6; Ex. 3 at 134:12–135:11; Ex. 13 at 003999 (¶2), 004000 (¶8), 004025-27 (¶5.2(a)-(c)).)

---

[1] "Ex. __" refers to the exhibits attached to the Declaration of Robert E. Griffin, dated April 29, 2022. When citing to documents produced in these cases, Securities Intermediary will reference only the numerical portions of the Bates stamps.

1

6.      The lender who financed the KDI/Concordia Program—Columbus Circle Capital LLLP ("Columbus Circle"), an entity operated by Kavanaugh—was contractually owed a percentage of the death benefit as compensation for acting as an interim lender. (Ex. 4 at 57:5–57:19; Ex. 6 at 00018123 (¶5.2); Ex. 9 at 00018645 (¶5.2); Ex. 14 at 254:22–257:24, 270:15–271:10; Ex. 19 at 315:17–317:12; Ex. 13 at 004000 (¶7(a)), 4004-10.)

7.      Cohen and Romano sold the Policies after Kavanaugh was unable to secure the long-term financing from an institutional lender necessary to purchase the annuities that would fund the life insurance premiums in the KDI/Concordia Program, as Kavanaugh had done successfully with earlier tranches of the KDI Plan. (Ex. 21 at 004290-91; Ex. 4 at 66:20–67:11, 238:5–238:17, 240:23–241:18; Ex. 14 at 72:22–73:7, 121:5–123:6; Ex. 22 at 004325; Ex. 29 at 0000010-13; Ex. 30 at 000002-5.)

8.      Columbus Circle was providing interim financing until Kavanaugh could secure a long-term institutional lender, and the vast majority of the death benefit owed to the commercial lender was designed to cover the cost of buying the annuity which would fund future premiums. (Ex. 3 at 142:13–142:21; Ex. 11 at 003958, 3961; Ex. 14 at 36:11–37:14, 268:16–269:17; Ex. 21 at 004290; Ex. 23 at 000618; Ex. 24 at 00018683.)

**B.      Columbus Learns the Key Facts It Claims Render the Policies Invalid in 2003/2004**

9.      Columbus brought its lawsuits challenging the validity of the Policies in May 2020. (*Cohen* Dkt. 1; *Romano* Dkt. 1.)

10.     In late 2003 or early 2004, before Columbus issued the Policies, Columbus met with the people responsible for creating and marketing the KDI/Concordia Program, including Kavanaugh and two life insurance producers named Ed Leisher and Amy Holmwood. (Ex. 4 at 27:12–30:3; Ex. 3 at 33:7–37:4; Ex. 19 at 192:12–194:6.)

11.     Leisher and Holmwood ran a general agency called Potomac, which worked with

insurance brokers who themselves had clients interested in the KDI/Concordia Program. (Ex. 4 at 14:16–16:7, 107:11–107:17; Ex. 19 at 35:12–35:12, 40:20–41:11, 42:4–43:7.)

12. The meeting took place at a conference room in Columbus' offices, and it involved some of Columbus' most senior executives. (Ex. 4 at 25:17–30:3; Ex. 3 at 33:7–36:11.)

13. Columbus no longer has documents reflecting what specifically happened at that late 2003/early 2004 meeting. (Ex. 3 at 126:15–128:8, 137:22–138:11.)

14. Columbus learned about the KDI/Concordia Program at that meeting, and this meeting occurred prior to Columbus' decision to issue the Policies (as well as several other policies associated with the KDI/Concordia Program). (Ex. 3 at 33:7–33:20, 124:23–125:15.)

15. Several months after that meeting in Columbus' office (in the summer of 2004), Columbus issued the Romano Policy, the Cohen Policy, and several other premium financed policies that Columbus knew were associated with the KDI/Concordia Program. (Ex. 1; Ex. 2; Ex. 3 at 75:13–76:25.)

16. On June 25, 2004, Columbus exchanged emails with one of Leisher and Holmwood's colleagues concerning the "rush cases for KDI," which specifically referred to the Romano Policy and in which Columbus was informed "[t]hese are straight premium finance cases," "the source of the funds … will be the same bank for all of these cases," and "[t]here are additional cases to come, [it's] only these 6 cases where we have the time crunch." (Ex. 25 at 002208; Ex. 3 at 75:13–76:25.)

17. Hours later, Columbus circulated internal emails reflecting that the Romano Policy should be given "highest priority." (Ex. 26 at 002211–2212; Ex. 3 at 298:11–299:14.)

18. Shortly after issuing the Policies, Columbus learned that both Policies had been assigned as loan collateral to Columbus Circle. (Ex. 27; Ex. 28.)

19. On July 19, 2004 (for Romano) and August 13, 2004 (for Cohen), Columbus wrote to a Columbus Circle affiliate that "[w]e are in receipt of the special Collateral Assignment document, and as requested, have had this document reviewed by our legal staff." (Ex. 27 at 002251; Ex. 28 at 004216.) In both letters, Columbus wrote, "[o]ur attorneys have recommended that we provide you with the attached signed Acknowledgement of Assignment." (Ex. 27 at 002251; Ex. 28 at 004216.)

20. Columbus's attorneys reviewed the "Assignment of Life Insurance Policy as Collateral" contracts for both Policies, which gave Columbus Circle the right to acquire the Policies if the insureds' trusts (which owned the Policies) defaulted on the premium finance loans. (Ex. 27 at 002257; Ex. 28 at 004222; Ex. 3 at 86:2–89:18, 96:14–97:20, 112:17–118:5.)

21. On September 21, 2004, Columbus attended a WebEx meeting with representatives of the KDI/Concordia Program, in which they explained the KDI/Concordia Program to Columbus. (Ex. 3 at 121:21–157:1; Ex. 11 at 003937–66; Ex. 13 at 003996–4038.)

22. This September 21, 2004 WebEx was the second time Columbus executives attended a presentation regarding the KDI/Concordia Program. (Ex. 3 at 123:3–123:6.)

23. After the September 21, 2004 meeting, a Columbus Circle representative emailed Mark Wilkerson—who was then Chief Marketing Officer at Columbus—the PowerPoint that had been presented at the meeting, as well as samples of the Participation Agreement and Trust Agreement that insureds had to sign to participate in the KDI/Concordia Program. (Ex. 11; Ex. 13; Ex. 3 at 120:21–123:6, 146:18–148:19.) Those materials were then circulated internally at Columbus among its senior executives. (Ex. 11 at 003937; Ex. 13 at 003995.)

24. Section 6 of the sample Participation Agreement Columbus received stated that the life insurance policies would be pledged as collateral on the premium finance loans, and "[i]n the

event the Trust is unable to fulfill its obligations under the loans and such other agreements, the lenders and such other parties will have the right to obtain ownership of the life insurance policies pledged as security for the loans and such other agreements." (Ex. 13 at 003999–4000.)

25. Section 12 of the Participation Agreement stated that "under no circumstances shall the Trustee, the Insured or the Owners be personally liable for the payment of any indebtedness or expenses of the Trust or be liable for any breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trust under this Participation Agreement, the Trust Agreement or any other document." (Ex. 13 at 004001.)

26. Section 7(a) of the Participation Agreement stated that "[u]nder the Trust Agreement, the Owners shall be entitled to receive, subject to prior liens of lenders and the satisfaction of the obligations of the Trust, the portion of the death benefit allocated to the Owners, as described in the attached schedule (the 'scheduled death benefit')." (Ex. 13 at 004000.)

27. Section 8(b) of the Participation Agreement stated that "[u]nder no circumstances can the Owners or any permitted successor(s) or assign(s) of the Owners' beneficial interest in the Trust receive a distribution from the Trust of a portion of the death benefit from the life insurance policies on the life of the Insured that is greater than the Owners' allocable scheduled death benefit as set forth on the attached schedule." (Ex. 13 at 004000.)

28. The Participation Agreement attached a Scheduled Death Benefit chart which showed that the insured's beneficiary would obtain a portion of the death benefit that increased over time. (Ex. 13 at 004004.)

29. Section 2.6 of the sample Trust Agreement that Columbus received stated that the trust's owners "shall not be liable for any liabilities and obligations of the Trust," and Columbus testified that it was aware of the Trust Agreement's provisions. (Ex. 13 at 004017 (¶2.6); Ex. 3 at

155:24–157:1.)

30.     The PowerPoint presentation identified that the KDI/Concordia Program involved the use of premium financing and that the insured was only entitled to a portion of the death benefit. (Ex. 11 at 003958–62.)

31.     The PowerPoint presentation showed that the policy's death benefit would be split between the insured's beneficiary and the commercial lender according to a "scheduled death benefit" payout chart, which depended entirely on how long the insured lived. (Ex. 11 at 003958.)

**C.     Cohen and Romano Sell Their Policies Into the Secondary Market After Kavanaugh Is Unable to Obtain Long-Term Financing for the KDI/Concordia Program.**

32.     Kavanaugh was ultimately unable to secure the long-term financing from an institutional lender that was needed to buy the annuities which were to be used to keep the life insurance policies in force. (Ex. 21 at 004290–91; Ex. 4 at 66:20–67:11; Ex. 14 at 72:22–73:7; Ex. 4 at 238:5–17, 240:23–241:18.)

33.     Under the Concordia Plan, Columbus Circle was only meant to act as an interim lender while Kavanaugh negotiated with institutional banks. (Ex. 14 at 69:23–70;13, 84:8–85:25; Ex. 21 at ¶1, 004290–91; Ex. 4 at 66:11–72:13.)

34.     After Kavanaugh's inability to obtain long-term financing, the majority (but not all) of the insureds who took out policies as part of the Concordia Plan decided to sell their policies through beneficial interest transactions. (Ex. 14 at 69:23–70:13, 84:8–85:25.)

35.     On April 14, 2005, Cohen and Romano both signed contracts titled "Authorization to Sell Life Insurance Policy to Pay Off Premium Finance Loan," in which they had the option of (1) authorizing Columbus Circle to sell the Policies and use the proceeds to repay the premium finance loans, or (2) repaying Columbus Circle the loan balances and keeping the Policies. (Ex. 29 at 0000010–13; Ex. 30 at 000002; Ex. 33; Ex. 14 at 84:14–85:19; 121:5–123:6.)

36. Cohen and Romano both elected to sell their Policies. (Ex. 29 at 0000010–13; Ex. 30 at 000002; Ex. 33; Ex. 14 at 84:14–85:19; 121:5–123:6.)

37. On April 21, 2005, Columbus Circle entered into a Purchase and Sale Agreement to sell the Policies to Invest SLPS LLC (an entity not affiliated with Columbus Circle or Kavanaugh) alongside dozens of other KDI/Concordia policies. (Ex. 31 at 00000010–11; Ex. 14 at 84:13–85:8.)

38. Cohen and Romano both profited from the sales of their Policies because the sale proceeds exceeded the loan balance. (Ex. 93; Ex. 14 at 160:20–163:9, 261:24–262:19.)

**D.   Columbus Continues Its Analysis of the KDI/Concordia Program and Publishes Anti-STOLI Memos in 2005.**

39. In May 2005, Columbus informed its producers that it would no longer accept policies where the insureds used non-recourse loans to pay premiums and were intending to sell the policies. (Ex. 32; Ex. 34.)

40. In a May 2005 memo, Columbus wrote that "we wish to make clear our position in not accepting applications taken as a part of a non-recourse premium financing program which may violate insurable interest or other insurance or consumer protection laws." (Ex. 32 at 000002.)

41. On July 18, 2005, Columbus wrote "Columbus Life is *not* interested in writing investor-owned type business," and "we are also not interested in business where non-recourse notes make selling the policy to a secondary market maker attractive." (Ex. 34 at 000014.)

42. On May 11, 2005, Columbus internally recirculated the KDI/Concordia PowerPoint presentation that Columbus' executives had reviewed in September 2004. (Ex. 35 at 003936–3995.)

43. ███████████████████████████████████████████████



(Ex. 36 at 0009221–72; Ex. 3 at 180:21–191:9.)

44. ██████████████████████████████████████████████████████

██████ (Ex. 36 at 0009272.)

45. Columbus discussed how Potomac—Leisher and Holmwood's agency that marketed the KDI/Concordia Program—was connected to a significant percentage of Columbus' policies on elderly individuals. (Ex. 36 at 0009239–40; 9242; 9272.)

E. **Columbus Conducts an Internal Investigation Into the KDI/Concordia Program in September 2005.**

46. On August 3, 2005, Columbus received a letter from the Erwin & Johnston LLP law firm, seeking information about the Cohen Policy, the Romano Policy, and several other policies that were associated with the KDI/Concordia Program. (Ex. 37 at 000306.)

47. Three weeks later (on August 25, 2005), Columbus responded to Erwin & Johnson that it could not provide the requested information until Erwin & Johnson submitted an application to change the trustee associated with the policies. (Ex. 38 at 000307.)

48. On September 7, 2005, the Capital Trust Company of Delaware—the trustee of the Janet Cohen Delaware Trust—submitted forms to Columbus seeking to change the owner and beneficiary on the Cohen Policy to an entity called 70091V Life Settlement Trust, c/o Erwin & Johnson LLP, as Trustee. (Ex. 39 at 000334, 4239–4241.)

49. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████ (Ex. 40 at 004341–4342.)

50.  ████████████████████████████████████████████

████████████████████████████████████████ (Ex. 40 at 004342.)

51. Later that day, on September 7, 2005, Columbus Life sent a final version of that letter to Erwin & Johnson, which contained a new paragraph that was not in the original draft circulated earlier that day: "We are also reviewing insurable interest issues in connection with both attempted transfers and procurement of these and other policies. We reserve the right to take additional action including rescission." (Ex. 41 at 000311.)

52. Columbus testified that "these and other policies" referred to policies that Columbus knew were part of the KDI/Concordia Program, which would include both the Cohen and Romano Policies. (Ex. 42 at 71:11–73:8.)

53. In letters sent by Columbus between September and December 2005 to Leisher and Holmwood—the KDI/Concordia producers—Columbus stated that it was "further investigating the purpose of insurance disclosed in the application, as well as the patterns and practices related to this and other insurance policies." (Ex. 45 at 004383, 004384; Ex. 46 at 004349; Ex. 3 at 225:7–225:9; Ex. 42 at 88:8–89:18.)

54. In response to one of Columbus' rescission letters, Holmwood sent Columbus a letter dated September 15, 2005 stating that (1) the institutional lender they had previously used for other tranches of the KDI Plan (AI Credit) was no longer able to provide competitive financing; (2) the people running the KDI/Concordia Program had decided to implement a block of policies through interim financing, with the expectation that a different lender would refinance the debt; and (3) once the refinancing efforts failed, the insureds decided to sell the policies to a third-party

9

buyer.  (Ex. 21 at 004290–92.)

55. In her September 15, 2005 letter, Holmwood told Columbus that the insureds who participated in the KDI/Concordia Program never had any intent to sell the polices to an investor at the time they were procured.  (Ex. 21 at 004291.)

56. Columbus contemplated making phone calls to certain insureds, but Columbus does not know which of the insureds (if any) Columbus ultimately contacted.  (Ex. 47 at 004336–39; Ex. 42 at 91:16–93:21; Ex. 3 at 244:7–245:7.)

57. One of Columbus' 30(b)(6) witnesses (Robert Noschang) testified that Columbus considered doing an insurable interest review, but decided to focus on whether it could rescind policies in the KDI/Concordia Program for undisclosed, in-force insurance coverage in the policy applications.  (Ex. 42 at 81:5–18.)

58. Another Columbus 30(b)(6) witness (Lisa Fangman) testified that Columbus conducted an insurable interest review based on the contents of Columbus' September 7, 2005 letter to Erwin & Johnson, but Columbus could not locate any documents evidencing the scope of the review nearly two decades later.  (Ex. 3 at 220:9–223:15, 250:4–251:21.)

59. Mark Wilkerson—Columbus' former Chief Marketing Officer—remembers that Columbus conducted an insurable interest review concerning policies associated with Leisher (one of the KDI/Concordia producers), but he has no memory of the specifics of Columbus' insurable interest review.  (Ex. 94 at 132:16–137:4.)

60. The vast majority of the people who were employed at Columbus during the September 2005 time period, and who appear on the relevant emails from this time period, are no longer at Columbus.  (Ex. 3 at 265:2–269:20.)

61. In January 2019, Columbus' parent company Western & Southern Financial Group

("W&S")—implemented a company-wide email destruction policy that resulted in the loss of documents created prior to January 2016. (Ex. 3 at 259:19–260:16; Ex. 43; Ex. 44 at 004455–004458.)

62. According to W&S, one of the benefits of the policy was that it "[r]educes litigation and regulatory risk by helping to manage the amount of searchable content as well as the cost associated with searching emails for these purposes." (Ex. 44 at 004455.)

**F.   Columbus Constantly Flags the Cohen Policy and the Romano Policy as Potential STOLI Policies from 2006 Through 2014.**

63. In 2006, Columbus began tracking what it called "potential investor owned/life settlement polices," which were initially tracked on an internal Columbus webpage. (Ex. 48 at 007876; Ex. 42 at 178:5–18, 179:6–179:10.)

64. In December 2010, Columbus began circulating reports via email concerning "Possible Investor Owned / Life Settlement Policies," which flagged both the Cohen and Romano Policies. (Ex. 49 at 007856, 7863.)

65. These reports were designed to capture policies that Columbus believed were either STOLI policies or life settlement policies. (Ex. 42 at 208:1–17.)

66. Columbus updated these reports regularly from 2010 through 2014, repeatedly flagging the Cohen and Romano Policies. (Ex. 50 at 006537, 006544; Ex. 51 at 008989, 008996; Ex. 52 at 004092, 004099; Ex. 53 at 004979, 004986; Ex. 54 at 005378, 005384; Ex. 42 at 246:13-247:3.)

67. Both Policies were flagged on Columbus' internal webpage at some point between 2006 and December 2010, but Columbus did not know when. (Ex. 42 at 180:10–21.)

68. In January 2012, Columbus' then-president J.J. Miller requested that Columbus prepare a separate report with a different methodology designed to capture STOLI policies. (Ex.

11

55 at 004501; Ex. 42 at 233:3–7, 235:19–22.)

69. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████ (Ex. 55 at 004501-004502.)

70. Columbus testified that—based on its search criteria—the spreadsheet requested by Columbus' president included both the Cohen and Romano Policies. (Ex. 55 at 004502; Ex. 42 at 232:10–244:6.)

71. According to one of Columbus' 30(b)(6) witnesses, Columbus believed that its STOLI-tracking efforts were not worthwhile because Columbus believed it was "stuck with" policies that it believed were potentially STOLI. (Ex. 42 at 246:13–250:12.)

**G.    Columbus Acknowledges Six Ownership and Beneficiary Changes, and Regularly Represents that the Policies are Active, In-Force Policies.**

72. From 2005 through 2017, Columbus Life approved six separate ownership and beneficiary changes on the Policies including when Securities Intermediary acquired the Policies in 2017. (Ex. 42 at 116:19–119:12; Ex. 56; Ex. 57; Exs. 62–71.)

73. In 2006, Columbus learned both Policies were under the control of a receiver, after the SEC brought an enforcement action against ABC Viaticals—the entity that beneficially owned the Policies. (Ex. 42 at 154:3-164:12; Ex. 87; Ex. 88; Ex. 89; Ex. 90.)

74. In January 2009, after learning that the SEC receiver was selling the Policies as part of a court-approved sale process, Columbus approved the ownership and beneficiary changes to Orca LSI Trust. (Ex. 42 at 154:3-164:12; Ex. 91; Ex. 92.)

75. In certain instances, Columbus' in-house attorneys reviewed the ownership and beneficiary changes. (Ex. 42 at 130:2–134:10; *see generally* Exs. 101–109.)

76. Columbus issued annual reports every year on both the Cohen and Romano Policies, which Columbus only issues for active, in-force policies. (Exs. 72–73; Exs. 75–76; Ex. 42 at 271:14–272:1.)

77. Columbus also issued dozens of verifications of coverage on the Policies over the life of the Policies, in which Columbus represented to the Policy owners that the Policies were "active," "premium paying," and "in force." (Exs. 77–80; Ex. 42 at 282:7–284:2.)

78. Columbus also sent out in-force policy illustrations, which Columbus only provides for active, in-force policies. (Exs. 81–84; Ex. 42 at 302:19–304:17.)

79. Columbus has collected $5,692,951.41 in premiums on the Romano Policy and $4,653,336.35 in premiums on the Cohen Policy since the inception of the Policies through Romano's death in 2022 and through the present for Cohen (who is still alive). (Declaration of Ryan Harrison, dated April 28, 2022 ("Harrison Decl.") ¶¶ 3, 5; *see also* Exs. 115–116.)

**H. Columbus Attends an Industry Conference With Cozen O'Connor, Hires Cozen, and Conducts a Second Internal Investigation Into the KDI/Concordia Policies.**

80. In October 2018, a Columbus assistant vice president named Justin Payne attended a conference which included a marketing presentation on STOLI litigation by Cozen O'Connor—Columbus's counsel in this case. (Ex. 85 at 28:10–33:16; Ex. 86.)

81. During the marketing presentation, Cozen explained that the firm had success litigating STOLI cases on behalf of carriers, and that Cozen believed there was an argument that courts would let carriers void policies and keep the premiums. (Ex. 85 at 52:6–52:15; Ex. 86 at 006323–31.)

82. ████████████████████████████████████████████████████████████████████ (Ex. 43.)

83. Columbus testified that if Columbus had known before it filed the *Cohen* and

13

*Romano* cases that it would have to return all of the premiums received on the Cohen and Romano Policies, "it would have been considered and it would have had an impact on the decision to file in regards to the general cost benefit analysis." (Ex. 85 at 61:5–16.)

84. Columbus also testified that it was "correct" that "it would have been economically irrational to pay attorneys years' worth of litigation costs to save $10 million in death benefits if [Columbus] ha[d] to pay out $10.2 million in premiums." (Ex. 85 at 61:18–62:2, 154:2–155:8.)

I. **Securities Intermediary's Acquisition of the Policies on Behalf of Viva.**

85. In October 2016, Securities Intermediary acquired the Cohen and Romano Policies on behalf of its customer, Viva Capital Trust, as part of a portfolio that contained ▮▮▮▮ "the Portfolio"). (Ex. 110 at 0000729.)

86. Viva acquired the Portfolio in a UCC sale after Delta Lloyd, the lender to the prior Portfolio owner (the Orca Trust), foreclosed on the loan and sold the Portfolio. (Ex. 111 at 61:10–14.)

87. Viva's investment adviser, Preston Ventures LLC ("Preston"), and its legal counsel conducted due diligence on the Portfolio on Viva's behalf. (Ex. 111 at 63:25–64:5.)

88. In the 30(b)(6) deposition of Viva, Preston, and Blackstone, Jon Nelson (CEO of Preston) testified that the documents made available in the data room would have included the Policies, Policy applications, HIPAA and medical information, a letter confirming the payoff of the premium finance loan used for the Policies, verifications of coverage and acknowledgments by Columbus, policy illustrations issued by Columbus over the years, confirmation of premium payments, and any information that would have suggested any issue or challenge to the Policies (had there been any). (Ex. 111 at 126:10–127:11.)

89. Nelson testified that the information regarding the Cohen and Romano Policies that was available in the data room did not include the Participation Agreements, Trust Agreements, or

Master Funding Agreements, and Viva did not have copies of these documents when it acquired the Policies. (Ex. 111 at 130:21–131:5; 134:18–135:1.)

90. Nelson testified that they did not know what the KDI/Concordia Program was or who Bart Kavanaugh was at the time of their pre-acquisition diligence, or who owned or operated Columbus Circle. (Ex. 111 at 166:13–22, 165:7-24.)

91. Nelson testified that at the time of Viva's acquisition, they understood that the insureds used premium financing to pay premiums but did not know whether the loans were recourse or non-recourse. (Ex. 111 at 13:23–14:3, 131:23–132:3, 135:11–14.)

92. The servicer to Delta Lloyd for the Portfolio—Maple Life Analytics, LLC (which had been servicing the Portfolio since 2010)—provided certain representations and warranties in perpetuity for the Portfolio. (Ex. 111 at 118:22–119:3; 144:9–23; 148:3–10; 198:23–25.)

93. Maple Life represented that its diligence review of the Cohen and Romano Policies "did not disclose facts or circumstances which, in the commercially reasonable judgment of [Maple Life] would raise a material question as to whether the prima facie terms of the applicable insurable interest laws were met at the time of policy issuance." (Ex. 112 at A0000066; A0000072; A0000138; Ex. 111 at 203:19–205:23.)

94. Nelson testified that Maple Life confirmed that it was "not able to capture any more information than [w]hat was available in the data room." (Ex. 111 at 172:6–17.)

|  |  |
|---|---|
|  | Respectfully submitted, |
| OF COUNSEL: | /s/ *John M. Seaman* |
|  | John M. Seaman (#3868) |
| Harry S. Davis | Samuel D. Cordle (#6717) |
| Robert E. Griffin | ABRAMS & BAYLISS LLP |
| SCHULTE ROTH & ZABEL LLP | 20 Montchanin Road, Suite 200 |
| 919 Third Avenue | Wilmington, Delaware  19807 |
| New York, NY  10022 | (302) 778-1000 |
| (212) 756-2000 | seaman@abramsbayliss.com |
|  | cordle@abramsbayliss.com |
| Aislinn K. Affinito |  |
| SCHULTE ROTH & ZABEL LLP | *Attorneys for Defendant and Counterclaim-Plaintiff Wilmington Trust, National Association, as Securities Intermediary* |
| 901 Fifteenth Street, NW, Suite 800 |  |
| Washington, DC  2005 |  |
| (202) 729-7470 |  |

Date:  April 29, 2022

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| COLUMBUS LIFE INSURANCE COMPANY, | * * * | |
| Plaintiff, | * * | |
| v. | * * | No. 1:20-cv-00735-JLH |
| | * | No. 1:20-cv-00736-JLH |
| WILMINGTON TRUST, N.A., as Securities Intermediary, | * * * | |
| Defendant. | * * | |
| WILMINGTON TRUST, N.A., as Securities Intermediary, | * * * | |
| Counterclaim-Plaintiff, | * * | |
| v. | * * | |
| COLUMBUS LIFE INSURANCE COMPANY, | * * * | |
| Counterclaim-Defendant. | * * | |

## CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2022, my firm served true and correct copies of the (i) *Wilmington Trust, N.A., as Securities Intermediary's Consolidated Opening Brief in Support of its Motion for Summary Judgment*; (ii) *Declaration of Robert E. Griffin*; (iii) *Declaration of Ryan Harrison*; and (iv) *Statement of Material Facts Not in Dispute of Defendant/Counterclaim-Plaintiff Wilmington Trust, N.A., as Securities Intermediary* upon all counsel of record via CM/ECF.

| | |
|---|---|
| OF COUNSEL: | */s/ John M. Seaman* |
| | John M. Seaman (#3868) |
| Harry S. Davis | Samuel D. Cordle (#6717) |
| Robert E. Griffin | ABRAMS & BAYLISS LLP |
| SCHULTE ROTH & ZABEL LLP | 20 Montchanin Road, Suite 200 |
| 919 Third Avenue | Wilmington, Delaware  19807 |
| New York, NY  10022 | (302) 778-1000 |
| (212) 756-2000 | seaman@abramsbayliss.com |
| | cordle@abramsbayliss.com |
| Aislinn K. Affinito | |
| SCHULTE ROTH & ZABEL LLP | *Attorneys for Defendant and Counterclaim-* |
| 901 Fifteenth Street, NW, Suite 800 | *Plaintiff Wilmington Trust, National* |
| Washington, DC  2005 | *Association, as Securities Intermediary* |
| (202) 729-7470 | |

Dated: April 29, 2022

2