**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| COLUMBUS LIFE INSURANCE COMPANY,<br><br>          Plaintiff,<br><br>          v.<br><br>WILMINGTON TRUST, N.A., as Securities Intermediary,<br><br>          Defendant. | No. 1:20-cv-00735-MN-JLH |
| COLUMBUS LIFE INSURANCE COMPANY,<br><br>          Plaintiff,<br><br>          v.<br><br>WILMINGTON TRUST, N.A., as Securities Intermediary,<br><br>          Defendant. | No. 1:20-cv-00736-MN-JLH |

**COLUMBUS LIFE INSURANCE COMPANY'S BRIEF IN OPPOSITION TO**
**WILMINGTON TRUST'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ...................................................................................................... 1

II.  COUNTERSTATEMENT OF FACTS ..................................................................... 1

A.  The KDI Program Was Presented To Columbus Life As Legitimate. ................................. 4

B.  Columbus Life Underwrote And Issued The Policies In Good Faith ................................. 7

1.  The Romano Policy ........................................................................................ 8

2.  The Cohen Policy .......................................................................................... 9

C.  The Initial Premium Funding and Collateral Assignments Raised No Flags. .................. 10

D.  The Producers Reaffirmed Their Lies ............................................................................. 11

E.  Columbus Life Made Efforts To Combat STOLI. ......................................................... 11

F.  Columbus Life Decided To Challenge the Policies. ...................................................... 20

III. ARGUMENT ........................................................................................................ 23

A.  The Policies Are Void Ab Initio For Lack of Insurable Interest. ................................... 23

B.  Wilmington Trust Is Not Entitled To Any Premium Refund. ......................................... 24

1.  Wilmington Trust Is Not Entitled To A Premium Refund Because Refunding Premium To An Investor Like Viva—███████████ ███████████—Would Frustrate The Public Policy Rendering Them Void In the First Place. ...................................................... 24

2.  Wilmington Trust Is Not Entitled To An Automatic Refund. ................................. 26

3.  Viva's Argument That It Is Somehow "Less Culpable" Than Columbus Life Is Wrong. ..................................................................................... 30

4.  Viva Is Not Entitled To A Refund of Premiums It Did Not Pay. ........................... 35

5.  Wilmington Trust Is Not Entitled To Pre-Judgment Interest. ................................ 41

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abraham Miller, as Successor Trustee of the Miller 47 Street Trust 5 v. Sun Life*,
No. 2184-cv-02466 (Massachusetts Superior Court) ............................................................... 15

*Acceleration Bay LLC v. Electronic Arts Inc.*,
2019 WL 1376036 (D. Del. Mar. 27, 2019) ........................................................................... 22

*AMT Capital Holdings v. Sun Life*,
No. 654756/2016 (N.Y County Supreme Court) ..................................................................... 15

*Anguilla Re v. Lubert-Adler Real Estate Fund*,
2012 WL 5351229 (Del. Super. Ct. Oct. 16, 2012) ............................................................... 35

*Beeber v. Walton*,
32 A. 777 (Del. Super. 1887) ................................................................................................. 25

*Brighthouse Life Ins. Co. v. Geronta Funding*,
2019 WL 8198323 (Del. Super. Ct. Mar. 4, 2019) ("*Seck I*") .............................................. 31

*Brighthouse Life Ins. Co. v. Geronta Funding*,
2019 WL 8198325 (Del. Super. Ct. Aug. 7, 2019) ("*Seck IV*") ........................................... 33

*Brighthouse Life Ins. Co. v. Geronta Funding*,
2021 WL 4080672 (Del. Super. Ct. Aug. 20, 2021) ("*Seck V*") ...................................... 6, 33

*Citadel Holding Corp. v. Roven*,
603 A.2d 818 (Del. 1992) ....................................................................................................... 40

*Citrin v. Int'l Airport Ctrs.*,
922 A.3d 1164 (Del. Ch. 2006) ......................................................................................... 40, 41

*Cook v. Pierce*,
7 Del. 499 (Del. Super. 1862) ................................................................................................. 25

*Delaware State Univ. v. Thomas Co. Inc.*,
2020 WL 6799605 (D. Del. Nov. 19, 2020) ........................................................................... 22

*Della v. Diamond*,
210 A.2d 847 (Del. 1965) ....................................................................................................... 25

*E.M. Fleischmann Lumber Corp. v. Res. Corp. Int'l*,
114 F. Supp. 843 (D. Del. 1953) ............................................................................................ 41

*Edgewater Growth Capital Partners LP v. H.I.G. Capital, Inc.*,
   68 A.3d 197 (Del. Ch. 2013)................................................................41

*Eisenman v. Seitz*,
   25 A.2d 496 (Del. Ch. 1942)................................................................25

*Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*,
   817 A.2d 160 (Del. 2011)....................................................................41

*Hercules, Inc. v. AIU Ins. Co.*,
   784 A.2d 481 (Del. 2001)....................................................................41

*Houston Div. Finserv. Cas. Corp. v. Settlement Funding, LLP*,
   2016 U.S. Dist. LEXIS 42 (S.D. Tex. Mar. 30, 2016)..........................5

*Lavastone Capital v. Est. of Berland*,
   266 A.3d 964 (Del. 2021) ("*Berland*")................................................30

*Lincoln Nat'l Life Ins. Co. v. Snyder*,
   722 F. Supp. 2d 546 (D. Del. 2010)..............................................26, 27

*Mennen v. Wilmington Tr. Co.*,
   2015 WL 1914599 (Del. Ch. Apr. 24, 2015).......................................41

*Model Heating Co. v. Magarity*,
   81 A. 394 (Del. 1911).........................................................................25

*Oglesby v. Penn Mut. Life Ins. Co.*,
   877 F. Supp. 872 (D. Del. 1994).........................................................27

*Penn Mut. Life Ins. Co. v. Oglesby*,
   695 A.2d 1146 (Del. 1997)..................................................................27

*PHL Var. Ins. Co. v. Chong Son Pak Life Ins. Tr.*,
   2012 WL 13201401 (D. Del. July 25, 2021) ("*Pak*")...........................26

*PHL Var. Ins. Co. v. Price Dawe 2006 Ins. Tr.*,
   28 A.3d 1059 (Del. 2011) ("*Price Dawe*").............................10, 24, 27

*PHL Var. Ins. Co. v. Virginia L. Lankow Life Ins. Tr.*,
   2012 WL 13201402 (D. Del. July 25, 2012) ("*Lankow*")...................26

*Principal Life Ins. Co. v. Rucker 2007 Ins. Tr.*,
   774 F. Supp. 2d 674 (D. Del 2011).................................................26, 27

*Pruco v. Brasner*,
   2011 WL 13117063 (S.D. Fla. Nov. 4, 2011)......................................21

*Stonewall Ins. Co. v. E.I. du Pont de Nemours & Co.*,
  996 A.2d 1254 (Del. 2010) ...................................................................................41

*Sun Life v. Berck*,
  719 F. Supp. 2d 410 (D. Del. 2010)...............................................26, 27, 28, 36

*Sun Life v. Imperial Holdings*,
  2016 WL 10565034 (S.D. Fla. Sept. 22, 2016), *aff'd as to fraud claim*, 904
  F.3d 1197 (11th Cir. 2018) ...................................................................................34

*Sun Life v. Imperial Premium Fin.*, LLC,
  Nos. 17-10189, 17-10415 (S.D. Fla.)...................................................................15

*Sun Life v. Paulson*,
  07-cv-3877 (D. Minn) ............................................................................................15

*Sun Life v. U.S. Bank*,
  2016 WL 161598 (S.D. Fla. Jan. 14, 2016) ("*Malkin I*"), *aff'd*, 693 F. App'x
  838 (11th Cir. 2017) ("*Malkin III*") ...................................................................26

*Sun Life v. U.S. Bank*,
  2016 WL 3948059 (S.D. Fla. June 9, 2016) ("*Malkin II*")...................................39

*Sun Life v. U.S. Bank*,
  2019 WL 8353393 (D. Del. Dec. 30, 2019) ("*Sol II*").........................................38

*Sun Life v. U.S. Bank*,
  369 F. Supp. 3d 601 (D. Del. 2019) ("*Sol I*") ....................................................10

*Sun Life v. Wells Fargo*,
  2016 WL 5746352 (D.N.J. Sept. 30, 2016) ("*Bergman I*") .................................37

*Sun Life v. Wells Fargo*,
  2016 WL 6824367 (D.N.J. Nov. 17, 2016) ("*Bergman II*")................................37

*Sun Life v. Wells Fargo*,
  779 F. App'x 927 (3d Cir. 2019) ("*Bergman III*") .............................................37

*Sun Life v. Wells Fargo*,
  2018 WL 2100740 (N.D. Ill. Mar. 30, 2020) ("*Corwell I*") ...............................37

*Sun Life v. Wells Fargo*,
  2020 WL 1503641 (N.D. Ill. Mar. 20, 2020) ("*Corwell II*")...............................38

*Sun Life v. Wilmington Tr.*,
  2022 WL 179008 (Del. Super. Ct. Jan. 12, 2022) ("*Frankel/De Bourbon*")................... *passim*

*U.S. Bank v. Sun Life*,
2016 WL 8116141 (E.D.N.Y. Aug. 30, 2016), *adopted*, 2017 WL 347449
(E.D.N.Y. Jan. 24, 2017) ("*Van de Wetering*") ...............................................26, 36

*Wells Fargo v. Estate of Malkin*,
2022 WL 1671966 (Del. May 26, 2022) ("*Estate of Malkin*") ....................................... *passim*

*Windsor I, LLC v. CWCapital Asset Mgmt.*,
238 A.3d 863 (Del. 2020) .............................................................................35

*Wuliger v. Mfrs. Life Ins. Co.*,
567 F.3d 787 (6th Cir. 2009) .........................................................................40

**Statutes**

18 Del. C. § 2074(a)...........................................................................6, 7, 23, 31

81 Del. Laws 172 (2017) ..................................................................................30

Del. S.B. 220, 146th Gen. Assem. (2012)..............................................................29

Del. H.B. 87, 147th Gen. Assem. (2013)...............................................................29

Del. S.B. 71, Amendment 1, 148th Gen. Assem. (2015).............................................29

Del. S. Res. 19, 148th Gen. Assem. (2016) ...........................................................29

**Other Authorities**

Fed. R. Civ. P. 56(e)(3)...................................................................................22

Restatement (Second) of Contracts § 198...............................................................22

Restatement (Third) of Unjust Enrichment and Restitution § 32 ....................................25

## I.    INTRODUCTION

Six years or so ago—before buying the Policies or paying a penny in premium for them—Wilmington Trust's principal, Viva, ███████████████████████████████. At that point, Viva—a sophisticated, multi-billion dollar investor in life insurance policies—had a decision to make. It *could have* taken the basic diligence steps recommended by its own trade organization (ILMA) such as interviewing the applicable insureds, insurance producers, trustees, and lenders in an attempt to learn how the Policies were originated—that is, did the insureds actually pay the premium to create the Policies; were the Policies ever intended to serve a legitimate insurance purpose; or was there a side agreement at inception entitling the premium funder to most of the Policies' death benefits. Viva concedes, however, that it deliberately chose *not* to do this. Viva also *could have* raised ██████████████████ with Columbus Life in an attempt to either negotiate a rescission and refund or to obtain a release of future claims. Viva concedes, however, that it deliberately chose *not* to do this either. And, of course, Viva *could have* simply elected not to buy the Policies, but this too, Viva concedes, it elected *not* to do.

Instead, ████████████████████████████, Viva elected to buy and pay premium on them. In so doing, Viva elected to rely upon private contractual remedies it secured from the seller; Viva's belief that it would likely be able to slip the eventual death claims past an unwitting carrier's claims department; and Viva's belief that—if that failed and the Policies were successfully challenged—a court like this one would likely make Viva whole—and then some—by "refunding," not just the premiums Viva paid, but also the premium Viva did *not* pay—all with years-and-years of supposed pre-judgment interest at almost double the contractual rate.

Viva stayed true to this "say nothing, do nothing" strategy for years—including by denying that the Policies were void in its Answer and by sitting idly by in discovery while Columbus Life spent considerable time and resources trying to uncover what happened. Then, just over a month

1

ago, Viva revealed itself, disclosing for the first time, as part of its summary judgment motion, that it was *not* going to contest the Policies' validity and was instead going to try to obtain a "premium refund" of $15,929,517, which is almost $6 million more than the Policies' total death benefit and over $10 million more than Viva itself has paid in premium—a windfall by any measure.

Viva is not entitled to any of this. Under broadly-applicable Delaware law, a party to an agreement violating public policy is not entitled to a return of performance where such an award would frustrate the public policy giving rise to the agreement's invalidity in the first place. Here, ███████████████████████████████████████████████████████████████ without bothering to conduct even the most basic of investigations into the facts and without raising the concerns *it admits it had* with Columbus Life at the outset. Under these circumstances, awarding Viva a refund of premium would frustrate, not further, Delaware's longstanding, constitutionally-based prohibition against STOLI by sending a loud and clear message to upstream STOLI promoters to keep manufacturing STOLI in Delaware because big downstream money will buy it.

Although the Delaware Supreme Court has not yet addressed the premium refund issue in a STOLI case between a carrier and an investor, it has recently addressed the question of what to do with STOLI premiums in the related context of an estate's STOLI claim against an investor. And in that case, the Delaware Supreme Court explained that a refund of the premiums paid by that investor was potentially available if the investor "can *prove its entitlement* to those premiums under a viable legal theory," such as unjust enrichment, and that the investor cannot prove such an entitlement if it was "not reasonably unaware of the insurable interest problem."[1] Here, by its own admission, Viva █████████████████████████████████, but even if it had not been, any such ignorance would not be reasonable because Viva concedes it failed to take even the most

---

[1] *Wells Fargo v. Estate of Malkin*, 2022 WL 1671966 (Del. May 26, 2022) ("*Estate of Malkin*").

basic measures to investigate the Policy's key origination facts. And, of course, even if this Court were to deem Viva entitled to some amount of a premium refund (and, respectfully, it should not), pre-judgment interest would not be appropriate because Viva never conceded (until a few weeks ago) that the policies were invalid; there still has been no court order deeming the Policies invalid; and Viva did not make a demand for the Policies' premiums until, at earliest, its Answer in this litigation.[2] In fact, as noted, Viva concedes that it deliberately chose *not* to make such a demand and elected instead say nothing to Columbus Life when Viva bought the Policies. On these facts, pre-judgment interest is wholly inappropriate and unwarranted.

Respectfully, this Court should deny Wilmington Trust's summary judgment motion, declare the Policies void *ab initio* for lack of insurable interest, and dismiss with prejudice Wilmington Trust's counterclaims for a premium refund and interest.

---

[2] Viva's Answer denied that the Policies were invalid and demanded, in the alternative, a premium refund to the extent the Policies were deemed invalid. Viva then agreed to a 1.5 year discovery period, so that the parties could conduct discovery into the Policy's origination facts. Columbus Life did not know at this time that Viva had no intent to even try to argue that the Policies were valid and that Viva instead merely intended to seek delay-after-delay to ratchet up its supposed pre-judgment interest claim. Although Columbus Life expects that Wilmington Trust will try to deny that this was its intention, any such argument is belied by Wilmington Trust's own summary judgment papers. In those papers, Wilmington Trust states that the "sole" reason it is not contesting the Policies' invalidity is due to their "peculiar economics," by which Wilmington Trust means that Viva would make more money if the Policies are voided and all premiums returned with interest. But those "peculiar economics" are nothing new and were known to Viva when it filed its Answer denying that the Policies were invalid. Delaware law has no interest in rewarding this sort of bad faith behavior that does nothing but waste party and judicial resources by way of years of discovery in the hopes of ratcheting up a bad faith interest claim in a desperate attempt to ensure that wagering on human life in Delaware pays off, one way or the other.

## II.    COUNTERSTATEMENT OF FACTS[3]

### A.    The KDI Program Was Presented To Columbus Life As Legitimate.

Contrary to Wilmington Trust's contention (WT_Op._Br. at 9-22),[4] Columbus Life did not know that the Policies were created through non-recourse premium financing or otherwise know, until its 2019 investigation, that the Policies were STOLI.[5] The KDI Program was marketed to Columbus Life by Potomac Partners, through misrepresentations that concealed the STOLI nature of the program and tricked Columbus Life into thinking it was legitimate insurance.

Columbus Life representatives participated in two KDI presentations made by Potomac's Ed Leisher. The first presentation occurred sometime in late 2003/early 2004. **Exhibit DDD**, Dep. L. Fangman 30(b)6 at 33:7-20, 124:24-125:15. The second occurred in September 2004. Among others, Lisa Fangman, who was then Assistant Vice President of Underwriting and New Business, attended both presentations on behalf of Columbus Life. *Id.* at 35:2-8, 35:13-36:25, 123:7-124:7. Neither Columbus Life nor Leisher retained documentation of the first presentation, which was in the form of a PowerPoint. *Id.* at 34:8-35:8; **Ex. C** at 192:12-195:12. Columbus Life retained a copy of the PowerPoint slides for the second presentation (**Exhibit EEE**, Potomac PowerPoint

---

[3] Columbus Life hereby incorporates by reference the Statement of Facts provided by Columbus Life in its Opening Brief In Support of Its Cross-Motion for Summary Judgment.

[4] Wilmington Trust's Opening Brief in Support of its Summary Judgment Motion will be referred to as "WT_Op._Br."; whereas, Columbus Life's Opening Brief in Support of its Summary Judgement Motion will be referred to as "CL_Op._Br."

[5] Although Wilmington Trust has now conceded the Policies' invalidity, it denied their invalidity by way of its Answer filed as recently as 2020. That it apparently took a year and half of discovery in federal court for Wilmington Trust to concede that the Policies lack insurable interest belies Wilmington Trust's assertions that Columbus Life should have known that the Policies were invalid back in 2004 when the STOLI fraud was being actively perpetrated against Columbus Life and long before Delaware STOLI law (and modern STOLI law in general) began to be clarified.

Slides re: KDI/Concordia Program) which, according to Fangman, was "very similar in terms of discussion of the program" as the earlier presentation. **Ex. DDD** at 127:20-128:8.

During both presentations, ***Leisher represented that the premium financing that was being utilized in the Concordia Plan was full recourse. Id.*** at 300:3-301:8. The KDI Program's "structure" included the insured's trust owning the policy, the trust borrowing funds from a commercial lender to buy an annuity, and the annuity proceeds being used to pay the policy premiums. **Ex. EEE** at 3961. Although the PowerPoint slides do not provide the financing details, the slides repeatedly make representations that are consistent with legitimate policies funded by full recourse loans—and that are inconsistent with a STOLI scheme involving non-recourse premium financing—in that they represent, among other things, that (i) the policies in the KDI Program would have a "traditional insurable interest" for the "benefit for the insured's family" (***id.*** at 3940, 3942, 3962, 3936); (ii) the policies would be part of an insured's "estate planning," a "balanced estate plan," and "to avoid the gift/estate tax" (***id.*** at 3938, 3948, 3950-3953, 3957); (iii) there would be "no third party ownership interest" of the policies (***id.*** at 3942, 3936, 3938), "no change of policy ownership post-closing" (***id.*** at 3940) and that "we prohibit the transfer of a trust interest to any person or entity that does not have an insurable interest" (***id***. at 3941); and (iv) the KDI Program "delivers more net death benefit to the [insured's] family long term than any traditional policy" (***id.*** at 3945). **Ex. DDD** at 120:17-121:4, 126:15-127:8, 145:3-9, 145:25-126:6, 151:16-21. As Fangman explained, based upon these representations, Columbus Life "believed that the KDI/Concordia Program aligned with Columbus Life's business practices . . . with our, . . . expectations with regard to . . . things like insurable interest . . . appropriate estate planning and funding, and so it was . . . an approved program." **Ex. DDD** at 140:20-141:1.

Contrary to Wilmington Trust's assertions (WT_Op._Br. at 11-13, 24-25), the form Participation Agreement and Trust Agreement provided by Potomac did not place Columbus Life on notice that the financing was non-recourse. In this regard, Wilmington Trust erroneously relies upon §§ 6 and 12 of an unsigned, form Participation Agreement and ¶ 2.6 of an unsigned, form Trust Agreement provided to Columbus Life. Section 6 of the Participation Agreement provides that "[i]n the event the Trust is unable to fulfill its obligations under the loans and such other agreements, the lenders and such other parties will have the right to obtain ownership of the life insurance policies pledged as security for the loans and such other agreements." **Ex. G**; **Ex. H**. But nothing in § 6 indicates that the loans would be non-recourse or that the funder would have no recourse other than the policies pledged as collateral. Instead, § 6 merely provides that the policies under the Concordia Plan would serve as collateral for the loans. The loan itself, when issued, would necessarily have to be documented by a separate loan agreement, which would identify the lender and the borrower and set forth the loan terms (including the loan duration, principal and interest, events of default, and the lender's rights at loan maturity or default). Unsurprisingly, none of this is addressed by the Participation Agreement.[6] Accordingly, there is nothing inconsistent with this Participation Agreement provision (which is limited to merely addressing loan collateral) and a more fulsome loan agreement entered into by lender and borrower which would contain these terms and address its recourse or non-recourse nature.[7]

---

[6] Moreover, as Amy Holmwood acknowledged, the term "nonrecourse" does not appear in §§ 6 or 12 of the Participation Agreement. **Exhibit FFF**, Dep. A. Holmwood at 102:4-18, 154:4-16.

[7] *See, e.g.*, *Finserv Cas. Corp. v. Settlement Funding*, 2016 WL 1271505, at *1 (S.D. Tex. Mar. 30, 2016) (Inter-Creditor Agreement could not be relied upon to prove terms of a related Loan Agreement and Promissory Note, which is the best evidence of the parties' obligations thereunder).

The same is true with regard to § 12 of the form Participation Agreement and § 2.6 of the form Trust Agreement, which provide, *inter alia*, that the insureds and the trustees would not be liable for any of the trusts' obligations. These agreements are not loan agreements and, again unsurprisingly, do not identify the loan details, including the parties to the loan agreements, the loan terms, or the loan agreement parties' repayment obligations. There is simply not enough information in these provisions to determine either way whether the loan was recourse or non-recourse. And, as noted above, although non-recourse premium financing has since become suspect, very little was known about it in 2003-04. Indeed, even now, Wilmington Trust argues (WT_Op._Br. at 6-7) that the non-recourse premium financing at issue was legitimate and that, under Delaware law, not all non-recourse premium financing results in a finding of STOLI.

### B.    Columbus Life Underwrote And Issued The Policies In Good Faith.

Columbus Life had no reason to know, during the underwriting of the Policies, that they were being financed by non-recourse loans and that they were STOLI. The Policies were among 18 policies placed by Potomac with Columbus Life under the Concordia Plan in 2004. Based upon information and documentation provided to Columbus Life during underwriting, it appeared that (i) the insureds had a financial need for the Policies; and (ii) the Policies were supported by an insurable interest because the Policy owners/beneficiaries were trusts in the insureds' names, and nothing suggested to Columbus Life that the Policies were being taken out in bad faith for the benefit of stranger investors without an insurable interest in the insureds' lives or that the Policies lacked a legitimate insurance purpose. **Ex. DDD** at 55:16-56:3, 60:4-61:10, 103:3-24. Under 18 Del. C. § 2704(d), Columbus Life had the right to rely upon the accuracy of the representations

that were made to Columbus Life relative to insurable interest during the underwriting of the Policies and Columbus Life had no legal duty to investigate their accuracy.[8]

### 1.    The Romano Policy

After receiving a trial application seeking to qualify Anthony Romano medically and reviewing medical records, on February 20, 2004, Columbus Life made a tentative offer for a policy on Romano's life at Columbus Life's standard rate, subject to submission of an application and full underwriting. **Exhibit GGG**, Romano Tentative Offer. On April 29, 2004, Columbus Life received an Infolink Services Inspection Report. **Exhibit HHH**, Romano IR. Based upon an interview with the insured and other sources, the report stated, *inter alia*, that Romano had a $12,645,000 net worth and that the "Beneficiary is a Trust Fund for Estate Planning Requirements and to Provide for Charitable Contributions upon the Applicant's Death." *Id.*

On June 25, 2004, Columbus Life received a formal application for a $5 million policy, with the Romano Family Delaware Trust as owner and beneficiary. **Ex. BB**. The Agent's Report accompanying the application represented that the Policy was for "personal and family protection." *Id.* On that same date, Columbus Life also received a Confidential Financial Statement, which represented, *inter alia*, that Romano had a net worth of $12,645,000, which was sufficient to justify the amount of coverage applied for. **Ex. BB**; **Ex. DDD** at 60:4-61:10.

---

[8] In this regard, Section 2704(d) of the Delaware Insurance Code provides "An insurer shall be entitled to rely upon all statements, declarations and representations made by an applicant for insurance relative to the insurable interest of the applicant in the insured, and no insurer shall incur legal liability except as set forth in the policy by virtue of any untrue statements, declarations or representations so relied upon in good faith by the insurer." *See Sun Life v. Wilmington Tr.*, 2022 WL 179008, at *12 (Del. Super. Ct. Jan. 12, 2022) ("*Frankel/DeBourbon*") ("[I]n the absence of statutory or regulatory authority to the contrary, insurers should be able to rely on the information submitted as part of the application for insurance, in order to determine insurable interest."); *Brighthouse Life Ins. Co. v. Geronta Funding*, 2021 WL 4080672, at *20 (Del. Super. Ct. Aug. 20, 2021) ("*Seck V*") (Section "2704(d) reflects that the legislature did not intend to require insurers to investigate fraud in the application.").

During the underwriting of the Policy, on June 24, 2004, HK Ventures (which was associated with Potomac) requested to "list bill" six policies. **Exhibit III**, B. Ratz Correspondence, dated June 24, 2004. List billing involves a single premium payment being submitted to the insurer for multiple policies to be allocated among the policies. **Ex. DDD** at 70:3-16. Columbus Life's Chief Underwriter, Tom Holdridge, questioned why they were being list billed and asked for "details of these relative to source of premiums, owners and beneficiaries." **Ex. III** at 2208. Consistent with Leisher's representations that the Concordia Plan was for traditional estate planning for the benefit of the insureds' families and that the premium financing was full recourse, HK Ventures assured Columbus Life that "these are straight premium financing cases" and "the owner and beneficiary is an ILIT for the benefit of the family members of the insured." **Ex. III**.

Columbus Life thereafter issued a $5 million policy on Romano's life backdated (as is common) to May 23, 2004 (Ex. CC).[9] Columbus Life determined that the issuance of such a policy was appropriate given Romano's financials, which showed a potential need for the Policy and the designation of the insured's trust as owner and beneficiary. **Ex. DDD** at 55:16-56:3, 60:4-61:10.

### 2.    The Cohen Policy

After receiving a trial application seeking to qualify Janet Cohen medically and reviewing medical records, on June 23, 2004, Columbus Life made a tentative offer for a policy on Cohen's life at Columbus Life's standard rate, subject to submission of an application and full underwriting **Exhibit JJJ**, Cohen Tentative Offer. Thereafter, on June 28, 2004, Columbus Life received an August 6, 2003 Inspection Report. **Exhibit KKK**, First Cohen IR. Based upon an interview with the insured and other sources, the report stated, *inter alia*, that Cohen had $17,308,976 in assets

---

[9] Upon request, insurers can backdate policies to "save age," which means that the policy date is backdated before the insured's last birthday so the insured can obtain a lower premium rate based upon a lower age at policy issuance. **Ex. DDD** at 58:2-59:1.

and a $16,308,976 net worth and that the "Beneficiary is a Trust Fund for Estate Planning Requirements." *Id.* at 161, 163. The underwriter flagged the report as being outdated and requested an updated inspection report. **Exhibit LLL**, Correspondence re: Updated IR, dated July 19, 2004. On August 6, 2004, Columbus Life received an updated August 4, 2004 inspection report providing the same financial information as the earlier version. **Exhibit MMM**, Second Cohen IR.

On or about August 2, 2004, Columbus Life received a formal application for a $5 million policy listing the Janet Cohen Family 2004 Delaware Trust as owner and beneficiary. **Exhibit NNN**, Cohen Application. The Agent's Report, which accompanied the application, represented that the Policy was for "personal and family protection." ***Id***. at 4207. That same day, Columbus Life also received a Confidential Financial Statement signed by Cohen, which represented, *inter alia*, that she had a net worth of $16,308,976, which was sufficient to justify the amount of coverage applied for. **Exhibit OOO**, Cohen Fin. Stat.; **Ex. DDD** at 103:3-24.

Columbus Life thereafter issued a $5 million policy on Cohen's life with a policy date of August 6, 2004, concluding that such a policy was appropriate given the insured's financials, which demonstrated a potential need for the Policy and the designation of the insured's trust as owner and beneficiary. **Exhibit PPP**, Cohen Policy; **Ex. DDD** at 55:16-56:3, 103:3-24.

### C.    The Initial Premium Funding and Collateral Assignments Raised No Flags.

By the time that the Romano and Cohen Policies were issued, the Concordia Plan had been vetted by Columbus Life, and Columbus Life expected that the policy premiums would be initially funded, under the program, by full recourse premium financing provided by Columbus Circle Capital. Consequently, it came as no surprise to Columbus Life that Columbus Circle Capital was paying premiums and that collateral assignments for Columbus Circle Capital's security interest in the Policies would be processed shortly after the Policies were issued—which is exactly what occurred. **Ex. DDD** at 75:22-76:25, 86:9-92:7, 112:17-116:10. Because Columbus Life

understood, at the time, that premium financing (albeit full recourse premium financing) was being used to finance the initial premium payments, this was not a situation where it had been represented to Columbus Life during underwriting that the premium payments were being made by the insured and then a collateral assignment to a premium lender was submitted to the company for recording shortly after policy issuance. Accordingly, contrary to Wilmington Trust's suggestion (WT_Op._Br. at 10), there was nothing suspicious about the submission of the Collateral Assignments, and the assignments did not present any potential red flags at the time.

### D.    The Producers Reaffirmed Their Lies.

Not only did the Potomac producers lie to Columbus Life about the KDI Program and the premium financing in their marketing of the program and in their June 24, 2004 email to Holdridge, they continued to lie to Columbus Life after the Policies were issued. Indeed, during the course of Columbus Life's rescission in 2005 of certain KDI policies for material misrepresentations in the applications in failing to disclose other in-force insurance (discussed below), Amy Holmwood from Potomac sent Columbus Life a letter on September 15, 2005 (**Exhibit QQQ**, Holmwood Correspondence dated Sept. 15, 2006) in which she defended the legitimacy of the KDI Program and falsely represented that the Policies had been originated for the insureds' benefit.

### E.    Columbus Life Made Efforts To Combat STOLI.

Although Columbus Life has been proactive in combatting STOLI, Columbus Life's (and the life insurance industry's) knowledge of these increasing complex and fraudulent STOLI schemes[10] and their efforts to combat STOLI evolved over time. **Ex. DDD** at 56:4-57:4. Prior to

---

[10] STOLI schemes became increasingly complex over time. STOLI promoters concealed STOLI from insurers by transferring beneficial interests in trusts that owned policies, which transfers were not recorded with insurers. *See, e.g.*, *Price Dawe*, 28 A.3d 1059. STOLI schemes were also disguised through complex non-recourse premium financing programs, also designed as covers for

the STOLI phenomenon, insurers such as Columbus Life initially relied upon their normal, long-established underwriting procedures to avoid issuing policies lacking insurable interest. At the time the Policies were underwritten in 2004 (i.e., the early years of modern STOLI), Columbus Life "would review the proposed owner of the policy as well as the beneficiary to determine if the individual or entity that was identified aligned with the acceptable types of beneficiaries and owners . . . and aligned with the intent that was stated for coverage." **Ex. DDD** at 55:16-56:3.

Columbus Life's and other insurers' applications (including the applications for the Policies at issue) initially did not include questions about the use of premium financing or the insured's intent to sell policies being applied for on the secondary market. **Ex. DDD** at 101:15-102:12. However, as that STOLI phenomenon and Columbus Life's knowledge of it evolved, starting in mid-2005 (after the Policies had already been issued), Columbus Life began implementing new robust underwriting requirements to try to deter STOLI. This included sending out announcements in 2005 informing the producer sales field that Columbus Life would not accept "stranger owned life insurance (SOLI)," "investor owned life insurance (IOLI)"—applications for policies that were intended at inception to be sold on the secondary market and/or non-recourse premium financing. **Exhibit RRR**, CLIC Field Memo dated May 2005; **Exhibit SSS**, CLIC Field Memo dated July 15, 2005; **Exhibit TTT**, CLIC Field Memo dated July 18, 2005; **Ex. DDD** at 157:15-23. As Columbus Life explained in its announcement, this type of business was problematic in several respects in that (i) "the subsequent sale of the policy in the life settlement market results in the policy being owned by an investor that anticipates profits when the insured dies"; (ii) "[i]ndividuals who participate in SOLI and IOLI programs may unwittingly reduce their

---

investors to create policies for investors, without tipping off insurers. *See, e.g., Sun Life v. U.S. Bank*, 369 F. Supp. 3d 601, 611 (D. Del. 2019) ("*Sol I*").

future ability to obtain insurance coverage"; (iii) "these programs raise many legal and financial issues that individuals may not fully understand at the time they enter into the transaction; (iv) "[t]here is growing concern that state and federal securities regulators may feel compelled to regulate SOLI, IOLI, Viatical and life settlements as securities transactions"; and (v) "[i]f life insurance is acquired by outside financing and then sold to investors," there was a concern that Congress may strip life insurance of "the favorable tax treatment that currently makes our products so attractive." **Ex. RRR** at 4376.

Thereafter, Columbus Life started to roll out interim underwriting requirements to try to deter STOLI and non-recourse premium financing, which had by then been recognized as a potential indicator of STOLI, including by requiring the submission of forms entitled "Requests for Preliminary Underwriting," an "Investor-Owned Life Insurance (IOLI) Certification," and a "Premium Financing Applicant Disclosure Statement." **Ex. TTT** at 4403-4406. Columbus Life also provided producers with updated Financial Underwriting Guidelines and Advanced Underwriting Guidelines for Premium Financing.[11] **Ex. RRR**; **Ex. SSS**; **Ex. TTT**; **Ex. DDD** at

---

[11] Wilmington Trust speciously asserts that, because certain events at Columbus Life took place around the same time in May 2005, that there was some causal relationship between them. Wilmington Trust tries to link the issuance of the STOLI announcements and the company's anti-STOLI efforts with the circulation of t███████████████████████████████████████ ████████████████████ WT_Op._Br. at 14-15, 38. Contrary to Wilmington Trust's assertion, these events were not related to each other. As Fangman explained, the Concordia Plan materials were provided to Brown, as a newly appointed Chief Underwriter, to familiarize him as to the Concordia and other insurance programs and was not connected to Columbus Life's anti-STOLI efforts at the time. **Ex. DDD** at 176:4-179:21. She also testified that there was no relationship between the company's anti-STOLI efforts and t███████████████████████ ███████████████████. *Id.* at 184:11-185:20, 192:9-193:3. Moreover, there is nothing controversial about the Potomac/Concordia Plan references █████████████████████████ ███████████████████. Consistent with Columbus Life's understanding of the Plan and the representations made in Leisher's presentations, the ████████████ stated Columbus Life's

158:10-159:9. The IOLI Certification had questions requiring the disclosure and details of any intended premium financing arrangement and any policy owner intent to take out a policy to sell it on the secondary market. **Ex. SSS**. Although the IOLI Certification was to be signed by the insured and owner, Columbus Life's understanding was that the IOLOI Certification could not completely prevent STOLI and could only serve as a deterrent because it was not part of the policy application and, consequently, any misrepresentations made in the certification or any of these other interim documents could not be relied upon to rescind a policy; the intent was to catch potential STOLI polices in the application phase and decline to issue them. **Ex. DDD** at 159:4-9.

These measures were implemented in 2005 *as interim measures* to deter STOLI because any revisions to Columbus Life's application forms had to go through an arduous regulatory approval process by the insurance departments of each state where Columbus Life policies were sold. Columbus Life was only able to start getting that approval to include these premium financing and STOLI-related questions in application forms by state insurance departments in 2006. **Ex. DDD** at 159:10-160:1; *see, e.g.*, **Ex. VVV** (regulatory approval by Ohio Dep't of Insurance).

Columbus Life also examined policies for behavioral trends that were unusual and *potentially* indicative of STOLI and focused on changes of ownership to entities that did not appear to have an insurable interest. Although life settlements are legal and there are legitimate reasons why a policy owner might acquire a policy for legitimate insurance purposes but then (due to some change in circumstances) decide to sell their policy on the secondary market, a secondary market sale soon after policy issuance is a *potential* STOLI indicator. Consequently, in 2006, Columbus

---

understanding, at the time, that (i) the KDI Program was "an extension of [a] traditional estate plan"; (ii) supported by an "insurable interest"; (iii) with "no transfer of ownership"; and (iv) with the insureds' trusts borrowing money to purchase annuities to fund premiums. *Id.* at 9238. The only other references to Potomac include background data on the agency and data regarding their volume of business, *along with those of several other agencies. Id.* at 9239-9241, 9270-9271.

Life started tracking ownership changes to entities that did not appear to have an insurable interest on high face amount policies on elderly insureds. **Exhibit WWW**, Dep. of R. Noschang 30(b)6 at 175:3-176:16. These policies were initially tracked on Columbus Life's computer system and, starting in 2010, Columbus Life began circulating cumulative reports entitled "Potential Investor Owned/Life Settlement Policies" listing such policies by, *inter alia*, producer groups. These lists were generated until the end of 2014. **Exhibit XXX**, Possible Investor Owned Policy Lists dated Feb. 26, 2011; **Exhibit YYY**, Possible Investor Owned Policy Lists dated Aug. 31, 2010; **Exhibit ZZZ**, Possible Investor Owned Policy Lists dated Oct. 15, 2012; **Exhibit AAAA**, Possible Investor Owned Policy Lists dated Jan. 4, 2013**; Ex. WWW** at 177:16-179:10. 182:20-183:10, 192:20-193:5, 196:11-197:4, 202:12-203:11, 230:1-19, 246:13-247:15. As discussed in greater detail below, at the time, Columbus Life believed that there was nothing that it could do with potential STOLI policies and that it was "stuck' with them so the primary purpose of these lists was to provide them to the Marketing Department so they could assess the company's relationship with producers that were involved with policies on these lists and whether that relationship should be terminated.[12] **Ex. WWW** at 247:16-248, 250:19-251:10, 252:2-8.

Contrary to Wilmington Trust's mischaracterization (WT_Op._Br. at 4, 19-20, 39), these were not "STOLI lists." Instead, these were lists of "Potential Investor Owned/Life Settlement Policies" based upon very broad *potential* STOLI indicators that also included many legal life

---

[12] Wilmington Trust's assertion that a January 24, 2012 internal Columbus Life email constituted a further refinement to "capture STOLI policies more surgically" (WT_Op._Br. at 19) and to exclude legitimate life settlements is baseless. As Robert Noschang, Assistant Vice President New Business and previously Assistant Vice President, Policy Services for Columbus Life, explained, the criteria that was then applied (issue age 70+, face amount of $5+ million, and issued between 2003-2006) were not capturing policies "that are specifically STOLI," but rather just "tried to identify where . . . the largest concentration of where STOLI policies could exist are" and that policies with that criteria "may or may not be STOLI." **Ex. WWW** at 231:17-234:12, 235:10-17.

settlements.[13] **Ex. WWW** at 208:5-17. In fact, Columbus Life has paid almost all of the death claims it has received on policies appearing on these lists.[14] In this regard, as of December 31, 2021, Columbus Life had received death claims for 279 policies that have appeared on these lists and more than 97% of these claims (271) have been paid by Columbus Life in the ordinary course and three claims were pending payment as of the end of 2021. **Ex. CCC**. Moreover, Columbus Life has been a party to relatively few legal actions (19) in which it sought a judicial declaration whether a policy was an invalid STOLI policy. ***Id.***

Moreover, to the extent that Columbus Life had suspicions that some policies appearing on these lists might potentially be STOLI, it had no legal obligation to disclose that information to the policy owners.[15] *See Frankel/DeBourbon*, 2022 WL 179008, at *11-14 (rejecting Wilmington

---

[13] As Noschang explained, Columbus Life understands that there is a distinction between legal life settlements and STOLI policies in that (i) "a life settlement would have been a policy that was . . . legitimately sold and . . . as the policy progressed, . . . the insured or owner may have determined that they no longer needed that policy, and it was sold on the secondary market"; and (ii) "an investor-owned policy, or STOLI policy, would have been a policy that was really a wager on a human life, and it was . . . with the intent that it was going to be transferred at some point in time." **Ex. WWW** at 175:15-176:16, 176:21-177:8; *see Frankel/DeBourbon*, 2022 WL 179008, at *7 ("Over time a secondary market for life insurance emerged allowing policy holders 'who no longer need life insurance to receive necessary cash during their lifetimes.' The secondary market is both legal and highly regulated. . . . A STOLI policy is one where a third party creates a life insurance policy for the benefit of those who have no relationship to the insured. Thus, a STOLI policy lacks an insurable interest, resulting in an illegal wager on human life."").

[14] Through the end of December 2021, Columbus Life was administering approximately 120,298 policies. Over the five-year period from January 1, 2017 through December 31, 2021, Columbus Life received 10,934 death claims and out of those claims, Columbus Life paid 10,347 claims (over 94%). Of the 10,934 death claims received by Columbus Life over that five-year period, it has denied only nine claims (.08%). The remaining 578 claims that had not yet been paid were pending payment. It is not unusual for Columbus Life to have that amount of claims pending payment at any point in time because, on average, Columbus Life roughly receives 200-300 death claims per month, it takes on average 30 days to settle a claim, and some claims may take longer to process because, for example, some claims' requirements are missing—such as claim paperwork being incomplete or not filled out correctly, or delayed receipt of estate or trust documentation. **Ex. CCC**.

[15] There have been several instances where life insurers have either communicated their suspicions to policy owners that their in-force policies might be STOLI or challenged the validity of in-force

16

Trust's argument that insurer had duty to disclose appearance of policies on suspected STOLI policy lists, explaining that "[t]here is no authority that imposes a duty on [insurer] to inform policy owners that policies had been 'flagged' as STOLI. Wilmington Trust also presents no authority that implies [insurer] had a duty to cease accepting premiums. . . . There is no evidence [insurer] is in violation of any statute or regulations that directly addresses these issues.").

And, as noted, from the time that the Policies were issued in 2004 until late 2018, Columbus Life believed that it was "stuck" with them and other policies appearing on the lists and Columbus Life had no intent to challenge their validity. Columbus Life's initial understanding—consistent with traditional life insurance rescission principles—was that Columbus Life could only challenge the validity of a policy (i) if brought within the contestable period; and (ii) if it had evidence of material misrepresentation in the insurance application. As Noschang explained, "we believed that we were stuck with these policies" because any challenge to STOLI policies had "to be within the contestable period and have material misrepresentations, and we did not believe those conditions existed." **Ex. WWW** at 253:13-18. Fangman likewise explained that Columbus Life believed, at the time, that a lawsuit "alleging that policies were invalid because they lacked insurable interest" had to be filed within the two-year contestable period with evidence of an application misrepresentation. **Ex. DDD** at 158:12-19. And Justin Payne, Assistant Vice President, Claims, similarly explained that, "prior to November of 2019, Columbus Life had never filed a lawsuit challenging the validity of a life insurance policy for lack of insurable interest," and that Columbus

---

policies as STOLI only to be sued by the policy owners for damages alleging that such actions made the policy worth less on the secondary market. *See, e.g.*, *AMT Capital Holdings v. Sun Life*, No. 654756/2016 (N.Y County Supreme Court); *Sun Life v. Paulson*, 07-cv-3877 (D. Minn); *Sun Life v. Imperial Premium Fin.*, LLC, Nos. 17-10189, 17-10415 (S.D. Fla.); *Abraham Miller, as Successor Trustee of the Miller 47 Street Trust 5 v. Sun Life*, No. 2184-cv-02466 (Massachusetts Superior Court).

Life was unaware at that time that legal challenges could be brought "on STOLI cases outside of the contestable period." **Exhibit BBBB**, Dep. of J. Payne 30(b)6 at 26:7-16, 36:19-37:4.

Although Columbus Life suspected *after* policy issuance that the Policies *might be* STOLI based upon some suspicious policy behavior (including early changes in ownership to entities that did not appear to have an insurable interest), Columbus Life believed that it did not have any legal basis to challenge policy validity due to the lack of any evidence of material misrepresentation in the applications, which were devoid of any STOLI-related questions. **Ex. PPP** at 9295-9297; **Ex. CC** at 357-359; **Ex. DDD** at 56:4-57:25, 162:18-20.

Wilmington Trust's assertion that the Court should disregard the unrebutted testimony of several Columbus Life executives regarding this understanding because the company has not surveyed every current and former company employee to confirm that was their understanding as well (WT_Op._Br. at 20-21, 38) is patently absurd. Columbus Life's high-level executives—Fangman,[16] Noschang,[17] and Payne—all consistently testified that this limitation on legal rights was the company's understanding at the time based upon their own understanding as well as their interactions with other executives in departments that would have been involved with any such policy assessments—including the Claims, Underwriting, Operations and Legal Departments.[18]

---

[16] Fangman joined Western & Southern (Columbus Life's parent company) in 2000. She was the Assistant VP of Underwriting and New Business between 2000-2007. She was VP of Underwriting and New Business from 2007-2015. And, she has been the VP of Insurance Operations since 2015 with responsibilities for overseeing the claims department, corporate records department and annuity operations department. **Ex. DDD** at 28:12-29:17.

[17] Noschang joined Western & Southern in 2000. He started as the Director of Operations Analysis and Corporate records, became Assistant VP of Policy Services and Operations Analysis in 2004 and then became the Assistant VP of New Business in 2018. **Ex. WWW** at 27:8-29:11.

[18] Payne was involved in Columbus Life's decision to file these and other lawsuits involving KDI policies seeking declarations that they are void human life wagers. **Ex. BBBB** at 25:20-26:10.

**Ex. BBBB** at 36:19-37:4; **Ex. WWW** at 74:20-75:14, 79:6-12,158:2-8, 257:7-258:8, 258:19-259:19, 262:12-263:3, 263:12-19; **Ex. DDD** at 158:12-19.

Moreover, Columbus Life's actions taken during this time period were entirely consistent with this understanding. For example, when Columbus Life obtained information during the two-year contestable period that there were material misrepresentations (unrelated to insurable interest) in applications for certain KDI policies, it promptly took action to rescind such policies. In this regard, in the fall of 2005, Columbus Life obtained information (either through an alert from the Medical Information Bureau or a reinsurer) that there were policies issued by other insurers on certain KDI insureds that were not disclosed in response to an application question about other in-force policies. **Ex. WWW** at 106:15-107:6. Columbus Life initially rescinded certain policies (insureds ███████████████████████), some of which rescissions (██████████████ ████) were retracted based upon further investigation into the representations. Those policies did not include either the Romano or Cohen Policies because there was no undisclosed insurance issues with those policies. **Exhibit CCCC**, Compendium of Letters re: Policy Rescissions; **Ex. DDD** at 82:21-85:1, 216:4-8, 242:18-243:16, 245:249:15; **Ex. WWW** at 85:22-88:1, 93:2-21, 95:2-12, 96:5-99:15, 100:9-101:18, 102:1-104:15, 110:10-111:3.

Furthermore, because Columbus Life believed that its right to challenge the validity of STOLI policies was limited and that it was "stuck" with such policies, Columbus Life explored other alternatives to legal challenges to suspected STOLI policies. In this regard, Columbus Life initially tried to reject premium payments made by, and changes of ownership in favor of, an entity (Erwin & Johnson) that lacked an insurable interest in the lives of Cohen and other Concordia Plan insureds. However, after consulting with the Legal Department, Columbus Life retracted this position because it concluded that the policy contracts did not allow it to reject any such premium

payments or ownership changes. **Ex. DDD** at 216:12-220:8, 223:19-224:17, 241:19-242:3; **Ex. WWW** at 60:7-67:21, 73:12-74:5, 74:20-75:14.

     **F.**     **Columbus Life Decided To Challenge the Policies.**

     It was not until October of 2018 when Payne attended a STOLI presentation at an International Claims Association conference that Columbus Life's understanding of its ability to bring legal challenges on suspected STOLI policies changed. **Exhibit DDDD**, Int'l Claims Conference PowerPoint Slides. At that presentation, Payne learned that there had been recent legal developments under Delaware and some other states' laws that (i) held that STOLI was an illegal void *ab initio* human life wager; (ii) allowed post-contestable challenges to policies lacking an insurable interest; (iii) did not require proof of material misrepresentations in applications; (iv) recognized that STOLI schemes that feigned technical compliance with insurable interest requirements were void human life wagers; and (v) recognized that non-recourse premium finance loan transactions disguised to appear to be legitimate loans were, in fact, void STOLI. **Ex. BBBB** at 29:5-30:13, 33:17-35:16, 36:19-37:4, 38:13-39:10, 44:9-45:20, 49:9-51:4.

     Promptly thereafter, Payne shared this information with Fangman and Columbus Life's Legal Department. **Ex. BBBB** at 65:11-66:18. Then, Columbus Life began to evaluate certain blocks of policies for potential legal challenges.[19] *Id.* at 70:14-71:10. Because the ICA presentation primarily focused on Delaware as a favorable jurisdiction for potential STOLI challenges,

---

[19] Wilmington Trust's suggestion that the inception of the company's review of potential STOLI policies was timed to coincide with its implementation of a three-year document retention policy at the beginning of 2019 (WT_Op._Br. at 17-18, 38-39) is baseless. The review shortly followed the company's new understanding of its legal rights based upon the October 2018 ICA presentation; the document retention policy (which resulted in the purging of emails older than three years) had been adopted three years earlier in 2016; and there is simply no evidence that the company made its decision to wait until its new email retention policy was implemented before undertaking this review process. **Ex. DDD** at 258:2-259:15, 282:23-283:17, 285:8-11.

Columbus Life initially identified, for review, Delaware-issued policies on its books that were "entity owned"—a total of nine policies. *Id.* at 73:19-75:13. After excluding three policies owned by entities that appeared to be related to insureds, there were a total of six Delaware entity-owned policies for review—which included Romano, Cohen and four other Concordia Plan policies produced by Potomac. *Id.* at 84:14-86:13. As part of its review, on July 19, 2019, Columbus Life sent letters to the owners of the six policies (including letters to Wilmington Trust as owner of the Policies) requesting the disclosure of "any evidence" they may have had that the policies were STOLI and informing them that Columbus Life "reserves the right to have the policy declared void *ab initio* and to retain some or all of the premium" if the "policy is determined to be STOLI, or otherwise violates the applicable insurable interest and legal requirements for a life insurance policy." Columbus Life received no response from Wilmington Trust. **Exhibit EEEE**, Compendium of Reservation of Rights Letters.

Columbus Life also referred these policies to outside counsel at the law firm of Cozen & Connor for review and investigation, which included reaching out to insureds' family members. **Ex. BBBB** at 79:6-80:19. During this investigation, Columbus Life obtained ***actual evidence that the KDI Program was STOLI*** from an interview of Giselle Huber, a probate attorney and daughter of one of the insureds (Rita Kluener), who stated that (i) her mother did not need insurance; (ii) her mother was solicited to participate in the program so that a high face value policy could be obtained on her life with a nominal $1,000 contribution; (iii) Ms. Huber had expressed concerns at the time to her mother about the legitimacy of the program; and (iv) her mother did not pay and could never have afforded to pay the substantial policy premiums. **Exhibit FFFF**, G. Huber

Statement; **Ex. BBBB** at 80:19-82:12, 83:1-84:13.[20] As Payne explained, "from the interview of Giselle Huber, we were highly suspicious that this was a nonrecourse premium finance loan" and "as both policies [Romano and Cohen] were sold through this KDI Program," the Huber interview was "relevant in terms of it shed light on the program." **Ex. BBBB** at 92:13-21, 116:8-15.

Cozen's investigation also included an interview of Neela Patel, a former Potomac employee, who stated that her job responsibilities included generating spreadsheets with life expectancy evaluations ("LEs") of insureds in the Concordia Plan. LEs are commonly generated in STOLI transactions so that investors can value their human life wagers by projecting the amount of premium that will likely have to be paid during the duration of an insured's remaining life expectancy before an insured dies and the investor can collect a death benefit.[21] As Payne explained, Columbus Life learned, through its counsel, that the generation of LEs was "a sign of STOLI behavior on an agent's part." **Ex. BBBB** at 82:13-22.

After filing a lawsuit in May 2020 challenging the Kluener policy, Columbus Life obtained further evidence for the first time in *Kluener* discovery that the Concordia Plan was STOLI including, *inter alia*, the KDI Master Funding Agreement, which confirmed that the premium financing was non-recourse and that the Plan included a "Death Benefit Sweep," which enriched investors lacking any insurable interest. **Ex. BBBB** at 89:10-90:20; **Ex. K** at 618 ("Death Benefit

---

[20] Cozen's interview of Huber occurred during the summer of 2019 although her statement was not memorialized in a declaration until June 2021 after a lawsuit was filed by Columbus Life on May 29, 2020 challenging the Kluener policy as a void human life wager under Delaware law. **Ex. FFFF**; **Ex. BBBB** at 80:13-81:21.

[21] *See, e.g.*, *Pruco v. Brasner*, 10-cv-808804, 2011 WL 13117063, at *2 (S.D. Fla. Nov. 4, 2011) ("Life expectancy reports are used to gauge the life expectancy of a prospective insured and are used to calculate the life insurance policy in the secondary market for life insurance. The longer the insured's projected life expectancy, the less valuable a policy is likely to be in the secondary market because of the continuing obligation to pay premium over many years before the insured dies and the death benefit becomes payable.").

Sweep"); **Ex. L** at 18683 ("Death Benefit Sweep"). Columbus Life thereafter decided to challenge other in-force KDI policies including the Romano and Cohen Policies as void human life wagers under Delaware law. As Payne explained, the decision to bring these legal actions was based upon a review of the Romano and Cohen policy files, the data provided in the Huber and Patel interviews, the discovery obtained in the *Kluener* action, and the company's changed understanding of its legal rights based upon the ICA presentation. **Ex. BBBB** at 121:13-123:11.

## III.    ARGUMENT

### A.    The Policies Are Void *Ab Initio* For Lack of Insurable Interest.

The Policies are void *ab initio* for lack of insurable interest for the reasons set forth in Columbus Life's Opening Brief. (CL_Op._Br. at 24-35). Wilmington Trust concedes that the Policies should be declared void *ab initio* for lack of insurable interest.. WT_Op._Br. at 2 ("Securities Intermediary will not contest the issue of policy invalidity in these cases, [and] will assume that the Policies are void for purposes of summary judgment motions."). Pursuant to Rule 56(e), where issues are conceded and facts are undisputed, the Court may "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3). Columbus Life respectfully submits that the undisputed and conceded facts show that Policies are void *ab initio*. Thus, Columbus Life respectfully requests the Court enter summary judgment and declare the Policies void *ab initio* as a matter of law. *Cf. e.g.*, *Del. State Univ. v. Thomas Co. Inc.*, 2020 WL 6799605, at *65 (D. Del. Nov. 19, 2020) (granting summary judgment where party "concedes to summary judgment" on the claims and arguments); *Acceleration Bay LLC v. Electronic Arts Inc.*, 2019 WL 1376036, at *3 (D. Del. Mar. 27, 2019) (granting "motion for summary judgment on the conceded issues.").

### B.    Wilmington Trust Is Not Entitled To Any Premium Refund.

#### 1.    Wilmington Trust Is Not Entitled To A Premium Refund Because Refunding Premium To An Investor Like Viva— ██████████████████ —Would Frustrate The Public Policy Rendering Them Void In the First Place.

Although the parties cite to different authorities as setting forth the test for evaluating the premium refund question, the authorities cited by both parties actually makes clear that the central question to be decided in a given case is whether returning performance made under an agreement violating public policy will further or frustrate the public policy rendering the agreement void *ab initio* in the first place. Columbus Life's Opening Brief, for example, cited to the *Seck* court's application of the Restatement (Second) of Contracts § 198, which allows for a premium refund where the buyer was (i) "excusably ignorant" of the policy's insurable interest problems (sub-section (a)); or (ii) coerced or tricked into buying the policy (sub-section (b), as clarified by the official comments). CL_Op._Br. at 36-40. And although Viva prefers the framework of the Restatement (Third) of Unjust Enrichment and Restitution § 32, the reality is that even this newer, less-accepted approach only allows a refund of performance made under an illegal agreement "if the allowance of restitution will not defeat or frustrate the policy of the underlying prohibition."

Moreover, while the Delaware Supreme Court has not yet specifically addressed the premium refund question in the context of STOLI cases brought by carriers under 18 Del. C. § 2074(a), the *Seck* court's approach is consistent with the Delaware Supreme Court's recent discussion of whether STOLI investors can obtain a premium set-off in the context of STOLI cases brought by the families of insureds under 18 Del. C. § 2704(b). *Estate of Malkin*, 2022 WL 1671966. In that case, the Delaware Supreme Court stated that an investor "being sued under Section 2704(b) may recover the premium *it paid* on the void contract *if it can prove its entitlement* to those premiums under a viable legal theory," such as unjust enrichment, and proceeded to

discuss approvingly the parties' agreement that the investor "cannot recover the premiums it paid if [the investor] was not reasonably unaware of the insurable interest problems." *Id.* at *12-13.

All of which is to say that a downstream investor like Viva cannot prove an entitlement to restitution under a STOLI policy unless the investor undertook appropriate diligence and bought the policy in question without knowing it had insurable interest problems. The reason for this is simple. A buyer who buys a policy reasonably unaware of its insurable interest problems does not incentivize upstream promoters to create more STOLI; rather, it notifies upstream actors that the downstream money is only interested in buying legitimate policies and that there is no place in the life settlement market for STOLI. The contrary is, of course, also true. Refunding premium to an investor like Viva that did not conduct a reasonable investigation and that elected to buy the Policies ███████████████████████████████████████ sends a loud and clear message to upstream actors *to create more STOLI* to satisfy that indiscriminate demand.

As explained more fully in Columbus Life's Opening Brief, Wilmington Trust cannot prove an entitlement to a premium refund here—regardless of which exception it tries to proceed under—because Viva concedes ████████████████████████████████████ ████████████████████████████████████████████, and willfully blinded itself to the Policies' origination facts by declining to do the most basic things imaginable such as calling the applicable insureds, insurance brokers, trustees, and lenders to determine the origination facts; seeking out copies of the applicable program documentation (including those referenced by name in the Data Room), and reaching out to Columbus Life to address the concerns Viva admits it had before buying them.[22] Cl._Op._Br. at 20-24, 36-40. Again, rewarding

---

[22] Viva absurdly contends that it declined to call Columbus Life before buying the Policies solely on principle (i.e., that it was not Viva's job to ask). The reality is that Viva did not ask because it

sophisticated investors who willfully blind themselves to the problems associated with the policies they buy would send a clear message to upstream actors to keep creating STOLI because there are deep-pocketed investors like Viva downstream willing to buy them, warts and all.

### 2.    Wilmington Trust Is Not Entitled To An Automatic Refund.

As set forth in Columbus Life's Opening Brief, Wilmington Trust's claim on behalf of its principal, Viva, seeking an automatic refund of premiums must fail. CL_Op._Br. at 36-41. Indeed, the Delaware Supreme Court has held that "[a] court may never enforce agreements void *ab initio*, no matter what the intentions of the parties," *Price Dawe*, 28 A.3d at 1067, and that where "it is against the public policy of this State to permit its courts to enforce an illegal contract prohibited by law . . . [o]rdinarily, . . . neither party has a remedy *to any extent* against the other." *Della v. Diamond*, 210 A.2d 847, 849 (Del. 1965) (emphasis added). If restitution of performance under an illegal agreement is *ordinarily* not appropriate, it follows that restitution cannot be *automatic*.

Moreover, as noted above, the purpose of Delaware's general rule against relief under agreements that violate public policy is to protect the public by discouraging the creation of such agreements. *See Eisenman v. Seitz*, 25 A.2d 496, 498 (Del. Ch. 1942) (refusing return of property made into an illegal agreement for retail liquor business because "[t]he illegal terms are of such a character as would tend to promote evasion or frustration of restrictive and regulatory objects of the Act," and rejecting argument that leaving plaintiff where it was found was "unjust or inequitable" "'on account of public interest.'" (quoting *McMullen v. Hoffman*, 174 U.S. 639, 669 (1899))); *see also Cook v. Pierce*, 7 Del. 499, 502-03 (Del. Super. 1862) (declining remedy of repayment of money because the contract was "illegal and void, and no action can be maintained

---

did not want to alert what it apparently considered to be a sleepy carrier to insurable interest issues that could result in Columbus Life investigating and seeking to invalidate the policies.

upon it for the recovery of the money."); *Model Heating Co. v. Magarity*, 81 A. 394, 394 (Del. 1911) (recognizing that "[i]n *Cook v. Pierce*, a well-established principle was applied correctly."); *Beeber v. Walton*, 32 A. 777, 779 (Del. Super. 1887) (refusing return of premiums because "the contract made in reference thereto is illegal and void, and consequently no action can be maintained upon such contract, or upon the said premium notes.").

At bottom, the reason an investor is not automatically entitled to a STOLI premium refund is the same reason an insurer is not automatically entitled to retain the premiums: The question in each case comes down to whether awarding restitution under the illegal agreement at issue in that case would further or frustrate Delaware's insurable interest public policy. Here, as noted above, rewarding Viva with a premium refund would frustrate Delaware's strong, constitutionally-based public policy against human life wagers because it would reward an investor who, by its own admission, did nothing more than review the documents the seller put in a Data Room, elected not to do basic things like reach out to the applicable insureds, insurance agents, trustees, or lenders to gather the basic program documentation and to determine basic things like who actually paid the premiums and/or whether there existed a side-agreement at inception entitling a third party to most of the death benefit, and instead ███████████████████████████████████████.[23]

---

[23] All of this begs the question: Why would a sophisticated investor be willing to pay millions of dollars for a portfolio of insurance policies ████████████████ without doing even the most basic diligence? The answer, it seems, is twofold. First, Viva appears to have believed that by remaining silent and not raising its concerns with the insurer, it might induce what it apparently considered to be a sleepy insurer to simply pay the death claims without any real analysis. **Ex. MM** at 215:12-19, 216:1-25, 217:4-13. Second, ████████████████████████████████████████████████████████████████ ██████████████████████████████████████. **Ex. VV** Nos. 4-6; **Ex. MM** at 88:11-17; **Ex. RR**. ████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████. This is all the more reason to deny restitution

The primary case to which Wilmington Trust cites in support of its automatic premium refund rule is *Berck*, one of a trio of pre-*Price Dawe* federal district court decisions that also includes *Rucker* and *Snyder*.[24] Although the policies in those cases were alleged to be either void *ab initio* or merely void*able* due to lack of insurable interest, the courts' opinions treated STOLI the way a policy's premiums might otherwise be treated if the underlying infirmity worked a mere private harm (that is, if STOLI policies were treated as being merely voidable, not void *ab initio* as against public policy). In so doing, these opinions relied upon *Oglesby v. Penn Mut. Life Ins. Co.*, a case involving rescission of a disability policy based on medical misrepresentations in the application; that is, a policy procured through a mere private fraud. *See Berck*, 719 F. Supp. 2d at 418 (citing *Oglesby*, 877 F. Supp. 872); *Snyder*, 722 F. Supp. 2d at 564 (citing *Oglesby*, 877 F. Supp. 872); *Rucker*, 774 F. Supp. 2d at 681 n.68 (citing *Oglesby*, 877 F. Supp. 872).

But a year later, in *Price Dawe*, the Supreme Court held that policies lacking insurable interest "harm the public" and are void *ab initio*, devoting an entire section to the difference between void policies (which harm the public) and voidable policies (which do not). 28 A.3d at 1067-68. In so doing, the Court distinguished *Oglesby*'s private lies as constituting "basic fraud," rendering that policy merely void*able*, and not providing the proper framework for analyzing

---

here. If there are no consequences to investors when they knowingly buy policies with insurable interest problems—and especially if those transactions are still profitable to them—the market will respond accordingly, and Delaware will once again be flooded by future STOLI.

[24] *See Sun Life v. Berck*, 719 F. Supp. 2d 410, 418 (D. Del. 2010); *Lincoln Nat'l Life Ins. Co. v. Snyder*, 722 F. Supp. 2d 546, 564-65 (D. Del. 2010); *Principal Life Ins. Co. v. Rucker 2007 Ins. Tr.*, 774 F. Supp. 2d 674, 681 n.68 (D. Del 2011).Wilmington Trust also cites to *U.S. Bank v. Sun Life*, 2016 WL 8116141, at *19 (E.D.N.Y. Aug. 30, 2016), *adopted*, 2017 WL 347449 (E.D.N.Y. Jan. 24, 2017) ("*Van de Wetering*"); *Sun Life v. U.S. Bank*, 2016 WL 161598, at *18, 21 (S.D. Fla. Jan. 14, 2016) ("*Malkin I*"), *aff'd* 693 F. App'x 838 (11th Cir. 2017) ("*Malkin III*"); *PHL Var. Ins. Co. v. Chong Son Pak Life Ins. Tr.*, 2012 WL 13201401, at *1 (D. Del. July 25, 2021) ("*Pak*"); and *PHL Var. Ins. Co. v. Virginia L. Lankow Life Ins. Tr.*, 2012 WL 13201402, at *1 (D. Del. July 25, 2012) ("*Lankow*"). Those cases, in turn, all rely upon *Berck*, *Snyder*, and *Rucker*.

policies lacking insurable interest, which are "egregiously flawed" because they "harm the public" and are "a fraud on the court." *Id.* n.25 (citing *Oglesby*, 695 A.2d 1146, 1151 (Del. 1997)).

Recognizing the threat that *Price Dawe*'s holding in this regard posed to the potential profitability of investing in Delaware-issued STOLI policies, the STOLI lobby immediately launched into action and tried to get the General Assembly to pass laws that would do essentially the same thing as Wilmington Trust urges this Court to do here: Automatically refund premium to investors upon a finding of STOLI. And yet session-after-session, these bills were rejected. *See* Del. S.B. 220, 146th Gen. Assem. (2012) (proposing automatic premium return for insurable interest cases except to owners who violated Section 2704); Del. H.B. 87, 147th Gen. Assem. (2013) (same except without interest); Del. S.B. 71, Amendment 1, 148th Gen. Assem. (2015) (same, but only from insurers having filed five insurable interest suits in Delaware in a single year and no return to owner who engaged in fraud in the origination).

Moreover, in 2016, after the last of these bills failed yet again to pass, Delaware's Senate directed Delaware's Department of Insurance ("DOI") to investigate, *inter alia*, the insurable interest challenges being brought by insurers to determine whether it recommended new legislation to "provide certainty to investors" or "what policies or rules should be established to avoid expensive and unnecessary litigation for owners." Del. S. Res. 19, 148th Gen. Assem. (2016). The DOI issued a report, which noted the repeated failure of the aforementioned bills that would "require[] life insurers to return premiums paid for policies rescinded or determined to be void because they were fraudulently obtained by a person without an insurable interest." **Ex. BBB**. Importantly, DOI did *not* recommend passing those bills or any other bill automatically awarding premium; instead, it went the other way and recommended legislation that "strongly discourages STOLI," which recommendation the General Assembly accepted. *Id.*; 81 Del. Laws 172 (2017).

When properly understood, Wilmington Trust's argument in favor of an automatic premium refund rule boils down to the public policy consideration identified by Judge Robinson in *Berck*—the concern that "if an insurance company could retain premiums while also obtaining rescission of a policy, it would have the undesirable effect of incentivizing insurance companies to bring rescission suits as late as possible, as they continue to collect premiums at no actual risk." But this concern ignores entirely the other side of the equation: If STOLI investors get automatic refunds in STOLI cases, it will have the undesirable effect of incenting them to conduct precisely the sort of willfully blind diligence Viva conducted here, which will in turn incentivize unscrupulous upstream actors to create more STOLI for the Viva's of the world to buy.

The answer is not some bright-line, automatic refund rule—or even some bright-line premium retention rule—rather, the facts of each case should be evaluated on their merits as the Superior Court properly did in *Seck* with an eye towards determining whether a premium refund in that particular case would further or frustrate Delaware's human life wagering prohibition.

### 3.    Viva's Argument That It Is Somehow "Less Culpable" Than Columbus Life Is Wrong.

Viva spills considerable ink trying to argue that carriers might develop secret plans to sit on known STOLI policies and collect premium year-over-year always intending to challenge them after the premiums were collected. The problem for Viva, however, is that facts are stubborn things, and the facts of *this* case do not fit into Viva's narrative. To the contrary, Columbus Life properly underwrote the policies based on what it knew at the time and in statutory reliance upon the insurable interest representations set forth in the applications. Columbus Life was lied to about the KDI Program (and all other STOLI scams that were perpetrated against it during the mid-2000s) and was tricked into issuing policies it would not have issued had it been told the truth. Thereafter, Columbus Life took actions, consistent with the rest of the industry, to combat STOLI

and to prevent STOLI business from being placed on its books. Columbus Life also took measures to track potential STOLI policies on its books, and challenged the Policies at issue here shortly after it learned that doing so was possible, and only then after a rigorous analysis into the facts and law. Wilmington Trust's attempts to paint this case as one where a carrier pursued a decade-long secret plan to collect premiums on policies it knew it was going to challenge later for insurable interest is simply not supported by the record.

*First*, Wilmington Trust's contention that Columbus Life learned that the Concordia Plan "involved non-recourse premium finance as early as late 2003 or early 2004" from the first Leisher presentation, WT_Op._Br. at 37, is not supported. To the contrary, (i) Fangman testified that Leisher represented at that presentation and at a subsequent September 2004 presentation (both of which she attended) that the financing was full recourse; (ii) the Concordia Plan was marketed to Columbus Life as a legitimate insurance plan for traditional estate planning purposes, for the benefit of insureds' families, and fully supported by insurable interest; and (iii) the representations made in Potomac's marketing materials are fully consistent with legitimate policies and full recourse premium financing and inconsistent with illegitimate policies and non-recourse premium financing. And, in any event, as the Delaware Supreme Court has explained, the mere fact that a policy was funded through a non-recourse loan does not necessarily make it STOLI. *Lavastone Capital v. Est. of Berland*, 266 A.3d 964, 973 (Del. 2021) ("*Berland*") .

*Second*, Wilmington Trust's reliance upon a September 2005 investigation into Concordia Plan policies (WT_Op._Br. at 14-19, 21, 38-39) is misplaced because (i) Columbus Life's understanding at the time and until late 2018 was that it could only challenge validity within the contestability period and for material misrepresentations in the application; (ii) Columbus Life has never had any evidence that there were any misrepresentations in the Romano and Cohen

applications, which are devoid of any premium financing- or STOLI-related questions; and (iii) Columbus Life promptly took action in 2005 to rescind other KDI policies where, unlike here, it had evidence of material misrepresentations. And, in any event, insurers are permitted to rely on representations made in applications regarding insurable interest and are not required to investigate fraud post contestable period. 28 Del. C. § 2704(d); *Brighthouse Life Ins. Co. v. Geronta Funding*, 2019 WL 8198323, at *3 n.17 (Del. Super. Ct. Mar. 4, 2019) ("*Seck I*").

*Third*, Wilmington Trust mischaracterizes the "Possible Investor Owned/Life Settlement" Policy lists generated at Columbus Life (and which included entries for the Romano and Cohen Policies) as "STOLI lists." WT_Op._Br. at 4, 19-20, 39. To the contrary, when a policy appeared on these lists, it did not mean that a policy was, in fact, STOLI or invalid STOLI.[25] It only meant that a policy had certain *indicia* of STOLI based on very broad criteria—elderly insureds, high face amount policies, and ownership transfers to entities that did not appear to have an insurable interest—all of which are also indicative of perfectly legitimate policies.[26] And even if Columbus Life believed policies on the lists were, in fact, STOLI, Columbus Life's understanding, at the time, was that it was "stuck" with them and there was nothing it could do to challenge them.

---

[25] As discussed *supra* at § II(E), Columbus Life also had no intent, at the time these lists were generated, to deny death claims or to challenge policy validity when insureds later died and the policies matured—as evidenced by Columbus Life's actual claims experience for policies appearing on these lists (having paid 97% of death claims on such policies). And, Columbus Life has been a party to very few legal actions challenging policies as void STOLI—having filed lawsuits challenging only nineteen policies as STOLI, all of which were filed after Columbus Life's understanding of its legal rights changed in late 2018.

[26] As Fangman explained, "Insurable interest is required at the time of application of a policy"; "the policy language gives the contract owner the right to assign and/or change ownership of the policy once it's in force without any requirement for insurable interest"; "there are very valid reasons for people to assign their policies, to transfer their beneficiary" in that "[t]hey may get divorced, . . . [or] sell a business" among other reasons; and "they can choose who they want to assign those benefits to, and we don't have the right to say you can't do that" because "the contract does not give us that right." **Ex. DDD** at 172:9-22.

Moreover, even if Wilmington Trust's characterization of these policy lists were accurate (which it is not), the lists do not evidence any culpability on Columbus Life's part. Indeed, recently, in *Frankel/DeBourbon*, Judge Johnson in the Delaware Superior Court considered and appropriately rejected Wilmington Trust's exact same argument here in entering summary judgment that two Sun Life policies were void *ab initio* STOLI policies under Delaware law and in dismissing Wilmington Trust's unfair and deceptive trade practices counterclaim, ruling that:

> Wilmington Trust argues that Sun Life's practices were unfair and deceptive because Sun Life allegedly internally treated the Policies as STOLI for almost a decade. Wilmington Trust further asserts that Sun Life began tracking ownership changes that occurred within the first three years after the Policies were in force. Thus, Wilmington Trust argues that Sun Life was aware that the Policies at issue were STOLI Policies as early as 2009. Wilmington Trust further argues that Sun Life purposefully intended to profit from the premiums on the Polices.
>
> Wilmington Trust presents no authority to support the proposition that Sun Life had a duty to bring litigation sooner or to determine whether policies were illegal STOLI and therefore invalid. There is no authority that imposes a duty on Sun Life to inform policy owners that policies had been "flagged" as STOLI. Wilmington Trust also presents no authority that implies Sun Life had a duty to cease accepting premiums.
>
> Of course, the life insurance industry in general could consider whether such efforts to identify STOLI policies should become industry standards and practices. However, in the absence of statutory or regulatory authority to the contrary, insurers should be able to rely on the information submitted as part of the application for insurance, in order to determine insurable interest.
>
> The Court finds no evidence of any actions by Sun Life inconsistent with insurance industry practices. The life insurance industry is highly regulated.
>
> There is no evidence Sun Life is in violation of any statute or regulations that directly addresses these issues.
>
>        *     *     *     *
>
> The Court finds that Sun Life had no duty to bring litigation sooner or to determine whether the Policies were STOLI.

*Frankel/DeBourbon*, 2022 WL 179008, at *11-14.

33

*Fourth*, Wilmington Trust erroneously argues (WT_Op._Br. at 38-39) that Columbus Life was culpable in processing ownership/beneficiary changes, issuing annual reports, providing verifications of coverage (stating that the Policies "were 'active' and 'in force'"), and collecting premiums. Columbus Life is not culpable for engaging in this routine policy administration activity (particularly when it thought the Policies were not subject to challenge) because:

- *Columbus Life is contractually required to process ownership/beneficiary changes.*[27] **Ex. WWW** at 152:7-16. While a policy is in-force, the owner has the unfettered right to change the owner and beneficiary.[28] *See* **Ex. PPP** at 9308-9309 ("You may change the Owner . . . at any time by written notice to Us" and "You may change the Beneficiary at any time before the death of the Insured by sending the written notice to Us."); **Ex. CC** at 338-339.[29]

- *Columbus Life is contractually required to provide annual reports. See* **Ex. PPP** at 9323 ("At least once a year We will send You an annual report without charge showing" certain specified policy information); **Ex. CC** at 353 (same).

- *Columbus Life is contractually required to provide illustrations at the request of the owner. See* **Ex. PPP** at 9323 ("You may request other information about this policy, including a projected illustration of policy benefits and values, based upon assumptions as are necessary and specified by Us and/or You."); **Ex. CC** at 353 (same).

- *Columbus Life is contractually required to accept premiums on in-force policies and issue grace notices. See* **Ex. PPP** at 9311-9312 ("Premium Payment" and "Grace Period and Termination of Coverage."); **Ex. CC** at 341-342 (same).

- *Statements contained in the verifications of coverage that the Policies were "active" or "in force" were accurate.* The phrases "active" and "in force" are synonymous and convey

---

[27] In particular, Wilmington Trust argues (WT_Op._Br. at 22) that Columbus Life was on notice that the Policies were STOLI because, in connection with one change of ownership/beneficiary, Columbus Life was informed that ABC Viaticals was in receivership as part of a SEC enforcement action. Wilmington Trust's argument is misplaced, however, because there is no evidence that ABC Viaticals had any involvement with the origination of the Romano and Cohen Policies and appears to have been nothing more than a subsequent purchaser on the life settlement market.

[28] When Columbus Life receives a change of ownership/beneficiary request, it will process the request if the paperwork is in order. **Ex. WWW** at 125:1-13.

[29] In addition, the Polices were freely assignable. *See* **Ex. PPP** at 9324 ("You may assign this policy by giving Us notice of the assignment."); **Ex. CC** at 354 (same).

the same, accurate policy status—that the Policies had not terminated, were not in grace, and that sufficient premium had been paid to maintain them.[30] **Ex. WWW** at 271:7-16.

In sum, there is no evidence from which a reasonable juror could conclude that Columbus Life issued the Policies in 2004 and collected premium on them year-over-year intending all along to challenge them for lack of insurable interest. To the contrary, Columbus Life was the victim of a fraud and did not learn that the Policies were invalid and challengeable until shortly before it brought suit here. But there *is* indisputable evidence that Viva willfully blinded itself during its diligence period in 2016 and bought the Policies ███████████████████████████████████ Thus, Delaware's strong public policy against human life wagering would be furthered by denying the refund (because Columbus Life brought this claim shortly after learning the claim existed) and would be frustrated by awarding the refund (because Viva ████████████████████████████ ████████████████ hoping to slip the ultimate death claims on the Policies past an unwitting carrier).

### 4.    Viva Is Not Entitled To A Refund of Premiums It Did *Not* Pay.

To the extent the Court deems Viva entitled to a premium refund, any such refund should be limited to the premiums actually paid by Viva for a variety of reasons.

*First*, as Wilmington Trust's Opening Brief makes clear, its restitution claim is predicated on a theory of unjust enrichment, i.e., that it would be unjust to allow Columbus Life to keep all

---

[30] Courts have recognized, under similar circumstances, that insurers are not culpable when they make such truthful statements regarding the status of a policy. *See, e.g.*, *Seck V*, 2021 WL 4080672, at *22-23 (holding that the insurer "did not commit wrong," reasoning that the insurer "accurately stated that the Seck Policy was active"); *Brighthouse Life Ins. Co. v. Geronta Funding*, 2019 WL 8198325, at *8 (Del. Super. Ct. Aug. 7, 2019) ("*Seck IV*") (in denying policy owner's motions to amend pleading to assert a fraud claim, court held that policy owner "fail[ed] to establish that [insurer's] Verification report was a half-truth when it stated the policy (which the court ruled was invalid STOLI) was 'active'"); *Sun Life v. Imperial Holdings*, 2016 WL 10565034, at *6 (S.D. Fla. Sept. 22, 2016) (entering summary judgment and dismissing fraud claim against insurer based upon insurer's "statements made in the correspondence [that] relate to the status of the policies" ruling that "there was nothing false at the time of the correspondence" when insurer stated that the policies were "in force"), *aff'd as to fraud claim*, 904 F.3d 1197, 1123-24 (11th Cir. 2018).

of the premiums because it supposedly incurred "no risk."[31] In so doing, Wilmington Trust ignores the principle that to recover under unjust enrichment "there must be some direct relationship . . . between a defendant's enrichment and a plaintiff's impoverishment." *Anguilla Re v. Lubert-Adler Real Estate Fund*, 2012 WL 5351229, at *1 (Del. Super. Ct. Oct. 16, 2012); *Windsor I, LLC v. CWCapital Asset Mgmt.*, 238 A.3d 863, 875-76 (Del. 2020). Here, the payment of premium by Viva's *predecessors* did not impoverish *Viva*.

Wilmington Trust tries to hide the lack of any direct relationship between Viva and the premiums Viva did *not* pay by arguing (WT_Op._Br. at 43- 44) that Viva bought from Delta Lloyd "all right, title and interest" in the Policies, "all rights related to or deriving therefrom," and "all proceeds of any of the foregoing" and that this somehow means Viva bought from Delta Lloyd the right to a refund of performance made by Delta Lloyd and its predecessors to the extent the Policies were deemed void *ab initio*. But Viva does not cite to a single case saying that a party can sell rights to performance made under an agreement violating public policy. There is none.

Moreover, Viva does not even attempt to prove that the contractual language it cites between Viva and Delta Lloyd was ever understood by the parties to encompass premium refund "rights" like the ones Viva seeks to enforce here, nor does Viva even allege (let alone attempt to prove) that it paid more for the Policies due to the alleged inclusion these so-called "rights" in the sale. And, in any event, even if Viva did buy the rights it now claims it bought, that would not

---

[31] The contention that Columbus Life incurred no risk is false. Columbus Life was the victim of a fraud and has at all times been subject to the risk that the fraud would be culminated through a claim for death benefits. Columbus Life has also been forced to incur substantial costs to issue and maintain these Policies over time, and has been forced to incur substantial costs to pursue this litigation, including without limitation almost two years of litigating policy validity issues, only to have Viva, through Wilmington Trust, concede at the last minute that the Policies lacked insurable based on supposed "unique economics" that were known to Viva throughout the entire case, including when it filed its Answer denying that the Policies were invalid.

establish the "direct" connection required by law between the impoverishment and the enrichment because Viva did not pay these premiums. If Viva has a claim for additional amounts against its predecessors up the commercial chain, Viva is free to pursue those claims.

Finally, if Viva's theory—that Delaware law authorizes parties to an unlawful agreement to obtain restitution of performance made by its predecessors in interest—were tenable (and it is not), Viva would also have to prove that each prior owner up the commercial chain (i) purported to sell its alleged premium refund rights to its buyer; and (ii) that each of the sellers of those alleged rights would themselves be entitled to a refund. After all, an assignee does not obtain rights that were not actually assigned, nor can an assignee possibly take any greater right than possessed by the assignor in the first place. Here, Viva does not even point to evidence that any of the owners prior to Delta Lloyd purported to assign their "rights"—nor has Viva taken any effort to show who those prior owners were and how they would be entitled to a refund. This is not surprising because Viva's legal theory is untenable, and its predecessors-in-interest to the Policies include, without limitation, the original wrongdoers (the Kavanaugh Organization) and an entity prosecuted by the SEC for running a Ponzi scheme in connection with the Policies (ABC Viaticals).

*Second*, courts applying Delaware law routinely refuse to award premiums paid by prior owners. After finding policies void *ab initio* for lack of insurable interest, the courts in both *Malkin* and *Van de Wetering*, for example, limited the premium refund to those paid by the then-current policy owner (U.S. Bank) on behalf of its then-current client (Lavastone Capital). In *Van de Wetering*, the court (incorrectly) followed *Berck*, but (correctly) read *Berck* as only allowing a defendant "a refund of the premiums *it paid*." 2016 WL 8116141, at *19 (emphasis added). Indeed, the *Berck* court was faced with a single payer situation, and Wilmington Trust does not offer any good reason for extending *Berck* beyond its facts to allow for a "refund" of premiums in excess

what the defendant actually paid.[32] Moreover, although Wilmington Trust is technically correct that *one* of the reasons for the *Malkin* court's ruling was that the defendant had not pled a claim for a refund of the premiums paid by prior owners, Wilmington Trust omits the other independent reason the *Malkin* court gave for refusing to award premiums: "***U.S. Bank does not cite to any Delaware authority mandating a return of premium payments made by a third party, and neither Berck nor the other cases relied upon by the Court require that result***." *Sun Life v. U.S. Bank*, 2016 WL 3948059, at *2 (S.D. Fla. June 9, 2016) ("*Malkin II*") (emphasis added).

The refusal of these courts applying Delaware law to "refund" premium to an investor that it did not pay is in accord with the way courts have approached this issue under the law of other jurisdictions. In *Bergman*, for example, the District Court for the District of New Jersey, applying New Jersey law, rejected the policy owner's argument that it was entitled to a refund—not only of the premiums that *it had paid*, but also premiums *paid by prior owners*, by reasoning that "the Court does not find any equitable reason to require recoupment of this amount from Sun Life." *Sun Life v. Wells Fargo*, 2016 WL 5746352, at *12 (D.N.J. Sept. 30, 2016) ("*Bergman I*"); *Sun Life v. Wells Fargo*, 2016 WL 6824367, at *2-3 (D.N.J. Nov. 17, 2016) ("*Bergman II*") (holding evidentiary hearing and requiring insurer to refund to securities intermediary the premiums paid by it and with its money but not money paid by others). The Third Circuit affirmed the trial court's decision on appeal. *Sun Life v. Wells Fargo*, 779 F. App'x 927 (3d Cir. 2019) ("*Bergman III*").

By way of further example, the District Court for the Northern District of Illinois, applying Illinois law, recently rejected a securities intermediary's argument in a STOLI case that it was entitled to recoup the premiums paid by prior owners, further ruling that the securities intermediary

---

[32] That is, a situation where the defendant trust was the same entity that had owned the policy from inception. As a consequence, the premium refund being discussed did not include premiums paid by prior owners because there were no prior owners.

was only entitled to recoup premiums for the investor on whose behalf it was litigating the case, not prior owners that it might have also served as securities intermediary for. *Sun Life v. Wells Fargo*, 2018 WL 2100740, at *5 (N.D. Ill. Mar. 30, 2020) ("*Corwell I*") (ruling on the pleadings that "[a]ny recovery by the Bank of premiums paid is limited to payments innocently made by it. The Bank would not be entitled to restitution of all premiums received by plaintiff from any source but only those premiums paid innocently by the Bank itself."); *Sun Life v. Wells Fargo*, 2020 WL 1503641, at *15 (N.D. Ill. Mar. 20, 2020) ("*Corwell II*") ("The Bank is also seeking restitution of premiums it paid from the time it first acquired the Policy as securities intermediary for AIG. However, Vida Capital is the current beneficial owner of the Policy and the Bank does not show why premiums paid on behalf of prior beneficial owners should be recoverable for Vida Capital.").

Wilmington Trust's reliance upon the district court's decision in *Sun Life v. U.S. Bank*, 2019 WL 8353393 (D. Del. Dec. 30, 2019) ("*Sol II*") is misplaced. There, the court ordered a refund to the current policy owner of all premiums paid on the policy—not as part of an order voiding the STOLI policy at issue or as unjust enrichment damages—but instead as damages on a promissory estoppel claim—a claim which this Court correctly dismissed on the pleadings.

Wilmington Trust's reliance on the *Frankel/DeBourbon* decision is also misplaced. In that case, the court did not order the insurer to refund premiums paid by the prior owners to the current owner; instead, the court ordered the insurer to refund the premiums to whichever entity paid them. This was an unusual remedy that neither party sought, that is legally deficient for numerous reasons,[33] and that is currently on appeal. In fact, even Judge Johnston observed that the result she was ordering, which included refunding premiums to the original wrongdoing investors, was

---

[33] Among other things, Delaware law does not mandate a return of premium; the prior owners to whom the court ordered a refund be made to were not before the Court, and in fact, most if not all of those prior owners no longer exist, having been disbanded or terminated long ago.

"unfair." 2022 WL 179008, at *13. And at a post-judgment hearing, Judge Johnston further expressed her discomfort with her own decision, but explained that, in her view, she had to order the insurer to refund all of the premiums paid. *See* Post-Judgment H'rg Tr., *Frankel/DeBourbon*, N18C-07-289 MMJ CCLD (Del. Super. Ct. Mar. 16, 2022).

Finally, Wilmington Trust's argument that Columbus Life must refund to Viva all of the premiums paid by Viva's predecessors to avoid a windfall is, frankly, more than a little ironic. Viva, through Wilmington Trust, has paid approximately $5.3 million in premiums for the Policies. Setting aside interest for the moment, Viva is seeking to be "refunded," not just the $5.3 million it paid but another approximately $4.85 million in premium it did not pay. The relief Viva seeks is therefore a windfall to Viva by any measure, particularly since ███████████████████████ ████████████████████████████████████████████████.

But, of course, Viva's pursuit of a windfall does not stop there. After forcing Columbus Life to litigate—at substantial time and expense—the Policies' validity over the course of the last two years, Wilmington Trust has now completely abandoned its claim that the Policies are valid and is instead proceeding solely on its "alternative" claim for a premium refund. According to Wilmington Trust (WT_Op._Br. at 2, n.3), it is doing this "solely because of the peculiar economics," meaning that if Wilmington Trust were to be awarded (i) all the premiums Viva paid; (ii) all the premiums prior owners paid; and (iii) pre-judgment interest on those amounts—Viva "will be better off financially"—because, according to Viva, it would make almost $16 million that way, which is $6 million more than the Policies' aggregate $10 million death benefit.

The Court is not required and should not award Viva the premiums paid by other owners (for the reasons explained above) or any pre-judgment interest (for the reasons explained below), but the mere fact that Viva has abandoned its claims to the Policies' validity and is instead pursuing

an award $6 million above what it would have received if the Policies were legitimate and Columbus Life had simply paid them in the ordinary course should tell the Court all it needs to know about who is seeking a windfall. To be clear, not only does Wilmington Trust have the audacity to claim that Viva should get $6 million more than the aggregate death benefit for knowingly buying STOLI, but, if this result were endorsed by the Court, it would mean that Delaware law somehow puts STOLI investors in a far better position than the owners of legitimate insurance policies. Indeed, when an insured takes out a legitimate policy on his own life for the benefit of his family, and substantially outperforms his life expectancy, that insured does not have the ability to ask the insurance company to forget about the death benefit and simply refund him the premiums he paid, let alone at statutorily inflated interest rates. Endorsing Wilmington Trust's new strategy would have the perverse effect of reducing a STOLI investors' risk relative to honest policyholders; a STOLI investor could buy a policy and pay premiums on it knowing that if the premiums ever became unaffordable, it could merely reveal that the policy is STOLI and receive all of the premiums back. *See Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787 (6th Cir. 2009).

### 5.    Wilmington Trust Is Not Entitled To Pre-Judgment Interest.

Wilmington Trust is trying to profit from Viva knowingly investing in human life wagers that violate Delaware's longstanding law, public policy, and constitution by abandoning its claims that the Policies are legitimate and instead seeking the enormous windfall of (i) the premiums it paid (~$5.3 million); (ii) the premiums it did not pay (~$4.85 million)—and almost $6 million of interest on top of that to boot. But interest here is profoundly improper and should not be awarded.

Although Delaware courts often apply pre-judgment interest as a matter of right in the ordinary course, in a contract case like this one, "pre-judgment interest should . . . not accrue until the point at which the defendant has, without justification, refused to live up to its obligation and make payment," *Citrin v. Int'l Airport Ctrs.*, 922 A.3d 1164, 1167 (Del. Ch. 2006), which typically

means the claimant must first make a demand for payment before pre-judgment interest will be deemed to have accrued, *see, e.g.*, *Citadel Holding v. Roven*, 603 A.2d 818, 826 (Del. 1992); *Stonewall Ins. Co. v. E.I. du Pont de Nemours*, 996 A.2d 1254, 1262 (Del. 2010); *Hercules, Inc. v. AIU Ins. Co.*, 784 A.2d 481, 507-508 (Del. 2001); *Citrin*, 922 A.2d at 1165. Moreover, courts applying Delaware law have substantial discretion over pre-judgment interest issues, including in setting the appropriate rate, the method of calculation, and—importantly—whether to eliminate periods of time entirely due to delay on behalf of the claimant. *Gotham Partners v. Hallwood Realty Partners*, 817 A.2d 160, 173 (Del. 2011); *Mennen v. Wilmington Trust*, 2015 WL 1914599, at *36 (Del. Ch. Apr. 24, 2015); *Edgewater Growth Capital Partners v. HIG Capital*, 68 A.3d 197, 238 (Del. Ch. 2013); *E.M. Fleischmann v. Res. Corp.*, 114 F. Supp. 843, 845 (D. Del. 1953).

Columbus Life treats the life insurance policies it has issued as active and in force unless and until a court of competent jurisdiction declares them invalid. No such declaration has yet issued in this case, and Wilmington Trust has at all times—at least until very recently—taken the position that the Policies are valid and supported by an insurable interest. Prior to this litigation, Wilmington Trust never came to Columbus Life to make a demand for a premium refund. Nor has Columbus Life ever owed Wilmington Trust any premium refund, including because the Policies have not yet been deemed void *ab initio*, and this Court has yet to decide whether Wilmington Trust has proven an entitlement to any such premium refund, and if so, in what amount. Because Columbus Life is not yet (and may never be) liable to refund any premium to Viva—and because Viva did not make a demand for any such refund prior to the initiation of this litigation—prejudgment interest on any pre-litigation premium refunds would not be appropriate.

This is made all the more clear by the fact that ██████████████████████████ ████████████████████ without first raising those insurable interest problems with Columbus

42

Life. To be clear, Viva's corporate representative admitted that Viva could have done so, but that Viva declined to do so solely on supposed "principle" i.e., Viva's belief that asking these sorts of questions was simply not its job. This excuse makes no sense and what really happened here is plain: Viva elected not to reach out to Columbus Life ███████████████████████ because Viva did not want to alert an unwitting carrier to the existence of insurable interest issues; instead, Viva wanted to keep Columbus Life in the dark and try to slip death claims past its claims personnel upon Cohen and Romano's deaths.[34] It would be unfair to charge Columbus Life with interest when its counterparty never made a demand for a premium refund all the ██████████ ██████████████████████████ that it did not intend to share with the carrier.

Nor should this Court award interest on premiums paid after the start of this litigation. Columbus Life initiated this litigation seeking a declaration that the Policies were void *ab initio* for lack of insurable interest. Wilmington Trust's Answer did not concede, as Wilmington Trust does now, that the Policies lacked insurable interest; instead, Wilmington Trust claimed that the Policies were valid, and asserted a premium refund claim in the alternative only to the extent the Policies were deemed valid. The parties then agreed to a 1.5 year discovery period precisely so that the facts related to the Policies' validity could be uncovered and presented to the Court. Columbus Life used that time to issue 21 subpoenas and take 9 depositions, all largely focused on the Policies' origination. By way of contrast, Wilmington Trust did almost nothing in discovery other than to seek extensions, first a two month extension of the discovery period, and then an indefinite extension (which would have amounted to over a year) for summary judgment briefing.

---

[34] No rational juror could fail to come to this conclusion from the indisputable factual. Nor should Wilmington Trust be heard to argue to the contrary since Wilmington Trust refused to produce the details of its insurable interest analysis under the guise of attorney client privilege.

Wilmington Trust's motivation for this curious litigation conduct was only recently revealed when Wilmington Trust filed its Opening Brief in Support of Summary Judgment, through which Wilmington Trust abandoned any claim that the Policies were legitimate and instead elected to proceed solely on its hyper-inflated premium refund claim. According to Wilmington Trust, this volte-face had nothing to do with what Wilmington Trust learned about the Policies in discovery; to the contrary, according to Wilmington Trust, this sudden reversal was done by it for one and one reason only: Because this case has "peculiar economics" pursuant to which Wilmington Trust believes it will do better financially if it gets a full premium refund plus statutory interest than it would have had it been awarded the Policies' death benefits at contractual interest. But those so-called "peculiar economics" were known to Wilmington Trust when it filed its Answer denying that the Policies were invalid; were known to Wilmington Trust when it agreed to a 1.5 year discovery period; and were known to Wilmington Trust when it participated in deposition-after deposition-focused on validity. At no point did Wilmington Trust see fit to tell Columbus Life that it did not intend to defend the Policies' validity due to "peculiar economics" that have existed since the beginning of these cases. This sort of gamesmanship—through which Wilmington Trust is seeking desperately to have these human life wagers pay off one way or the other—should not be rewarded. To the extent this Court determines that a refund of some amount of premium is appropriate, this Court should exercise its discretion to refuse to accrue interest on those amounts precisely as Judge Johnston recently did in the *Frankel*/*DeBourbon* cases.

## IV.    CONCLUSION

For the reasons set forth above, and in Columbus Life's Motion for Summary Judgment, Columbus Life's Motion for Summary Judgment should be granted and Wilmington Trust's Motion for Summary Judgement should be denied.

Dated: May 31, 2022

Respectfully submitted,

*/s/ Donald L. Gouge, Jr.*
Donald L. Gouge, Jr. (#2234)
DONALD L. GOUGE, JR., LLC
800 N. King Street, Suite 303
Wilmington, Delaware 19801
(302) 658-1800, Ext. 1

COZEN O'CONNOR
Michael J. Miller (*pro hac vice*)
Joseph M. Kelleher (*pro hac vice*)
Charles J. Vinicombe (*pro hac vice*)
Philip J. Farinella (*pro hac vice*)
1650 Market St., Suite 2800
Philadelphia, PA 19103
*Attorneys for Plaintiff,*
*Columbus Life Insurance Company*