**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

COLUMBUS LIFE INSURANCE
COMPANY,

               Plaintiff,

      v.

WILMINGTON TRUST, N.A., as
Securities Intermediary,

               Defendant.

_____

WILMINGTON TRUST, N.A., as
Securities Intermediary,

               Counterclaim-Plaintiff,

      v.

COLUMBUS LIFE INSURANCE
COMPANY,

               Counterclaim-Defendant.

No. 1:20-cv-00735-MN-JLH (D.I. 161)
No. 1:20-cv-00736-MN-JLH (D.I. 157)

PUBLIC VERSION FILED
JUNE 7, 2022

**WILMINGTON TRUST, N.A., AS SECURITIES INTERMEDIARY'S**
**CONSOLIDATED BRIEF IN OPPOSITION TO COLUMBUS LIFE INSURANCE**
**COMPANY'S MOTION FOR SUMMARY JUDGMENT**

OF COUNSEL:

Harry S. Davis
Robert E. Griffin
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, NY 10022
(212) 756-2000

Aislinn K. Affinito
SCHULTE ROTH & ZABEL LLP
901 Fifteenth Street, NW, Suite 800
Washington, DC 2005
(202) 729-7470

Dated: May 31, 2022

John M. Seaman (#3868)
Samuel D. Cordle (#6717)
ABRAMS & BAYLISS LLP
20 Montchanin Road, Suite 200
Wilmington, Delaware 19807
(302) 778-1000
seaman@abramsbayliss.com
cordle@abramsbayliss.com

*Attorneys for Defendant and Counterclaim-*
*Plaintiff Wilmington Trust, National*
*Association, as Securities Intermediary*

# TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ...........................................................................1

II.     ARGUMENT ....................................................................................................8

        A.      Columbus' Premium Return Arguments are Based on an Incorrect
                Explanation of Delaware Law. ..................................................................8

                1.      Columbus Ignores the Majority Rule in Delaware that Carriers Must
                        Automatically Return Premiums on Void Policies. ....................................8

                2.      Columbus Materially Misrepresents the Restitution Principles Under
                        the Restatement (Second) of Contracts §§ 197–198.................................14

        B.      Columbus Misstates the Facts Regarding Viva's Acquisition of the Policies
                to Support Its Erroneous Excusable Ignorance Argument....................................24

                1.      Viva's Due Diligence Was Entirely Reasonable, Especially Given that
                        Viva Bought the Policies in a UCC Sale. ..................................................24

                2.      Columbus' Argument that Viva Should Have Done Even More
                        Diligence on the Policies is Meritless.......................................................27

                3.      Columbus' Argument that Viva Bought the Policies Knowing They
                        Had Insurable Interest Risk is Disingenuous and Irrelevant.....................32

        C.      It Would Be Bad Public Policy to Let Columbus Void the $10 Million in
                Death Benefits Under the Policies and Keep the $10.3 Million in Premiums It
                Collected on Those Policies.....................................................................35

III.    CONCLUSION...............................................................................................39

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                        **Page(s)**

*37 Besen Parkway, LLC v. John Hancock Life Ins. Co. (U.S.A.),*
    2017 WL 5126103 (S.D.N.Y. Oct. 5, 2017)....................................................................28

*Estate of Beverly E. Berland v. Lavastone Capital LLC,*
    No. 1:18-cv-02002-SB-SRF, ECF No. 157 (D. Del. Mar. 2, 2021) .......................................12

*Bob Jones Univ. v. U.S.,*
    461 U.S. 574 (1983)......................................................................................................13

*Boling v. Prospect Funding Holdings, LLC,*
    324 F. Supp. 3d 887 (W.D. Ky. 2018)............................................................................16

*Brighthouse Life Ins. Co. v. Geronta Funding,*
    2019 WL 8198323 (Del. Super. Ct. Mar. 4, 2019) ...................................................2, 14

*Brighthouse Life Ins. Co. v. Geronta Funding,*
    2021 WL 4080672 (Del. Super. Ct. Aug. 20, 2021)............................................2, 14, 25

*Columbus Life Ins. Co. v. Wells Fargo Bank,*
    2021 WL 106919 (D. Del. Jan. 12, 2021)................................................................10, 11

*Columbus Life Ins. Co. v. Wilmington Tr., N.A.,*
    2021 WL 1820573 (D. Del. May 6, 2021),
    *R&R adopted*, 2021 WL 3886370 (D. Del. Aug. 31, 2021) .............................................24

*Columbus Life Ins. Co. v. Wilmington Tr., N.A.,*
    2021 WL 1820614 (D. Del. May 6, 2021)......................................................................24

*Della v. Diamond,*
    210 A.2d 847 (Del. 1965) ...................................................................................11, 12, 36

*DiJiacomo v. Progressive Ins. Co.,*
    2008 WL 4817085 (Del. Super. Ct. Oct. 17, 2008)..........................................................16

*Erwin, in His Capacity as Trustee of the Orca LS I Tr. v. Fin. Life Servs., LLC,*
    No. 8:09-cv-1463 (C.D. Cal. Apr. 21, 2010) ............................................................31, 32

*Hartford Life & Annuity Ins. Co. v. Doris Barnes Family 2008 Irrevocable Tr.,*
    2012 WL 688817 (C.D. Cal. Feb. 3, 2012),
    *aff'd*, 522 F. App'x 664 (9th Cir. Jan. 13, 2014) ............................................................38

*Kelly v. Purdue Farms,*
    123 A.3d 150 (Del. Super. Ct. 2015) ...........................................................................14

*Kramer v. Phoenix Life Ins. Co.*,
   940 N.E.2d 535 (N.Y. 2010)...........................................................................38

*Landgraf v. USI Film Prods.*,
   511 U.S. 244 (1994).......................................................................................36

*Lincoln Nat'l Life Ins. Co. v. Gordon R.A. Fishman Irrevocable Life Tr.*,
   638 F. Supp. 2d 1170 (C.D. Cal. 2009) ........................................................38

*Lincoln Nat'l Life Ins. Co. v. Snyder*,
   722 F. Supp. 2d 546 (D. Del. 2010)......................................................... *passim*

*Lomax v. Nationwide Mut. Ins. Co.*,
   964 F.2d 1343 (3d Cir. 1992).......................................................................16

*Moragne v. States Marine Lines, Inc.*,
   398 U.S. 375 (1970).......................................................................................37

*Nike, Inc. v. Wu*,
   2020 WL 257475 (S.D.N.Y. Jan. 17, 2020),
   *aff'd sub nom.* 12 F.4th 119 (2d Cir. 2021) ....................................................1

*Ohio Nat'l Life Assurance Corp. v. Davis*,
   803 F.3d 904 (7th Cir. 2015) ........................................................................17

*PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Tr., ex rel. Christiana Bank and Tr. Co.*,
   28 A.3d 1059 (Del. 2011))...................................................................... *passim*

*PHL Variable Ins. Co. v. Bank of Utah*,
   780 F.3d 863 (8th Cir. 2015) ........................................................................17

*PHL Variable Ins. Co. v. Chong Son Pak Life Ins. Tr.*,
   2012 WL 13201401 (D. Del. July 25, 2012) ......................................9, 11, 37

*PHL Variable Ins. Co. v. Virginia L. Lankow Life Ins. Tr.*,
   2012 WL 13201402 (D. Del. July 25, 2012) ......................................9, 11, 37

*Principal Life Ins. Co. v. Lawrence Rucker 2007 Ins. Tr.*,
   774 F. Supp. 2d 674 (D. Del. 2011)......................................................... *passim*

*Red Lion Broad. Co. v. F.C.C.*,
   395 U.S. 367 (1969).......................................................................................13

*SPV-LS, LLC v. Transamerica Life Ins. Co.*,
   2016 WL 1466529 (D. S.D. Apr. 14, 2016) ..................................................38

*Sun Life Assur. Co. of Can. v. Wilmington Tr. Co.*,
   2017 WL 978997 (D. Utah Mar. 13, 2017) ...................................................17

*Sun Life Assurance Co. of Can. v. Berck,*
    719 F. Supp. 2d 410 (D. Del. 2010)...................................................................*passim*

*Sun Life Assurance Co. of Can. v. Conestoga Trust Services, LLC,*
    263 F. Supp. 3d 695 (E.D. Tenn. 2017),
    *aff'd*, 717 F. App'x 600 (6th Cir. 2018)............................................................17

*Sun Life Assurance Co. of Can. v. U.S. Bank Nat'l Ass'n,*
    2016 WL 161598 (S.D. Fla. Jan. 14, 2016),
    *aff'd in relevant part*, 693 Fed. App'x 838 (11th Cir. 2017).........................*passim*

*Sun Life Assurance Co. of Can. v. U.S. Bank Nat'l Ass'n,*
    2019 WL 8353393 (D. Del. Dec. 30, 2019)......................................................*passim*

*Sun Life Assurance Co. of Can. v. Wells Fargo Bank, N.A.,*
    2020 WL 1503641 (N.D. Ill. Mar. 30, 2020).......................................................33

*Sun Life Assurance Co. of Can. v. Wells Fargo Bank N.A.,*
    779 F. App'x 927 (3d Cir. 2019) ........................................................................17

*Sun Life Assurance Co. of Can. v. Wilmington Tr., Nat'l Ass'n,*
    2022 WL 179008 (Del. Super. Ct. Jan. 12, 2022) ..........................................*passim*

*Telecomms. Law Prof'ls PLLC v. T-Mobile US, Inc.,*
    2015 WL 13159051 (D.D.C. Jan. 12, 2015).......................................................16

*U.S. Bank Nat'l Ass'n v. Sun Life Assurance Co. of Can.,*
    2016 WL 8116141 (E.D.N.Y. Aug. 30, 2016), *R&R adopted*, 2017 WL
    347449 (E.D.N.Y. Jan. 24, 2017) ...............................................................9, 10, 37

*U.S. v. Kimbell Foods, Inc.,*
    440 U.S. 715 (1979)...........................................................................................36

*Wells Fargo Bank, N.A. v. Pruco Life Ins. Co.,*
    200 So. 3d 1202 (Fla. 2016)..............................................................................38

*Wyrick v. Greggo & Ferrara,*
    2012 WL 2563007 (Del. Super. Ct. May 31, 2012) ..........................................16

**Statutes**

Cal. Ins. Code §§ 10113.1(g)(B), 10113.3(s) .................................................38

Fla. Stat. §§ 626.99289, 626.99291 ...............................................................38

N.Y. Ins. Law § 7815(c) ................................................................................38

U.C.C. ........................................................................................................*passim*

**Other Authorities**

Restatement (Second) of Contracts .......................................................................... *passim*

Restatement (Third) of Restitution and Unjust Enrichment 54, .......................................... *passim*

# I.    PRELIMINARY STATEMENT

Columbus Life Insurance Company's ("Columbus") motion for summary judgment concerning return of premiums is—to borrow a phrase from the former Chief Judge of the U.S. District Court for the Southern District of New York— "a trifecta: wrong on the facts, contrary to law, and unworkable as a matter of public policy." *Nike, Inc. v. Wu*, 2020 WL 257475, at \*22 (S.D.N.Y. Jan. 17, 2020), *aff'd sub nom.* 12 F.4th 119 (2d Cir. 2021).   Simply put, Columbus cannot keep the \$10.3 million in premiums it received over the life of the Policies[1] while being relieved of its obligation to pay the \$10 million in death benefits under the Policies.   To do so would be to enforce one side of a contract at the expense of a counterparty who does not obtain the benefit of its bargain, and courts cannot—and should not—reach this inequitable conclusion. The only rational remedy in this case is to order Columbus to repay every penny of premiums (plus interest) that it received since the inception of the Policies to Wilmington Trust, N.A., as Securities Intermediary ("Securities Intermediary")[2] on behalf of its customer Viva Capital Trust ("Viva"), and no rational juror would conclude otherwise.[3]

*"Contrary to Law."*  Taking that "trifecta" slightly out of order, let's start with the law.

---

[1] "Policies" refers to the \$5 million policy insuring the life of Anthony Romano and the \$5 million policy issuing the life of Janet Cohen which are at issue in these cases.

[2] Securities Intermediary has acted, and continues to act, solely in its capacity as a securities intermediary pursuant to the UCC.  *See* U.C.C. § 8-102(a)(14).

[3] As explained on page 2 of Securities Intermediary's opening brief in support of its own motion for summary judgment, given the unusual circumstances here where the amount of premiums paid over the life of the Policies exceeds the death benefits—solely for purposes of this case— Securities Intermediary is not contesting policy validity even though Securities Intermediary believes a careful review of the facts merits the conclusion that there are triable issues of fact on policy validity.  As a result, Securities Intermediary confines its opposition here to the return of premiums issue and does not address the validity of the Policies.  Moreover, given that Securities Intermediary's counterclaim for breach of the implied covenant of good faith and fair dealing turns on the existence of a contract, Securities Intermediary is no longer pursuing that claim given its decision to not contest policy validity.

The overwhelming majority of courts applying Delaware law have held that when a policy is void *ab initio*, the carrier must *automatically* return the premiums.  In its brief, Columbus simply ignores those cases, including the Delaware Superior Court's ruling four months ago—in a case that Columbus' counsel litigated—in which Judge Johnston forcefully endorsed the automatic premium return rule when holding "[t]he Court finds that Sun Life cannot be absolved from any obligations to pay death benefits *and* yet retain premiums."  *Sun Life Assurance Co. of Can. v. Wilmington Tr., Nat'l Ass'n*, 2022 WL 179008, at *13–14 (Del. Super. Ct. Jan. 12, 2022) ("*De Bourbon/Frankel*").  Columbus also fails to acknowledge that the most recent, and on point, Restatement expressly provides that "contractual performance by a party who does not receive (and cannot compel) the promised counterperformance will frequently result in the unjust enrichment of the recipient and a prima facie entitlement to restitution."  Restatement (Third) of Restitution and Unjust Enrichment § 32, cmt. B (2011).

Instead, Columbus relies on a case called *Seck*— which the *De Bourbon/Frankel* court called an "outlier" that should be "strictly limited to its facts"— and then rewrites the test adopted by *Seck* in an attempt to render Columbus' 16-year course of dealing concerning the Policies legally irrelevant.  On a highly unusual set of facts where *both sides* sought rescission of an insurance policy because the insured was a fictitious person, the *Seck* court held that, to recover premiums on a void policy, the policy owner must prove restitution under the Restatement (Second) of Contracts §§ 197–198 (1981).  *See Brighthouse Life Ins. Co. v. Geronta Funding*, 2021 WL 4080672, at *1 n.8, *24 (Del. Super. Ct. Aug. 20, 2021) ("*Seck IV*") (appeal docketed); *Brighthouse Life Ins. Co. v. Geronta Funding*, 2019 WL 8198323 (Del. Super. Ct. Mar. 4, 2019) ("*Seck I*").  But even under the Restatement (Second) of Contracts provisions relied upon by *Seck*, there are three independent grounds for restitution: (1) if refusing to return premiums would result

2

in a disproportionate forfeiture (§ 197), (2) if the policy owner was excusably ignorant of the facts giving rise to the policy's invalidity (§ 198(a)), or (3) if the carrier is more culpable than the policy owner (§ 198(b)).

But this Court would not know from reading Columbus' brief that there are *three* separate grounds for restitution under the Restatement (Second) of Contracts §§ 197–198 and the *Seck* court's analysis.   That is because Columbus asserts that, under the Restatement (Second) of Contracts and *Seck*, Securities Intermediary's "premium refund claim fails, unless it can prove that Viva was reasonably unaware of the Policies' insurable interest problems[.]"  Brief at 37.[4]

Consider what this means.    After ignoring Judge Johnston's decision in *De Bourbon/Frankel*, refusing to admit it is asking this Court to adopt a minority rule on return of premiums, and neglecting to mention that this minority rule is based on concepts from the Restatement (Second) of Contracts that since have been updated in the more recent Restatement (Third) of Restitution and Unjust Enrichment, Columbus then collapses the three grounds for restitution under the (outdated) Restatement (Second) of Contracts §§ 197–198 into a single inquiry—excusable ignorance.  Columbus, in other words, is not even content to litigate return of premiums under *Seck*'s deeply flawed minority rule on return of premiums in Delaware. Columbus wants this Court to modify that minority rule to transform a restitution standard that involves three disjunctive considerations—disproportionate forfeiture, excusable ignorance, or not equally in the wrong—into a new test that focuses solely on excusable ignorance.

Columbus' misguided effort to rewrite the Restatement (Second) of Contracts proves why Securities Intermediary is entitled to a premium refund—even if the Court were to reject the

---

[4] "Brief" refers to the Brief in Support of Columbus Life Insurance Company's Motion for Summary Judgment, dated Apr. 29, 2022. (20-735, D.I. 147; 20-736, D.I. 139).

automatic premium return rule adopted by the vast majority of courts applying Delaware law, disregard the more pertinent Restatement (Third) of Restitution and Unjust Enrichment, and instead apply the Restatement (Second) of Contracts framework endorsed by *Seck*. By pretending that excusable ignorance is the only ground for a premium refund under the Restatement, Columbus is trying to divert the Court's attention away from (1) whether letting Columbus simultaneously void the Policies *and* keep the premiums would be a disproportionate forfeiture under Restatement (Second) of Contracts § 197, and (2) whether Columbus is more culpable than Viva under Restatement (Second) of Contracts § 198(b). And that's because—to use Columbus' own hubristic rhetoric— "the facts are terrible" (Brief at 40) for Columbus on disproportionate forfeiture and comparative culpability.

The disproportionate forfeiture analysis considers whether Columbus would obtain a windfall if it could void the Policies and keep the premiums, and it is difficult to imagine a more obvious windfall than permitting Columbus to avoid its obligation to pay $10 million in death benefits while letting Columbus keep $10.3 million in premiums it received on the Policies. And regarding the comparative culpability between Columbus and Viva, it's not even a close call. Columbus knew all the material facts regarding the KDI/Concordia Program by September 2005 (at the latest), and yet it failed to bring these lawsuits for another 15 years as it collected millions of dollars in premiums—an amount that ballooned so high that the Policies' premiums now exceed the Policies' death benefits. Viva knew nothing about the KDI/Concordia Program—or the Policies' connection to the KDI/Concordia Program—because, among other things, Viva bought the Policies as part of an ████████ portfolio in a UCC foreclosure 12 years after the Policies' inception in 2004 and did not have access to the same documents concerning the KDI/Concordia Program that Columbus had possessed for over a decade.

4

***"Wrong on the Facts."*** Now let's turn to the facts. Even if this Court were to accept Columbus' flawed argument that a policy owner can *only* recover premiums on a void policy if it can prove excusable ignorance, Columbus distorts the factual record on what Securities Intermediary's customer Viva knew and believed before it acquired the Policies in 2016 beyond recognition.

To begin with, Columbus does not bother trying to compare Viva's pre-acquisition diligence on the Policies to the *Seck* policy owner's pre-acquisition diligence on the Seck policy, even though *Seck* is the *only* case that has *ever* applied Restatement (Second) of Contracts § 198(a) to whether a policy owner is entitled to a premium return under Delaware law. And that is because Viva's due diligence does not remotely resemble the *Seck* policy owner's due diligence, which rendered that policy owner unable to show excusable ignorance. The *Seck* policy owner, for example, did not bother to review the documents made available by the seller in the data room concerning the Seck policy before it bought the Seck policy. By contrast, Viva—through its investment advisor Preston Ventures LLC ("Preston")—reviewed every available document possible, and even secured representations concerning the Policies that are not typically available in a UCC policy portfolio sale.

None of Columbus' efforts to second guess Viva and Preston's due diligence demonstrate that Viva lacked excusable ignorance. For example, Columbus' main argument that Viva did not follow diligence guidelines published by the Institutional Longevity Markets Association ("ILMA") misses the point because those guidelines are designed for life settlement providers that purchase policies in the secondary market; they are not applicable to institutional investors like Viva that buy policies from other investors in the tertiary market. Columbus knows this, because its attorneys deposed ILMA previously on this very issue less than two years ago. Unlike life

settlement providers who buy policies directly from insureds, tertiary market buyers like Viva buy policies years after the insureds sell their policies into the secondary market, often alongside dozens, if not hundreds, of other policies in large portfolios.  The idea that tertiary market buyers should pick up the phone and interview hundreds of insureds and their brokers before buying portfolios is unworkable.

Columbus also misrepresents Viva's conclusions concerning the Policies when arguing that Viva bought the Policies knowing they had insurable interest risks.  It is true that Viva appreciated that there was some risk because the Policies are Delaware policies, and the industry knows that Delaware policies have some amount of risk because of *Price Dawe*.  But, as Columbus knows, ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

***"Unworkable as a Matter of Public Policy."***  Finally, consider the public policy consequences of letting Columbus void $10 million of death benefits on the Policies and keep $10.3 million in premiums.  Courts applying Delaware law already have addressed the public policy interests at stake and have held that this outcome would be horrible public policy.  *See, e.g.*, *De Bourbon/Frankel*, 2022 WL 179008, at *13–14; *Sun Life Assurance Co. of Can. v. Berck*, 719 F. Supp. 2d 410, 418–419 (D. Del. 2010) ("*Berck*").  And when facing the same question under different state laws—can a carrier be absolved of having to pay a policy's death benefit *and* keep all the premiums on that very same policy? — Courts have answered with a resounding "NO," emphasizing that the carrier would receive an enormous, inequitable windfall if it could void a policy and keep the premiums.

Columbus also misses the point when it criticizes Viva's testimony that, when it bought

6

the Policies, Viva understood that it would receive a full return of premiums if it turned out the Policies were void.  From a public policy perspective, the fact that Viva took into account Delaware law on return of premiums when entering into a major commercial transaction is the very reason why the Court should order Columbus to return the premiums and not upend Delaware law and the settled expectations it has created in the market.  The law is meant to promote stability and predictability in commercial transactions, and businesses are encouraged to take the law into account when planning their affairs.  When Viva bought the Policies in 2016, *every single court applying Delaware* law had held that carriers were obligated to return premiums if policies were declared void *ab initio*.  The outcome that Columbus urges this Court to accept—that it can void the Policies and keep the premiums—therefore would have been entirely *unpredictable* when Viva bought these Policies in 2016, which is contrary to one of the law's foundational objectives of promoting predictability, stability, and certainty.

Finally, because Columbus cannot explain why letting Columbus keep the premiums on a void policy is good public policy from the carrier perspective, Columbus points its finger back at Viva.  Columbus argues that if carriers have to refund premiums on void policies, it will lead to the proliferation of a second wave of stranger originated life insurance ("STOLI") policies.  This is fearmongering, untethered to the reality of the life insurance markets that exist today.  The legal landscape that led to STOLI policies in the 2004–07 time period was materially different than the legal landscape that exists today.  Because of the last 15 years of court decisions and state legislation, Columbus' claim that there could be people cooking up STOLI 2.0 is unsupportable conjecture.  If there were any risk that ordering carriers to refund premiums on void policies will somehow "sound a loud message upstream to would-be STOLI promoters to keep generating STOLI" (Brief at 37), then presumably the industry would have seen those policies by now.

Indeed, courts applying Delaware law have been ordering carriers to automatically refund premiums on void policies for the last 12 years without causing a second wave of STOLI policies.

## II.    ARGUMENT

### A.    Columbus' Premium Return Arguments are Based on an Incorrect Explanation of Delaware Law.

Columbus argues that "[b]ecause a STOLI *investor* will never be in the class of persons the insurable interest rules were designed to protect—and because one cannot be duped into paying for an illegal wager if one was aware of the policy's insurable interest problems—Wilmington Trust's premium refund claim fails, unless it can prove that Viva was reasonably unaware of the Policies' insurable interest problems[.]"  Brief at 37.  Columbus' premium refund argument is wrong on the law for two reasons:  (1) Columbus ignores the majority rule in Delaware on return of premiums (automatic return); and (2) Columbus butchers even the minority rule that it purports to apply (the Restatement (Second) of Contracts §§ 197-98).

### 1.    Columbus Ignores the Majority Rule in Delaware that Carriers Must Automatically Return Premiums on Void Policies.

Earlier this year, Delaware Superior Court Judge Johnston held "[a]s a matter of public policy, it would not be fair for Sun Life to retain all premiums, while never having to pay death benefits as agreed in exchange for receiving premiums," "[t]he Court finds that Sun Life cannot be absolved from any obligations to pay death benefits *and* yet retain premiums," "Sun Life must disgorge premiums," and "[t]he Court finds that premiums cannot be retained where policies are declared invalid."  *De Bourbon/Frankel*, 2022 WL 179008, at *13-14.[5]  Columbus' counsel

---

[5] Although Securities Intermediary has filed an appeal in *De Bourbon/Frankel*, Securities Intermediary is not appealing the Delaware Superior Court's fundamental holding that carriers cannot keep premiums when policies are invalid.  Instead, Securities Intermediary is appealing (1) the Superior Court's refusal to permit Securities Intermediary to assert equitable claims and defenses to recover the death benefits, (2) the Superior Court's holding that the carrier had to

litigated *De Bourbon/Frankel* on behalf of Sun Life, and yet Columbus does not even cite Judge

Johnston's premium refund decision—never mind try to explain why this Court should not follow

the Delaware Superior Court's decision on Delaware law.

The reality is that *De Bourbon/Frankel* was a forceful reaffirmation (even *after* the outlier

decision in *Seck*) of the automatic premium return rule that courts applying Delaware law have

been reliably applying for the last 12 years. *See U.S. Bank Nat'l Ass'n v. Sun Life Assurance Co.

of Can.*, 2016 WL 8116141, at *19 (E.D.N.Y. Aug. 30, 2016), *R&R adopted*, 2017 WL 347449

(E.D.N.Y. Jan. 24, 2017) ("*Van de Wetering*"); *Sun Life Assurance Co. of Can. v. U.S. Bank Nat'l

Ass'n*, 2016 WL 161598, at *18, *21 (S.D. Fla. Jan. 14, 2016) ("*Malkin I*"), *aff'd in relevant part*,

693 Fed. App'x 838 (11th Cir. 2017) ("*Malkin III*"); *PHL Variable Ins. Co. v. Chong Son Pak Life

Ins. Tr.*, 2012 WL 13201401, at *1 (D. Del. July 25, 2012) ("*Pak*"); *PHL Variable Ins. Co. v.

Virginia L. Lankow Life Ins. Tr.*, 2012 WL 13201402, at *1 (D. Del. July 25, 2012) ("*Lankow*");

*Principal Life Ins. Co. v. Lawrence Rucker 2007 Ins. Tr.*, 774 F. Supp. 2d 674, 682 (D. Del. 2011)

("*Rucker*"); *Lincoln Nat'l Life Ins. Co. v. Snyder*, 722 F. Supp. 2d 546, 564–65 (D. Del. 2010)

("*Snyder*"); *Berck*, 719 F. Supp. 2d at 418–19; *cf. Sun Life Assurance Co. of Can. v. U.S. Bank

Nat'l Ass'n*, 2019 WL 8353393, at *4 (D. Del. Dec. 30, 2019) ("*Sol III*").

Columbus not only ignores *De Bourbon/Frankel*, it does not cite any of those other

premium refund decisions—all of which eviscerate Columbus' argument that Securities

Intermediary cannot recover premiums "unless it can prove that Viva was reasonably unaware of

the Policies' insurable interest problems[.]"  Brief at 37.  Judge Robinson explained in *Berck* and

---

refund premiums to the particularly party in the chain-of-title who paid the premiums (rather than
to Securities Intermediary on behalf of Viva (which bought the rights to the premiums when it
acquired the policies at issue), and (3) the Superior Court's decision not to award prejudgment
interest on return-of-premium damages.

*Snyder* that "[i]f an insurance company could retain premiums while also obtaining rescission of a policy, it would have the undesirable effect of incentivizing insurance companies to bring rescission suits as late as possible, as they continue to collect premiums at no actual risk." *Berck*, 719 F. Supp. 2d at 418–19; *see also Snyder*, 722 F. Supp. 2d at 564–65. Chief Magistrate Judge Thynge held in *Rucker* that "under Delaware law [the carrier's] argument that it may retain premiums received on the Policy that this court held to be void *ab initio* for lack of an insurable interest at inception *necessarily fails*." *Rucker*, 774 F. Supp. 2d at 682 (emphasis added). Similarly, a Florida federal court applying Delaware law in *Malkin* recognized that policy owners are "entitled to a return of the premiums in order to prevent manifest inequity." *Malkin I*, 2016 WL 161598, at *21. Consistent with those cases, a New York federal court applying Delaware law in *Van de Wetering* recognized "[s]everal Delaware courts have held that an insurance company cannot 'have it both ways' by obtaining rescission of a life insurance policy and simultaneously retaining the premiums paid on the policy." *Van de Wetering*, 2016 WL 8116141, at *19 (citations omitted).

Although Columbus fails to acknowledge the existence of those automatic premium return cases, it does make four arguments in the abstract about why this Court should reject an automatic premium refund rule: (1) Columbus claims this Court expressed skepticism about "whether premium payments are an automatic remedy" at oral argument in the *Ann Snyder* case (Brief at 40 (quoting *Snyder* H'rg Tr., at 5:19–22)), (2) Columbus argues "[a]n automatic premium refund rule is inconsistent with Delaware's longstanding principle that, 'ordinarily,' parties to a contract violating public policy are left where they are found" (*id.* at 40); (3) Columbus asserts that investors "have long known that *Price Dawe*'s holding that STOLI policies are not merely voidable—but rather are void *ab initio*—is fatal to their automatic premium refund argument" (*id.*

at 41); and (4) Columbus suggests that the automatic premium refund is not Delaware law because the Delaware legislature failed to pass legislation codifying that rule (*id.* at 41).  All four arguments fail.[6]

  ***First***, this Court held oral argument in *Ann Snyder* 15 months before the Delaware Superior Court reaffirmed the rule that "premiums cannot be retained where policies are declared invalid" after *Seck* had been decided.  *See De Bourbon/Frankel*, 2022 WL 179008, at \*13-14.  And in this Court's opinion in *Ann Snyder* (as opposed to its comments during oral argument), this Court correctly noted that "federal courts applying Delaware law have consistently permitted requests for the return of premium payments," citing *Van de Wetering*, *Pak*, *Lankow*, *Rucker*, *Snyder*, and *Berck*—all of which were automatic premium return cases.  *See Columbus Life Ins. Co. v. Wells Fargo Bank*, 2021 WL 106919, at \*8 (D. Del. Jan. 12, 2021) ("*Ann Snyder*").  In fact, this Court noted that "if an insurance company could challenge the enforceability of the policy at any time while also retaining the premiums, 'it would have the undesirable effect of incentivizing insurance companies to bring ... suits as late as possible, as they continue to collect premiums at no actual risk.'"  *Ann Snyder*, 2021 WL 106919, at \*8 (quoting *Snyder*, 722 F. Supp. 2d at 565).

  ***Second***, the Delaware Supreme Court's remark in *Della*—a case involving the illegal, unlicensed operation of a bar—that "[o]rdinarily, we think … neither party has a remedy to any extent against the other," *Della v. Diamond*, 210 A.2d 847, 849 (Del. 1965), does not foreclose an automatic premium refund rule.  *Della* did not explain what "ordinarily" meant in this context, what circumstances would result in one party having a remedy against another party, or what that remedy would be.  As the Restatement (Third) of Restitution and Unjust Enrichment makes clear,

---

[6] Securities Intermediary has already addressed certain of these arguments in its own motion for summary judgment, but will do so again here so that this opposition brief will be a comprehensive response to Columbus' opening brief.

"[r]escission … permits the claimant to reverse a contractual exchange and recover a performance thereunder, without regard to whether the underlying contract would be classified as 'void' from its inception or merely 'subject to avoidance,'" and "[r]escission … may therefore be employed to reverse transfers made under unenforceable or illegal agreements[.]"  Restatement (Third) of Restitution and Unjust Enrichment 54, cmt. a & Reporter's Note a.  *Della*'s statement that "ordinarily … neither party has a remedy to any extent against the other," can be easily squared with the rule that "premiums cannot be retained where policies are declared invalid."  *De Bourbon/Frankel*, 2022 WL 179008, at *13–14.  Indeed, the *De Bourbon/Frankel* court did just that—the Superior Court cited *Della* in its decision, and still ordered an automatic return of premiums.  *Id.* at *12 n.47, *13–14.

If anyone is seeking a remedy that is inconsistent with the Delaware Supreme Court's prior decisions, it is Columbus.  In *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Tr., ex rel. Christiana Bank and Tr. Co.*, the Court explained "[a] court may never enforce agreements void *ab initio*, no matter what the intentions of the parties."  28 A.3d 1059 (Del. 2011).  And yet, by trying to keep $10.3 million in premiums without having to pay the $10 million in death benefits, Columbus is asking this Court to enforce one side of void contracts in contravention of *Price Dawe*.  In fact, Third Circuit Judge Bibas—sitting by designation in the District of Delaware—made this point when he noted, "[i]f the agreement is void from the start, *that suggests the correct outcome would be a remittance of the policy payment and premiums*."  *Estate of Beverly E. Berland v. Lavastone Capital LLC*, No. 1:18-cv-02002-SB-SRF, ECF No. 157, at 5 (D. Del. Mar. 2, 2021) (emphasis added).

**Third**, *Price Dawe*'s holding that policies lacking insurable interest are void *ab initio* (rather than voidable) is irrelevant to whether there is an automatic premium refund rule under

Delaware law.  Indeed, the courts applying Delaware's automatic premium refund rule have done so after holding that a policy is void *ab initio* under *Price Dawe*, or have assumed that the policy is void *ab initio*.  *See, e.g.*, *De Bourbon/Frankel*, 2022 WL 179008, at *13-14 (after concluding that the policies at issue were void *ab initio*, holding "[t]he Court finds that premiums cannot be retained where policies are declared invalid"); *Malkin I*, 2016 WL 161598, at *21 (after holding that the policy was void *ab initio*, finding "a plaintiff cannot have it both ways by seeking to rescind a life insurance policy as void *ab initio* and simultaneously requesting to retain the premiums paid on the policy"); *Rucker*, 774 F. Supp. 2d at 682 ("Thus it is clear from *Berck* and *Snyder*, that under Delaware law Principal's argument that it may retain premiums received on the Policy that this court held to be void *ab initio* for lack of an insurable interest at inception necessarily fails"); *Berck*, 719 F. Supp. 2d at 418 (explaining "[i]n the event the Berman Policy is rescinded for being void ab initio, plaintiff seeks to retain some or all of the premiums it obtained from the policy," and then holding that the insurer could not simultaneously invalidate the policy and then keep the premiums).

**Finally**, the fact that Delaware's Legislature did not codify the automatic premium return rule *actually supports* Securities Intermediary's argument that, under Delaware law, carriers must automatically refund premiums on void policies.  "[U]unsuccessful attempts at legislation are not the best of guides to legislative intent."  *Red Lion Broad. Co. v. F.C.C.*, 395 U.S. 367, 381 n.11 (1969).  But to the extent legislative inaction is helpful, the Delaware Legislature's decision to not pass legislation demonstrates the Legislature's intent to preserve the status quo in Delaware, *see Bob Jones Univ. v. U.S.*, 461 U.S. 574, 600 (1983), which means the automatic premium refund rule that courts had been consistently applying while the Delaware Legislature was considering premium legislation.  *See, e.g.*, *Rucker*, 774 F. Supp. 2d at 682; *Snyder*, 722 F. Supp. 2d at 564-

65, *Berck*, 719 F. Supp. 2d at 418-19.  Indeed, legislative inaction in response to well-established judicial precedent "must be taken as the General Assembly's intent to retain that rule," *Kelly v. Purdue Farms*, 123 A.3d 150, 158 (Del. Super. Ct. 2015), and not presuppose that through inaction the legislature sought to overturn the common law.

### 2.    Columbus Materially Misrepresents Restitution Principles Under the Restatement (Second) of Contracts §§ 197–198.

In *Seck*, Delaware Superior Court Judge Streett held—on a very unusual set of facts involving a fictitious insured—that a policy owner seeking a premium return on a void policy had to demonstrate its entitlement to restitution under Restatement (Second) of Contracts §§ 197–198. *See, e.g.*, *Seck IV*, 2021 WL 4080672, at *1 n.8, *24; *Seck I*, 2019 WL 8198323, at *4.  Section 197 states: "Except as stated in §§ 198 and 199, a party has no claim in restitution for performance that he has rendered under or in return for a promise that is unenforceable on grounds of public policy *unless denial of restitution would cause disproportionate forfeiture*."  Restatement (Second) of Contracts § 197 (1981) (emphasis added).  Section 198 then continues:

> A party has a claim in restitution for performance that he has rendered under or in return for a promise that is unenforceable on grounds of public policy if
>
> (a) he was excusably ignorant of the facts or of legislation of a minor character, in the absence of which the promise would be enforceable, or
>
> (b) he was not equally in the wrong with the promisor.

Restatement (Second) of Contracts § 198 (1981). (emphasis added).

Compare what the Restatement (Second) of Contracts §§ 197–198 actually provides (as quoted above) to how Columbus tries to twist the same Restatement test in its brief:

> The exception [*i.e.*, where restitution is permitted on an illegal contract] is where a claimant proves it was excusably ignorant of the facts giving rise to the contract's illegality; is in a class of persons the public policy at issue was designed to protect; or was tricked into

14

the illegal contract. …

Because a STOLI investor will never be in the class of persons the insurable interest rules were designed to protect—and because one cannot be duped into paying for an illegal wager if one was aware of the policy's insurable interest problems—Wilmington Trust's premium refund claim fails, unless it can prove that Viva was reasonably unaware of the Policies' insurable interest problems, which it cannot do.

(Brief at 36–37.)

Columbus' articulation of the Restatement is indefensible. Columbus has taken sections of the Restatement (Second) of Contracts that expressly recognize that restitution is appropriate in three independent scenarios—*i.e.*, disproportionate forfeiture (§ 197), excusable ignorance (§ 198(a)), and comparative culpability (§ 198(b))—and reconstructed the test so that a party's entitlement to restitution rises and falls on whether it was excusably ignorant, thereby purposefully ignoring two of the three tests established under the Restatement (Second) of Contracts which Columbus purports to rely upon. And the reason why Columbus rejiggers the Restatement so that the three independent grounds for restitution collapse into one ground—excusable ignorance—is because Columbus has no legitimate responses to the fact that (1) letting Columbus void $10 million in death benefits and keep $10.3 million in premiums would constitute disproportionate forfeiture and (2) Columbus is clearly more culpable than Viva.

In point of fact, even if this Court were to apply the Restatement (Second) of Contracts as it was written (as distinguished from the misleading formulation that Columbus proffers), Securities Intermediary is entitled to a premium refund under all three independent branches of that test.

***Disproportionate Forfeiture.*** Section 197's comments make clear that a "forfeiture" refers to "the denial of compensation that results when the obligee loses his right to the agreed exchange

after he has relied substantially, as by preparation or performance, on the expectation of that exchange." Restatement (Second) of Contracts § 197 cmt. b. The extent to which a forfeiture is disproportionate "depend[s] on the extent of that denial of compensation as compared with the gravity of the public interest involved and the extent of the contravention [of public policy]." *Id.*[7] And while Delaware courts have not considered Section 197 on comparable facts—*i.e.*, an insurer that wants to avoid paying $10 million in death benefits and retain $10.3 million in premiums— courts have found disproportionate forfeitures in other contexts where a party "receives an enormous windfall at no cost whatsoever." *Boling v. Prospect Funding Holdings, LLC,* 324 F. Supp. 3d 887, 895 (W.D. Ky. 2018); *see also Telecomms. Law Prof'ls PLLC v. T-Mobile US, Inc.*, 2015 WL 13159051, at *8 (D.D.C. Jan. 12, 2015) (where party "would forfeit the alleged value of its … services without receiving the benefit … it bargained for with a sophisticated business client").

That is what Columbus seeks here— "an enormous windfall at no cost whatsoever," *Boling*, 324 F. Supp. 3d at 895—and there is no credible argument to the contrary. Columbus is asking this Court to void $10 million in death benefits under the Policies and let Columbus keep the $10.3 million in premiums that it received under those Policies. Delaware courts and the Third Circuit are loathe to grant these types of windfalls to insurers, and this case should be no exception. *See, e.g.*, *Wyrick v. Greggo & Ferrara*, 2012 WL 2563007, at *3 (Del. Super. Ct. May 31, 2012) ("Allowing Hartford to avoid coverage under these special circumstances would amount to a windfall for Hartford[.]"); *DiJiacomo v. Progressive Ins. Co.*, 2008 WL 4817085, at *2 (Del. Super. Ct. Oct. 17, 2008) ("Allowing the carrier to avoid stacking here means a windfall for the

---

[7] As discussed extensively below, this Court would not contravene any public interest if it ordered Columbus to return the $10.3 million in premiums. (*See* p. 35-40 *infra*.)

16

carrier."); *Lomax v. Nationwide Mut. Ins. Co.*, 964 F.2d 1343, 1347 (3d Cir. 1992) ("If an insurer is allowed to reduce the judgment against it by the amount of collateral benefits paid … [t]he insurer … will realize an unwarranted windfall advantage, benefitting from the receipt of premiums and being relieved of the obligation to pay UM benefits.").

And outside of Delaware, courts have repeatedly found that letting carriers void policies and keep the premiums paid to them in return for their promise to pay death benefits would result in unfair windfalls to the carriers. *See, e.g.*, *Sun Life Assurance Co. of Can. v. Wells Fargo Bank N.A.*, 779 F. App'x 927, 929 (3d Cir. 2019) (affirming lower court ruling that "permitting Sun Life to keep Wells Fargo's premium payments would be an unfair windfall"); *Sun Life Assurance Co. of Can. v. Conestoga Trust Services, LLC*, 263 F. Supp. 3d 695, 704 (E.D. Tenn. 2017), *aff'd*, 717 F. App'x 600 (6th Cir. 2018) ("*Collins*") (holding that "[a]llowing Sun Life to retain the premiums would be a windfall to the company"); *Sun Life Assur. Co. of Can. v. Wilmington Tr. Co.*, 2017 WL 978997, at *8 (D. Utah Mar. 13, 2017) (holding that alleged STOLI policy was incontestable under Utah law, and explaining "[t]o invalidate policies long after the period of incontestability would give an insurance company a perverse incentive to reap windfalls by not challenging suspect policies up front so that the company may collect premiums indefinitely, and only later, after risks are fully quantified, allege illegality"); *Ohio Nat'l Life Assurance Corp. v. Davis*, 803 F.3d 904, 911 (7th Cir. 2015) (rejecting carrier's attempt to keep premiums on a void policy, and emphasizing "[r]etention of the premiums would thus have been a windfall for Ohio National to which it had no entitlement"); *PHL Variable Ins. Co. v. Bank of Utah*, 780 F.3d 863, 870 (8th Cir. 2015) (holding that a policy was valid under Minnesota law, and noting "[t]he question is whether Minnesota public policy requires that we permit an insurer who collected over $500,000 in premiums—a windfall it will keep if we affirm—to renege on its contractual obligation").

***Not Equally in the Wrong.*** Section 198(b) of the Restatement (Second) of Contracts permits restitution when the party seeking restitution was "not equally in the wrong with the promisor." Restatement (Second) of Contracts § 198(b). Judge Stark's decision in *Sol III*—in which he ordered a carrier (represented by Columbus' counsel) to return every penny in premiums that it had collected on a void policy to the policy owner as restitution damages—is directly on point, and yet Columbus does not even cite the case in its brief.

In *Sol III*, Judge Stark undertook a comparative culpability analysis by comparing the policy owner's fault to the insurer's fault. Judge Stark began by noting that the policy owner "is not an ignorant or duped party, but a highly-sophisticated secondary market investor with nearly $9 billion in life insurance portfolio investments." *Sol III*, 2019 WL 8353393, at *4. The Court found that the policy owner "knew the Sol policy was premium financed, that Coventry was involved in the policy origination, and that the policy portfolio it was acquiring was higher risk due to 'overzealous origination methods' that were subject to legal challenge." *Id.* The Court explained that the policy owner's "due diligence into the Sol Policy also raised several red flags," and concluded "the Court is convinced that [the policy owner] knew or should have known at the time it purchased the Sol Policy there was a substantial risk the Policy was an illegal STOLI policy." *Id.*[8]

Judge Stark then moved to the carrier's culpability. The Court explained that the insurer "may have been unaware at origination that some of its policies constituted illegal human life wagers, but Sun Life admits (as the facts compel it to) that it subsequently developed a list of suspected STOLI policies." *Sol III*, 2019 WL 8353393, at *4. The Court continued:

> With the release of *Price Dawe*, Sun Life also knew (or should have

---

[8] As explained below, none of those same conclusions apply to Viva's diligence of the Policies at issue in these cases. (*See* p. 24-32, *infra*.)

> known) that it could invalidate STOLI policies even after the two-year incontestability period.  Yet, rather than notify policyholders that their policies were suspected STOLI, or that the validity of their policies may be challenged at any time, Sun Life "made the strategic decision not to pursue investigating [these] policies," and continued to collect (often enormous) premiums.

*Id.*  After rejecting the carrier's argument that "the equities warrant leaving the parties where the Court found them"— the same argument Columbus makes here (Brief at 36)—Judge Stark held that "[t]he only equitable remedy justified here is restitution damages, in which all premiums paid to Sun Life on the Sol Policy … are returned to [the policy owner]."  *Sol III*, 2019 WL 8353393, at *4 (citing *Rucker*, 774 F. Supp. 2d at 682–83; *Snyder*, 722 F. Supp. 2d at 565; *Berck*, 719 F. Supp. 2d at 418–19).  By "all premiums," the Court made clear this meant any premiums received by the carrier regardless of who paid them:  "While Sun Life argues that [the policy owner] is due only those premiums it directly paid … it is undisputed that [the policy owner] purchased all interest in the Policy, including the right to pursue the return of any premiums that had already been paid on the Policy."  *Id.* at *4 n.6.

If the policy owner was entitled to a full premium return under comparative fault principles in *Sol III*, then Securities Intermediary (on behalf of Viva) is clearly entitled to a full premium return under comparative fault principles here—particularly since many of Judge Stark's conclusions about the policy owner's fault in *Sol* do not apply to Viva on the undisputed facts of these cases.  (*See* p. 24-32 *infra*.)

Regarding Columbus' culpability,[9] Columbus claims that the Policies are void because the insureds procured them as part of the KDI/Concordia Program—a program that involved non-

---

[9] The facts concerning Columbus' culpability are described more extensively in Securities Intermediary's motion for summary judgment.  Securities Intermediary respectfully refers the Court to its summary judgment brief (at p. 5–25) for a more detailed explanation of Columbus' course of dealing regarding the Policies from 2004 through 2020.

recourse loans and where the lender had a contractual right to the majority of the death benefit. (Brief at 25–35.) But Columbus knew the Policies were part of the KDI/Concordia Program before Columbus even issued the Policies, and Columbus knew the KDI/Concordia Program involved non-recourse loans as early as late 2003 or early 2004. (Ex. 3 at 33:7–33:20, 75:13–76:25, 124:23– 125:15; Ex. 4 at 27:12–30:3, 95:5–98:3; Ex. 25 at 002208.)[10] Even if Columbus did not know that the KDI/Concordia Program involved non-recourse loans before issuing the Policies, Columbus undoubtedly had that knowledge in September 2004, when Columbus received samples of the Participation and Trust Agreements that insureds had to sign to buy policies as part of the KDI/Concordia Program. (Ex. 3 at 114:18–157:1; Ex. 13 at 003996–4038.) Section 12 of the Participation Agreement stated that the loans would be non-recourse to the insureds:

> It is expressly understood and agreed by the parties hereto that … (d) *under no circumstances shall the Trustee, the Insured or the Owners be personally liable for the payment of any indebtedness or expenses of the Trust or be liable for any breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trust under this Participation Agreement, the Trust Agreement or any other document*.

(Ex. 13 at 004001 (emphasis added).) And the sample Trust Agreement made the same point— *i.e.*, that the trust's owners "*shall not be liable for any liabilities and obligations of the Trust*." (Ex. 13 at 004017 (¶2.6) (emphasis added).)

Columbus also knew no later than September 2004 that the insureds who took out policies as part of the KDI/Concordia Program were only entitled to a portion of the death benefits. Section 7(a) of the Participation Agreement—which Columbus' executives received and reviewed in

---

[10] Numbered exhibits refer to the exhibits attached to the Declaration of Robert E. Griffin, dated Apr. 29, 2022, submitted in connection with Securities Intermediary's motion for summary judgment. (20-735, D.I. 146; 20-736, D.I. 144). Lettered exhibits refer to the exhibits attached to the Declaration of Philip J. Farinella, dated Apr. 29, 2022, submitted in connection with Columbus' motion for summary judgment. (20-735, D.I. 148; 20-736, D.I. 145).

September 2004—expressly stated that "[u]nder the Trust Agreement, the Owners shall be entitled to receive, subject to prior liens of lenders and the satisfaction of the obligations of the Trust, the portion of the death benefit allocated to the Owners, as described in the attached schedule (the "scheduled death benefit")."  (Ex. 13 at 004000.)  Section 8(b) of the Participation Agreement similarly provided:

> Under no circumstances can the Owners or any permitted successor(s) or assign(s) of the Owners' beneficial interest in the Trust receive a distribution from the Trust of a portion of the death benefit from the life insurance policies on the life of the Insured that is greater than the Owners' allocable scheduled death benefit as set forth on the attached schedule.

(*Id.* at 004000.)  The Participation Agreement attached a "Scheduled Death Benefit" chart showing that the insured's beneficiary would obtain a portion of the death benefit.  (*Id.* at 004004.) Columbus also received a PowerPoint presentation regarding the KDI/Concordia Program in September 2004 which made the same point.  (Ex. 11 at 003937, 003961.)  The presentation included a flow-chart demonstrative showing that when the insured died, the commercial lender would receive its share of the death benefit with the remainder being paid to the insured's beneficiary.  (Ex. 11 at 003961.)

Columbus continued to investigate the KDI/Concordia Program in 2005.  In May 2005—the same month that Columbus began publishing anti-STOLI memos—███████████████████ █████ where its senior executives discussed the KDI/Concordia Program, with a particular focus on how a significant percentage of its policies were linked to Potomac—the agency responsible for marketing the KDI/Concordia Program.  (Ex. 36 at 0009221–72; Ex. 3 at 180:21 – 191:9.)  Columbus conducted an internal investigation into the KDI/Concordia Policies in September 2005, and the documents created during this time period show that Columbus' investigation included an "insurable interest" review.  Specifically, on September 7, 2005, a

Columbus executive wrote to Erwin & Johnson— trustee associated with a third-party investor that had acquired the Policies in a secondary market transaction: "***We are also reviewing insurable interest issues in connection with both attempted transfers and procurement of these and other policies***. We reserve the right to take additional action including rescission." (Ex. 41 at 000311 (emphasis added).)  Columbus testified that "these and other policies" referred to policies Columbus knew were part of the KDI/Concordia Program—including the Policies. (Ex. 42 at 71:11–73:8.)

In 2006, Columbus began tracking "potential investor owned/life settlement polices." (Ex. 48 at 007876.)  In December 2010, Columbus started circulating reports via email concerning "Possible Investor Owned / Life Settlement Policies," which flagged both the Cohen and Romano Policies. (Ex. 49 at 007856, 7863.)  Columbus testified that these reports were designed to capture policies that Columbus believed were potentially STOLI policies or potentially life settlement policies. (Ex. 42 at 208:1–17.)  Columbus updated these reports regularly from 2010 through 2014, consistently flagging the Cohen and Romano Policies. (Ex. 50 at 006537, 006544; Ex. 51 at 008989, 008996; Ex. 52 at 004092, 004099; Ex. 53 at 004979, 004986; Ex. 54 at 005378, 005384; Ex. 42 at 246:13-247:3.)

In January 2012, Columbus' president requested a separate STOLI report. (Ex. 55 at 004501; Ex. 42 at 233:3–7, 235:19–22.)  This STOLI report was designed to capture policies issued between 2003 and 2006, with face amounts of $5 million or greater, that were issued on insureds who were older than 70. (Ex. 55 at 004501.)  Based on that STOLI methodology, Columbus found 69 policies in force as of December 31, 2011. (*Id.* at 004502.)  Columbus testified that—based on its search criteria—the STOLI report included both the Cohen and Romano Policies. (*Id.* at 004502; Ex. 42 at 232:10-244:6.)

22

From September 2005 (when Columbus told the trustee associated with the Policies as of that date that it was conducting an "insurable interest review") through July 2019 (when Columbus sent Securities Intermediary a reservation of rights letter), Columbus never informed any of the Policies' owners that it suspected the Policies were STOLI.  Instead, Columbus, among other things, approved six ownership and beneficiary changes, sent out Annual Reports every year, and issued countless verifications of coverage—representing to the Policies' owners that the Policies were "active" and "in force."  (Ex. 42 at 116:19-119:12, 271:14-272:1, 282:7-284:2; Ex. 56; Ex. 57; Exs. 62-73; Exs. 75-78)   And most incredibly, Columbus collected *$10,346,287.80* in premiums without interest—an amount that now exceeds the Policies' $10 million in death benefits.  (Declaration of Ryan Harrison, dated Apr. 28, 2022, D.I. 145 ("Harrison Decl.") ¶¶3, 5.)

As discussed below, Viva did nothing wrong.  (*See* p. 24-32 *infra*.)  Viva bought the Policies in the tertiary market as part of an ██████████, 12 years after Columbus issued the Policies and began lining its pockets with premiums.  (Ex. 110 at 0000729.)  Viva bought the Policies in a UCC auction, which meant Viva and its investment advisor Preston had limited information regarding the Policies specifically and the portfolio generally (as is typical in UCC sales).  (Ex. 111 at 61:10–14, 123:14–127:11.)  Unlike Columbus, Viva did not know what the KDI/Concordia Program was (or that the Policies were part of the KDI/Concordia Program).  (Ex. 111 at 166:13–22.)  Unlike Columbus, Viva had no idea that the insureds paid premiums using non-recourse loans.  (Ex. 111 at 13:23–14:3, 131:23–132:3, 135:11–14.)  Viva also did not have copies of the Participation and Trust Agreements (the documents that Columbus has possessed since 2004), and Viva (unlike Columbus) did not know that the insureds were only entitled to a portion of the death benefit.  (Ex. 111 at 166:13–22, 131:23–132:3, 135:11–14.)

Viva is clearly "not equally in the wrong" with Columbus, which is why Columbus is so

desperate to transform Section 198(b)'s comparative fault test into one that does not examine Columbus' conduct at all, and instead, only considers whether the party seeking restitution "is in a class of persons the public policy at issue was designed to protect" or "was tricked into the illegal contract." (Brief at 36.) But this Court already rejected Columbus' attempt to rewrite Section 198(b) at the motion to dismiss stage: "Contrary to Columbus Life's argument, *In re American International Group* does not suggest that restitution is appropriate *only* where a party was either tricked or in a protected class." *Columbus Life Ins. Co. v. Wilmington Tr., N.A.*, 2021 WL 1820573, at *9 n.4 (D. Del. May 6, 2021), *R&R adopted*, 2021 WL 3886370 (D. Del. Aug. 31, 2021); *see also Columbus Life Ins. Co. v. Wilmington Tr., N.A.*, 2021 WL 1820614, at *9 n.4 (D. Del. May 6, 2021), *R&R adopted*, 2021 WL 3886373 (D. Del. Aug. 31, 2021).

## B. Columbus Misstates the Facts Regarding Viva's Acquisition of the Policies to Support Its Erroneous Excusable Ignorance Argument.

After ignoring two of three grounds for restitution under *Seck* and the Restatement (Second) of Contracts 197-198, Columbus argues that Securities Intermediary (on behalf of Viva) is not entitled to a premium refund because Viva was not excusably ignorant of the facts concerning the Policies' invalidity. (Brief at 36–41.) In doing so, Columbus materially misrepresents the factual record concerning Viva's acquisition of the Policies, which leaves no doubt that Viva was, in fact, excusably ignorant.

### 1. Viva's Due Diligence Was Entirely Reasonable, Especially Given that Viva Bought the Policies in a UCC Sale.

The most telling omission in Columbus' excusable ignorance argument is Columbus' failure to compare the facts concerning the *Seck* policy owner's utter lack of due diligence (which the *Seck* court concluded was purposeful in the hope of acquiring policies where the insured was already dead) with the facts concerning Viva's due diligence. *Seck* is the *only* case that has applied the Restatement (Second) of Contracts § 198(a) to whether a policy owner is entitled to premium

restitution on a void policy, and yet Columbus does not try to compare the *Seck* policy owner's complete lack of due diligence to Viva's due diligence.  And that is because Columbus knows that Viva's due diligence on the Policies looked nothing like the *Seck* policy owner's.

The *Seck* court held that the policy owner was not excusably ignorant because the policy owner had conducted "extremely limited" diligence.  *Seck IV*, 2021 WL 4080672, at *20. Tellingly, the *Seck* court found that the investor in that case "made the deliberate decision to superficially look at the Seck Policy by solely focusing on whether it was active," "purposefully ignored the possibility that some of the unexamined policies in the bulk purchase might have been unenforceable," and only examined "a small sample of policies (that did not include the Seck Policy)" as part of its diligence of 189 policies.  *Id.* at *19.  The *Seck* court found that the policy owner did not review information in the data room, and only sought to verify whether the insureds were alive *after* it acquired the policies because "this would allow the [policy owner] to receive death benefits without having to pay any premiums on any policy where the insured was already deceased."  *Id.* at *20.  In other words, the *Seck* court concluded that the policy owner had purposefully done superficial due diligence hoping that it would acquire policies on insureds who were already dead, thereby getting a windfall on any such policies.

Unlike the policy owner in *Seck*, there is no dispute that Preston, on behalf of Viva, looked at every piece of paper concerning the Policies that the seller made available in the data room and that the seller included in the data room *all* of the information that it had regarding the Policies (and the portfolio).  Those documents included, among other things, information about the Policies, information about the insureds, HIPAA and medical information, a letter confirming the payoff of premium finance loans on the Policies, and Columbus' verifications of coverage on the policies.  (Ex. 111 at 126:10–127:11.)  Preston also "requested from the servicer [of the portfolio]

25

any information that they had been able to acquire over the six years that they were servicing the policy." (*Id.* at 132:21–24.)  But the seller did not have—and thus did not make available to Preston—any of the documents that Columbus argues are proof that the Policies lacked an insurable interest, including the Participation Agreements, Trust Agreements, or Master Funding Agreements that Cohen and Romano signed in order to participate in the KDI/Concordia Program. (*Id.* at 130:21–131:5, 134:18–135:1.)

That said, there were limited documents available in the data room for the Policies because (1) Viva was buying the Policies in a UCC sale from a financing party, after the owner of the policies had defaulted on its financing and (2) as a result, the seller had limited information to make available in due diligence.  (Ex. 111 at 123:14–127:11, 172:6–17.)  So after Preston reviewed carefully every page of information that it received from the seller in the data room, Viva and Preston went further in diligence.  Significantly, even though sellers in UCC sales do not typically provide representations and warranties to buyers, Viva obtained certain representations and warranties, *in perpetuity*, from the Portfolio's servicer—Maple Life Analytics, LLC ("Maple"). (*See* Ex. 111 at 118:22–119:3, 140:9–16, 142:20–22, 144:9–23, 148:3–10.)  Viva secured representations that Maple's diligence and review of the Policies "did not disclose facts or circumstances which, in the commercially reasonable judgment of [the servicer] would raise a material question as to whether the prima facie terms of the applicable insurable interest laws were met at the time of policy issuance." (Ex. 112 at A0000066 (Representation #2), A0000072 (Exhibit C), A0000138 (Schedule 1 to Exhibit C); *see also* Ex. 111 at 203:19–205:23.)

Columbus' attempt to cast aspersions on Maple's unwillingness to provide additional representations (Brief at 22) is unpersuasive.  To begin with, Columbus ignores that these types of representations are *not* provided to buyers in UCC transactions.  (*See* Ex. 111 at 140:9–16, 142:20–

26

22, 148:3–10.)  The fact that Viva was able to obtain *any* representations whatsoever from Maple under the circumstances demonstrates excusable ignorance (not its absence).    Separately, Columbus points to a carve-out from Maple's representations that the servicer applied to all Delaware policies based solely on "the historical information around litigation in Delaware, not necessarily that these policies were of concern but the state, in fact, was the concern." (Ex. 111 at 203:6–204:9.)  Viva and Preston's 30(b)(6) witness made clear that the servicer "was just simply being extremely cautious" because it was making representations (that are not typically made in UCC sales) "in perpetuity."    (*Id.*)    So Maple's unwillingness to represent that the Policies themselves had an insurable interest had nothing to do with the bona fides of the Policies; it had everything to do with the fact they were Delaware policies and that even the servicer had limited information because it was not involved in originating the Policies.

### 2.    Columbus' Argument that Viva Should Have Done Even More Diligence on the Policies is Meritless.

Knowing Viva's due diligence on the Policies does not resemble the *Seck* policy owner's "extremely limited" due diligence, Columbus plays Monday morning quarterback with regard to the extensive due diligence that Viva did before acquiring the portfolio that contained the Policies. Columbus points to four ways that—in Columbus' view—Viva could have done *even more* diligence on the Policies, going so far as to fault Viva for not obtaining documents that were unavailable to the seller or to Maple (which had serviced the Policies previously).  But Columbus (and its litigation counsel) are not expert witnesses on the customs and practices of tertiary market diligence, and the Court should reject Columbus' after-the-fact attempts to conjure ways Viva could have done even more.

***First***, Columbus argues that Viva did not follow the Institutional Longevity Markets Association's ("ILMA") diligence guidelines.  (Brief at 22, 39.)  In doing so, Columbus ignores

27

that the ILMA guidelines do not apply to tertiary market buyers like Viva.[11]  As Viva and Preston's 30(b)(6) witness testified—and as the ILMA document itself makes clear—the ILMA guidelines apply to *life settlement providers* who buy policies from insureds in the *secondary market*; they do not apply to *institutional investors* who buy policies from *other investors* in the *tertiary market*. (Ex. 111 at 255:2–17 ("We wouldn't even have referenced this document, as it, as you know, applies to [a] provider's secondary practice, not a tertiary buyer's activity or practice. … This document is not something we would have referred to in a tertiary transaction."); Ex. SS, p. 1 (titled "Life Settlement *Provider* Best Practices" and explaining that the suggested procedures are designed to supplement those "employed by life settlement *providers*") (emphasis added).)  In fact, these secondary market diligence steps are designed to "protect" downstream investors in the tertiary market like Viva because, as here, the documentation available in diligence to a tertiary participant like Viva may be limited.  (Ex. SS, p. 1.)

Columbus knows this.  ILMA recently filed an amicus brief in the *Estate of Malkin* case—where Columbus' counsel represents the Estate of Malkin—explaining why its diligence guidelines are inapplicable to tertiary market buyers.  (Declaration of John A. Kelly, dated May 31, 2022 ("Kelly Decl."), ¶¶ 7-9)  And even if Columbus were unaware of those briefs, its attorneys deposed ILMA in the *De Bourbon/Frankel* litigation less than two years ago.  In *De*

---

[11] As *Price Dawe* makes clear, "an active secondary market for life insurance, sometimes referred to as the life settlement industry, has emerged," "[t]his secondary market allows policy holders who no longer need life insurance to receive necessary cash during their lifetimes," and "[t]he market provides a favorable alternative [for insureds] to allowing a policy to lapse, or receiving only the cash surrender value."  *Price Dawe*, 28 A.3d at 1069.  There is also a separate investor market for life insurance that *Price Dawe* did not consider—"the tertiary market, i.e., the market in which life insurance policies are traded among investors, but not between investors and original owners or insureds."  *37 Besen Parkway, LLC v. John Hancock Life Ins. Co. (U.S.A.)*, 2017 WL 5126103, at *1 (S.D.N.Y. Oct. 5, 2017) (describing the differences between the secondary and tertiary markets).

*Bourbon/Frankel*, ILMA testified that ILMA's guidelines are not applicable to tertiary market investors like Viva who buy portfolios of policies that already have been sold into the life settlements market. (Kelly Decl., ¶¶ 5-6; Kelly Decl. Ex. A at 48:21–50:2, 150:19–152:15, 154:6–156:18.) ILMA testified that its guidelines describe best practices that life settlement providers should follow in the secondary market—*i.e.*, the market where providers purchase policies directly from insureds—in order to provide comfort to ILMA's members (like Viva) who are purchasers in the tertiary market. (Kelly Decl., Ex. A at 48:21–50:2.) ILMA testified that "ILMA … doesn't speak to how an investment enterprise does their transactions in the tertiary market." (Kelly Decl., Ex. A at 157:14 – 17; *see also id.* 141:22–142:9.) It is telling that Columbus and its attorneys did not subpoena ILMA for a deposition here, but instead elected to rely on attorney argument concerning the ILMA document.

The ILMA guidelines do not even make sense when applied to tertiary market buyers like Viva. Unlike secondary market providers, tertiary market buyers often purchase dozens, if not hundreds, of policies in a single portfolio, which precludes any realistic possibility of conducting "phone interviews" with hundreds of insureds or obtaining certifications from hundreds of insurance producers. (*See, e.g.*, Ex. SS, p. 2.) And as Viva and Preston's 30(b)(6) witness testified, these types of endeavors would have been "fruitless," and inconsistent with industry standard tertiary market diligence. (Ex. 111 at 185:9–15.) Take phone calls to insureds. Viva and Preston testified that insureds and their family have "an obligation [to provide information] only to the existing owner, not some prospective or potential owner." (Ex. 111 at 69:20–71:3, 178:1–8, 180:10–18.) The same is true for brokers and agents who helped the insureds take out the policies, often a decade earlier. Preston did not contact insureds (or their families), agents, or brokers

because they lack any incentive or obligation to provide information to prospective purchasers about policies that were issued 10 years earlier. (*See id.* at 182:18–23.)[12]

***Second***, Columbus's suggestion that Preston should have tracked down additional documents that were not in the data room—for ██████, as Preston's pre-acquisition diligence steps would not have applied to the Cohen and Romano Policies in isolation—makes no sense. (Brief at 21–22, 39.) Maple expressly confirmed to Viva that it was "not able to capture any more information than [w]hat was available in the data room." (Ex. 111 at 172:6–17.) Preston and Viva could not possibly know who, if anyone, had copies of any additional, decade-old documents related to the ██████ in the Portfolio that were not in the data room, which would have resulted in hundreds, if not thousands, of inquiries. It certainly would have been pointless for Preston ask Columbus for its files concerning the Policies; Columbus' own records reflect that it rejects requests for information relating to policies from third parties that do not themselves own the policy. (*See, e.g.*, Ex. 38 (refusing to provide policy illustrations to someone other than the owner, explaining "[s]ince you are not the owner we are unable to comply with your request for illustrations").

***Third***, Columbus criticizes Viva for supposedly not trying to determine during its pre-acquisition diligence whether Cohen and Romano used non-recourse loans to pay premiums on the Policies. (Brief at 21–22.) But that is not what the record reflects; Preston and Viva did try to figure out whether the insureds paid premiums with non-recourse loans, but they were unable to determine that one way or another. Preston and Viva's 30(b)(6) witness testified that—in an

---

[12] Columbus misrepresents Viva and Preston's testimony when it argues that Viva and Preston did not try to contact insureds because they did not have their phone numbers. (Brief at 39 n.24.) Viva and Preston testified that it would have been improper (not impossible) to call insureds until after the deal closed, and the insureds had been informed of the new owner. (Ex. 111 at 69:17–71:3, 177:24–178:8, 180:10–18.)

attempt to figure out whether the Policies involved non-recourse premium finance—Preston reviewed the documents in the data room and "requested from the servicer any information that they had been able to acquire over the six years that they were servicing the policy." (Ex. 111 at 132:16–133:3.)  But according to Viva and Preston's witness, the servicer "indicated that there was no additional information available to them."  (*Id.*)

There also is an obvious irony here.  Columbus is arguing that the Court should let Columbus void the Policies and keep the $10.3 million in premiums on the Policies because Viva did not figure out that Cohen and Romano used non-recourse loans to pay premiums on the Policies.  But Columbus knew before it issued the Policies that the KDI/Concordia Program involved non-recourse premium finance and yet it issued those Policies anyway.  (*See* p. 20 *supra*.)  And even if Columbus did not know that the Policies were non-recourse premium financed before it issued the Policies, Columbus knew that fact no later than September 2004 when it reviewed copies of sample Participation and Trust Agreements, which had provisions explicitly stating that the loans were non-recourse to the insureds.  (*See* p. 20-21 *supra*.)  This informational disparity between Columbus and Viva is one of the very reasons why, under Section 198(b) of the Restatement (Second) of Contracts, Viva is entitled to premium restitution because it's "not equally in the wrong" with Columbus.

***Finally***, Columbus argues (Brief at 22) that Viva was not excusably ignorant because, six years before Viva acquired the Policies, a different prospective buyer of the Cohen Policy filed a counterclaim against one of the Cohen Policy's prior owners, alleging that the Cohen Policy was a STOLI policy.  *See* Notice of Removal, Exhibit A (Complaint), *Erwin, in His Capacity as Trustee of the Orca LS I Tr. v. Fin. Life Servs., LLC*, No. 8:09-cv-1463 (C.D. Cal. Apr. 21, 2010) (ECF No. 1); *see also* Answer and Counterclaims, *Erwin, in His Capacity as Trustee of the Orca LS I*

*Tr. v. Fin. Life Servs., LLC*, No. 8:09-cv-1463 (C.D. Cal. Apr. 21, 2010) (ECF No. 42).

Importantly, this is not a court decision holding that the Cohen Policy was a STOLI policy. Rather, it is simply a pleading from 2010 that has allegations relating to the Cohen Policy buried 19 pages into the defendant's answer and counterclaims.

When asked about this case, Viva and Preston's witness did not remember it. (Ex. 111 at 192:1–4.) That testimony is not surprising, because the case that mentioned the Cohen Policy in a pleading six years before Viva bought the Cohen Policy went nowhere. The case apparently never proceeded to discovery, and concluded *without* any finding that the Cohen Policy was void *ab initio*. The last docket entry before the parties agreed to a settlement was an order dismissing the action for lack of subject matter jurisdiction. *See* Order, *Erwin, in His Capacity as Trustee of the Orca LS I Tr. v. Fin. Life Servs., LLC*, No. 8:09-cv-1463 (C.D. Cal. Apr. 21, 2010) (ECF No. 54). In fact, if the allegation concerning the Cohen Policy was so significant and so apparent to anyone connected to the Cohen Policy, then Columbus presumably would have filed its own lawsuit seeking to invalidate the Cohen Policy. It did not. Instead, Columbus spent the next 10 years collecting millions of dollars in premiums.

### 3. Columbus' Argument that Viva Bought the Policies Knowing They Had Insurable Interest Risk is Disingenuous and Irrelevant.

Columbus also asserts that "Viva *admits* that prior to buying the Policies, Viva *knew* the Policies carried 'insurable interest-related risk' and bought them anyway," and "[t]his alone should be fatal to Viva's premium refund claim." (Brief at 37.) Columbus' argument is meritless—both legally and factually.

Even if Columbus were correct that "Viva *knew* the Policies carried 'insurable interest-related risk' and bought them anyway," this would *not* "be fatal to Viva's premium refund claim" as Columbus argues. When courts have considered facts where a policy owner acquired a policy

32

knowing it had insurable interest risk, courts have still ordered the carrier to refund the premiums anyway. *See, e.g.*, *Sol III*, 2019 WL 8353393, at *4 (ordering the carrier to refund all the premiums to a policy owner that "knew or should have known at the time it purchased the Sol Policy there was a substantial risk the Policy was an illegal STOLI policy"); *Sun Life Assurance Co. of Can. v. Wells Fargo Bank, N.A.*, 2020 WL 1503641, at *14–15 (N.D. Ill. Mar. 30, 2020) (ordering the carrier to return premiums to a policy owner that "conducted a due diligence review" before buying a policy and "knew it might be purchasing a lawsuit").

Columbus also does not fairly present the discovery record concerning Preston and Viva's conclusions concerning insurable interest risk.  It is true that Viva believed the Policies had "some amount" of insurable interest related risk.  But Columbus fails to mention that Viva believed the actual risk—as measured by the likelihood of a potential insurable interest challenge—was "very low" in light of:

(Ex. VV at No. 4 (emphasis added).)  In fact,

33

████████████████████ (*See* Ex. 111 at 95:4–9 ███████████████████

████████████████████ ; *see also* Ex. TT ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████ (Ex. 111 at 222:18–23.)

Columbus' argument that "Viva dismissed … out of hand" the possibility of bidding only on policies that did not have (very low) insurable risk (Brief at 38) is also not a reason for the Court to let Columbus keep the premiums. Maple—the servicer of the portfolio—advised Preston that Viva was unlikely to win if Viva's bid had "any sort of tranching or splitting of the portfolio." (Ex. 111 206:10–25.) Columbus's suggestion that Viva—or any prospective purchaser—should have refused to purchase certain policies in the Portfolio based on "very low" and "de minimis" insurable interest risk is nonsensical.

Equally nonsensical is Columbus' attempt to fault Viva for not bringing its "insurable interest concerns to Columbus Life's attention." (Brief at 38.) Columbus *already knew* the information that Columbus argues Viva should have brought "to Columbus Life's attention"—and *much, much more*. Columbus started secretly tracking and identifying the Policies as STOLI in 2006—ten years before Viva acquired the Policies. (*See* p. 22-23 *supra*.) And Columbus had the KDI/Concordia Program documents it believes were critical to evaluating insurable interest at inception as of September 2004—including the Participation Agreement and Trust Agreement (*see* p. 20-21 *supra*), which were unavailable to Viva during its due diligence 12 years later in 2016. (Ex. 111 at 130:21–131:5, 131:23–132:3, 134:18–135:1.)[13]

---

[13] Columbus misrepresents Viva and Preston's testimony when claiming that Viva and Preston testified "'[i]n no situation would [they] have evaluated the relationship between the insured and

C.     **It Would Be Bad Public Policy to Let Columbus Void the $10 Million in Death Benefits Under the Policies and Keep the $10.3 Million in Premiums It Collected on Those Policies.**

After distorting the law and the facts, Columbus tries to persuade the Court that its "heads I win, tails you lose" argument—*i.e.*, that it should keep the premiums and not pay the death benefits—is the right public policy outcome.  Columbus claims that "STOLI promoters only create STOLI to satisfy the demand of downstream investors," and "[i]f downstream investors … are refunded premium or otherwise made whole … they will continue buying policies they know have insurable interest problems, which in turn, will sound a loud message upstream to would-be STOLI promoters to keep generating STOLI."  (Brief at 37.)  Columbus' public policy argument is deeply flawed.

*First*, Columbus ignores that courts applying Delaware law already have weighed the public policy interests at stake and held that carriers simply cannot keep premiums if they do not have to pay the death benefits.  Judge Johnston ruled five months ago in *De Bourbon/Frankel* that "[a]s a matter of public policy, it would not be fair for Sun Life to retain all premiums, while never having to pay death benefits as agreed in exchange for receiving premiums."  *De Bourbon/Frankel*, 2022 WL 179008, at *13–14.  Judge Robinson made the same point over a decade ago in *Berck* and *Snyder*, holding:

> The payment … [of] premiums is the consideration for which the insurer agrees to assume the risk specified in the policy.  If an insurance company could retain premiums while also obtaining rescission of a policy, it would have the undesirable effect of incentivizing insurance companies to bring rescission suits as late as

---

the beneficiary' at inception to determine if the beneficiary had an insurable interest in the life of the insured."  (Brief at 22.)  In the part of the deposition cited by Columbus, the witness was testifying to Preston's business diligence.  The witness went on to testify that this type of evaluation (to the extent beneficiary information could be captured by the available documents) "is the lawyer's responsibility," and therefore, would have been evaluated by Viva's legal team. (*See* Ex. 111 at 44:10–45:5; 47:18–51:3.)

35

possible, as they continue to collect premiums at no actual risk.

*Berck*, 719 F. Supp. 2d at 418–419; *see also Snyder*, 722 F. Supp. 2d at 564–65.  The *Malkin* court found that, under Delaware law, a carrier had to return the premiums on a void *ab initio* policy to "prevent manifest inequity."  *Malkin I*, 2016 WL 161598, at *21.  The *Sol III* court—after finding that the policy owner "knew or should have known" the policy was STOLI—nonetheless held that "[i]f the Court were … to leave the parties as it found them, Sun Life would be unjustly enriched," and "[i]n the Court's view, no party here has shown itself to be an innocent victim, and none should leave the Court an undisputed victor."  *Sol III*, 2019 WL 8353393, at *4–5.  And finally, courts outside Delaware have repeatedly held that carriers cannot retain premiums on void policies because permitting such a result would sanction an inequitable windfall.  (*See* p. 17-18 *supra*.)

**Second**, in its brief, Columbus unknowingly stumbled upon another reason why public policy favors ordering carriers to refund premiums on void policies.  Columbus argues that—based on Viva's testimony— "Viva was confident that … Delaware courts would refund, not just the premium Viva paid, but also all of the premium Viva's predecessors paid," and "[t]his line of analysis is precisely the sort of thinking the Delaware Supreme Court's rule in *Della* was designed to prevent."  (Brief at 39.)  Columbus is 100% wrong.  The fact that Viva bought the Policies understanding that carriers must refund premiums on void policies proves why it would be terrible public policy to let Columbus keep the premiums.

"In structuring financial transactions, businessmen depend on state commercial law to provide the stability essential for reliable evaluation of the risks involved."  *U.S. v. Kimbell Foods, Inc.*, 440 U.S. 715, 739 (1979); *see also Landgraf v. USI Film Prods.*, 511 U.S. 244, 271 (1994) (making clear that, when it comes to "contractual or property rights," the law's "predictability and stability are of prime importance").  One of the very reasons why courts adhere to precedent is the

"desirability that the law furnish a clear guide for the conduct of individuals, to enable them to plan their affairs with assurance against untoward surprise." *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 403 (1970).

When Viva bought the Policies in 2016 in the tertiary market, courts applying Delaware law—at that point—had *unanimously* held that, if a policy were declared void, the carrier would be obligated to return the premiums *automatically*. *See Van de Wetering*, 2016 WL 8116141, at *19; *Malkin I*, 2016 WL 161598, at *18, *21; *Pak*, 2012 WL 13201401, at *1; *Lankow*, 2012 WL 13201402, at *1; *Rucker*, 774 F. Supp. 2d at 682; *Snyder*, 722 F. Supp. 2d at 564–65; *Berck*, 719 F. Supp. 2d at 418–19. Columbus' contention that Viva is not entitled to a premium refund because it took Delaware law into account when it paid ▅▅▅▅▅ to acquire the Portfolio containing the Policies is entirely backwards. This is one of the reasons why the Court *should* order Columbus to return the premiums. From a public policy perspective, the law is supposed to produce predictable results for people and businesses who are planning their affairs based on the prevailing law at any particular moment. If this Court were to accept Columbus' argument—that it can void the Policies and keep the premiums—it would be reaching an outcome that would have shocked the life settlement industry in 2016. This Court should not upend the law and frustrate the settled expectations of the business community by accepting Columbus' arguments, because doing so would represent bad public policy and make Delaware a less desirable state in which to do business.

***Third***, Columbus' public policy argument—that ordering carriers to refund premiums will somehow "sound a loud message upstream to would-be STOLI promoters to keep generating STOLI" (Brief at 37)—is rank speculation. The market that existed in the 2004–07 time period when carriers were issuing what are now known as STOLI policies was entirely different than the

market that exists today.  In light of those market differences, the suggestion that court-ordered premium refunds will incentivize STOLI is untenable.

As *Price Dawe* recognized, "[i]n approximately 2004, securitization emerged in the life settlement industry," "[s]ecuritization substantially increased the demand for life settlements, but did not affect the supply side," and "STOLI promoters sought to solve the supply problem by generating new, high value policies."  *Price Dawe*, 28 A.3d at 1070.  State legislatures responded to STOLI policies—and certain court decisions finding that such policies were valid under preexisting insurable interest statutes—by enacting legislation designed to prevent the issuance of future STOLI policies.  *Compare Wells Fargo Bank, N.A. v. Pruco Life Ins. Co.*, 200 So. 3d 1202, 1205–06 (Fla. 2016) (holding that STOLI policies are incontestable after two years) *with* Fla. Stat. §§ 626.99289, 626.99291 (legislation concerning STOLI); *compare Kramer v. Phoenix Life Ins. Co.*, 940 N.E.2d 535, 536-37, 539 n.5 (N.Y. 2010) (holding that STOLI policies are valid under New York law) *with* N.Y. Ins. Law § 7815(c) (legislation concerning STOLI); *compare Lincoln Nat'l Life Ins. Co. v. Gordon R.A. Fishman Irrevocable Life Tr.*, 638 F. Supp. 2d 1170, 1170-71, 1177, 1179 (C.D. Cal. 2009) *with* Cal. Ins. Code §§ 10113.1(g)(B), 10113.3(s) (legislation concerning STOLI); *cf. Price Dawe*, 28 A.3d at 1069–70 (explaining that the life settlement market is "highly regulated" and "most states have enacted statutes governing secondary market transactions").[14]

The existence of court decisions and STOLI legislation over the last 15 years demonstrates why Columbus' public policy argument—*i.e.*, that this Court should grant Columbus a $10.3

---

[14] The reason why these statutes do not apply in STOLI cases is because they are not retroactive. *See, e.g.*, *SPV-LS, LLC v. Transamerica Life Ins. Co.*, 2016 WL 1466529, at *3 n.2 (D. S.D. Apr. 14, 2016); *Hartford Life & Annuity Ins. Co. v. Doris Barnes Family 2008 Irrevocable Tr.*, 2012 WL 688817, at *5 (C.D. Cal. Feb. 3, 2012), *aff'd*, 522 F. App'x 664 (9th Cir. Jan. 13, 2014).

million windfall to avoid "sound[ing] a loud message upstream to would-be STOLI promoters to keep generating STOLI" (Brief at 37)—is conjecture, at best.  The laws governing the insurance markets in 2022 are fundamentally different than they were in the early 2000s—the time period when "STOLI promoters sought to solve the supply problem by generating new, high value policies." *Price Dawe*, 28 A.3d at 1070.  If ordering carriers to return premiums on void policies was going to incentivize the creation of new STOLI policies, then presumably the market would have seen some evidence of these policies by now. Courts have been ordering carriers to refund premiums on void policies for the last 12 years—*see, e.g.*, *Rucker*, 774 F. Supp. 2d at 682; *Snyder*, 722 F. Supp. 2d at 564–65; *Berck*, 719 F. Supp. 2d at 418–19—and Columbus cites no empirical evidence suggesting that those decisions have somehow led to the proliferation of new STOLI policies.  If there has been no explosion of new STOLI policies over the past decade—during which courts were unanimously ordering a full refund of premiums on void policies—there is no justification for abandoning that long-standing legal principle on return-of-premiums out of fear that somehow reaffirming established precedent will suddenly change the universe.

## III.    CONCLUSION

The Court should deny Columbus' motion for summary judgment on return of premiums.

OF COUNSEL:

Harry S. Davis
Robert E. Griffin
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, NY  10022
(212) 756-2000

Aislinn K. Affinito
SCHULTE ROTH & ZABEL LLP
901 Fifteenth Street, NW, Suite 800
Washington, DC  2005
(202) 729-7470

Dated: May 31, 2022

*/s/ John M. Seaman*
John M. Seaman (#3868)
Samuel D. Cordle (#6717)
ABRAMS & BAYLISS LLP
20 Montchanin Road, Suite 200
Wilmington, Delaware  19807
(302) 778-1000
seaman@abramsbayliss.com
cordle@abramsbayliss.com

*Attorneys for Defendant and Counterclaim-Plaintiff Wilmington Trust, National Association, as Securities Intermediary*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 31st day of May, 2022, I caused a true and correct copy of (i) *Wilmington Trust, N.A., as Securities Intermediary's Consolidated Brief in Opposition to Columbus Life Insurance Company's Motion for Summary Judgment* and (ii) *Defendant Wilmington Trust, N.A., as Securities Intermediary's Responses to Columbus Life Insurance Company's Concise Statement of Undisputed Facts in Support of its Motion for Summary Judgment* to be served upon the counsel of record listed below via electronic mail.

Donald L. Gouge, Jr., Esq.
DONALD L. GOUGE, JR., LLC
800 N. King Street, Suite 303
Wilmington, DE 19801

Thomas J. Francella, Jr., Esq.
Gregory F. Fischer, Esq.
Brian D. Burack, Esq.
COZEN O'CONNOR
1201 N. Market Street, Suite 1001
Wilmington, Delaware 19801

*/s/ John M. Seaman*
John M. Seaman (#3868)

{A&B-00807423-}