# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| COLUMBUS LIFE INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>WILMINGTON TRUST, N.A., as Securities Intermediary,<br><br>Defendant. | C.A. No. 1:20-CV-00735-MN-JLH (D.I. 162)<br>C.A. No. 1:20-CV-00736-MN-JLH (D.I. 158)<br>PUBLIC VERSION FILED<br>JUNE 7, 2022 |
| WILMINGTON TRUST, N.A., as Securities Intermediary,<br><br>Counterclaim-Plaintiff,<br><br>v.<br><br>COLUMBUS LIFE INSURANCE COMPANY,<br><br>Counterclaim-Defendant. | |

**DEFENDANT WILMINGTON TRUST, N.A., AS SECURITIES INTERMEDIARY'S, RESPONSES TO COLUMBUS LIFE INSURANCE COMPANY'S CONCISE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR <u>SUMMARY JUDGMENT</u>**

Defendant Wilmington Trust, N.A. as Securities Intermediary, ("SI") submits these Responses to Columbus Life's ("Columbus") Concise Statement of Undisputed Facts in Support of its Motion for Summary Judgment. SI notes that the majority of Columbus' Concise Statement of Undisputed Facts in Support of its Motion for Summary Judgment relate to the alleged invalidity of the policies at issue in this case (the "Policies"). But as SI made clear in its motion for summary judgment, given the unusual circumstances here where the amount of premiums paid over the life of the Policies exceeds the death benefits—solely for purposes of this case—SI is not contesting policy validity even though Securities Intermediary believes a careful review of the facts merits

1

the conclusion that there are triable issues of material fact on policy validity which would preclude a grant of Columbus Life's summary judgment motion on that issue. Even though SI is not contesting policy validity solely for purposes of these cases, SI will nevertheless respond to all of the paragraphs in Columbus' Concise Statement of Undisputed Facts in Support of its Motion for Summary Judgment.

1. SI admits that Bart Kavanaugh designed the KDI/Concordia Program[1] in the early 2000s and ran the KDI/Concordia Program through a series of entities he owned and controlled. SI disputes the remainder as unsupported by the cited portions of the record. (Ex. A at 52:22, 63:17-64:14, 102:3-21, 143:21-24.)[2]

2. SI admits that Kavanaugh recruited Ed Leisher, who in turn recruited insurance brokers such as Mark Goodman of First Financial Resources ("FFR") in Naples, Florida. SI disputes the remainder as unsupported by the cited portions of the record.

3. SI cannot admit or dispute this statement because it is unclear what "concept" is being referenced. SI further disputes this factual allegation to the extent the term "induced" contradicts the clear record that Mr. Romano and Ms. Cohen were financially sophisticated, well-informed, and advised on the costs and benefits of the KDI/Concordia Program, and willing participants in any Kavanaugh-related insurance program. (Ex. B ¶ 11; Ex. 19 at 181:21-183:13, 208:12-210:14; *see also* Ex. R ¶¶ 4-6; Ex. 20 at 52:5-54:22, 59:17-25, 79:3-86:1.)

4. SI admits that the trusts were administered by a corporate trustee, CTC of Delaware, that,

---

[1] Throughout this Response, SI uses the term "KDI/Concordia Program" to describe the program through which the Insureds took out the Cohen and Romano Policies.

[2] Lettered exhibits refer to the exhibits attached to the Declaration of Philip J. Farinella, dated April 29, 2022. Numbered exhibits refer to the exhibits attached to the Declaration of Robert E. Griffin, dated April 29, 2022. When citing to documents produced in these cases, SI will reference only the numerical portions of the Bates stamps.

in connection to its role as trustee, was selected and directed by Kavanaugh. SI disputes the remainder as unsupported by the cited portions of the record, which do not describe the loans as nonrecourse,[3] mention Carmel Group, suggest the trusts were paid for by Kavanaugh, or suggest the loans were created on forms provided by Kavanaugh. (Ex. D at 37-2-3; *see also* Ex. L at 00018683; Ex. 11 at 003958; Ex. W at Art. 2, §§ 1-2; Ex. FF at Art 2., §§ 1-2.)

5. SI admits that the funding for the KDI/Concordia Program was non-recourse and thus the insureds were not responsible for repaying the loans, but disputes the remainder of these allegations as unsupported by the cited portions of the record. The record does not establish whether any insureds involved in the KDI/Concordia Program actually paid any portion of the policies' premiums.

6. SI admits that the features of the policies were selected by Kavanaugh, and that the transactions were carried out on forms created by Kavanaugh. SI disputes the remainder as unsupported by the cited portions of the record. It is unclear what specific forms Paragraph 6 is referencing in asserting that insureds were not required to sign "most" of them, but Mr. Romano and Ms. Cohen each signed insurance applications, as well as the Participation Agreement, Trust Agreement, Amended and Restated Participation Agreement, and Amended and Restated Trust Agreement, which constitute "most" of the "documents to the transaction." (*See also* Ex. 1 at 00017911; Ex. 2 at 00018563; Ex. G at 00018101; Ex. 41 at 00018623; Ex. 15 at 00018172; Ex., 17 at 00018716.)

7. SI admits that a central component of the KDI/Concordia Program was to purchase annuities that, in turn, would provide enough of a payment stream to simultaneously pay down the

---

[3] While SI admits the loans were nonrecourse, the cited portions of the record do not support this statement.

interest and principal on the loans made to the trusts in order to pay the premiums on the life insurance policies and to purchase the single premium immediate annuity.  SI also admits that the seniors were not allowed to select which annuity, if any, might be bought on their lives.  SI disputes the remainder of the allegations as unsupported by the cited portions of the record.  The term "funder" is not found in any of the cited portions of the record (or the KDI/Concordia Program agreements), and the record establishes the annuities to be purchased in connection with the KDI/Concordia Plans were for the benefit of the Insureds.  (*See also* Ex. 14 at 113:22-114:11, 201:9-206:10; Ex. 11 at 003954, 003958, 003961-62; Ex. 4 at 22:1-23:6; Ex. G ¶¶ 2, 5, 8; Ex. 8 ¶¶ 2, 5, 8.)

8.      SI disputes these allegations as unsupported by the cited portions of the record.  The "trusts" were not the holders of the beneficial interest (and thus could not transfer them), and any right of the holder to transfer the beneficial interest to the trust was heavily qualified by the trust agreements.  (Ex. I §§ 3.1(a), 3.2(b), 3.4(a); *see also* Ex. 9 §§ 3.1(a), 3.2(b), 3.4(a).)

9.      SI disputes these allegations as unsupported by the cited portions of the record.  SI disputes these allegations to the extent they suggest any fixed order in which payments under the supposed "waterfall" would occur, which order is not explicit in the cited portions of the record.  (Ex. G ¶ 8(b); Ex. H ¶ 8(b).)  Moreover, in addition to the death benefit being used to repay interest and principal on the loans (which were themselves to be used to pay premiums) and the Scheduled Death Benefit, the record shows the death benefit also was to be used to pay any taxes, expenses and other obligations of the trust, as well as to repay the loan made to purchase the single premium immediate annuity or annuities at the core of the KDI/Concordia Program.  (*See also* Ex. G ¶ 8(b); Ex. H ¶ 8(b); Ex. 11 at 003951-52, 003954-59, 003958, 003961-62; Ex. 14 at 206:5-206:10, 201:9-206:10; Ex. 18 at §§ 5.2(b)-(c); Ex. 16 at §§ 5.2(b)-(c); Ex. 4 at 22:21-23:6, 44:3-45:10; Ex. 15 ¶¶

6, 8(b); Ex. 17 ¶¶ 6, 8(b); Ex. 117 at 16:19-25, 17:1-24.) SI further disputes these allegations to the extent they rely on the term "funder," which is not found in the cited portions of the record. (Ex. G; Ex. H; Ex. I; Ex. J; Ex. K; Ex. L.)

10. Admitted.

11. SI disputes these allegations as unsupported by the cited portions of the record, which do not establish that AI Credit "declined" to fund the KDI/Concordia Program, Kavanaugh's intent, or that Kavanaugh decided to fund the policies "itself" because of these factors.

12. SI admits that Columbus Circle Capital ("Columbus Circle") was operated by Bart Kavanaugh and that Columbus Circle lent funds to Carmel Group ("Carmel") in order for Carmel to, in turn, lend the funds necessary to put the policies in force to the newly formed trusts. SI disputes these allegations to the extent the term "bearing the seniors' names" implies that the *only* relationship between the trusts and the seniors were shared names, which suggestion is unsupported by the cited portions of the record. (*See also* Ex. R ¶¶ 3, 5-6; Ex. 20 at 39:4-40:15.)

13. SI disputes these allegations as unsupported by the cited portions of the record, which establish only that Kavanaugh arranged for the policies to be sold after he and Nomura failed to agree on the long-term funding of the program, and that Kavanaugh was unsuccessful in finding another third-party, long-term lender to finance the plan.

14. Admitted.

15. SI admits that, in the 1990s, Janet Cohen was in her early 70s, was living with her husband in Florida, and that Ms. Cohen during this period worked with George Wilson and Mark Goodman to plan for the efficient passing of her assets upon her death. SI disputes the remainder as unsupported by the cited portions of the record.

16. SI admits that Janet Cohen agreed to participate in the KDI/Concordia Program, that in

connection with the KDI/Concordia Program a $6 million American General policy was issued on the life of Ms. Cohen, and that the policy was funded through a system of loans financed by AI Credit. SI disputes the remainder as unsupported by the cited portions of the record.

17. Admitted.

18. Admitted.

19. SI disputes these allegations as unsupported by the cited portions of the record, which suggest only that certain described types of estate planning analysis were not conducted by certain persons in connection with Ms. Cohen's participation in the KDI/Concordia Program (and do not suggest any additional estate planning analysis was necessary). (*See also* Ex. 20 at 48:2-14, 48:2-14, 77:7-25, 77-80, 94:2-10; Ex. 1 at 0017910.)

20. SI admits that: the Participation Agreement was signed by Janet Cohen on August 2, 2004; the Participation Agreement does not permit Ms. Cohen to "select the lenders, the issuers or type of life insurance policies, or the issuers or type of annuity policies, to change the lenders, the life insurance policies or the annuity policies, [or] to own directly own" them, that the Participation Agreement specifies that the Trust would own the policy; that Cohen and/or her estate would retain an interest in the policy until her death; and that the death benefit would be used to pay interest and principal on the loans and obligations of the Trust. SI disputes the phrase "a trust bearing Cohen's name" insofar as it implies that the only relationship between the trust and Cohen was a shared name. (*See also* Ex. R ¶¶ 3, 5-6; Ex. 20 at 39:4-40:15.) SI disputes these allegations to the extent they are premised on the term "funder," which term is not used in the cited agreement. (Ex. G ¶ 8(b).) SI disputes the characterization of Ms. Cohen's portion of the death benefit as "relatively small," which is a subjective characterization and provides no basis for comparing this portion's "relative" size. (*See also* Ex. 19 at 317:8-12.)

6

21. Admitted.

22. Admitted, except that SI disputes the allegation that Janet Cohen did not sign the Trust Agreement. The Participation Agreement signature page states that "the parties hereto have signed this Participation Agreement and by signing below the Insured also has signed the Trust Agreement, as of August 2, 2005." (Ex. E at 263:12-22l, 208:18-209:8; *see also* Ex. G at 18101)

23. Admitted, except to the extent these allegations assert that "every" feature of the prospective policy was selected by Kavanaugh, which assertion is unsupported by the cited portions of the record. Rather, the record indicates that "the particular product that was applied for" was selected by KDI. (Ex. C at 132:12–18.)

24. Admitted.

25. Admitted.

26. SI admits that the Master Funding Agreement provides that the loan would be nonrecourse and that it was through the Master Funding Agreement that Carmel would receive the premiums needed to incept and maintain the Cohen Policy on an interim basis before a long-term lending was locked in. SI disputes that that it was "[t]hrough this agreement" that Ms. Cohen had "no liability to repay these premiums." The nonrecourse nature of the program was memorialized in *every* significant document concerning the KDI/Concordia Program, including the Participation Agreement and Trust Agreement. (*See also* Ex. 4 at 94:4, 97:5-7; Ex. G ¶ 12(d); Ex. 16 at § 2.6; Ex. I at §§ 2.3(a), 2.3(e), 2.6.)

27. Admitted.

28. SI admits that the Cohen Trust collaterally assigned the Cohen Policy to Columbus Circle on the same day the Master Funding Agreement was executed. SI disputes this allegation to the extent it suggests that Kavanaugh would be personally paid or repaid any portion of the death

7

benefit or Scheduled Death Benefit, which allegation is not supported by the cited portions of the record.

29.     Admitted.

30.     Admitted.

31.     SI disputes these allegations as unsupported by the cited portions of the record, which do not suggest Kavanaugh was personally entitled to the Cohen Policy's death benefit.

32.     SI disputes these allegations as unsupported by the cited portions of the record. The record establishes that the intent of the KDI/Concordia Program was for the death benefit to be used to pay the outstanding balance on the loans made to the trust for the life insurance policy premiums and single premium immediate annuity or annuities. Thus any reduction in Cohen's Scheduled Death Benefit did not denote Kavanaugh's "ownership stake," and instead reflected an increase in the cost of the annuity that would be needed to run the program. (*See also* Ex. 11 at 003951-52, 003954-59, 003958, 003961-62; Ex. 14 at 206:5-206:10, 201:9-206:10; Ex. 4 at 22:21-23:6, 44:3-45:10; Ex. 15 at ¶¶ 6, 8(b); Ex. 117 at 16:19-25, 17:1-24; *compare* Ex. 15 at 00018173 *with* Ex. G at 00018102.)

33.     Admitted.

34.     SI admits that Mark Goodman encouraged Anthony Romano to participate in the Concordia Tranche of the KDI Program, and that Goodman pitched the KDI/Concordia Program to Romano as a "risk-free way to . . . take what, to [Romano], was a nominal amount of money, a thousand dollars, and turn it into a larger amount in exchange for giving away [his] future insurability that [he] had already determined [he] did not need." SI disputes that Mr. Romano had already bought "the insurance he needed for" his estate plan, as there is evidence in the record indicating that Mr. Romano only had $50,000 in life insurance at the time he applied for the Policy.

(*See also* Ex. 2 at 00018562; Ex. D at 139:6-9.)

35.     SI admits that Mr. Romano would not have participated if he had to pay any of the premiums himself and was only persuaded to participate because the transaction was presented to him as risk free. SI disputes the use of the phrase "some money," to the extent it misleadingly omits that Mr. Romano was presented with a way to make at least ▆▆▆▆▆▆▆▆▆▆ for his participation. (*See also* Ex. 17 at 00018717.) SI disputes the allegation that Mr. Romano was "selling his future insurability to Kavanaugh," which is a legal conclusion and/or attorney argument unsupported by the record.

36.     SI admits that Mr. Romano executed a Participation Agreement substantively identical to the one signed by Ms. Cohen on June 24, 2004, that the Participation Agreement provided that Mr. Romano was not allowed to choose the policies that would be taken out on his life, that the Participation Agreement specifies when the death benefit owed to Mr. Romano would be paid to the Trust, that Mr. Romano was only entitled to the amount specified in the Scheduled Death Benefit, and that the obligations of the trust could be so great that Mr. Romano might be entitled to no death benefit at all. SI disputes the allegation that the death benefit would "be used to repay the funder for the premiums with interest," which mischaracterizes the language of the Participation Agreement and uses a term ("funder") not found anywhere in the agreement.

37.     Admitted.

38.     SI admits that the Romano Trust Agreement was executed on June 24, 2004, that Halpern never met or spoke with Mr. Romano, that Halpern never did any estate planning for Mr. Romano, and that CTC was selected as trustee and directed by Kavanaugh. SI disputes the allegation that Mr. Romano did not sign the Trust Agreement. The Participation Agreement signature page states that "the parties hereto have signed this Participation Agreement and *by signing below the Insured*

*also has signed the Trust Agreement*, as of June 24, 2004." (*See also* Ex. 8 at 000186213 (emphasis added).) SI also disputes the allegation that Kavanaugh paid the trustee, which is unsupported by the cited portions of the record.

39. Admitted, except to the extent these allegations assert that "every" feature of the prospective policy was selected by Kavanaugh, which assertion is unsupported by the cited portions of the record. Rather, the record merely indicates that KDI decided the "type of policy" Mr. Romano applied for. (Ex. C at 81:19–82:14, 90:13–91:8.)

40. Admitted.

41. Admitted.

42. Admitted.

43. Admitted.

44. Admitted.

45. Admitted.

46. SI disputes these allegations as unsupported by the cited portions of the record, which do not suggest Kavanaugh was personally entitled to the Romano Policy's death benefit.

47. Admitted.

48. SI disputes these allegations as unsupported by the cited portions of the record. The record establishes that the death benefit was being used to pay for a single premium immediate annuity, not Kavanaugh's "percentage share," and that the reduced Scheduled Death Benefit in the documents reflects an increase in the cost of the annuity that would be needed to run the program. (*See also* Ex. 11 at 003951-52, 003954-59, 003958, 003961-62; Ex. 14 at 206:5-206:10, 201:9-206:10; Ex. 18 §§ 5.2(b)-(c); Ex. 4 at 22:21-23:6, 44:3-45:10; Ex. 17 ¶¶ 6, 8(b); Ex. 117 at 16:19-25, 17:1-24; *compare* Ex. 17 at 00018717 *with* Ex. 8 at 00018624.) SI also incorporates its

responses to Paragraph 31 and Paragraph 46.

49.    SI disputes these allegations as unsupported by the cited portions of the record and based upon an unproven and unsupported premise, and incorporates its response to Paragraph 46.

50.    Admitted.

51.    Admitted.

52.    Admitted.

53.    Admitted

54.    Admitted.

55.    Admitted.

56.    SI admits that the Policies were held by various Orca-related entities before 2016 when the organization defaulted on a loan from Delta Lloyd, at which point Delta Lloyd foreclosed on the portfolio of ▇ policies and put it up for auction.  The citation to the record does not support the allegation that ABC Viaticals sold the Policies to an entity called The Settlement Group or that the policies were sold in late 2008 to the Orca Trust.

57.    SI admits that Blackstone Tactical Opportunities Advisors LLC is an affiliate of The Blackstone Group ("Blackstone") and that Blackstone Tactical Opportunities Advisors LLC manages a number of entities that Columbus collectively refers to as "Viva."  The citations do not support the allegations that Blackstone is one of the world's largest investment managers, that Blackstone has over $881 billion of assets under management, that one of the asset classes it invests in is high-face value life insurance policies insuring the lives of seniors, or that "Viva" is a "constellation of overseas" special purpose vehicles.

58.    SI disputes these allegations as unsupported by the cited portions of the record.  Viva's pre-acquisition factual investigation did not consist "solely" of reviewing the documents the seller

11

put in a "Data Room"; as the record reflects, Viva conducted significantly more diligence than simply reviewing data room documents, including, by way of example only, securing representations in perpetuity from the servicer. (Ex. MM at 118:22–119:3, 140:9–16, 142:20–22, 144:9–23, 148:3–10.) Additionally, although SI admits that, in 2016, Viva, a sophisticated investor with the knowledge and experience necessary to evaluate the risks inherent in buying large portfolios of life insurance policies, was provided with the opportunity to bid on the Orca Portfolio, the cited portion of the record does not support this allegation.

59.     Admitted.

60.     SI admits that Viva knew the Policies utilized premium financing and that Viva did not know whether the financing was non-recourse. SI disputes the remainder as unsupported by the cited portions of the record. The record establishes that Viva tried to determine whether the financing was non-recourse and whether the Insureds paid the premiums by reviewing all of the evidence provided in the sale process and requesting information from the servicer. (Ex. MM at 132:16–133:3.) SI also disputes these allegations to the extent they are premised on any implications arising out of the phrases "manufactured" and "not natural." The record establishes that premium financing was a "tool" sometimes used to issue "manufactured" policies, but does not suggest such policies are STOLI. (Ex. MM 154:21–155:9.) Rather that serving as an indication of STOLI, the phrase "manufactured" in the context of premium financed policies simply refers to "allowing insureds to take out a life insurance policy, and eases the need for, you know, cash out of pocket." (Ex. MM at 81:16–21.) The phrase "not natural" is used as a synonym for the "supply from the secondary market that was not premium financed." (Ex. MM 79:23–80:5.)

61.     SI disputes these allegations as based on legal conclusions and unsupported by the cited

portions of the record.  Whether "an investor owning a policy's death benefit at inception, either directly or through a side-agreement, would make it STOLI" is a legal argument, not a statement of fact.  Neither Preston nor Viva testified that they did not try to determine whether "any such side-agreement existed for the Policies"; rather Preston testified generally that it reviewed whatever information was available, and any additional investigation into the existence of a side agreement (if the seller provided no documentation of its existence) would have been based upon "what the likelihood of that exercise might be and the need to do that."  (Ex. MM at 50:12–21, 53:14–54:1.)  SI disputes the quoted portion ("[i]n no situation would [they] have evaluated the relationship between the insured and the beneficiary at the issuance of a policy") to the extent it is attributed to Viva and not Preston.  (Ex. MM at 44:10–14 (question specifically asking if "Preston investigate[d]").)  SI also disputes this truncated quoted portion, which materially and misleadingly omits that the witness testified that this type of evaluation (to the extent beneficiary information could be captured by the available documents) "is the lawyer's responsibility," and therefore, would have been evaluated by Viva's legal team.  (Ex. MM at 44:10–45:5; 47:18–51:3.)

62.     SI admits that Blackstone is a member of the Institutional Longevity Markets Association ("ILMA").  SI disputes the remainder of these allegations as unsupported by the cited portions of the record and as based on a false premise and a distortion of the record.  The record demonstrates that ILMA's diligence guidelines, including those cited, are designed for life settlement providers that purchase policies in the secondary market directly from insured; they are not applicable to or intended to be followed by institutional investors like Viva that buy portfolios of policies from other investors in the tertiary market.  (Ex. MM at 255:2–17; Ex. SS at p. 1; *see also* Declaration of John A. Kelly, dated May 31, 2022.)

63.     Admitted, except to the extent these allegations suggest Maple Life was required to (or

13

ordinarily would) give any representations as to any policies, to the extent they suggest Maple Life refused to give certain representations as to the Cohen and Romano Policies specifically, or to the extent they suggest Maple Life refused to give any representations as to the Cohen and Romano Policies. The record demonstrates that these types of representations are typically not provided to buyers in UCC transactions. (*See also* Ex. MM at 140:9–16, 142:20–22, 148:3–10.) Additionally, the supposed "carve-out" did not apply to the Cohen and Romano Policies specifically; rather, it applied to all Delaware policies based solely on "the historical information around litigation in Delaware, not necessarily that these policies were of concern but the state, in fact, was the concern." (*See also* Ex. MM at 203:6–204:9.) Finally, the record demonstrates that Maple Life did provide certain representations as to the Cohen and Romano Policies specifically. (*See also* Ex. MM at 118:22–119:3, 140:9–16, 142:20–22, 144:9–23, 148:3–10, 203:19–205:23; Ex. 112 at A0000066 (Representation #2), A0000072 (Exhibit C), A0000138 (Schedule 1 to Exhibit C).)

64.    SI disputes these allegations as unsupported by the cited portions of the record.[4] ▮

▮▮▮▮▮▮▮▮

---

[4] Paragraph 64 cites to "Ex. TT," which appears to be an incorrect citation as it has no relevance to the allegations for which it is cited.

██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
███████████████████████████. (Ex. MM at 215:12–217:13.)

65.     SI disputes these allegations as unsupported by the cited portions of the record. ████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████ (Ex. VV at No. 4.) ████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████. ██████████████████
██████████████████████████████████████████
█████████████████████████████████ (Ex. MM at 223:3–224:6.)

---

[5] The cited portions of the record here (Ex. MM at 88:11-17 and Ex. RR) do not relate to any ████████████████████████████████████, and appear to be cited in error.

15

| | |
|---|---|
| OF COUNSEL:<br><br>Harry S. Davis<br>Robert E. Griffin<br>SCHULTE ROTH & ZABEL LLP<br>919 Third Avenue<br>New York, NY  10022<br>(212) 756-2000<br><br>Aislinn K. Affinito<br>SCHULTE ROTH & ZABEL LLP<br>901 Fifteenth Street, NW, Suite 800<br>Washington, DC  2005<br>(202) 729-7470<br><br>Dated: May 31, 2022 | Respectfully submitted,<br><br> /s/ John M. Seaman  <br>John M. Seaman (#3868)<br>Samuel D. Cordle (#6717)<br>ABRAMS & BAYLISS LLP<br>20 Montchanin Road, Suite 200<br>Wilmington, Delaware  19807<br>(302) 778-1000<br>seaman@abramsbayliss.com<br>cordle@abramsbayliss.com<br><br>*Attorneys for Defendant and Counterclaim-Plaintiff Wilmington Trust, National Association, as Securities Intermediary* |

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of May, 2022, I caused a true and correct copy of (i) *Wilmington Trust, N.A., as Securities Intermediary's Consolidated Brief in Opposition to Columbus Life Insurance Company's Motion for Summary Judgment* and (ii) *Defendant Wilmington Trust, N.A., as Securities Intermediary's Responses to Columbus Life Insurance Company's Concise Statement of Undisputed Facts in Support of its Motion for Summary Judgment* to be served upon the counsel of record listed below via electronic mail.

> Donald L. Gouge, Jr., Esq.
> DONALD L. GOUGE, JR., LLC
> 800 N. King Street, Suite 303
> Wilmington, DE 19801

> */s/ John M. Seaman*
> John M. Seaman (#3868)

{A&B-00807284-4}