**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| COLUMBUS LIFE INSURANCE COMPANY,<br><br>        Plaintiff,<br><br>        v.<br><br>WILMINGTON TRUST, N.A., as Securities Intermediary,<br><br>        Defendant. | No. 1:20-cv-00735-MN-JLH<br><br>**FILED UNDER SEAL** |
| COLUMBUS LIFE INSURANCE COMPANY,<br><br>        Plaintiff,<br><br>        v.<br><br>WILMINGTON TRUST, N.A., as Securities Intermediary,<br><br>        Defendant. | No. 1:20-cv-00736-MN-JLH<br><br>**FILED UNDER SEAL** |

**COLUMBUS LIFE INSURANCE COMPANY'S REPLY**
**BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ............................................................................................... 1

II.   ARGUMENT ..................................................................................................... 2

    A.    Wilmington Trust Is Not Entitled To A Refund Of The Premiums It Paid. ........... 2

        1.    ███████████████████████████████████. ................ 3

        2.    Wilmington Trust Cannot Prove That Columbus Life Oppressed or Misrepresented Viva Into Paying Premium............................................. 9

        3.    Wilmington Trust Cannot Prove A Disproportionate Forfeiture. ............. 12

        4.    Wilmington Trust Cannot Prove That Viva Is In The Class Of Persons The Insurable Interest Laws Were Designed To Protect............ 13

        5.    Wilmington Trust's Contention That Columbus Life Conflated The Restatement's Exceptions Is Meritless. ............................................. 14

        6.    Wilmington Trust Is Not Entitled To An Automatic Refund. ................. 15

        7.    Wilmington Trust Is Not Entitled To A "Refund" of Premiums Paid By The Policies' Prior Owners. ........................................................ 15

    B.    If The Court Determines Wilmington Trust Is Entitled To Some Amount Of A Refund, That Award Should Not Include Pre-Judgment Interest............... 20

III.  CONCLUSION ................................................................................................. 23

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Am. Gen. Corp. v. Continental Airlines Corp.*,
    622 A.2d 1 (Del. Ch. 1992).........................................................................................22

*Aveta Inc. v. Bengoa*,
    2010 WL 3221823 (Del. Ch. Aug. 13, 2010) ............................................................20

*Baltimore Life Ins. Co. v. Floyd*,
    91 A. 653 (Del. Super. Ct. 1914), *aff'd*, 94 A. 515 (Del. 1915) ..............................11

*Brighthouse Life Ins. Co. v. Geronta Funding*,
    2019 WL 8198323 (Del. Super. Ct. Mar 4, 2019) ....................................3, 8, 14, 15

*Brighthouse Life Ins. Co. v. Geronta Funding*,
    2019 WL 8198324 (Del. Super. Ct. Mar. 14, 2019) ..................................3, 8, 14, 15

*Brighthouse Life Ins. Co. v. Geronta Funding*,
    2021 WL 4080672 (Del. Super. Ct. Aug. 20, 2021)...................................................8

*Central States Health & Life Co. v. Miracle Hills*,
    456 N.W.2d 474 (Neb. 1990)......................................................................................9

*Debakey v. Raytheon Serv.*,
    2000 WL 1273317 (Del. Ch. Aug. 25, 2000) ..........................................................12

*Del. Tr. Co. v. Everitt*,
    140 A.2d 778 (Del. Ch. 1958)...................................................................................16

*Della v. Diamond*,
    210 A.2d 847 (Del. 1965) .......................................................................................2, 3

*Eisenman v. Seitz*,
    25 A.2d 496 (Del. Ch. 1942)......................................................................................3

*Geronta Funding v. Brighthouse Life Ins. Co.*,
    207 A.3d 579 (Del. 2019) ..........................................................................3, 8, 14, 15

*Interim Healthcare v. Spherion*,
    884 A.2d 513 (Del. Super. Ct. 2005), *aff'd*, 886 A.2d 1278 (Del. 2005) ...............11

*Klinedinst v. CACH, LLC*,
    2014 WL 606629 (Del. Super. Ct. Jan. 10, 2014) ...................................................16

*Meyers v. Quiz–DIA LLC*,
2018 WL 1363307 (Del. Ch. Mar. 16, 2018)..........................................................20

*Moskowitz v. Mayor and Council of Wilmington*,
391 A.2d 209, 211 (Del. 1978) ...............................................................19, 20, 21

*PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Tr.*,
28 A.3d 1059 (Del. 2011) ("*Price Dawe*") .............................................................11

*Pontone v. Milso Indus.*,
100 A.3d 1023 (Del. Ch. 2014).............................................................................20

*In re Quest Software Inc. Shareholders Litig.*,
2013 WL 3356034 (Del. Ch. July 3, 2013)...............................................................4

*Resort Point Custom Homes, LLC v. Tait*,
2010 WL 1443274 (Del. Super. Ct. Apr. 7, 2010).................................................17

*Segovia v. Equities First*,
2008 WL 2251218 (Del. Super. Ct. May 30, 2008) ..........................................15, 19

*Sun Life v. U.S. Bank*,
2019 WL 8353393 (D. Del. Dec. 30, 2019).............................................................11

*Sun Life v. U.S. Bank*,
693 F. App'x 838 (11th Cir. 2017) ........................................................................20

*Valeant Pharma. v. Jerney*,
921 A.2d 732 (Del. Ch. 2007)...............................................................................19

*VGS v. Castiel*,
2004 WL 876032 (Del. Ch. Apr. 22, 2004) ..........................................................11

*Watkins v. Beatrice Co.*,
560 A.2d 1016 (Del. 1989) ...................................................................................22

*Wells Fargo v. Estate of Malkin*,
2022 WL 1671966 (Del. May 26, 2022)....................................................... *passim*

**Statutes**

6 Del. C. § 2301(a)....................................................................................................22

18 Del. C. § 2704 ..................................................................................................9, 12

**Other Authorities**

Restatement (Second) of Contracts §§ 197, 198...................................3, 11, 12, 13, 17

## I.    INTRODUCTION

Before Viva bought the Policies—and before Viva paid a single penny in premium for them— ████████████████████████████████████████████████████████████ ██████████████ Viva should have either declined to buy them or conducted a reasonable investigation to determine how the premiums were paid, whether the Policies were taken out in good faith, and whether there was a side arrangement at inception entitling a stranger to the death benefits. This is, after all, what Viva's own trade organizations say that investors who actually care about avoiding STOLI policies should do. Viva—a sophisticated, multi-billion dollar hedge fund—obviously had the means to do this. Viva could have picked up the phone and called the insureds, or their family members, or their advisors, or the brokers, or the trustees, or the lenders. Viva had their names, the names of their companies, and/or their actual phone numbers in its files. But Viva decided not to do one iota of external investigation and instead chose to willfully blind itself to the origination facts of policies ██████████████████████. This is fatal to Wilmington Trust's premium refund claim because a STOLI investor cannot prove an entitlement to a premium refund unless it was reasonably unaware of the policy's insurable interest problems.

Wilmington Trust has nothing of any substance to say in response. It says, for example, that Viva did not need to follow its own trade organization's minimum diligence standards; that it would not have been practical for Viva to make some phone calls before spending millions of dollars on policies it concedes it knew were risky; and that Viva would not even know how or where to begin. Each of these excuses is more frivolous and disingenuous than the next. Viva is a sophisticated, multi-billion dollar hedge fund. The notion that it lacked the ability to investigate policies it knew were risky and potentially human life wagers is absurd. The reality is that Viva willfully blinded itself because Viva thought it could profit handsomely from investing in human life wagers that are anathema to hundreds of years of public policy, violative of the Delaware

Constitution, and represent a fraud on the court. A party that pays money into an illegal agreement after willfully blinding itself to the facts giving rise to that invalidity is not entitled to restitution.

Moreover, awarding restitution to Wilmington Trust here would frustrate Delaware's public policy against STOLI. To be clear, after being caught red-handed buying and perpetuating human life wagers in violation of Delaware's public policy and Constitution, Wilmington Trust is asking this Court to award it $6 million *more than* the Policies' combined death benefit. That is, Wilmington Trust is claiming an entitlement to be paid $6 million more than it would have been paid if it had invested in *legitimate* policies *solely because* it invested in *illegal* policies and got caught. Awarding Wilmington Trust the relief it seeks would not just frustrate Delaware's public policy against human life wagering, it would eviscerate and make a complete mockery of it.

Respectfully, for the reasons set forth in Columbus Life's prior briefing, and set forth below, Columbus Life's motion for summary judgment should be granted. The Policies should be declared void *ab initio*, and Wilmington Trust's request for a premium refund should be denied.

## II.    ARGUMENT

### A.    Wilmington Trust Is Not Entitled To A Refund Of The Premiums It Paid.

STOLI policies are "void *ab initio*, anathema to hundreds of years of public policy, [and] violative of the Delaware Constitution," "represent a 'fraud on the court,' and can never be enforced." *Wells Fargo v. Estate of Malkin*, 2022 WL 1671966, at *1, *9 n.48 (Del. May 26, 2022) ("*Malkin*"). Where, as here, "it is against the public policy of this state to permit its courts to enforce an illegal contract prohibited by law . . . [o]rdinarily . . . neither party has a remedy to any extent against the other." *Della v. Diamond*, 210 A.2d 847, 849 (Del. 1965) (citing *Eisenman v. Seitz*, 25 A.2d 496 (Del. Ch. 1942) (refusing to return money paid into void *ab initio* agreement because that would disincentivize parties from entering into those kinds of illegal agreements in future)). Thus, parties to STOLI policies are ordinarily not entitled a refund of premiums paid and

2

must instead prove an entitlement. *Brighthouse Life Ins. Co. v. Geronta Funding*, 2019 WL 8198323 (Del. Super. Ct. Mar 4, 2019), *interlocutory certif. denied*, 2019 WL 8198324 (Del. Super. Ct. Mar. 14, 2019), *interlocutory appeal denied*, 207 A.3d 579 (Del. Mar. 28, 2019).

To prove an entitlement, an investor must "establish the elements of a viable legal theory, such as unjust enrichment" and show that awarding restitution will not frustrate "the public policy underlying the ban on human life wagering." *Malkin*, 2022 WL 1671966, at *6, *12-14; *see Della*, 210 A.2d at 849; *Eisenman*, 25 A.2d at 498; *see also* Restatement (Second) of Contracts §§ 197, 198. The sorts of cases where courts across the country have held that refunds will not frustrate public policy are summarized by the Restatement (Second) of Contracts § 198: Where the claimant was (i) excusably ignorant; (ii) in a protected class; or (iii) oppressed or misrepresented into the illegal agreement. *Id.* cmts. a & b. Consistent with that authority, the Delaware Supreme Court recently explained that an investor cannot recover STOLI premiums unless it was "reasonably unaware of the insurable interest problems." *Malkin*, 2022 WL 1671966, at *13.

Wilmington Trust cannot prove an entitlement to a premium refund here because its principal, Viva, *willfully blinded* itself to the details of the Policies during its (non-existent) diligence period and paid every penny of the premium it now seeks ██████████████ ████████████████████ in the hopes that it would eventually slip death claims on those Policies past an unwitting carrier and profit handsomely on illegal and unconstitutional human life wagers.

**1.** ████████████████████████████████████
████████████████████████████████████████████████
████████████████████ Indeed, in response to written interrogatories, Viva wrote:

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

3



**Ex. VV** at Nos. 4-5. At Viva's deposition, ████████████████████████████

████████████████████████████████████████████ **Ex. MM** at 218:13-

225:5; *see also* **Exhibit GGGG**, Viva's heavily-redacted ████████████████

In its motion papers (Ans. Br. 11), Wilmington Trust tries to walk back ██████████

████████████████████████████████████ by baldly arguing that ████████████

████████ had nothing to do with any particular attribute of the Policies themselves and that ██

████████████████████████████████ and the industry knows that

Delaware policies have some amount of risk because of *Price Dawe*." But Viva's interrogatories

don't say that; ████████████████████████████████████████████████████

████████████████████████████████████ "A party cannot use the attorney-

client privilege as both a 'shield' from discovery and a 'sword' in litigation. A defendant may not

refuse to produce privileged attorney-client communications only to rely subsequently on the

substance of those communications to prove its case." *In re Quest Software Inc. Shareholders

Litig.*, 2013 WL 3356034, at *2 (Del. Ch. July 3, 2013). That is precisely what Wilmington Trust

is trying to do here. Having refused to disclose during discovery ████████████████████

██████████████████████████ Wilmington Trust's attorneys cannot now be allowed to offer

speculation as to ████████████████████ It would violate Delaware's shield-not-a-sword rule

and be fundamentally unfair to allow Wilmington Trust to argue that ████████████████████

████████████████████████████████████████████████████████████████████████

█████████████████████ but then refused to allow Columbus Life to explore the details ███████

████████████████████████████████████████████████[1]

*Any Alleged Ignorance of the Facts Giving Rise to the Illegality Arose Out Of Viva's Willful Blindness.* Wilmington Trust's attorneys argue that ████████████████████████████

████████████████████ Viva did not necessarily know that they would, if challenged, be deemed to lack insurable interest because, it argues, Viva did not know all of the Policies' origination facts. But assuming for sake of argument that Viva did not know all of the facts giving rise to the Policies' illegality, that is only because Viva willfully blinded itself to those facts. To be clear, Wilmington Trust concedes (Ans. Br. 30-31) that the *only* factual investigation Viva made into the Policies was to review the "limited documents available in the data room for the Policies," and that Viva did not do one iota of external investigation.[2] Indeed Viva concedes that it did not try to obtain the core program documents referenced (but not contained) in the data room (e.g., the Participation Agreement, the Trust Agreement, and the Financing Agreement) and that it did not even bother to make a single phone call to even a single insured—even though Viva had their phone numbers and Viva's own trade organization's "minimum" diligence guidelines instructs

---

[1] Viva's interrogatory responses likewise try to explain ████████████████████████████ But it would not be fair for the Court to consider this explanation either since Viva refused to disclose ████████████████████████████████████████████████████████ ██████ What Viva is really doing here is disclosing alleged facts on this topic that it believes are favorable while shielding Columbus Life from exploring "the details" and "the reasons why," which are obviously negative. *See* **Ex. MM** at 218:13-225:5 (conceding that Viva was testifying to some, but not all, █████████████████████ and was leaving some parts out).

[2] The best Viva says is that it sought and obtained (watered-down) representations and warranties from the seller's agent regarding insurable interest. But that is not an investigation into facts; that is Viva's attempt to cover itself in the event certain of the policies it was buying turned out to be invalid. The fact that Viva could (and did) engage in "private ordering" to reduce its risk is even more reason why Viva should look for relief to its own commercial chain. *See Malkin*, 2022 WL 1671966, at *13 (finding that if a factfinder determines a STOLI investor has a remedy at law against the entity from which it purchased the STOLI policy, then the STOLI investor cannot sustain an unjust enrichment claim against the party bringing the § 2704 claim).

investors to do both of those things before buying policies to ensure that the policies were properly funded and originated and that they are not buying policies created for investors.[3] Viva cannot be heard to argue that it was excusably ignorant when it willfully blinded itself to the facts.

Wilmington Trust's explanations for why Viva did not do these things are not tenable. Wilmington Trust says (Ans. Br. 32-35) that ILMA's minimum diligence guidelines somehow do not pertain to Viva because Viva buys policies from other investors; whereas, the ILMA guidelines were only intended to apply to investors who buy policies from original policyholders. This is a distinction without any semblance of a difference. The reason ILMA's minimum diligence guidelines call for investors to interview insureds and other persons prior to buying policies is to ensure that those policies were funded properly and not created for investors. All investors—regardless of whether they consider themselves operatives in the so-called secondary or tertiary markets—have an interest in ensuring that the policies they buy were properly originated.[4]

Wilmington Trust's argument (Ans. Br. 34) that the "ILMA guidelines do not even make sense when applied to tertiary market buyers like Viva [because] [u]nlike secondary market providers, tertiary market buyers often purchase dozens, if not hundreds, of policies in a single

---

[3] Viva's attorneys at Schulte Roth & Zabel (Weinberger and Ziser) have long served as outside general counsel to ILMA. D.I. 159-1 at 34:20-35:22, 85:2-14); *see also* ILMA Amicus Brief, *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Tr.*, No. 174, 2011, at 1 (Del. June 23, 2011) (Trans. ID 38312090) (identifying Ziser and Weinberger as authors of ILMA's brief).

[4] ILMA does not actually dispute this. *See* D.I. 159-1 at 127:1-133:1 (ILMA testifying that the purpose of the guidelines is to prevent investors from trading in STOLI and "to make sure that everybody up and down the stream adheres to the laws of the various states governing this transaction"). Instead, ILMA's point is that, in its view, downstream buyers should able to pass the buck upstream, requiring upstream investors to do the diligence ILMA recognizes needs to be done so that downstream investors don't have to. But ILMA cites to no provision of the law that immunizes downstream buyers from conducting reasonable diligence. There is none. If downstream buyers like Viva want to rely upon the diligence done by upstream sellers, they are free to do that through standard contractual mechanisms such as representations, warranties, indemnification, etc. But the mere fact that Viva is a downstream purchaser does not relieve it of the obligation to do a reasonable investigation, or failing that, to live with the consequences.

portfolio, which precludes any realistic possibility of conducting 'phone interviews' with hundreds of insureds or obtaining certifications from hundreds of insurance producers" is frivolous. The portfolio Viva bought for ███████████████████████ **Exhibit HHHH**, Preston Portfolio Evaluation, at 12. Viva—a multi-billion dollar hedge fund—cannot possibly say with a straight face that making █ phone calls before investing ████████ was not realistically possible. And, at most, only ████████ were issued in Delaware—the state Viva concedes it knew was a risky place to invest in STOLI.[5] Not even Wilmington Trust has the chutzpah to suggest that making ████████ before spending ████████ would have been unreasonable.[6]

Wilmington Trust also argues (Ans. Br. 35) that it "makes no sense" to expect Viva to have "tracked down additional documents that were not in the data room" because "Viva could not possibly know who, if anyone, had copies of any additional, decade-old documents . . . which would have resulted in hundreds, if not thousands, of inquiries." This argument is also frivolous. Viva concedes that the data room contained copies of the Authorization to Sell Trust Certificate to Pay Off Premium Finance Loan for both Policies. **Ex. Q**; **Exhibit IIII**, Auth. to Sell Tr. Cert. (Cohen); **Ex. MM** at 128:16-129:9, 134:6-9. These documents identify the original policyholders as the Cohen and Romano Trusts, respectively; state that the trustee of both was Capital Trust Company of Delaware; state that the lender was Columbus Circle Capital, LLLP; and provide

---

[5] Most of the policies in the portfolio were issued in states like New York, California, and Florida, which Viva considers to be "safe states" where insurance companies are unable to successfully challenge STOLI policies. **Ex. HHHH** at 17; **Ex. MM** at 221:8-11.

[6] The notion that calling insureds would be "fruitless" because they were not under a *contractual obligation* to speak is absurd and hardly warrants a response. Moreover, as soon as Viva acquired the portfolio—and before it paid the premium it is seeking to have refunded—Viva actually *did* have its servicer call the insureds so Viva could track their health and become notified when they died. But even then Viva did not make any inquiry into the Policies' origination facts even though they identified those policies as risky. **Ex. MM** at 42:2-11, 44:10-19, 49:10-51:7, 53:10-25, 128:9-129:9, 130:21-133:3, 134:3-135:18, 154:21-155:3, 170:13-173:22, 176:24-178:1, 181:18-182:23.

signature lines for both Bart Kavanaugh (as Chairman of Columbus Circle) and Robert Eaddy (as SVP of Capital Trust Company). Viva also concedes that the data room contained copies of the applications which list Ed Leisher as the insurance producer. **Ex. Q**; **Ex. IIII**. Viva also concedes that the data room contained the names, addresses, and telephone numbers for the insureds, their family members, and in Cohen's case, her attorney (George Wilson). **Ex. ZZ** at rows 59-62, 236-238; **Ex. MM** at 178:9-182:1. Any one of these individuals could have given Viva the information it needed. Wilmington Trust's contention that Viva did not know who to ask for the relevant documentation—and that figuring it out would have taken thousands of inquiries—is total fiction.

***Viva And Geronta Conducted Essentially the Same Non-Existent Diligence.*** Wilmington Trust's papers argue (Ans. Br. 29) that "[t]he most telling omission in Columbus' excusable ignorance argument is Columbus' failure to compare the facts concerning the *Seck* policy owner's utter lack of due diligence . . . with the facts concerning Viva's due diligence," which Wilmington Trust has the audacity to refer to (Ans. Br. 32) as "extensive." But what factual investigation did Viva conduct that Geronta[7] did not? Neither investor bothered to conduct a single piece of external investigation whatsoever. Although both had the insureds' phone numbers, neither bothered to call them; although both had the ability to contact the trustee of the original policyholders, neither did; although both had the ability to contact the insurance producer and the original premium funder, neither did that either. Instead, both Viva and Geronta chose to willfully blind themselves, which as Geronta explained is the "standard in the tertiary market." *Brighthouse Life Ins. Co. v. Geronta*

---

[7] The investor in *Seck* was a hedge fund called Geronta Funding that was also represented in connection with that transaction by Viva's attorneys at Schulte Roth & Zabel (Boris Ziser and Tom Weinberger). Ltr. from Geronta to B. Ziser and T. Weinberger, Appendix to Brighthouse's Ans. Br., *Seck*, No. 380, 2021 (Del. Mar. 3, 2022), D.I. 33 at B109.

*Funding*, 2021 WL 4080672, at *17 (Del. Super. Ct. Aug. 20, 2021) ("*Seck*").[8] The reality is that the "utter lack of due diligence" Viva describes Geronta as having conducted (Ans. Br. 29) is not meaningfully different from the utter lack of diligence Viva did here.

> **2.    Wilmington Trust Cannot Prove That Columbus Life Oppressed or Misrepresented Viva Into Paying Premium.**

Viva—a sophisticated, billion-dollar hedge fund that has been advised since its inception by sophisticated attorneys who themselves have deep roots in the STOLI market—is a STOLI investor. Viva does not invest in the legitimate life settlement market—it invests in the illegitimate underbelly of that market. Indeed, as is seen in litigation after litigation, Viva's business model involves knowingly buying portfolios of human life wagers that most of the market won't touch. That is what Viva did when it bought the Monarch Portfolio; that is what Viva did when it bought the LPC Portfolio; that is what Viva did when it bought several tranches of the AIG/Coventry Portfolio; and that is what Viva did here. CL_Op._Br. at 20. Indeed, Viva bought the Policies ███████████████████████████; made the deliberate "business decision" to pay premiums on them anyway; and never once brought its concerns to Columbus Life (either to seek a policy cancellation and premium refund or a release of claims). To the contrary, Viva kept its concerns to itself and sat silently by in the hopes it would eventually be able to slip death claims on these illegal human life wagers past an unwitting carrier. Columbus Life did not oppress or trick Viva into paying premium; Viva paid every penny knowing exactly what it was doing.

---

[8] Although the quoted language was in reference to why downstream investors don't check to see if the insureds are deceased prior to buying the policies, the factual investigation Geronta is saying that tertiary market members don't do is the same: They do not conduct one iota of external diligence. With respect to whether insureds are alive, they do no diligence for the reasons explained by Geronta. With respect to stranger origination, they do no diligence for reasons illustrated by this case: They do not want to know how the policies were originated so that, if their policies are ever challenged, their lawyers can stand before courts like this one and argue that their clients were just innocent downstream purchasers who had no idea the policies were improperly originated.

Wilmington Trust contends (Ans. Br. 23) that *Sol* is "directly on point," but fails to mention that *Sol* was predicated on a theory this Court already dismissed as inapplicable—promissory estoppel. Moreover, to the extent *Sol* is read to stand for the more general proposition that, anytime both parties to a STOLI policy are inexcusably ignorant, insurers must refund premium, it is mistaken.[9] To the contrary, when such is the case, the correct result is to leave both parties where they are found. *See, e.g.*, *Central States Health & Life Co. v. Miracle Hills*, 456 N.W.2d 474, 478 (Neb. 1990) (citing Restatement (Second) of Contracts § 198) ("Neither party was excusably ignorant of the facts affecting the use of premises and neither party is entitled to restitution.").

In the 2000s, the insurance industry was the victim of a massive STOLI fraud. Insurers, like Columbus Life, issued policies in good faith reliance upon the insurable interest-related representations contained in policy applications, as they are permitted to do by statute. 18 Del. C. § 2704(d). But they were tricked by investors who dressed up illegitimate STOLI transactions to look like legitimate business. Although the insurers tried over time to understand and combat the massive fraud that was being perpetrated against them, they were not successful. Every market participant has a role to play in ensuring a legitimate market. The time for an insurer to conduct its investigation is during underwriting. The time for investors to conduct their investigation is during diligence. Wilmington Trust's argument that Columbus Life should have done more to determine that the Policies were STOLI *after* they were underwritten and issued ignores the reality that insurers are not the policemen of the life settlement market. When an insurer, like Columbus Life, issues policies after a good faith investigation, the burden falls on investors to do their part by conducting reasonable diligence and refusing to buy policies ███████████████████

---

[9] For the reasons discussed throughout Columbus Life's papers, Columbus Life was not inexcusably ignorant of the Policies' lack of insurable interest here.

████████████ A rule that awards investors, like Viva, who deliberately do not do this with a premium refund will incentivize the creation of more STOLI.[10] *See* CL_Op._Br. at 37-41.

In fact, the *Sol* analysis, if applied to the economics of this case, illustrates why applying that analysis is profoundly wrong. In *Sol*, the court ordered the insurer to disgorge all premiums received to the current policyholder plus interest, which amounted to a "refund" of $1.9 million on a $10 million policy. *Sun Life v. U.S. Bank*, 2019 WL 8353393, at *3 (D. Del. Dec. 30, 2019) ("*Sol*"). Although that decision was wrong for the reasons explained above, the STOLI investor there still took a substantial loss for investing in STOLI. But if that same (incorrect) rule were applied here, the opposite would happen: Viva would be rewarded handsomely for investing in STOLI. Not only would Viva get its entire $10 million human life wager payout, but it would also get $6 million to boot. This would send exactly the wrong message to the STOLI investors and creators of the world: That investing in human life wagers in violation of Delaware's longstanding public policy and constitution can be immensely profitable, even if you get caught. *See Malkin*,

---

[10] Wilmington Trust's argument (Ans._Br. at 12, 42-44)—that STOLI is over because "[t]he laws governing the insurance markets in 2022 are fundamentally different than they were in the early 2000s" and that states like Delaware, which were targeted by massive STOLI scams in the mid-2000s, can therefore let their guards down now—is as speculative as it is wrong. As *Price Dawe* recognizes, STOLI is driven by the market forces of supply and demand. *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Tr.*, 28 A.3d 1059, 1070 (Del. 2011) ("*Price Dawe*"). If there is money to be made creating STOLI, unscrupulous actors will create it, and if downstream STOLI investors are allowed to profit when they get caught knowingly buying STOLI, they will keep buying it, sustaining the very demand that causes STOLI to be created in the first place. Wilmington Trust's arguments that recent court decisions and legislation confirming STOLI to be unlawful will change that is absurd. STOLI has been illegal in Delaware for hundreds of years. *Id.* at 1067 n.22 (citing *Baltimore Life Ins. Co. v. Floyd*, 91 A. 653 (Del. Super. Ct. 1914), *aff'd* 94 A. 515, 520 (Del. 1915)); *see Malkin*, 2022 WL 1671966, at *1 ("For hundreds of years, the law has prohibited wagering on human life through the use of life insurance that was not linked to a demonstrated economic risk."); *id.* at *9 n.48 ("We stress that STOLI arrangements are unique in that they are not simply void *ab initio*, anathema to hundreds of years of public policy, or violative of the Delaware Constitution, but they boast all three of these unenviable qualities."). That did not stop STOLI promoters from targeting Delaware in the 2000s, and it won't stop them from targeting Delaware again in the future. The only thing that will stop STOLI is to make STOLI unprofitable.

11

2022 WL 1671966, at *6 (when considering STOLI counterclaims, courts should look, as appropriate, to "the public policy underlying the ban on human life wagering" to decide the counterclaims' viability); *id.* at *9 ("[B]ecause STOLI policies are void *ab initio*, when an investor receives their proceeds it does not commit 'a violation of the rights of the claimant' but rather a violation of Article II, Section 17 of Delaware Constitution and of the State's public policy.").

### 3.    Wilmington Trust Cannot Prove A Disproportionate Forfeiture.

Wilmington Trust fundamentally misstates the concept of disproportionate forfeiture. Section 197 is not concerned with whether denying restitution will cause the promisor to receive an alleged "windfall." Rather, it is concerned with whether the promisee suffered a "disproportionate forfeiture," meaning disproportionate to the promisee's misconduct in light of the public policy at stake, not the money retained by the promisor. Restatement (Second) of Contracts § 197 cmt. b ("Whether the forfeiture is 'disproportionate' for the purposes of this Section will depend on the extent of that denial of compensation as compared with the gravity of the public interest involved and the extent of the contravention.").[11]

Here, Viva's misconduct was willfully blinding itself to the Policies' origination facts and buying policies ██████████████████████, and the forfeiture it stands to suffer is the loss of the premiums it knowingly paid to maintain those Policies. This is not remarkable in any way and certainly not disproportionate to Viva's knowing and/or willfully blind acquisition. Indeed, courts in Delaware and across the country routinely decline to rescue disappointed buyers from the natural consequences of their lack of diligence. *See, e.g.*, *Interim Healthcare v. Spherion*,

---

[11] Wilmington Trust's argument (Ans._Br. at 21) that courts applying the laws of other states have supposedly "found disproportionate forfeitures in other contexts where a party 'receives an enormous windfall at no cost whatsoever'" are not on point. Most of them do not even involve void *ab initio* agreements and many do not even contain the phrase "disproportionate forfeiture."

884 A.2d 513, 551 n.305 (Del. Super. Ct. 2005) ("Delaware courts do not rescue disappointed buyers from circumstances that would have been guarded against through normal due diligence and negotiated contractual protections."), *aff'd*, 886 A.2d 1278 (Del. 2005) (Table); *VGS v. Castiel*, 2004 WL 876032, at *6 (Del. Ch. Apr. 22, 2004) (sophisticated investor's failure to recognize importance of contract made available during due diligence diminished plaintiff's fraud and breach of contract claim); *Debakey v. Raytheon Serv.*, 2000 WL 1273317, at *26-28 (Del. Ch. Aug. 25, 2000) (finding party's "cost-benefit analysis" that "less-than-careful job of diligence would suffice" was a decision it was "free to make," but that it must "live with its consequences").

This is particularly so when the gravity of the public interest is considered. Viva ███ bought and perpetuated human life wagers in the hopes of cashing in on their death benefits. This was no "mere technical violation of a rule or regulation"—the classic example of disproportionate forfeiture. Restatement (Second) of Contracts § 197 cmt. b ("The exception is especially appropriate in the case of technical rules or regulations that are draw so that their strict application would result in such forfeiture if restitution were not allowed."). Indeed, the Delaware Supreme Court made clear that when an investor "obtains" STOLI death benefits it violates Delaware's Constitution, *Malkin*, 2022 WL 1671966, at *9, and the General Assembly made clear through 18 Del. C. § 2704(b) that the owner of any STOLI policy should be subject to a significant forfeiture. Declining to award a knowing STOLI buyer a premium refund is not a disproportionate forfeiture.

### 4. Wilmington Trust Cannot Prove That Viva Is In The Class Of Persons The Insurable Interest Laws Were Designed To Protect.

As noted, courts have found that awarding restitution under void *ab initio* agreements will not frustrate the public policy giving rise to the invalidity where it is provided to the persons the public policy was designed to protect. Restatement (Second) of Contracts § 198 cmt. b. Here, the public policy giving rise to the Policies' invalidity is Delaware's immense policy against human

life wagering. The doctrine of insurable interest was designed to protect insureds from investors, not to protect investors from their own knowing decision to invest in human life wagers. Viva is plainly not in the class of persons the insurable interest laws were designed to protect.

### 5. Wilmington Trust's Contention That Columbus Life Conflated The Restatement's Exceptions Is Meritless.

Wilmington Trust spills considerable ink (Ans. Br. 7-9, 19-29) complaining that Columbus Life has somehow conflated what it refers to as the Restatement's "disjunctive" analysis into a single consideration: excusable ignorance. Wilmington Trust is mistaken. Section 198 discusses three categories of cases where courts across the country have determined that restitution of money paid into illegal agreements would not frustrate public policy, namely when the claimant (i) is excusably ignorant; (ii) is in the protected class; and (iii) was oppressed or misrepresented into the illegal agreement. *Id.* cmts. a & b. Section 197 discusses an additional situation: where the claimant's forfeiture is disproportionate to its conduct. Set the protected class category aside since even Wilmington Trust can't bring itself to argue that Viva is in a protected class. The common thread running through the other exceptions is that parties who knowingly pay money into illegal agreements without being reasonably unaware of their invalidity cannot recover. An inexcusably ignorant claimant cannot recover because it either knew or should have known of the illegality. Although a party oppressed or misrepresented into an illegal agreement may recover, one cannot be oppressed or misrepresented into paying money into an illegal agreement if one knew or should have known that it was illegal. And finally denying restitution to a knowing or willfully blind participant does not result in disproportionate forfeiture for the reasons discussed above.

Although the exceptions are couched in the disjunctive, paying premium into an illegal STOLI policy without being reasonably unaware of the policy's insurable interest problems is fatal to an investor's claim for a premium refund, as other investors have conceded. *See Malkin*, 2022

14

WL 1671966, at *13 ("Next, the parties appear to agree that Berkshire cannot recover the premium it paid if Berkshire was not reasonably unaware of the insurable-interest problem. We leave for determination of the certifying jurisdiction the issue whether Berkshire was reasonably unaware that the Policy was a STOLI arrangement and, thus, whether an award of restitution would be consistent with 'the fundamental principles of justice or equity and good conscience.").

**6.      Wilmington Trust Is Not Entitled To An Automatic Refund.**

For the reasons expressed in Columbus Life's prior briefing, Wilmington Trust's argument that it is entitled to an automatic, proof-less refund of all premiums ever paid is incorrect and misstates Delaware law. *See* CL_Op._Br. at 36-41; CL_Ans._Br. at 26-30.[12] For sake of efficiency, Columbus Life will not repeat those arguments here.

**7.      Wilmington Trust Is Not Entitled To A "Refund" of Premiums Paid By The Policies' Prior Owners.**

Wilmington Trust is not just seeking a refund of the premium Wilmington Trust paid for Viva. Wilmington Trust is also seeking a "refund" of the premium it did *not* pay. The Court need to not reach this question here since no rational factfinder could conclude that Viva proved an entitlement to its *own* premium back. But assuming *arguendo* that Wilmington Trust had proven an entitlement to a refund of the premiums it, on behalf of Viva, paid, Wilmington Trust's claim for a refund of premiums paid by prior owners fails for additional reasons.

To prove unjust enrichment,[13] a claimant must prove "the unjust retention of a benefit to the loss of another, or the retention of money or property against the fundamental principles of

---

[12] As this Court is aware, this issue is currently before the Delaware Supreme Court in the *Seck* case, which was recently argued, and a decision will likely be issued soon. *See* Oral Argument, *Seck*, No. 380, 2021 (Del. June 8, 2022), available at https://livestream.com/accounts/5969852/events/10395723/videos/231578200/player.

[13] Viva pled an entitlement to the premiums paid by prior owners through an unjust enrichment counterclaim. D.I. 10 Cntrcl. IV; D.I. 10 Cntrcl. IV.

justice or equity or good conscience." *Malkin*, 2022 WL 1671966, at \*12. The elements are "(1) an enrichment; (2) an impoverishment; (3) a relation between the enrichment and impoverishment; (4) the absence of justification; and (5) the absence of a remedy provided by law." *Id.* No rational factfinder could conclude that Wilmington Trust has proven these elements here.

Wilmington Trust's explanation for why it thinks it can prove unjust enrichment as to premiums it did *not* pay is briefed (Op. Br. 43-45) in threadbare fashion over the course of a mere two pages. Wilmington Trust contends that—in addition to the premium Viva paid to Columbus Life (discussed *supra*, § II(A)(3)), Viva was also impoverished by paying ███████ to Delta Lloyd to acquire the Policies. But Viva did not pay *Columbus Life* to acquire the Policies; rather, Viva paid *the seller*, *Delta Lloyd*. That is, the impoverishment Wilmington Trust seeks to redress did not enrich Columbus Life; it enriched Delta Lloyd, who received ███████ from Viva in exchange for unenforceable STOLI policies. This is an insurmountable obstacle for Wilmington Trust as it shows there is no relationship between the alleged enrichment and impoverishment.

To try to remedy this, Wilmington Trust argues that Viva's Bill of Sale with Delta Lloyd can be interpreted as conveying to Viva, not just the Policies, but also the rights prior owners may have possessed to obtain their own premium refund. This argument fails as well for many reasons.

*First*, Wilmington Trust does not cite to any cases holding that alleged rights to refunds of performance made into agreements void *ab initio* as against Delaware's public policy and Constitution are susceptible to being sold.

*Second*, Wilmington Trust does not cite to any contractual provision actually stating that Wilmington Trust was buying Delta Lloyd's alleged right to a refund of the premiums it paid in

the event the Policies were deemed to be human life wagers, nor does Wilmington Trust offer any evidence from Delta Lloyd that it intended to sell any such rights to Viva.[14]

*Third*, even if we assume for sake of argument that Delta Lloyd purported to sell to Viva *Delta Lloyd's* alleged rights to recover the premiums *Delta Lloyd* paid, Wilmington Trust does not even try to show that Delta Lloyd possessed and sold to Viva the alleged rights of all of the investors that owned the Policies *prior to Delta Lloyd*.

Indeed, one would not know it from reading Wilmington Trust's briefs, but the Policies were conveyed as many as eight times post-issuance and prior to being acquired by Delta Lloyd. Indeed, as Columbus Life understands it, (i) the Policies were originally issued to the Trusts; (ii) a year or so later, the Trusts sold their residual interests in the Policies to Columbus Circle Capital; (iii) Columbus Circle then sold the Policies to Invest SLPS; (iv) Invest SLPS then conveyed the Policies to ABC Viaticals; (v) after ABC Viaticals was put into receivership due to life insurance securitization fraud, ABC Viaticals sold the Policies to Orca LSI Trust; (vi) a few years later, Orca LSI Trust transferred the Policies to Orca Halley Trust; (vii) six months or so later, Orca Halley Trust transferred the Policies to Halley Trust;  (viii) about 3.5 years later, Halley Trust transferred the Policies to Orca Trust; and (ix) about three years after that, Delta Lloyd acquired the Policies by foreclosing on Orca Trust, which entity shortly thereafter sold the Policies to Viva, which entity shortly thereafter transferred them to Wilmington Trust, as alleged securities intermediary.

Wilmington Trust does not even bother to argue—let alone prove—that *those* prior owners purported to sell *their* alleged rights to their past-paid premiums down the commercial chain, and thus Wilmington Trust has utterly failed to prove that Viva is, in fact, the assignee of any such

---

[14] Indeed, as Justice Traynor suggested at during oral argument in *Seck*: Any argument that Viva's predecessors intended to sell those rights to Viva would itself be evidence that both Delta Lloyd and Viva knew that the Policies would, if challenged, be deemed void for lack of insurable interest.

rights. *See, e.g.*, *Del. Tr. Co. v. Everitt*, 140 A.2d 778, 782 (Del. Ct. Ch. 1958) (the assignee has the burden of proving the assignment); *Klinedinst v. CACH, LLC*, 2014 WL 606629, at *1 (Del. Super. Ct. Jan. 10, 2014) ("[A] plaintiff with an assignment has the burden to show the assignment in order to establish it is the proper party to bring the action.") (citing cases).

*Fourth*, even if we were to assume for sake of argument that all prior owners purported to convey their past-paid premium rights, if any, down the commercial chain, Wilmington Trust has yet another failure of proof, namely that Wilmington Trust does not even try to prove that those prior owners *possessed* premium refund rights to begin with. If those prior owners did not themselves have a right to a refund—because, for example, they did not pay premiums reasonably unaware of the insurable interest problems—then they would not have any refund rights to convey, meaning Viva could not possibly have taken an assignment of any such (non-existent) rights. *See Resort Point Custom Homes, LLC v. Tait*, 2010 WL 1443274, at *2 (Del. Super. Ct. Apr. 7, 2010) ("It is a rudimentary principle of contract law that the assignee takes the assigned claim subject to all defenses of the obligor against the assignor. That is to say that the assignee stands in the shoes of the assignor. He acquires no greater right than that which was possessed by his assignor. Moreover, defenses may be interposed against the assignee if they were available against the assignor.") (footnote calls omitted).Viva's inability to prove that any prior owner could satisfy a § 198 exception is fatal to Viva's claim that it can enforce any such unproven rights.[15]

*Fifth*, as noted, Wilmington Trust argues that it can recover *from Columbus Life* premiums Viva did *not* pay because Viva paid ███████ *to Delta Lloyd*. But, unjust enrichment is not available where there is an adequate remedy at law. *See Malkin*, 2022 WL 1671966, at *13 (STOLI

---

[15] Not only did Viva fail to argue that any of its predecessors could satisfy a § 198 exception, but Viva did not take discovery from those prior owners, meaning the record is devoid of any evidence to that effect, and summary judgment is appropriate.

investor has no unjust enrichment claim for premium paid if investor has legal claim to recover those premiums against third-party). Here, Wilmington Trust pats itself on the back because Viva supposedly acquired what Wilmington Trust describes as fulsome representations and warranties relating to the Policies' insurable interest "*in perpetuity*" from the seller's servicer. (Ans._Br. at 31) (original emphasis). Once the Policies are deemed void *ab initio* for lack of insurable interest, Wilmington Trust (or Viva) can seek to recover the ████████ Viva paid Delta Lloyd from Delta Lloyd and/or its servicer who made insurable interest representations to Viva. But due to the availability of this remedy, it cannot recover those amounts from Columbus Life.

*Finally*, it would violate basic principles of justice to allow Wilmington Trust to knowingly pay premiums on Policies ████████████████████████ for years in the hopes of eventually sneaking death claims on those human life wagers past the carrier and then—when it gets caught—force the carrier to pay that STOLI investor $11+ million more than it paid in premium and $6+ million more than the total STOLI death benefit. It is against everything Delaware law stands for to reward investors for knowingly buying illegal human life wagers that "are void *ab initio*, anathema to hundreds of years of public policy, [and] violative of the Delaware Constitution." *Malkin*, 2022 WL 1671966, at *9 n. 48. Indeed, investing in STOLI in Delaware should never be profitable because STOLI investing violates Delaware's Constitution. *See Malkin*, 2022 WL 1671966, at *9 ("[B]ecause STOLI policies are void *ab initio*, when an investor *receives their proceeds* it does not commit 'a violation of the rights of the claimant' but rather a violation of Article II, Section 17 of Delaware Constitution and of the State's public policy."). That is precisely the outcome Wilmington Trust is angling for here: To profit from investing in STOLI.

19

**B.      If The Court Determines Wilmington Trust Is Entitled To Some Amount Of A Refund, That Award Should Not Include Pre-Judgment Interest.**

Because this Court should not award Wilmington Trust any premium refund, this Court need not address the question of pre-judgment interest. But to the extent this Court deems some amount of refund appropriate, Wilmington Trust is not entitled to pre-judgment interest on it. The reasons for this are already set forth in Columbus Life's summary judgment papers and include the indisputable fact that at no time prior to this litigation did Wilmington Trust (or Viva) ever demand that Columbus Life cancel the Policies and refund its premium. *See* CL_Ans._Br. at 25.

Wilmington Trust's argument that it is entitled to pre-judgment interest is limited to a single paragraph (Op. Br. 45) in which it cites to a *per curiam* decision by a panel of the Eleventh Circuit in the *Sun Life/Malkin* case for the proposition that where "the claimant seeks a refund of payments it never should have made, prejudgment interest accrue[] from the date of the claimant's payments." *Sun Life v. U.S. Bank*, 693 F. App'x 838, 841 (11th Cir. 2017) (citing *Valeant Pharma. v. Jerney*, 921 A.2d 732 (Del. Ch. 2007) and *Segovia v. Equities First*, 2008 WL 2251218, at *23 (Del. Super. Ct. May 30, 2008)). But the *Sun Life/Malkin* panel's decision with respect to prejudgment interest is at odds with Delaware Supreme Court precedent.

In *Moskowitz v. Mayor and Council of Wilmington*, the Delaware Supreme Court held that pre-judgment interest on a refund claim cannot begin to accrue unless and until the claimant makes a demand for that refund. 391 A.2d 209, 211 (Del. 1978).[16] The *Moskowitz* court thus rejected the

---

[16] Although the plaintiff in *Moskowitz* was a taxpayer who had made excessive tax payments to the City of Wilmington, the court explained that the rules it was applying were applicable generally and not limited to tax contexts. 391  A.2d at 211. Accordingly, Delaware courts have applied *Moskowitz*'s notice or demand requirement in a variety of contexts outside the tax area. *See, e.g.*, *Aveta Inc. v. Bengoa*, 2010 WL 3221823, at *2 (Del. Ch. Aug. 13, 2010) ("When a party has a right, contractual or otherwise, to a monetary amount, the party is entitled to prejudgment interest running from the date the [p]ayment is due. Payment becomes due when a particular amount is

very argument Wilmington Trust makes here (as well as the conclusion reached by the panel in *Sun Life/Malkin*),[17] namely that interest on a refunded payment must always accrue from the date on which the payment was made. As the *Moskowitz* court explained, "[t]he computation of interest may vary from case to case, depending upon two considerations." *Id.*

Relevant here is the consideration that prejudgment interest on a refunded payment can begin to accrue only after the plaintiff has informed the recipient that the payment was excessive, improper, or unlawful. As the *Moskowitz* court explained: "[I]nterest is awarded from the date the taxpayer gave notice to the governmental entity that the taxpayer considered the tax payment unlawful or improper . . . Thus, a taxpayer may recover interest from the date the tax payment was made if the payment was accompanied by adequate notice that the payment is considered to be excessive, improper, or unlawful; but if such notice did not accompany the tax payment then interest will not begin to accumulate until there has been a later act constituting notice to the taxing authority that, in the opinion of the taxpayer, the tax is excessive, improper, or illegal." *Id.* at 211.

One "rationale underlying this rule is that money is not due and payable, and thus not in default, until there has been a demand therefor." *Id.* Another is fairness: A party "should only pay interest from the time it fairly had the opportunity to satisfy the plaintiff's demand for reimbursement." *Meyers v. Quiz–DIA LLC*, 2018 WL 1363307, at *12 (Del. Ch. Mar. 16, 2018).

---

demanded."); *Pontone v. Milso Indus.*, 100 A.3d 1023, 1058 (Del. Ch. 2014) ("A party from whom advancement is improperly withheld is entitled to interest computed from the date of demand.").

[17] The panel's decision in *Sun Life/Malkin* never so much as mentions *Moskowitz*, even though that is the Delaware Supreme Court's seminal case on the question of when interest on a refunded payment accrues. Instead of following *Moskowitz*, *Sun Life/Malkin* relied on *Valeant* and *Segovia*, but those cases are inapposite because (i) they too make no mention of *Moskowitz*; and (ii) neither actually discusses the question of accrual dates; indeed, there is no indication the parties even contested the accrual date. *Valeant*, 921 A.2d at 755–56; *Segovia*, 2008 WL 2251218, at *23.

21

Under *Moskowitz*—the Delaware Supreme Court's seminal case on the question of when pre-judgement interest begins to accrue on a refund claim—Wilmington Trust is not entitled to any interest on any premium refund this Court might deem fit to award. Before it paid a single penny in premium, Wilmington Trust ███████████████████████████████████ It deliberately declined to demand that Columbus Life cancel the Policies and refund premium. Instead, it chose to ██████████████████████████████████████████████████ ████████████████████████. Importantly, before each and every premium payment Wilmington Trust made, it had the option to reach out to Columbus Life ███████████ and to ask for a policy cancellation and refund. But at every single juncture, Wilmington Trust declined to do so. Under *Moskowitz*, Wilmington Trust is not entitled to pre-judgment interest on any refund that might ultimately be awarded because Wilmington Trust never made a demand for such a refund, let alone told Columbus Life that the payments were excessive, improper, or unlawful.

This is true even for the period during which this litigation has been pending. In its Answer, Affirmative Defenses, and Counterclaims, Wilmington Trust *denied* the Policies were invalid and thus denied that it had any right to a premium refund. Wilmington Trust then entered into a litigation charade where it sat idly by as Columbus Life spent substantial resources developing an evidentiary record sufficient to prove that the Policies were STOLI. But, as Wilmington Trust itself now concedes, it never intended to defend the Policies' validity, and always intended to concede the lack of insurable interest to take advantage of what Wilmington Trust refers to as the Policies' "peculiar economics"—economics that were known to Wilmington Trust at the outset of this litigation—so that Wilmington Trust could shoot the moon for windfall profits many millions of dollars in excess of what its profits would have been had the Policies never been challenged.

22

Indeed, under *Moskowitz*, the trial court has "some discretion in determining the amount of interest where there has been undue delay in the process of a lawsuit," taking "into consideration all of the actions of the parties and apportion[ing] fault for any delay, thereby reducing the interest due in accordance with the degree of the plaintiff's or his attorney's responsibility for the delay in determining the question at issue." 391 A.2d at 211. That is exactly what Wilmington Trust did here through its litigation charade, and as a consequence, the entire period of this litigation should be exempt from pre-judgment interest because Wilmington Trust has been playing a dilatory, bad faith game all along in an attempt to balloon any refund with years of pre-judgment interest.[18]

## III.    CONCLUSION

For the reasons set forth above, and in Columbus Life's prior moving papers, Columbus Life's Motion for Summary Judgment should be granted and Wilmington Trust's Motion for Summary Judgement should be denied.

Dated: June 23, 2022

Respectfully submitted,

*/s/ Donald L. Gouge, Jr.*
Donald L. Gouge, Jr. (#2234)
DONALD L. GOUGE, JR., LLC
800 N. King Street, Suite 303
Wilmington, Delaware 19801
(302) 658-1800, Ext. 1

---

[18] By its terms, Delaware's legal rate of interest, as specified in 6 Del. C. § 2301(a), applies only "[w]here there is no expressed contract rate." *See Watkins v. Beatrice Co.*, 560 A.2d 1016, 1023 (Del. 1989). Moreover, where the remedy is equitable (as in the case of restitution) rather than legal, the court has discretion in fixing the rate. *See Am. Gen. Corp. v. Continental Airlines Corp.*, 622 A.2d 1, 14 (Del. Ch. 1992). To the extent that this Court determines (as it should not do) that some amount of pre-judgment interest is appropriate, the more appropriate rate is not Delaware's legal rate of 5% over the Federal Reserve Discount Rate but rather the contractual rate of 3%. **Ex. T** at 862, 875; **Ex. CC** at 330, 344. The parties specifically contemplated that, had the Policies been legitimate, this contractual rate would have applied to the Account Value of the Policies.

23

COZEN O'CONNOR
Michael J. Miller (*pro hac vice*)
Joseph M. Kelleher (*pro hac vice*)
Charles J. Vinicombe (*pro hac vice*)
Philip J. Farinella (*pro hac vice*)
1650 Market St., Suite 2800
Philadelphia, PA 19103
*Attorneys for Plaintiff,*
*Columbus Life Insurance Company*

## <u>CERTIFICATE OF SERVICE</u>

I, Donald L. Gouge, Jr., do hereby certify that on this 23rd day of June, 2022, a copy of the within Plaintiff Columbus Life Insurance Company's Reply Brief in Support of its Motion for Summary Judgment was filed via CM/ECF and served on all counsel of record.


Dated: June 23, 2022                                   */s/ Donald L. Gouge, Jr.*
                                                                    Donald L. Gouge, Jr. (#2234)

25