**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| COLUMBUS LIFE INSURANCE COMPANY, | * | |
| | * | |
| | * | No. 1:20-cv-00735-MN-JLH |
| Plaintiff, | * | No. 1:20-cv-00736-MN-JLH |
| | * | |
| v. | * | **PUBLIC VERSION OF D.I. 168** |
| | * | **FILED JUNE 30, 2022** |
| WILMINGTON TRUST, N.A., as Securities Intermediary, | * | |
| | * | |
| | * | |
| Defendant. | * | |
| _____ | * | |
| | * | |
| WILMINGTON TRUST, N.A., as Securities Intermediary, | * | |
| | * | |
| | * | |
| Counterclaim-Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| COLUMBUS LIFE INSURANCE COMPANY, | * | |
| | * | |
| | * | |
| Counterclaim-Defendant. | * | |
| | * | |

**WILMINGTON TRUST, N.A., AS SECURITIES INTERMEDIARY'S
CONSOLIDATED REPLY BRIEF IN FURTHER SUPPORT OF ITS MOTION FOR
SUMMARY JUDGMENT**

OF COUNSEL:

Harry S. Davis
Robert E. Griffin
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022
(212) 756-2000

Aislinn K. Affinito
Schulte Roth & Zabel LLP
901 Fifteenth Street, NW, Suite 800
Washington, DC 2005
(202) 729-7470

Dated: June 23, 2022

John M. Seaman (#3868)
Samuel D. Cordle (#6717)
Abrams & Bayliss LLP
20 Montchanin Road, Suite 200
Wilmington, Delaware 19807
(302) 778-1000
seaman@abramsbayliss.com
cordle@abramsbayliss.com

*Attorneys for Defendant and Counterclaim-Plaintiff Wilmington Trust, National Association, as Securities Intermediary*

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................1

II.   ARGUMENT ........................................................................................................2

    A.    Estate of Malkin Does Not Address Whether a Carrier Can Void a Policy and Keep the Premiums, as Columbus Seeks to Do Here. .............................................2

    B.    Columbus' Arguments Concerning Its Nearly Two-Decade Long Course of Conduct With Respect to the Policies Ignore the Undisputed Facts. .....................7

        1.    Columbus Knew the KDI/Concordia Program Was a Non-Recourse Premium Finance Program No Later than September 2004. ......................7

        2.    Columbus Conducted an Insurable Interest Investigation Into the KDI/Concordia Program in September 2005...........................................10

        3.    Columbus' Statistical Argument Concerning Its STOLI Lists is Misleading and Beside the Point..............................................................11

        4.    Columbus' Argument that It Did Not Know About STOLI Litigation Until October 2018 Cannot Defeat Summary Judgment. .........................13

    C.    ██████████████████████████████████████████ .................................16

    D.    The Court Should Reject Columbus' Fallback Argument that Columbus Can Keep Some of the Premiums, i.e., That Columbus is Entitled to a Partial Windfall. ...............................................................................................................17

    E.    Columbus' Unfounded and Unsupported Accusation that Securities Intermediary Decided Not to Contest Policy Invalidity at the Start of this Case is 100% False. ...........................................................................................22

    F.    Securities Intermediary and Viva are Not Seeking a Windfall; They are Forcing Columbus to Sleep in the Bed that Columbus Made...............................24

III.  CONCLUSION...................................................................................................25

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Anderson v. Liberty Lobby Inc.*,
   477 U.S. 242 (1986) ................................................................................. 15

*Brighthouse Life Ins. Co. v. Geronta Funding*,
   2021 WL 4080672 (Del. Super. Ct. Aug. 20, 2021) *("Seck IV")* ................................. 3

*Columbus Life Ins. Co. v. Wilmington Tr., N.A.*,
   2021 WL 1820573 (D. Del. May 6, 2021), *adopted by* 2021 WL 3886370
   (D. Del. Aug. 31, 2021) ............................................................................ 3

*Christopher R. Erwin, as Tr. of the Orca LSI Tr. v. Fin. Life Servs., LLC*,
   No. 8:09-cv-01463 (C.D. Cal. Dec. 11, 2009) (Dkt. 1) ......................................... 20

*Geronta Funding v. Brighthouse Life Ins. Co.*,
   No. 380, 2021 (Del. Sup. Ct.) ("*Seck*") ........................................................ 4

*Kramer v. Phoenix Life Ins. Co.*,
   940 N.E.2d 535 (N.Y. 2010) ....................................................................... 12

*Lavastone Capital LLC v. Estate of Berland*,
   266 A.3d 964 (Del. 2021) .......................................................................... 22

*Lincoln Nat'l. Life Ins. Co. Life Ins. Co. v. Snyder*,
   722 F.Supp.2d 546 (D. Del. 2010) .......................................................... 3, 5, 19

*M.K. v. Prestige Acad. Charter Sch.*,
   470 F. Supp. 3d 417 (D. Del. 2020) ............................................................. 14

*Matsushita Elec. Indus. Co. v. Zenith Radio Co.*,
   475 U.S. 574, 587 (1986) ......................................................................... 14

*Nemec v. Shrader*,
   991 A.2d 1120 (Del. 2010) ......................................................................... 6

*Norton v. Poplos*,
   443 A.2d 1 (Del. 1982) ............................................................................. 5

*PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Tr.*,
   28 A.3d 1059 (Del. 2011) ...................................................................*passim*

*Principal Life Ins. Co. v. Lawrence Rucker 2007 Ins. Tr.*,
   774 F. Supp. 2d 674 (D. Del. 2011) ........................................................ 5, 18, 19

*Quantum Loyalty Sys., Inc. v. TPG Rewards*,
   2011 WL 2015221 (D. Del. May 24, 2011) .............................................................. 15

*SEC v. ABC Viaticals*,
   No. 3:06-CV-2136-P (N.D. Tex. Oct. 6, 2008) (Dkt. 179) .................................... 20

*Sun Life Assur. Co. of Can. v. Berck*,
   719 F. Supp. 2d 410 (D. Del.2010) ..................................................... 5, 19, 21

*Sun Life Assur. Co. of Can. v. Conestoga Tr. Servs., LLC*,
   263 F. Supp. 3d 695 (E.D. Tenn. 2017) *aff'd*, 717 F. App'x 600 (6th Cir. Apr. 3,
   2018) .......................................................................................................... 21

*Sun Life Assur. Co. of Can. v. U.S. Bank Nat'l Ass'n*,
   693 F. App'x 838 (11th Cir. June 12, 2017) ("*Malkin III*") ...................................... 25

*Sun Life Assur. Co. of Can. v. U.S. Bank Nat'l Ass'n*,
   2016 WL 3948059 (S.D. Fla. June 9, 2016) ("*Malkin II*") ..................................... 19

*Sun Life Assur. Co. of Can. v. U.S. Bank Nat'l Ass'n*,
   2019 WL 2151695 (D. Del. May 17, 2019) ("*Sol II*") ........................................... 13

*Sun Life Assur. Co. of Can. v. U.S. Bank Nat'l Ass'n*,
   2019 WL 8353393 (D. Del. Dec. 30, 2019) ("*Sol III*") .......................................*passim*

*Sun Life Assur. Co. of Can. v. Wells Fargo Bank, N.A.*,
   208 A.3d 839 (N.J. 2019) ............................................................................ 12

*Sun Life Assurance Co. of Can. v. Wells Fargo Bank N.A.*,
   779 F. App'x 927 (3d Cir. 2019) .................................................................... 21

*Sun Life Assurance Co. of Can. v. Wilmington Tr., N.A.*,
   2022 WL 179008 (Del. Super. Ct. Jan. 12, 2022) ("*De Bourbon/Frankel*") ................*passim*

*Wells Fargo Bank, N.A. v. Estate of Malkin*,
   -- A.3d --, 2022 WL 1671966 (Del. May 26, 2022) ..........................................*passim*

*Wells Fargo Bank, N.A. v. Pruco Life Ins. Co.*,
   200 So. 3d 1202 (Fla. 2016) ......................................................................... 12

**Statutes and Rules**

18 Del. C. § 2704(b) ......................................................................................... 2, 3, 4

Fed. R. Civ. P. 1 .............................................................................................. 22

Fed. R. Evid. 801(c) ................................................................................................ 8

Fed. R. Evid. 802 .................................................................................................... 8

**Other Authorities**

Restatement (Second) of Contracts § 198 ................................................................ 13

Restatement (Third) of Restitution and Unjust Enrichment § 54 (2011) ....................... 5

## I.     INTRODUCTION

Columbus Life Insurance Company ("Columbus") is a sophisticated, $5 billion insurer that knew the key facts concerning the alleged illegality of the Policies in 2004, began publishing memos about STOLI in 2005, conducted an insurable interest investigation into the Policies in 2005, started flagging the Policies on STOLI lists at some point between 2006 and 2010, and waited to bring these lawsuits until 2020.  The question here is simple:  Can Columbus, on these undisputed facts, walk away from its obligation to pay $10 million in death benefits on the Policies *and* keep the $10.3 million in premiums on the very same Policies?  The answer is "no."

Columbus is not entitled to a Court-approved, eight-figure windfall.  And none of Columbus' desperate attempts to avoid that commonsense reality has any merit whatsoever.  The Court should reject Columbus' efforts at misstating the law, ignoring the undisputed facts concerning Columbus' course of conduct, falsely asserting that Viva Capital Trust ("Viva") ███ ███████████████████████████████████, or conjuring baseless conspiracy theories about Viva's and its counsel's motives and litigation strategy.  The Delaware Supreme Court made clear in *Price Dawe* that "[a] court may never enforce agreements void *ab initio*, no matter what the intentions of the parties," *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Tr.*, 28 A.3d 1059, 1067 (Del. 2011), and yet Columbus is trying to do exactly that by asking this Court to enforce one side of contracts that Columbus believes are void *ab initio*.[1]

---

[1] Wilmington Trust, N.A., as Securities Intermediary ("Securities Intermediary")—which has acted, and continues to act, solely in its capacity as a securities intermediary pursuant to the UCC, *see* U.C.C.§ 8-102(a)(14)—has already submitted two briefs explaining why Columbus cannot keep the $10.3 million in premiums on the Policies and be relieved of its obligation to pay the $10 million in benefits under the Policies.  In those briefs, Securities Intermediary has responded to many of the arguments in Columbus' opposition, including, for example, why—as a matter of public policy—Columbus cannot keep the premiums.  Securities Intermediary will focus its reply on those arguments advanced by Columbus that Securities Intermediary has not addressed elsewhere.

## II.    ARGUMENT

### A.    *Estate of Malkin* Does Not Address Whether a Carrier Can Void a Policy and Keep the Premiums, as Columbus Seeks to Do Here.

The Delaware Supreme Court's decision in *Wells Fargo Bank, N.A. v. Estate of Malkin*, -- A.3d --, 2022 WL 1671966 (Del. May 26, 2022), does ***not***, as Columbus claims, stand for the proposition that "a downstream investor like Viva cannot prove an entitlement to restitution under a STOLI policy unless the investor undertook appropriate diligence and bought the policy in question without knowing it had insurable interest problems."  (CL Opp. at 24–25.)[2]  There are three reasons why.

***First***, the Delaware Supreme Court made clear that the premium claim in *Estate of Malkin* (an estate case) is different than the premium claim here (a carrier case).  In *Estate of Malkin*, the Court answered two certified questions from the Eleventh Circuit, one of which was:  "If an insurance contract is void … can the party that is being sued under § 2704(b) recover premiums it paid on the void contract?"  *Id.* at *1.  Section 2704(b) is the Delaware statute that "allows the estate of a deceased STOLI insured to 'maintain an action to recover' the death benefit from its recipient."  *Id.* at *1; *see also* 18 Del. C. § 2704(b).  It was in that context that the Court held that a Section 2704(b) defendant can recover premiums from an estate if it "can prove its entitlement to those premiums under a viable legal theory."  *Estate of Malkin*, 2022 WL 1671966, at *1.

These cases are not Section 2704(b) cases; they are lawsuits filed by an insurer seeking to avoid its obligation to pay the Policies' death benefits and keep the Policies' premiums.  *Estate of Malkin* made clear that different considerations are present in carrier cases than estate cases, when explaining "[s]everal courts have addressed whether a policyholder may recover the premiums it

---

[2] "CL Opp." refers to Columbus' Brief in Opposition to Wilmington Trust's Motion for Summary Judgment, dated May 31, 2022.  (*See Cohen* Dkt. 160; *Romano* Dkt. 156.)

paid when the insurer raises an insurable-interest challenge to a life insurance policy.  But few, if any, decisions have addressed whether a downstream purchaser of a policy may recover, in a case brought by an estate under Section 2704(b), premiums it paid to maintain the policy."  *Id.* at *12.

Perhaps trying not to tip its hand on how it will decide the return-of-premiums question in the carrier context, the Court cited *De Bourbon/Frankel* (an automatic return case), *Snyder* (another automatic return case), and *Seck* (the outlier case where the insured never existed and where a court applying Delaware law, for the very first time, invoked the Restatement (Second) of Contracts).  *See id.* at *12 n.63 (citing *Sun Life Assur. Co. of Canada v. Wilmington Tr., N.A.*, 2022 WL 179008, at *12–14 (Del. Super. Ct. Jan. 12, 2022) ("*De Bourbon/Frankel*"), *Brighthouse Life Ins. Co. v. Geronta Funding*, 2021 WL 4080672, at *19 (Del. Super. Ct. Aug. 20, 2021) (appeal pending) ("*Seck IV*"), and *Lincoln Nat'l. Life Ins. Co. v. Snyder*, 722 F.Supp.2d 546, 564-65 (D. Del. 2010)).  The Court also cited this Court's recognition that the "Delaware Supreme Court has yet to tell us whether and under what circumstances restitution can be recovered from an insurer when a policy is found to be an illegal STOLI policy," but that "federal courts applying Delaware law have consistently permitted requests for the return of premium payments[.]"  *Id.* (quoting *Columbus Life Ins. Co. v. Wilmington Tr., N.A.*, 2021 WL 1820573, at *8–9 (D. Del. May 6, 2021), *adopted by* 2021 WL 3886370 (D. Del. Aug. 31, 2021)).

*Estate of Malkin* does not shed light on whether—in a carrier case (such as the cases before this Court)—the Delaware Supreme Court will (1) agree with the majority of courts that have required carriers to automatically return premiums on void policies (*see* SI Br. at 28–29; SI Opp. at 13–14),[3] (2) endorse Judge Streett's outlier decision in *Seck* (*see* SI Br. at 31, 33; SI Opp. at 19),

---

[3] "SI Br." refers to Securities Intermediary's Consolidated Opening Brief in Support of Its Motion for Summary Judgment.  (*See Cohen*, Dkt. 141; *Romano*, Dkt. 143.)  "SI Opp." refers to Securities

or (3) create another test entirely.  Notably, the remedy for return of premiums on a void *ab initio* policy in a case brought by a carrier seeking to avoid paying a death benefit while trying to keep all the premiums is before the Delaware Supreme Court in *Seck* and *De Bourbon/Frankel*.  *See Geronta Funding v. Brighthouse Life Ins. Co.*, No. 380, 2021 (Del.) ("*Seck*"); *Sun Life Assur. Co. of Can. v. Wilmington Tr., N.A.*, No. 126, 2022 (Del.) ("*De Bourbon/Frankel*").[4]

**Second**, to the extent *Estate of Malkin* is applicable here (it is not), the Court's holding leaves the door wide open for a policy owner to seek an automatic premium return.  The Court held "the party that is being sued under Section 2704(b) may recover the premiums it paid on the void contract *if it can prove its entitlement to those premiums under a viable legal theory*."  *Estate of Malkin*, 2022 WL 1671966, at *12 (emphasis added).  In doing so, the Delaware Supreme Court made no effort to list all the legal theories that are "viable" in seeking a return of premiums, choosing instead to cite both *Seck* and automatic return of premium cases.  The Court then explained "*[i]n the context of this case*, [the policy owner] asserted a counterclaim for unjust enrichment, seeking to recover the premiums it paid as a restitutionary offset to the Estate's recovery under Section 2704(b)."  *Id.* (emphasis added).  Not surprisingly given the way the parties had framed the pleadings, the Court went on to analyze unjust enrichment as one such viable legal theory.  Contrary to Columbus' unsupported argument, the *Estate of Malkin* Court therefore did *not* hold that unjust enrichment is the *only* theory under which a policy owner can recover premiums on a void policy; it recognized that unjust enrichment was *one potential option*, because that it is what the policy owner had pleaded.

---

Intermediary's Consolidated Brief in Opposition to Columbus' Motion for Summary Judgment, dated May 31, 2022.  (*See Cohen*, Dkt. 157; *Romano*, Dkt. 161.)

[4] In *Seck*, the appeal is fully briefed and the Court heard oral argument on June 8, 2022.  In *De Bourbon/Frankel*, the final appeal brief is due on August 11, 2022.  Thus, the case will be fully briefed this summer, argued in the fall, and decided before year-end.

The automatic premium refund rule is based on a different well-established theory—rescission. *See, e.g.*, *Principal Life Ins. Co. v. Lawrence Rucker 2007 Ins. Tr.*, 774 F. Supp. 2d 674, 680–82 (D. Del. 2011); *Snyder*, 722 F. Supp. 2d at 564–65; *Sun Life Assur. Co. of Can. v. Berck*, 719 F. Supp. 2d 410, 418–19 (D. Del.2010). Under Delaware law, rescission "results in abrogation or 'unmaking' of an agreement, and attempts to return the parties to the status quo." *Norton v. Poplos*, 443 A.2d 1, 4 (Del. 1982); *see also, e.g.*, Restatement (Third) of Restitution and Unjust Enrichment § 54 (2011), cmt. a & Reporter's Note a ("Rescission … permits the claimant to reverse a contractual exchange and recover a performance thereunder, without regard to whether the underlying contract would be classified as 'void' from its inception or merely 'subject to avoidance.'"). Nothing in *Estate of Malkin* suggests that a policy owner cannot rely on rescission principles to recover premiums from a carrier on a void policy—as courts applying Delaware law have been doing for the last 12 years.

**Third**, even if *Estate of Malkin* had held that policy owners must prove unjust enrichment to recover premiums in a carrier case (it did no such thing), Columbus is still wrong when it argues that Viva cannot recover premiums unless it "undertook appropriate diligence and bought the policy in question without knowing it had insurable interest problems." (CL Opp. at 24–25.) As has become Columbus' practice in these cases, Columbus ignores how its own conduct with respect to the Policies factors into the restitution analysis that Columbus wrongly argues *Estate of Malkin* already endorsed for carrier cases.

In *Estate of Malkin*, the Court provided guidance, in *dicta*, on what the fact finder would have to consider in determining whether the policy owner could recover premiums from the estate as restitution damages on its unjust enrichment claim. *See Estate of Malkin*, 2022 WL 1671966, at *12–13. The Court noted that unjust enrichment is "the unjust retention of a benefit to the loss

of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Id.* at *12 (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010)).  The Court pointed out that the fact finder would therefore have to decide "whether [the policy owner] was reasonably unaware that the Policy was a STOLI arrangement and, thus, whether an award of restitution would be consistent with 'the fundamental principles of justice or equity and good conscience.'" *Estate of Malkin*, 2022 WL 1671966, at *13.

But in deciding "whether an award of restitution would be consistent with 'the fundamental principles of justice or equity and good conscience'" in a carrier case (as opposed to an estate case), courts would not only have to consider what the policy owner knew; ***courts would also have to consider what the insurer knew.***  That is the essence of Judge Stark's decision in *Sol III*—a decision concerning unjust enrichment and restitution principles that Columbus cannot meaningfully distinguish.[5]  Judge Stark found that the policy owner "knew or should have known at the time it purchased the Sol Policy there was a substantial risk the Policy was an illegal STOLI policy." *Sun Life Assur. Co. of Can. v. U.S. Bank Nat'l Ass'n*, 2019 WL 8353393, at *4 (D. Del. Dec. 30, 2019) ("*Sol III*").  Notwithstanding that, the policy owner was still entitled to a full premium refund—*i.e.*, all premiums the carrier had collected (as opposed to only those premiums the policy owner had paid)—as restitution because, in light of what the carrier knew and did, Judge Stark held that the carrier would be unjustly enriched if it could keep *any* of the premiums it received on the Sol policy. *See id.* at *4 & n.6.

Judge Stark's decision to order the carrier to return all the premiums to a sophisticated

---

[5] Columbus' only response to *Sol III* is that Judge Stark considered premium restitution in the context of an opinion on promissory estoppel damages.  (CL Opp. at 39.)  That is beside the point. Columbus does not dispute that Judge Stark ordered the carrier to refund all the premiums pursuant to a restitution analysis and held that letting the carrier keep the premiums would be unjust enrichment. *See Sol III*, 2019 WL 8353393, at *4.

policy owner who he found knew or should have known that the Sol policy had substantial STOLI risk underscores the central problem in Columbus' argument that the Court should let Columbus keep any of the premiums it received on these Policies.  Regardless of what test applies and what Viva knew before it bought the Policies, the question is whether Columbus is entitled to a multi-million dollar windfall by allowing it to keep the $10.3 million in premiums on the Policies if it does not have to pay the $10 million in death benefits.  Delaware law does not permit that result. *See, e.g.*, *De Bourbon/Frankel*, 2022 WL 179008, at *13 (granting summary judgment in favor of policy owner and against carrier on return of premiums and holding "[a]s a matter of public policy, it would not be fair for Sun Life to retain all premiums, while never having to pay death benefits as agreed in exchange for receiving premiums").

### B.    Columbus' Arguments Concerning Its Nearly Two-Decade Long Course of Conduct With Respect to the Policies Ignore the Undisputed Facts.

Columbus tries to portray itself as a victim, arguing it "was lied to about the KDI Program," "took actions, consistent with the rest of the industry, to combat STOLI," and "challenged the Policies at issue shortly after it learned that doing so was possible."  (CL Opp. at 30–31; *see also id.* 4–23.)  But as Columbus notes, "facts are stubborn things" (*id.* at 30), and the undisputed facts concerning Columbus' course of dealing demonstrate why Columbus cannot keep the Policies' premiums if it does not have to pay the Policies' death benefits.

### 1.    Columbus Knew the KDI/Concordia Program Was a Non-Recourse Premium Finance Program No Later than September 2004.

Columbus filed these cases in May 2020 alleging that the Policies were void because the insureds used non-recourse loans to pay premiums[6]—***nearly 16 years after Columbus learned***

---

[6] (*See, e.g.*, *Cohen* Complaint, Dkt. 1 at ¶ 21; *Romano* Complaint, Dkt. 1 at ¶ 21.)

*that very fact*.  Columbus concedes that, in September 2004, it reviewed copies of sample Participation and Trust Agreements that insureds had to sign to participate in the KDI/Concordia Program.  (Ex. 3 at 114:18–157:11.)[7]  The sample Participation Agreement stated that "***under no circumstances***" would the insureds "***be personally liable for the payment of any indebtedness or expenses of the Trust***" (*e.g.*, premium finance loans).  (Ex. 13 at 004001 (¶ 12) (emphasis added).)  The sample Trust Agreement similarly provided that the trust's owners "***shall not be liable for any liabilities and obligations of the Trust***" (*e.g.*, premium finance loans).  (Ex. 13 at 004017 (¶ 2.6) (emphasis added).)  In light of those provisions, Columbus' claim that "Columbus Life did not know that the Policies were created through non-recourse premium financing" (CL Opp. at 4) flies in the face of the undisputed facts and lacks any credibility.

Faced with the undisputed fact that Columbus reviewed documents in September 2004, which stated unmistakably that the insureds would not be liable for the trusts' indebtedness or expenses (including premium finance loans), Columbus offers four primary rebuttals, none of which has any merit.

***First***, Columbus argues that its Rule 30(b)(6) witness (Lisa Fangman) testified that Ed Leisher—one of the KDI/Concordia Program's brokers—told Columbus in a late 2003/early 2004 meeting that the KDI/Concordia Program involved *recourse* (rather than *non-recourse*) loans.  (CL Opp. at 5, 31.)  Of course, that is hearsay.  *See* Fed. R. Evid. 801(c), 802.[8]  Putting aside the obvious hearsay problem, that far-fetched testimony conflicts with (1) the sample Participation and Trust

---

[7] Numbered exhibits refer to the exhibits filed by Securities Intermediary and lettered exhibits refer to the exhibits filed by Columbus.

[8] Columbus took Ed Leisher's deposition before Ms. Fangman testified regarding Mr. Leisher's alleged statement during this late 2003/early 2004 meeting.  Columbus did not ask Mr. Leisher whether he told Columbus that the loans were recourse rather than non-recourse during that meeting.  Instead, Columbus elected to rely on Ms. Fangman's testimony to prove the truth of something Mr. Leisher allegedly said.

Agreements that Columbus reviewed in September 2004 (*see* Ex. 13 at 004001 (¶ 12), 004017 (¶ 2.6)), and (2) the testimony from Amy Holmwood—another KDI/Concordia Program broker— who testified she was present for this late 2003/early 2004 meeting with Columbus, and that KDI/Concordia Program's representatives told Columbus that the KDI/Concordia Program involved ***non-recourse*** premium financing.  (Ex. 4 at 27:12–30:3, 95:5–98:3.)

***Second***, conceding the Participation and Trust Agreements unambiguously stated that "the insureds and the trustees would not be liable for any of the trusts' obligations," Columbus counters "[t]hese agreements are not loan agreements" and "[t]here is simply not enough information in these provisions to determine either way whether the loan was recourse or non-recourse."  (CL Opp. at 7.)  Columbus' argument is meritless.  The Participation and Trust Agreements expressly state that insureds would not be "personally liable for the payment of ***any*** indebtedness or expenses of the Trust."  (Ex. 13 at 004001 (¶ 12) (emphasis added); *see also id.* 004017 (¶ 2.6).)  Columbus did not need to review the actual loan agreements between the insureds' trusts and the premium finance lender to know that the loans were non-recourse to insureds.[9]

***Third***, Columbus claims that the KDI/Concordia PowerPoint presentation led Columbus to believe that the insureds used recourse loans to pay premiums.  (CL Opp. at 5, 31.)  But Columbus neglects to mention that Columbus' senior executives received this KDI/Concordia Program PowerPoint on the very same date (September 22, 2004) that it received the sample Participation and Trust Agreements—both of which made clear that the insureds would not be

---

[9] Columbus argues "as Amy Holmwood acknowledged, the term 'nonrecourse' does not appear in §§ 6 or 12 of the Participation Agreement."  (CL Opp. at 6 n.6.)  Columbus ignores what Ms. Holmwood actually said about Paragraph 12:  "My understanding is this is explaining that there will be no personal liability on behalf of the indebtedness of the trust that would cause this to be recourse[] to the trust and to the individual, to the owner.  ***This is the nonrecourse statement explained in a sentence***."  (Ex. 4 at 150:22–151:5 (emphasis added).)

personally liable for the trusts' debts (*i.e.*, that this was a *non-recourse* premium finance program). (Ex. 11; Ex. 13.)  It strains credibility for Columbus to assert in the face of these undisputed facts that Columbus believed the PowerPoint presentation was referring to recourse loans—indeed, the word "recourse" is not used anywhere in the PowerPoint—when Columbus received documents the same day making clear that the insureds would not be personally liable for any of the trusts indebtedness (including premium finance loans).

        **Fourth**, implicitly conceding it knew the KDI/Concordia Program involved non-recourse loans no later than September 2004, Columbus contends "although non-recourse premium financing has since become suspect, very little was known about it in 2003-04," and "under Delaware law, not all non-recourse premium financing results in a finding of STOLI."  (CL Opp. at 7; *see also id.* at 4 n.5, 31.)  That argument fares no better.  Whether Columbus would have won or lost a STOLI litigation if it had sought to invalidate the Policies in the 2004–05 time period— or at any other point during the last two decades—is irrelevant.  Columbus began publishing memos in May 2005 expressing its corporate opinion that non-recourse premium financed policies were tantamount to STOLI policies.  (Ex. 32 at 000002 ("[W]e wish to make clear our position in not accepting applications taken as a part of a non-recourse premium financing program which may violate insurable interest … laws.").)  If Columbus wanted to void the Policies based on the fact that insureds in the KDI/Concordia Program used non-recourse loans to pay premiums, then Columbus should have brought these cases 15 years ago.

### 2.    Columbus Conducted an Insurable Interest Investigation Into the KDI/Concordia Program in September 2005.

        Columbus does not dispute that Columbus **conducted an insurable interest investigation into the KDI/Concordia Program in 2005**.  Although Columbus mentions briefly that it took steps to rescind certain KDI/Concordia policies in the fall of 2005 for misrepresentations relating to

undisclosed coverage (CL Opp. at 19, 31–32), Columbus does not address that (1) on September

7, 2005, Columbus wrote to the trustee for the secondary market buyer ███████████████

███████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████ (2) Columbus testified that "these and

other policies" referred to policies Columbus knew were part of the KDI/Concordia Program (such

as the Policies). (Ex. 41 at 000311 (emphasis added); Ex. 42 at 67:22–73:8.)  Although Columbus'

witnesses provided inconsistent testimony on the precise scope of Columbus' 2005 insurable

interest investigation (*see* SI Br. at 16–17), it is undisputed that this investigation occurred 15 years

before Columbus filed these lawsuits seeking to invalidate the Policies.[10]

### 3.    Columbus' Statistical Argument Concerning Its STOLI Lists is Misleading and Beside the Point.

Columbus tries to downplay how it started tracking the Policies on STOLI lists at some

point between 2006 and 2010, arguing that its lists were "based upon very broad *potential* STOLI

indicators" and "Columbus Life has paid almost all of the death claims it has received on policies

appearing on these lists."  (CL Br. at 15–16; *see also id.* at 32.)  Columbus boasts that it has

received death claims for 279 policies appearing on its STOLI lists, has paid 97% of those claims,

and has only filed 19 lawsuits seeking to invalidate policies on its STOLI lists.  (*Id.* at 16.)

Columbus' statistical argument is flawed for three reasons.

*First*, Columbus does not address whether it has paid claims on policies that are governed

by state laws which are favorable or unfavorable to carriers.  In certain states, the laws are carrier-

friendly because insurable interest challenges are permitted after the contestability period expires

---

[10] This underscores the duplicity of Columbus' argument that ████████████████████████████

██████████████████████████████████████ (CL Opp. at 43.)  Columbus believed the
Policies had insurable interest issues 11 years before Viva bought them in 2016.

and/or courts scrutinize the policy's issuance to determine whether a policy has an insurable interest. *See, e.g.*, *Sun Life Assur. Co. of Can. v. Wells Fargo Bank, N.A.*, 208 A.3d 839 (N.J. 2019); *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Tr.*, 28 A.3d 1059 (Del. 2011).  In many other states, courts apply the plain meaning of their statutes in a way that does not benefit carriers seeking to evade their contractual obligations. *See, e.g.*, *Wells Fargo Bank, N.A. v. Pruco Life Ins. Co.*, 200 So. 3d 1202 (Fla. 2016); *Kramer v. Phoenix Life Ins. Co.*, 940 N.E.2d 535 (N.Y. 2010).

Columbus' argument that it has paid 97% of claims on policies appearing on its STOLI lists is therefore meaningless.  Columbus has not presented statistics showing, for example, the extent to which it has paid claims on Delaware and New Jersey policies that appear on its STOLI lists, including the percentage of claims paid on Delaware and New Jersey policies since Columbus began filing STOLI lawsuits at the end of 2019.

**Second**, in January 2012, Columbus' then-president J.J. Miller requested a STOLI report with a search criteria designed to target STOLI policies more precisely.  (Ex. 55 at 004501; Ex. 42 at 233:3–7, 235:19–22.)  Mr. Miller's chosen methodology for identifying STOLI policies—*i.e.*, policies issued between 2003–2006, with face amounts of $5 million or greater, issued on insureds older than 70—resulted in 69 potential STOLI policies across Columbus' entire book of business.  (Ex. 55 at 004501–4502.)  So while Columbus boasts it has received death claims for 279 policies on its STOLI lists and only challenged 19 policies, Columbus does not address the relationship between those 19 lawsuits and the 69 policies included within Mr. Miller's STOLI report.

**Third**, regardless of how many claims Columbus has paid on policies appearing on its STOLI lists, there is no dispute that Columbus never told Securities Intermediary—or any of the Policies' predecessor owners—***that Columbus put these very Policies on its STOLI lists***.  Instead, Columbus argues it did not have a duty to disclose that it was treating the Policies internally as

STOLI while accepting millions of dollars in premiums. (CL Opp. at 33.) In support of that argument, Columbus cites the *De Bourbon/Frankel* court's ruling that—for purposes of a Massachusetts statutory claim for unfair or deceptive trade practices— "[t]here is no authority that imposes a duty on [the insurer] to inform policy owners that policies had been 'flagged' as STOLI." *De Bourbon/Frankel*, 2022 WL 179008, at *12.

But the issue currently before this Court is ***not*** whether there was a disclosure duty under Massachusetts law;[11] it is whether Columbus' failure to inform Securities Intermediary it had been flagging the Policies on STOLI lists since December 2010 (at the latest) is one of the reasons why, under Section 198(b) of the Restatement (Second) of Contracts, Columbus cannot void the Policies *and* keep the $10.3 million in premiums. Columbus' failure to disclose that it was treating the Policies as STOLI—coupled with Columbus' myriad verifications that the Policies were "in force" (*see* SI Br. at 22)—prevented Viva from deciding for itself how to handle that Columbus had been treating the Policies as STOLI for years before Viva bought the Policies.

### 4. Columbus' Argument that It Did Not Know About STOLI Litigation Until October 2018 Cannot Defeat Summary Judgment.

Columbus' defense that not a single person at the company knew Columbus could file lawsuits seeking to invalidate policies for lack of insurable interest until October 2018 is inherently unbelievable. (CL Opp. at 17–20.) Columbus would have this Court accept that far-fetched argument, even though Columbus (1) learned about STOLI no later than 2005 when it began focusing on the relationship between STOLI and non-recourse premium finance, (2) started changing its life insurance applications to address STOLI in 2005, (3) began tracking potential

---

[11] Judge Johnston's decision on Massachusetts statutory unfair or deceptive trade practices conflicts with Judge Stark's decision in *Sol II*, which permitted a Massachusetts statutory claim for unfair or deceptive trade practices to go to trial. *See Sun Life Assur. Co. of Can. v. U.S. Bank Nat'l Ass'n*, 2019 WL 2151695, at *2–4 (D. Del. May 17, 2019).

STOLI policies internally in 2006, (4) started circulating written STOLI lists to senior executives in 2010, and (5) had its employees conducting specific STOLI studies at the direct request of its then-President J.J. Miller in 2012.  (SI Br. at 14, 19–20; CL Opp. at 12–15.)

As the Court has explained, "on a motion for summary judgment, if the factual context renders the nonmoving party's claim implausible … they must come forward with more persuasive evidence to support their claim than would otherwise be necessary."  *M.K. v. Prestige Acad. Charter Sch.*, 470 F. Supp. 3d 417, 420 (D. Del. 2020) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Co.*, 475 U.S. 574, 587 (1986)); *see also id.* at 424 (rejecting party's "counter-narrative" as having so "little plausibility" that it failed to create a "triable issue of material fact"). Here, no rational jury would believe that a company so sophisticated about STOLI dating back to 2005 did not know that other carriers were bringing STOLI litigations before 2018.  Securities Intermediary is willing to accept, solely for purposes of argument, that Columbus' 30(b)(6) witnesses may not have known carriers could bring STOLI lawsuits until one of its employees (Justin Payne) attended a Cozen presentation in October 2018.  (SI Br. at 20–21; CL Opp. at 20.) But for a jury to accept that the entire company—with directors and officers who owe fiduciary duties to shareholders, as well as a team of in-house attorneys—did not know about STOLI litigation until 2018 is a bridge too far.  That is particularly true because Columbus is a member of the American Council of Life Insurers ("ALCI"), and the ALCI has been reporting on STOLI litigation since 2010 (if not earlier) and filed an amicus brief in *Price Dawe*. (Ex. 122).[12]

That is why it is not "patently absurd" (CL Opp. at 18), for Securities Intermediary to

---

[12] *See Florida Insurers and Agents Oppose Legislative Effort to Promote "STOLI," an Illegal Arrangement that Harms* Seniors, ACLI News Release (Feb. 21, 2012), *available at* https://www.acli.com/posting/nr12-015; ACLI *Comments on Kramer Case*, ACLI News Release (Nov. 18, 2010), *available at* https://www.acli.com/posting/nr10-059.

highlight that Columbus' 30(b)(6) witnesses did not speak with *any* current or former employees to prepare for depositions in which they testified, on behalf of Columbus, that *nobody at the company* knew about STOLI litigation until 2018.  What is "patently absurd" is Columbus' suggestion that a reasonable jury could find that, as an institution, Columbus was asleep at the wheel for over a decade while other carriers were bringing STOLI cases.  In fact, Columbus is only able to argue that nobody at Columbus knew about STOLI litigation before 2018 because it failed to file these lawsuits while percipient witnesses were still with the company, purged emails that predate January 2016, and decided not to educate its 30(b)(6) witnesses about facts that are nearly 20 years old by conferring with former employees.  (SI Br. at 17–18, 20–21.)

That said, Columbus' feigned ignorance about STOLI litigation is irrelevant because, even if the Court were to accept it, it would not create a *material* issue of fact.  *See, e.g.*, *Quantum Loyalty Sys., Inc. v. TPG Rewards*, 2011 WL 2015221, at *2 (D. Del. May 24, 2011) ("Irrelevant or unnecessary factual disputes are immaterial and are insufficient to defeat a motion for summary judgment.") (citing *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 258 (1986)).  As Judge Stark made clear in *Sol III*, "[w]ith the release of *Price Dawe*, [the insurer] also knew (**or should have known**) that it could invalidate STOLI policies even after the two-year incontestability period." *Sol III*, 2019 WL 8353393, at *4 (emphasis added).  So even if the Court were to believe Columbus' argument that nobody at Columbus—none of its directors, officers, and/or in-house lawyers—knew about STOLI litigation until October 2018, that would not be a reason to let Columbus keep the premiums because Columbus **should have known** about STOLI litigation. Indeed, if the Court were to accept Columbus' argument, the Court would be rewarding corporate negligence and encouraging corporations to purposefully avoid important legal developments affecting their businesses so that they could claim ignorance of the law.

15

**C.** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Columbus' argument that it should be able to void the $10 million in Policies and keep the

$10.3 million in premiums rests on the false narrative ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  (*See, e.g.*, CL Opp. at 1, 2, 25.)  In certain

instances, Columbus goes even further—falsely claiming that Securities Intermediary ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮  (*Id.* at 41.)

Securities Intermediary has detailed Viva's due diligence on the Policies in its prior briefs,

and it will not repeat all of those points here.  (*See* SI Br. at 25–28; SI Opp. at 24, 29–32.) ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮  is not supported by a shred of evidence.  Viva bought the Policies

as part of an ▮▮▮▮▮ portfolio in a UCC auction from a secured lender, and Viva (unlike

Columbus) had no insight into the origination of the Policies, the relationship between the Policies

and the KDI/Concordia Program, whether the premium financing was recourse or non-recourse,

or anything else that would allow Viva (and its investment advisor Preston Ventures LLC

("Preston")) to make insurable interest determinations.  (*See* SI Br. at 25–28; SI Opp. at 28, 29–

32.)

What Viva knew was that the Policies were Delaware policies, ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮  (Ex. 111 at 94:12–95:9, 95:24–96:8.)  Viva did so because Delaware policies generally—

***not the Policies at issue here specifically***—have some insurable interest risk because of the

Delaware Supreme Court's decision in *Price Dawe* (which permits challenges after the

contestability period and directs courts to "scrutinize" the circumstances giving rise to a policy's

16

issuance).  (*Id.* at 95:11–23.)  Simply put, because of *Price Dawe*, every Delaware policy—no matter how clean it is—has *some* insurable interest risk.  But that is not the same as saying that ████████████████████████████████████████████ these Policies that presented insurable interest risk beyond the fact that they were issued subject to Delaware law.

By misleadingly arguing that ████████████████████████████████████████████ ████████████████████████████████████████████████ (CL Opp. at 25, 41), Columbus is trying to distract the Court from how Columbus, unlike Viva, (1) knew the insureds used non-recourse loans to pay premiums on the Policies in 2004; (2) knew the lender was entitled to a portion of the death benefit at the Policies' inception in 2004; (3) conducted an insurable interest investigation into the Policies in 2005; and (4) started flagging the Policies on STOLI lists at some point between 2006 and 2010.  (SI Br. at 9–20.)  ████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████ does not mean Columbus can keep the $10.3 million in premiums it received on the Policies.

### D.    The Court Should Reject Columbus' Fallback Argument that Columbus Can Keep Some of the Premiums, *i.e.*, That Columbus is Entitled to a Partial Windfall.

Columbus claims that, if the Court orders Columbus to return premiums on the Policies, the premium refund should be limited to those premiums that Securities Intermediary paid on behalf of Viva rather than all of the premiums that Columbus collected.  (CL Opp. at 35–41.)  None of Columbus' arguments withstand scrutiny.

***First***, by arguing that Securities Intermediary has not cited a single case where a court has agreed that a policy owner can recover premiums paid by a prior owner in a void *ab initio* policy's chain-of-title because "[t]here is none" (CL Opp. at 36), Columbus ignores *Sol III*.  Judge Stark ordered the carrier to return all of the premiums that it received on the Sol policy to the policy

owner, as opposed to only those premium the policy owner had paid, because the policy owner had acquired "all interest in the Policy, including the right to pursue the return of any premiums that had already been paid on the Policy."  *Sol III*, 2019 WL 8353393, at *4 n.6.

 ***Second***, admitting Viva bought "'all right, title and interest' in the Policies, 'all rights related to or deriving therefrom,' and 'all proceeds of any of the foregoing,'" Columbus claims that Securities Intermediary has not shown that Viva understood it was buying the rights to previously paid premiums.  (CL Opp. at 36.)  But the contractual language in the Bill of Sale speaks for itself.  (SI Br. at 43–44.)  Regardless, as the Declaration of Jon Nelson makes clear, Viva acquired all of the rights to recover premiums paid by the prior owners in the Policies' chain-of-title.  (Declaration of Jon Nelson, dated June 22, 2022.)

 ***Third***, Columbus contends that, in order to recover premiums paid by prior owners, Viva would have to "prove that each prior owner up the commercial chain (i) purported to sell its alleged premium refund rights to its buyer; and (ii) that each of the sellers of those alleged rights would themselves be entitled to a refund."  (CL Opp. at 37.)  But in making this argument, Columbus is demanding that Viva make an evidentiary showing that no court applying Delaware law has ever required.  And tellingly, Columbus cites no authority.

 To date, courts applying Delaware law have split four ways on whether carriers must disgorge some, or all, of the premiums on a void *ab initio* policy.  The majority of courts have simply ordered the carrier to refund all the premiums to the policy owner, without analyzing whether that policy owner made every premium payment.  *See, e.g.*, *Principal Life Ins. Co. v. Lawrence Rucker 2007 Ins. Tr.*, 774 F. Supp. 2d 674, 682–83 (D. Del. 2011).  At the opposite end of the spectrum, some courts have limited the carrier's premium reimbursement obligation to those premiums paid by the final policy owner—emphasizing that the policy owner had neither sought

nor proven a right to relief beyond that which it sought in its pleadings. *See, e.g.*, *Sun Life Assur. Co. of Can. v. U.S. Bank Nat'l Ass'n*, 2016 WL 3948059, at *2 (S.D. Fla. June 9, 2016) ("*Malkin II*").[13]   Judge Stark took a different tack and ordered the carrier in *Sol III* to return all of the premiums to the final policy owner in the chain-of-title based on the policy owner's acquisition of "all interest in the Policy." *Sol III*, 2019 WL 8353393, at *4 n.6.  And Judge Johnston ordered the carrier in *De Bourbon/Frankel* to return 100% of the premiums it had received, but required it to pay those monies to the particular parties who made the premium payments. *See De Bourbon/Frankel*, 2022 WL 179008, at *13–14.

Tellingly, none of those courts have scrutinized whether predecessor policy owners in the chain-of-title would themselves be able to prove an entitlement to a premium refund[14] or examined the contractual language pursuant to which prior owners in the chain of title relinquished their rights in the policies (as Columbus argues that this Court should do here).  Regardless, the record in this case is clear that the Policies' predecessor owners sold all their rights and interests in the Policies, which necessarily encompasses the right to pursue a return of premiums from Columbus.

In 2005, Ms. Cohen and Mr. Romano authorized the assignments of "all right, title and interest in the certificate of beneficial interest of the Trust[s]," *i.e.*, the Trusts that themselves were the original owners of the Policies, to Columbus Circle.  (*See* Ex. 29 ¶ 1; Ex. Q ¶ 1.)  Columbus

---

[13] Columbus' reliance on cases where courts have limited a policy owner's premium refund to only those premiums that the policy owner had paid (as opposed to requiring the carrier to return all of the premiums it had received) is misplaced.  (CL Opp. at 37–38.)  None of those cases addressed facts comparable to those present here and in *Sol III* where the policy owner purchased the right to recover premiums paid by prior owners in the policy's chain of title.

[14] That said, the fact that the *Berck*, *Snyder*, and *Rucker* policy owners were awarded automatic premium refunds refutes Columbus' argument that an "original wrongdoer[]" (*i.e.*, a third-party investor that was responsible for the insurable interest violation) cannot recover premiums.  (CL Opp. at 37.)  In *Berck*, *Snyder*, and *Rucker*, the policy owner who received the premium reimbursement *was* investor who supposedly responsible for the insurable interest violation.

Circle then sold "all right, title, and interest" to each certificate of beneficial interest to Invest SLPS LLC—an entity affiliated with ABC Viaticals.  (Ex. 31 at Art. 1.1; Ex. 14 at 85:2–8.)  ABC Viaticals then transferred "all [of its] right, title and interest" in the Policies to the 70091V Life Settlement Trust (for the Cohen Policy) and 70078V Life Settlement Trust (for the Romano Policy).  (Ex. 119 at Art. 2.01; Ex. 56; Ex. 59 at 000696; Ex. 120 at Art. 2.01; Ex. 57.)

On November 17, 2006, ABC Viaticals was placed into receivership.  (Ex. 89 at 2503–04, 2520.)  The Court-appointed Receiver took "exclusive jurisdiction and possession of the assets, monies, securities, choses in action, and properties, real and personal, tangible and intangible, of whatever kind and description, wherever situated, of [ABC Viaticals and others] that are attributable to funds provided to [ABC Viaticals and others] by an investor and/or any entities they own or control."  (*Id*. at 2504 ¶ 1.)  The Receiver held the Policies until the Court ordered the sale of the Policies (as part of the assets of ABC Viaticals) to Settlement Group, Inc.  *See* Order ¶ 30, *SEC v. ABC Viaticals*, No. 3:06-CV-2136-P (N.D. Tex. Oct. 6, 2008) (Dkt. 179).  Pursuant to the Purchase and Sale Agreement in that transaction, the "Purchased Assets" included the Policies, as well as "all rights of recourse or recovery against any third party, and all other claims, rights, causes of action, remedies, powers and privileges, under, relating to or arising out of" the Policies.  (*See* Exhibit 1 to Order § 1.1(a)(v), ), Add. A at COH-J, Add. A at ROM-A (2), *SEC v. ABC Viaticals*, No. 3:06-CV-2136-P (N.D. Tex. Oct. 6, 2008) (Dkt. 179-1).

Settlement Group subsequently sold the portfolio containing the Policies to Orca LSI Trust, including "all rights, title and interest in and to the Policy Portfolio," for the benefit of a Netherlands-based entity called Orca LSI B.V.  (*See* Ex. 121; Exhibit B to Notice of Removal at Art. 4.01, *Christopher R. Erwin, as Tr. of the Orca LSI Tr. v. Fin. Life Servs., LLC*, No. 8:09-cv-01463 (C.D. Cal. Dec. 11, 2009) (Dkt. 1).)  For the next seven years, various Orca trusts held the

portfolio including the Policies until it was sold by Delta Lloyd to Viva in a UCC sale after Orca defaulted on its financing.  (*See* Ex. 110; *see also* Exs. 58–71.)  And finally, as explained above, Viva bought "all of its right, title and interest of every kind, nature and description, in and to the Assets," which assets included the Policies.  (Ex. 110 at ¶ 1, Annex A.)

*Finally*, the business realities of the tertiary market for life insurance underscore why accepting Columbus' argument that it should only have to return the premiums that Viva itself paid would be bad public policy.  As Cozen's PowerPoint presentation produced by Columbus makes clear, the cases where courts limited a carrier's obligation to return premiums to only those premiums paid by the final policy owner in the chain of title are "***significant because of the frequency of trading***."  (Ex. 86 at 006331 (emphasis added).)  In other words, as time passes, it becomes more likely that a new investor will buy a policy in the tertiary market.  If a carrier could press the "reset" button on the premium refund calculation every time a policy traded on the tertiary market, it would incentivize insurers to do exactly what the *Berck* court cautioned against 12 years ago, *i.e.*, "bring rescission suits as late as possible, as they continue to collect premiums at no actual risk."  *Berck*, 719 F. Supp. 2d at 418–19.

Courts have been ordering carriers to refund premiums on void policies for years precisely to prevent insurers from obtaining windfalls.  *See, e.g.*, *Sun Life Assurance Co. of Can. v. Wells Fargo Bank N.A.*, 779 F. App'x 927, 929 (3d Cir. 2019) (affirming ruling that "permitting Sun Life to keep Wells Fargo's premium payments would be an unfair windfall"); *Sun Life Assurance Co. of Can. v. Conestoga Tr. Servs., LLC*, 263 F. Supp. 3d 695, 704 (E.D. Tenn. 2017), *aff'd*, 717 F. App'x 600 (6th Cir. 2018) (holding that "[a]llowing Sun Life to retain the premiums would be a windfall to the company").  If carriers only have to return premiums to the final policy owner in

the chain of title, it would result in the very windfall that the premium refund rule is designed to prevent given the frequency in which policies trade in the tertiary market.

### E. Columbus' Unfounded and Unsupported Accusation that Securities Intermediary Decided Not to Contest Policy Invalidity at the Start of this Case is 100% False.

Columbus' opposition is littered with false accusations that Securities Intermediary, Viva, and their counsel devised a scheme at the outset of this case that they would concede policy validity and then delay discovery in order to increase return-of-premium premium damages. (CL Opp. at 3 n.2, 43–44.) The Court should reject this conspiracy theory, which is not supported by a shred of evidence.

To this day, Securities Intermediary does not "concede" that the Policies are invalid. Quite the contrary, based on facts that Securities Intermediary learned during discovery concerning the KDI/Concordia Program—as well as the Delaware Supreme Court's November 16, 2021 decision in *Lavastone Capital LLC v. Estate of Berland*, 266 A.3d 964 (Del. 2021)[15]—Securities Intermediary believes there are questions of material fact that preclude summary judgment on policy validity. (SI Br. at 2, 3–8 ; SI Opp. at 1 n.3.) But Securities Intermediary also believes it is irrational to spend millions of dollars at trial and on appeal fighting with Columbus over whether the Policies had insurable interests at inception—wasting this Court's time and resources in the process—when it is undisputed that the $10.3 million in premiums at issue exceed the $10 million in death benefits, without even accounting for pre-judgment interest.

There is nothing "just, speedy, and inexpensive," Fed. R. Civ. P. 1, about a complex, multi-

---

[15] The Court held that an insured's use of a non-recourse loan, coupled with their intent to sell the policy, does not render a policy invalid "so long as the use of nonrecourse funding did not allow the insured or his or her trust to obtain the policy 'without actually paying the premiums' and the insured or his or her trust procured the policy in good faith, for a lawful insurance purpose, and not as a cover for a wagering contract." *Estate of Berland*, 266 A.3d at 973.

week jury trial and post-trial appeals on insurable interest when (1) the overwhelming majority of courts applying Delaware law have ordered carriers to return premiums automatically if policies are void *ab initio* (*see* SI Br. at 28–29) and (2) in light of the premiums at stake, Securities Intermediary is better off financially if the Policies are declared invalid.  The same is true even if the Court were to limit Securities Intermediary's premium recovery to the premiums that Viva itself paid to Columbus Life, plus pre-judgment interest, where the approximate recovery would be $6,220,816.21 on both Policies.  (Declaration of Ryan Harrison, *Cohen* Dkt. 143; *Romano* Dkt. 145 at ¶ 7.)[16]  Much of the difference between the $10 million in death benefits and the $6.2 million in premiums plus interest would be swallowed by costs associated with trial preparation, pre-trial evidentiary motions, a jury trial, post-trial briefing, and appeals—coupled with the lost time-value of money that would result from stretching out this case well into 2024.

This is not "bad faith behavior" or "gamesmanship" (CL Opp. at 3 n.2; 44); this is an effort to be efficient and economically rational.  Columbus' accusation that, in discovery, "Viva had no intent to even try to argue that the Policies were valid and that Viva instead merely intended to seek delay-after-delay to ratchet up its pre-judgment interest claim" (CL Opp. at 3 n.2) is regrettable and nonsensical.[17]  The truth is that in planning for summary judgment motions, Viva and Securities Intermediary did what any litigant would have done:  it analyzed the record, assessed how the facts concerning the KDI/Concordia Program squared with the Delaware Supreme Court's November 2021 decision in *Estate of Berland*—a case addressing the legality of non-recourse

---

[16] This is a rough calculation because it assumes a flat 5.75% interest rate from the date of each premium payment.  If the Court orders Columbus to return premiums and awards prejudgment interest, the parties will have to run precise calculations depending on the date of payment.

[17] It is nonsensical because, among other things, the premiums at issue did not surpass the death benefits until the end of discovery.

premium finance—and concluded that it would be a better use of the parties' and this Court's resources to focus on premiums than to fight over policy validity at trial and appeal. Columbus cites no evidence to support its conspiracy theory because there is none.[18]

### F. Securities Intermediary and Viva are Not Seeking a Windfall; They are Forcing Columbus to Sleep in the Bed that Columbus Made.

Columbus' argument that it is actually Viva—not Columbus—that is seeking a windfall by asking the Court to award premium damages that are in excess of the Policies' death benefits is nothing short of the pot calling the kettle black. (CL Opp. at 40–41.) Securities Intermediary (on behalf of Viva) is seeking a remedy in this case that is consistent with the majority rule in Delaware and is a direct consequence of Columbus' greed.

Securities Intermediary did not ask Columbus to file lawsuits in which it asks this Court to accept that it is fair for Columbus to void $10 million in death benefits on the Policies and yet keep $10.3 million in premiums it received over the years (thereby asking this Court to enforce only one side of contracts that Columbus believes are void). Securities Intermediary did not encourage Columbus to pursue a litigation strategy that Columbus' own Rule 30(b)(6) witness agreed is "economically irrational" if the Court orders Columbus to refund premiums. (Ex. 85 at 60:19–62:2, 154:2–155:8.) Columbus brought these cases voluntarily, gambling that this Court would reject the majority rule of Delaware law concerning return of premiums and award Columbus a full-blown litigation windfall. Columbus could have done the economically rational thing and agreed to pay the $10 million under the Policies after receiving $10.3 million in premiums (never mind the time value of money and the investment returns Columbus earned on those premiums).

---

[18] The idea that Securities Intermediary engaged in "delay-after-delay" is baseless for reasons that Securities Intermediary has already addressed in prior correspondence with the Court. (*Cohen* Dkt. 111; *Romano* Dkt. 113.)

Instead, Columbus bet that this Court would grant Columbus a massive "heads I win, tails you lose" windfall by invalidating the Policies and letting Columbus keep the premiums.

Having made its bed, Columbus must now lie in it.  Securities Intermediary is not arguing with "audacity … that Viva should get $6 million more than the aggregate death benefit."  (CL Opp. at 41.)  The fact that Viva's recovery on return of premiums exceeds its recovery if the Policies are declared valid is a consequence of Columbus' economically irrational decision to file lawsuits seeking to invalidate policies where the premiums exceed the death benefits.  If the Court follows the majority rule on return of premiums under Delaware law and orders Columbus to disgorge the $10.3 million in premiums that it collected on the Policies, then perhaps Columbus will think twice next time before it files a lawsuit forcing one of its customers to expend money in litigation explaining to a court why, regardless of the applicable return-of-premiums test, it is inherently unfair for Columbus to void $10 million in death benefits and simultaneously keep $10.3 million in premiums.[19]

## III.    CONCLUSION

The Court should grant Securities Intermediary's motion for summary judgment.  That said, because the Delaware Supreme Court currently has two cases on it docket—*Seck* and *De Bourbon/Frankel*—that concern the return-of-premiums issues presented on these motions for summary judgment, Securities Intermediary believes that this Court should wait to adjudicate these motions until both cases are decided and the parties have an opportunity to brief the implications of decisions in those cases.

---

[19] Columbus argues that Securities Intermediary is not entitled to pre-judgment interest (CL Opp. at 41–44), without once acknowledging the Eleventh Circuit's decision in *Malkin III* which ordered a carrier in a STOLI case to return premiums plus prejudgment interest as of the date of each premium payment as a matter of well-settled Delaware law.  *See Sun Life Assur. Co. of Can. v. U.S. Bank Nat'l Ass'n*, 693 F. App'x 838, 841 (11th Cir. June 12, 2017).

OF COUNSEL:

Harry S. Davis
Robert E. Griffin
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, NY  10022
(212) 756-2000

Aislinn K. Affinito
SCHULTE ROTH & ZABEL LLP
901 Fifteenth Street, NW, Suite 800
Washington, DC  2005
(202) 729-7470

Date:  June 23, 2022

 _/s/ John M. Seaman_
John M. Seaman (#3868)
Samuel D. Cordle (#6717)
ABRAMS & BAYLISS LLP
20 Montchanin Road, Suite 200
Wilmington, Delaware  19807
(302) 778-1000
seaman@abramsbayliss.com
cordle@abramsbayliss.com

*Attorneys for Defendant and Counterclaim-Plaintiff Wilmington Trust, National Association, as Securities Intermediary*