**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| COLUMBUS LIFE INSURANCE COMPANY,<br><br>       Plaintiff,<br><br>  v.<br><br>WILMINGTON TRUST, N.A., as Securities Intermediary,<br><br>       Defendant. | | C.A. No. 1:20-CV-00736-MN-JLH<br><br>███████████████ |
| COLUMBUS LIFE INSURANCE COMPANY,<br><br>       Plaintiff,<br><br>  v.<br><br>WILMINGTON TRUST, N.A., as Securities Intermediary,<br><br>       Defendant. | | C.A. No. 1:20-CV-00735-MN-JLH<br><br>███████████████ |

**PLAINTIFF COLUMBUS LIFE INSURANCE COMPANY'S SUPPLEMENTAL
BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.    ARGUMENT .................................................................................................... 2

    A.    Wilmington Trust Cannot Recover The Premium It Did Not Pay ......................... 2

    B.    Wilmington Trust Cannot Meet A *Seck* Exception ...................................... 7

    C.    Wilmington Trust's Premium Restitution Claim Should Be Dismissed For Abuse Of The Attorney Client Privilege ...................................................... 11

    D.    Wilmington Trust Cannot Prove That It Lacks An Adequate Remedy At Law .... 13

    E.    Wilmington Trust Cannot Prove The Absence of Justification. ........................ 13

    F.    The *Sol* Decision Changes Nothing. ...................................................... 15

III.    CONCLUSION ............................................................................................... 15

# TABLE OF AUTHORITIES

## Cases

*Anguilla v. Lubert-Adler Real Estate Fund*,
  2012 WL 5351229 (Del. Super. Ct. Oct. 16, 2012) .............................................................. 2, 3

*Geronta Funding v. Brighthouse Life Ins. Co.*,
  2022 WL 3654872 (Del. 2022) ("*Seck*") ....................................................................... passim

*Maxwell v. Adapt*,
  2015 WL 1444388 (W.D. Pa. Mar. 30, 2015) ........................................................................... 3

*Ohio Midland v. Proctor*,
  480 F. Supp. 2d 1025 (E.D. Ohio 2007) ................................................................................... 3

*Ohio Nat'l Life Assur. Co. v. Davis*,
  803 F.3d 904 (7th Cir. 2015) .................................................................................................... 5

*PHL Variable Ins. Co. v. Sheldon Hathaway Ins. Tr.*,
  2013 WL 6230351 (D. Utah Dec. 2, 2013) ............................................................................ 13

*Rimini St. v. Oracle*,
  2017 WL 4227939 (D. Nev. Sept. 22, 2017) ............................................................................ 3

*Sun Life v. Conestoga Tr.*,
  263 F. Supp. 3d 695 (E.D. Tenn. 2017) ("*Collins*") ................................................................ 4

*Sun Life v. U.S. Bank*,
  2019 WL 8353393 (D. Del. Dec. 30, 2019) ("*Sol*") .............................................................. 15

*Sun Life v. U.S. Bank*,
  2016 WL 3948059 (S.D. Fla. Jan. 14, 2016) ("*Malkin*") ........................................................ 4

*Sun Life v. Wells Fargo*,
  2016 WL 6824367 (D.N.J. Nov. 17, 2016) ("*Bergman*") ........................................................ 4

*Sun Life v. Wells Fargo*,
  2020 WL 1503641 (N.D. Ill. Mar. 30, 2020) ........................................................................... 5

*Sun Life v. Wells Fargo*,
  44 F.4th 1024 (7th Cir. 2022) ("*Corwell*") .................................................................... 3, 5, 14

*TTSI Irrevocable Tr. v. Reliastar Life Ins. Co.*,
  60 So.3d 1148 (Fla. DCA 2011) ............................................................................................... 6

*U.S. Bank v. Sun Life*,
  2016 WL 8116141 (E.D.N.Y. Aug. 30, 2016) ("*Van de Wetering*") ........................................ 4

*Wells Fargo v. Estate of Malkin*,
   278 A.3d 53 (Del. 2022) ........................................................................... 2, 11, 13, 14

*Wuliger v. Mfrs. Life Ins. Co.*,
   567 F.3d 787 (6th Cir. 2009) ............................................................................. 6

**Other Authorities**

Restatement (Second) of Contracts §§ 197-199 ............................................................ 3

## I.    INTRODUCTION

Wilmington Trust has taken the position throughout this case that, if the Policies are STOLI, they should be rescinded, and it should receive an automatic, proof-less refund of all the premium Columbus Life ever received for the Policies, regardless of whether Wilmington Trust's principal, Viva, paid those premiums or not. In *Geronta Funding v. Brighthouse Life Ins. Co.*, 2022 WL 3654872 (Del. 2022) ("*Seck*"), the Delaware Supreme Court rejected that argument and held that an investor cannot obtain a premium refund in a STOLI case unless it proves the elements of unjust enrichment as well as a fault-based exception to Delaware's longstanding rule that parties to illegal agreements are generally left where they are found without relief.

The *Seck* decision is fatal to Wilmington Trust's position. It means Wilmington Trust cannot obtain a refund of the premium paid by the prior owners because, under the doctrine of unjust enrichment, if the claimant did not confer the asserted benefit upon the defendant, the claimant is not entitled to restitution of that benefit. It also means that Wilmington Trust cannot obtain a refund of the premium paid by Viva because Viva cannot meet any of the *Seck* exceptions.

Indeed, Viva is a sophisticated, multi-billion dollar hedge fund whose business model is buying illegal human life wagers at a discount. In buying the Policies, Viva ignored red flags, conducted almost zero diligence, and willfully blinded itself to the Policies' illicit nature, electing to mitigate its risk by ███████████████████████████████████████ ████████████████, hoping it would eventually be able to slip death claims on the Policies past Columbus Life's claims department. Also, no rational factfinder could accept that Viva was less at fault than Columbus Life; that Viva was excusably ignorant; that allowing Columbus Life to retain the premium would effect a forfeiture disproportionate to Viva's misconduct in ignoring the fraud; or that denying restitution would violate public policy. To the contrary, affording

Wilmington Trust the refund it seeks would *reward* it for investing in STOLI in Delaware by awarding it millions of dollars *more* than it paid for the policies and in premium.

## II.     ARGUMENT

### A.     Wilmington Trust Cannot Recover The Premium It Did Not Pay.

One of the elements of an unjust enrichment claim is an enrichment, an impoverishment, and a relationship between the two. *Wells Fargo v. Estate of Malkin*, 278 A.3d 53, 69 (Del. 2022). "It is a prerequisite to an unjust enrichment claim that the plaintiff acted for the defendant's benefit." *Id.* There must be "some direct relationship . . . between a defendant's enrichment and a plaintiff's impoverishment. In other words, there must be '[a] showing that the defendant was enriched unjustly by the plaintiff who acted *for* the defendant's benefit.'" *Anguilla v. Lubert-Adler Real Estate Fund*, 2012 WL 5351229, at *6 (Del. Super. Ct. Oct. 16, 2012).

Since they were issued, the Policies have had a number of different owners. The chart below shows the ownership history as well as how much each owner paid, if any, in premium.



As shown, the entities that owned the Policies prior to Viva collectively paid about $4.5 million in premium. Viva, which did not even exist until circa 2015-16 and which did not acquire the Policies until October 2016, was not impoverished when the Policies' prior owners paid that $4.5 million nor did those prior owners pay that premium for Viva's benefit. Thus, there is no connection between Columbus Life's enrichment and any impoverishment suffered by Viva, let alone a direct relationship between the two. *See id.* at *6 (dismissing unjust enrichment claim

because claimant's predecessor-in-interest—not claimant—was entity that conferred benefit, explaining "SOF 82's predecessor in interest—Barnes Bay—is the proper party to pursue an unjust enrichment claim against Small"); *Sun Life v. Wells Fargo*, 44 F.4th 1024, 1038 (7th Cir. 2022) ("*Corwell*") (rejecting investor's claim for restitution of premiums paid by prior owners because it did not pay them); *Ohio Midland v. Proctor*, 480 F. Supp. 2d 1025, 1033 (E.D. Ohio 2007) ("Under the doctrine of unjust enrichment, if the plaintiff did not confer the asserted benefit upon the defendant, the plaintiff is not entitled to judgment for unjust enrichment."); *Rimini St. v. Oracle*, 2017 WL 4227939, at *11 (D. Nev. Sept. 22, 2017) (dismissing unjust enrichment claim where defendant was enriched by third parties not by claimant); *Maxwell v. Adapt*, 2015 WL 1444388, at *7 (W.D. Pa. Mar. 30, 2015) ("The 'benefit' must be conferred by the plaintiff directly—indirect benefits bestowed by third parties will not support a claim of unjust enrichment.").

The fact that Wilmington Trust's principal (Viva) did not pay premium from 2004 through October 2016 is fatal to its claim to restitution of those payments. Although the *Seck* court did not directly address this question, it recognized that "rescission would result in the return of *any* premiums paid" and then *rejected* rescission as a proper remedy, adopting instead a restitution-based theory under the Restatement §§ 197-199. *Id.* at *9 (emphasis added). By their own terms, §§ 197-199 speak only to the possibility of restitution of performance the claimant "has rendered." And nearly every court to assess the premium refund question in STOLI cases—including almost every opinion canvassed by the Delaware Supreme Court in *Seck*—has *refused* to refund to the current owner the premiums paid by its predecessors.[1] *See* CL.Reply.Br. at 20-21.

In *Sun Life v. U.S. Bank*, the Southern District of Florida, applying Delaware law, rejected

---

[1] The only opinion cited by the *Seck* court that awarded a "refund" of STOLI premiums the claimant did not pay was *Sol*, which was wrongly decided for the reasons explained below.

a STOLI investor's request to be "refunded" premium paid by the prior owner, reasoning, *inter alia*, that it could not "cite to any Delaware authority mandating a return of premiums made by a third party." 2016 WL 3948059, at *2 (S.D. Fla. Jan. 14, 2016) ("*Malkin*"), *aff'd*, 693 F. App'x 838. In *U.S. Bank v. Sun Life*, the Eastern District of New York, applying Delaware law, also rejected a STOLI investor's request to be "refunded" premium paid by the prior owner. 2016 WL 8116141, at *6, *19 (E.D.N.Y. Aug. 30, 2016) ("*Van de Wetering*"), *adopted*, 2017 WL 347449.

In *Sun Life v. Wells Fargo*, the District of New Jersey, applying New Jersey law, found that the first group of premiums had been funded by the original STOLI investors; the second group had been paid by an investor (LTAP) with funds borrowed from Wells Fargo; and the third group had been paid for by Wells Fargo, as securities intermediary for ATC Reality, a Wells Fargo entity that acquired the Policy from LTAP after LTAP went bankrupt. 2016 WL 6824367 (D.N.J. Nov. 17, 2016) ("*Bergman*"). The court then refunded to Wells Fargo the second and third groups of premiums, but not the first group, reasoning that the latter two groups had been paid *with* Wells Fargo's own money, but the first was not. *Id.* at *2, *aff'd*, 779 F. App'x 927, 929 (3d Cir. 2019).

In *Sun Life v. Conestoga Tr.*, the Eastern District of Tennessee, applying Tennessee law, ruled a STOLI investor "will be limited to return of premiums paid after acquiring the ownership rights in the policy." 263 F. Supp. 3d 695, 704 (E.D. Tenn. 2017) ("*Collins*"), *aff'd*, 717 F. App'x 600 (6th Cir. 2018) ("We also affirm the district court's order directing Sun Life to repay the premiums that Conestoga (but not the five other assignees) paid to Sun Life on this policy.").

In *Ohio Nat'l Life Assur. Co. v. Davis*, the Seventh Circuit, applying Illinois law, affirmed a refund of premiums paid by the last policy owner (Egbert), but not the premiums paid by the prior owners, because Egbert did not know the policy was void. 803 F.3d 904, 911 (7th Cir. 2015).

Finally, in the recent *Corwell* case, the Northern District of Illinois dismissed the security

intermediary's STOLI premium refund claim to the extent it sought a "refund" of premiums paid by the policy's prior beneficial owners, even if those prior owners happened to have paid premium through the same securities intermediary, resulting in a refund of roughly $13,000 on a $5 million policy. 2020 WL 1503641, at *4 (N.D. Ill. Mar. 30, 2020). On appeal, a Seventh Circuit panel composed of Judges Wood, Easterbrook, and Hamilton affirmed the refusal to award the claimant an award of premium it did not pay by reasoning that "*it is hard to see how Vida [the policy's current beneficial owner] could ever have a claim to a refund of anything more than the $13,000 in premiums it paid itself through Wells Fargo*." *Corwell*, 44 F.4th at 1038 (emphasis added). The court then went even farther and reversed the trial court's decision refunding the $13,000 Vida paid. The court reasoned that Vida, like Viva here, "walked into the transaction as a highly sophisticated buyer fully aware of all the material facts and the significant risk that Corwell's policy would be found unlawful and void" and "took a calculated risk to try to profit from it by purchasing Corwell's policy at a discount and then attempting to cash in at his death." *Id.* at 1040. Although there were, as here, allegations that the carrier knew or should have known that the policy was void, the court, viewing the facts "in the light most favorable to . . . Vida," held that "[t]here is no viable theory here under which Sun Life was at substantially greater fault than Vida." *Id.*

Wilmington Trust tries to avoid this fatal flaw by arguing that all prior owners somehow assigned whatever unjust enrichment claims they may have had to Viva. But Wilmington Trust— the party with the burden—has no proof that this alleged cascade of assignments ever happened.[2] It has no evidence that any prior owner assigned an unjust enrichment claim; in fact, it did not even

---

[2] As the unjust enrichment plaintiff, and the party alleging the assignment, Wilmington Trust bears the burden of proof, which includes, among other things, the burden of proving the existence and content of any assignments. *See* CL.Reply.Br. at 16-19.

bother to put the transfer agreements for many of these ownership transfers into the record.[3]

But even if we were to assume solely for sake of argument that all prior owners purported to assign unjust enrichment claims to Viva, Wilmington Trust offers no evidence that the prior owners themselves could meet a *Seck* exception and thus that they even had a viable unjust enrichment claim to purport to assign to Viva to begin with.[4] Nor could it ever offer such evidence.

The first $502,561 in premium was paid by the original STOLI fraudsters (i.e., the Kavanaugh Organization laundered through the Trusts). An original STOLI fraudster will never be able to prove a *Seck* exception. *See, e.g.*, *Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 797-99 (6th Cir. 2009) (SOLI investor cannot recover premium refund due to its own unclean hands); *TTSI Irrevocable Tr. v. Reliastar Life Ins. Co.*, 60 So.3d 1148, 1149 (Fla. DCA 2011) ("Where a party wrongfully procures a life insurance policy on an individual in whom it has no insurable interest, the party is not entitled to a return of premiums paid for the void policy.").

The next $1,174,296 in premium was paid by ABC Viaticals, an entity later indicted by the SEC for lying to its investors, engaging in Ponzi tactics, and diverting $19 million for personal use, all of which got its principals 13-20 years in prison.[5] Wilmington Trust cannot (and has not tried) to prove that ABC Viaticals meets a *Seck* exception.

The next $2,839,082 in premium was paid by a series of affiliated "Orca" entities. In 2010, the first of these entities (the Orca LSI Trust) tried to sell the Cohen Policy; the buyer tried to back out of the transaction; and Orca sued to force the sale. In April 2010, the buyer, through a well-known STOLI investor firm (Locke Lord Bissell & Liddell), asserted counterclaims alleging that

---

[3] Specifically, Wilmington Trust has not provided a transfer agreement for the transfers represented by orange arrows in the figure above.

[4] WT.Op.Br. at 43-45.

[5] Order at 3, *SEC v. ABC Viaticals*, No. 3:06-cv-2136-P (N.D. Tex. Oct. 6, 2008), ECF No. 179.

the Cohen Policy was a void *ab initio* STOLI policy, thus at least putting the Orca entities on inquiry notice that the Policies were void.[6] But instead of raising these issues with Columbus Life, Orca sat on the Policies for another six years looking to sell them to another investor or to cash in on them when the Insureds died. Wilmington Trust cannot prove that Orca meets a *Seck* exception.

Because Wilmington Trust cannot prove that any of its alleged assignors meet a *Seck* exception to the general rule that parties to a STOLI agreement are left where they are found without restitution, the alleged assignments (which did not happen) are empty and worth nothing.

### B.    Wilmington Trust Cannot Meet A *Seck* Exception.

To obtain a premium refund, an investor must prove the elements of unjust enrichment as well as one of the *Seck* exceptions to the general rule that parties to a STOLI policy are ordinarily left where they are found without restitution. Here, Wilmington Trust can prove none.

**Excusable Ignorance.** "A party may obtain restitution if it is excusably ignorant of the facts leading to the unenforceability of the promise." *Seck*, 2022 WL 3654872, at *15. The following factors are relevant: "whether the facts surrounding the policy put or should have put the investor on notice that something was amiss; whether the party failed to notice red flags; and whether the investor's expertise in life insurance portfolio investments should have caused it to know or suspect that there was a substantial risk that the policy it purchased was void." *Id.*

Viva—a sophisticated investor that owns $2.5+ billion of life policies—was not ignorant (let alone excusably so) of the facts giving rise to the Policies' invalidity. Viva concedes that before buying the Policies it recognized that they carried insurable interest risk. Viva concedes that although the seller's agent represented (in connection with policies not at issue here) that it was not aware of facts or circumstances that would serve as a viable defense to payment of the death

---

[6] CL.Op.Br. at 22.

benefit (an obvious STOLI reference), the seller's agent refused to give this (or an alternate) representation to Viva with respect to the ████████████████ (including the Policies). Viva concedes that it knew the Policies were premium financed and that premium financed policies were "manufactured" and "not natural" and thus were potentially STOLI. Yet Wilmington Trust also concedes that the only factual investigation Viva undertook was to review what it concedes was the "limited" documentation available in the data room and that Viva declined to bid only on the policies it did not think had insurable interest issues. Instead, Viva concedes that it accounted for the Policies' insurable interest risk by obtaining certain other representations and warranties from the seller and otherwise ████████████████████████.[7] No rational juror could find Viva to have been excusably ignorant here.

**Not Equally At Fault.** A party may obtain restitution if it is less at fault. *Seck*, 2022 WL 3654872, at *15-18. In *Seck*, the court focused on whether either party was on inquiry notice. Here, Columbus Life denies that it was on inquiry notice. But even if one assumed solely for sake of argument that a rational fact-finder could conclude that Columbus Life was, at some point, put on inquiry notice, no rational fact-finder could fail to conclude, for the reasons set forth above, that Viva, at the very least, has also been on inquiry notice since before it bought the Policies. Thus, the worst any fact-finder could possibly find is that both parties were on inquiry notice. And, under *Seck*, where parties are in equipoise, they should be left where they are found. *See id.* at *14 ("[I]f the downstream investor was equally at fault with, or more at fault than, the insurer, [courts applying a fault-based approached have] left the parties where it found them, allowing the insurer to keep the premiums."). The comparative culpability analysis could end right there.

But, to the extent one were to look even closer, no rational fact-finder could fail to conclude

---

[7] CL.Op.Br. at 22, 38-39; WT.Ans.Br. at 31-32.

that the gap between Columbus Life's and Viva's fault is staggering and favors Columbus Life.

*Business Model*. Columbus Life tried to avoid issuing STOLI and, despite being the victim of STOLI fraud in the 2000s, tried, in the years that followed, to rid itself of STOLI. Moreover, Columbus Life brought this lawsuit promptly after learning from counsel that these Policies were likely STOLI and could be challenged as such.[8] In contrast, Viva's business model is buying STOLI at a discount and trying not to get caught.[9] *See Seck*, 2022 WL 3654872, at *16 (court should consider "whether a party engages in improper transactions as a business").

*Diligence*. Columbus Life conducted substantial diligence during underwriting, including various layers of investigation and verification with the Insureds and their advisors.[10] In contrast, Viva did nothing more than review the "limited" documentation contained in the data room and did not bother to call the Insureds or brokers before buying the Policies in violation of Viva's own trade organization's minimum diligence guidelines.[11] *See id.* at *17 (restitution analysis should incent investors to conduct "thorough investigation of insurance policies" before buying them).

*Timing*. Although Wilmington Trust alleges that Columbus Life should be deemed to have been on inquiry notice some years after the Policies were issued, it does not allege that Columbus Life was on inquiry notice of the Policies' invalidity before it issued them. Thus, even if Wilmington Trust's allegations are accepted as true, when Columbus Life made the decision to enter into these insurance contracts, it did not know and had no reason to know that the Policies were invalid. In contrast, as explained above, Viva knew the Policies had insurable interest risk before it bought them, but instead of conducting any diligence, elected to buy them anyway ■

---

[8] CL.Ans.Br. at 20-23.

[9] CL.Op.Br. at 20-23.

[10] CL.Ans.Br. at 7-10.

[11] CL.Op.Br. at 21-23, 39-40.

███. This shows Viva intended to violate Delaware's insurable interest rules; whereas, Columbus Life did not. It is also important because, even though a carrier can decline to issue a policy for most any reason, once it issues a policy, it incurs substantial legal obligations and is essentially stuck with that policy, unless and until it gathers evidence sufficient to prove invalidity. To be clear, the evidence a carrier must gather to prudently challenge a policy must be far more than mere suspicions because if it challenges policies incorrectly it runs the risk of substantial contractual and tort liability. There is, unfortunately, no commensurate cause of action against investors for bad faith claim submission so investors are emboldened to deny STOLI accusations even where, as here, they bought the policies knowing they were illegal in the hopes of bullying the carrier into paying the bogus claim or, at worst, getting premium refunded if they lose.

*Action*. In 2019, when Columbus Life learned the Policies were likely invalid and could be challenged, Columbus Life expressly reserved its rights to challenge the Policies. Having received that correspondence, Wilmington Trust did not approach Columbus Life in an attempt to seek a resolution. Instead, Wilmington Trust denied that the Policies were void, forced Columbus Life to engage in 1.5 years of costly litigation trying to gather evidence to prove the Policies are void, only for Wilmington Trust to turn around on summary judgment and not contest the Policies' validity and attempt to obtain a windfall judgment over 150% of the total STOLI death benefit in the hopes of turning a massive profit on these human life wagers. *See id.* at *16 (court should consider whether investor "concealed the void nature of the policy").

**Disproportionate Forfeiture**. A party may obtain restitution if "denial of restitution would cause disproportionate forfeiture." *Id.* at *15. Whether a forfeiture is disproportionate depends "on the extent of that denial of compensation as compared with the gravity of the public interest involved and the extent of the contravention." *Id.* Viva's misconduct was willfully blinding itself

to the Policies' STOLI issues, or as *Seck* put it, "ignoring the fraud." *Id.* at *17. Also, by buying the Policies knowing they had insurable interest problems, Viva sought to bring about violations of Delaware's Constitution. *Estate of Malkin*, 278 A.3d at 65 ("[B]ecause STOLI policies are void *ab initio*, when an investor receives their proceeds it . . . commit[s] . . . a violation of . . . Delaware['s] Constitution and of the State's public policy"). Refusing to refund premium to Viva now that it has been caught is not disproportionate. Instead, if Viva is given the refund it seeks, it will make about $6 million more than the total death benefit and an over $7 million profit from wagering on human life. This is bad public policy and will make Delaware a hospitable forum for STOLI going forward. *See Seck*, 2022 WL 3654872, at *17 (public policy analysis should take deterrence into account and force investors to conduct reasonable diligence).

**Withdrawal**. Viva did not withdraw before the illegality took effect. In contrast, it knowingly bought the Policies, paid premiums for years, tried to cash in on the Policies when the insureds died, and then, after Columbus Life brought this action, denied for years that there was anything wrong with the Policies, even alleging bad faith claims against Columbus Life and dragging Columbus Life through years of costly litigation.

**Public Policy**. As noted, Viva engaged in serious misconduct by ignoring and perpetuating a STOLI fraud, and Delaware's public policy would be defeated, not furthered, by awarding this deliberate STOLI buyer a premium refund.

## C.    Wilmington Trust's Premium Restitution Claim Should Be Dismissed For Abuse Of The Attorney Client Privilege.

By seeking a premium refund, an investor must prove, *inter alia*, that it satisfies a *Seck* exception to the general rule that parties to STOLI policies are left where they are found. The *Seck* exceptions require inquiry into, *inter alia*, whether the investor (i) "knew the policy was void at purchase"; (ii) "had knowledge of facts tending to suggest that the policy is void"; (iii) "failed to

notice red flags"; (iv) had expertise that "should have caused [it] to know or suspect that there was a substantial risk that the policy it purchased was void"; or (v) was on inquiry notice. 2022 WL 3654872, at *18. That is, an investor asserting a premium refund claim under *Seck* has "put at issue" what it knew or should have known about the Policy's origination and insurable interest thereby waiving any privilege that may otherwise have attached to the corresponding information.

Here, Viva's insurable interest diligence was conducted by attorneys at Schulte Roth, and Viva claims that the entirety of its knowledge of the Policies' insurable interest risk came from this firm. But even though Viva, through Wilmington Trust, has brought a claim for a premium refund, Viva has flatly refused to disclose its insurable interest analysis. Viva refused to produce this information in response to interrogatories. CL.Op.Br. at 23; CL.Reply.Br. at 4-5; **Ex. VV** at Nos. 4-6. Viva refused to produce its documents on this topic. CL.Op.Br. at 23; CL.Reply.Br. at 4-5; **Ex. JJJJ**, Preston & B'stone Priv. Logs. And Viva instructed its Rule 30(b)(6) witness not to answer these questions or gave long speaking "cautions" to the witness that had the same effect. **Ex. MM** at 39:3-21, 87:24-88:7, 89:13-90:11, 115:8-117:12, 176:24-177:16, 220:2-225:3.

By claiming privilege over these documents and this information, Wilmington Trust and Viva were essentially making yet another bet, this time that the *Seck* court would adopt an automatic rescission rule. Had *Seck* done so, what Viva knew or should have known would be irrelevant and this issue likely would have evaporated. But because *Seck* rejected the automatic remedy argument and adopted a fault-based remedy as described above, Wilmington Trust and Viva lost that bet and must now accept the consequences in the form of dismissal of the premium refund claim that its improper privilege invocations prevented Columbus Life from scrutinizing. *See* CL.Rpl.Br. at 3-5. Indeed, the documents and information Viva has withheld on grounds of privilege go to the heart of the very *Seck* exceptions Wilmington Trust (on behalf of Viva) invokes

in support of its premium refund claim. This is a textbook "at-issue" waiver, and having refused to produce these documents, Wilmington Trust's restitution claim should be dismissed.

### D. Wilmington Trust Cannot Prove That It Lacks An Adequate Remedy At Law.

The Delaware Supreme Court has held that if an investor in a STOLI case has an adequate remedy at law to recover its losses, including a claim against the entity that sold it the policy, its restitution claim fails. *Estate of Malkin*, 278 A.3d at 70. Here, Viva secured representations and warranties from the seller's agent ██████████████████. For example, after reviewing the Policies, the seller's agent represented and warranted that ████████████████████ ████████████████████████████████████. The seller's agent also represented that ██████████████████████████████████ ██████.[12] Wilmington Trust lauds these representations and warranties—referring to them as rare, "unlimited," and "*in perpetuity*"—even going so far as to argue that its alleged ignorance of the Policies' illicit origination should be excused precisely *because* it obtained these representations and warranties. WT.Op.Br. at 27, 40; WT.Ans.Br. at 10, 31-32 (emphasis in original). To the extent Viva has incurred losses in connection with the Policies, it should pursue its legal remedies up the commercial chain, and the availability of these remedies is another fatal flaw in its unjust enrichment claim. *See Estate of Malkin*, 278 A.3d at 70; *PHL Var. Ins. Co. v. Sheldon Hathaway Ins. Tr.*, 2013 WL 6230351 (D. Utah Dec. 2, 2013) (holding it was more equitable to require STOLI investor to seek damages from the entity that sold it the policy rather than from insurer).

### E. Wilmington Trust Cannot Prove The Absence of Justification.

Wilmington Trust spends a lot of time in its papers referring to Columbus Life's retention of the premium as being a windfall merely because Viva will be left without the proceeds of its

---

[12] As noted, the Cohen Policy was previously the subject of litigation (that was subsequently voluntarily dismissed) through which a potential buyer alleged that it was void STOLI.

illegal wager or a refund of the premiums it paid into that illegal wager. But the *Seck* decision reaffirmed Delaware's commitment to the general rule that parties to agreements that violate public policy, like STOLI policies, are generally left where they are found *without any relief to any party*.

In any event, allowing Columbus Life to retain premium here would not constitute a windfall. First, Columbus Life was the victim of a fraud, was tricked into issuing policies it did not want to issue, and has at all times been subject to the risk, in connection with these Policies and others, that it would be tricked into paying STOLI death claims. Indeed, there are only two Policies at issue here, but there is no telling how many other STOLI policies have slipped though the hands of Columbus Life despite its anti-STOLI efforts and directly into the pockets of Viva and other STOLI investors. Also, STOLI policies, which are designed to be owned by investors, do not behave like normal policies. Indeed, STOLI policies are nominally funded and almost never lapse, meaning insurers do not profit from these policies as initially expected. *See Corwell*, 44 F.4th at 1035 n.3; *U.S. v Carpenter*, 190 F. Supp. 3d 260, 269 (D. Conn. 2016). Finally, a carrier who steps up to enforce Delaware's constitutional prohibition on STOLI by challenging a suspected policy faces substantial risk (e.g., bad faith claims) and must litigate at substantial cost over a period of years against aggressive, deep-pocketed STOLI investors who deny all along that the STOLI policies are STOLI. Thus, even if there is a financial upside in connection with a challenge to particular STOLI policies, the *net result* of STOLI for Columbus Life and other insurers is negative because Columbus Life and other insurers have not doubt unknowingly paid on other STOLI policies, and further, the financial metrics of STOLI policies are bad for Columbus Life and other insurers (because STOLI policies never lapse and are minimally funded).

In addition, the profitability (or lack thereof) of the Policies should not be viewed in a vacuum. Columbus Life, for example, has paid out over 97% of the claims on its lists of potential

14

STOLI policies (**Ex. CCC** No. 6) and was likewise at risk of being tricked into paying these Policies. Further, Columbus Life has actually paid claims *to Wilmington Trust* on 20 such policies. **Ex. KKKK**, Excel of Possible Investor Owned Policies, at Rows 168, 189, 191-193, 232, 235, 244, 247, 255, 263, 283, 306, 312, 322, 364, 374, 382, 430, and 434. As a carrier who is willing to step forward and seek to enforce Delaware's Constitutional wagering prohibition, Columbus Life incurs massive costs litigating these cases over a periods of years against aggressive, deep-pocketed STOLI investors who insist STOLI policies are not STOLI (or cynically try to turn, as Wilmington Trust is trying here, to turn a STOLI loss into massive profits). This is no windfall.

### F.    The *Sol* Decision Changes Nothing.

Wilmington Trust's moving papers rely heavily on *Sol*, but after *Seck*, *Sol* gets Wilmington Trust nowhere. Not only was *Sol* a damages analysis after a jury verdict on a promissory estoppel claim that never should have gone to the jury, but the *Sol* court did not actually conduct the analysis this Court articulated in *Seck*. To be clear, the *Sol* court (without the benefit of *Seck*) did not conclude that either party was more or less at fault than the other. Instead, it found that both parties knew or should have known that there was a substantial probability that the at-issue policy lacked an insurable interest and that both parties did nothing about it. *Sun Life v. U.S. Bank*, 2019 WL 8353393, at *4 (D. Del. Dec. 30, 2019) ("*Sol*"). Having found that both parties possessed knowledge and did nothing, the court ordered Sun Life to refund premium, opining that since "no party here has shown itself to be an innocent victim . . . none should leave the Court an undisputed victor." *Id.* at *5. Respectfully, under *Seck*, this was error. Having failed to find that the investor was less to blame, the court should have applied the general rule that parties to illegal STOLI policies are *not* entitled to any relief and *denied* restitution.

### III.    CONCLUSION

Columbus Life respectfully requests the Court grant its motion for summary judgment.

Dated October 20, 2022

Respectfully submitted,

*/s/ Donald L. Gouge, Jr.*
Donald L. Gouge, Jr. (No. 2234)
DONALD L. GOUGE, JR., LLC
800 N. King Street, Suite 303
Wilmington, Delaware 19801
(302) 658-1800, Ext. 1

COZEN O'CONNOR
Michael J. Miller (*pro hac vice*)
Joseph M. Kelleher (*pro hac vice*)
Charles J. Vinicombe (*pro hac vice*)
Philip J. Farinella (*pro hac vice*)
1650 Market St., Suite 2800
Philadelphia, PA 19103
*Attorneys for Plaintiff,*
*Columbus Life Insurance Company*

## <u>CERTIFICATE OF SERVICE</u>

I, Donald L. Gouge, Jr., do hereby certify that on this 20th day of October, 2022, a copy of the within Plaintiff Columbus Life Insurance Company's Supplemental Brief in Support of Motion for Summary Judgment was filed via CM/ECF and served on all counsel of record.

Dated: October 20, 2022                   */s/ Donald L. Gouge, Jr.*

                                          Donald L. Gouge, Jr. (#2234)