**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| COLUMBUS LIFE INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>WILMINGTON TRUST, N.A., as Securities Intermediary,<br><br>Defendant. | No. 1:20-cv-00735-MN-JLH |
| COLUMBUS LIFE INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>WILMINGTON TRUST, N.A., as Securities Intermediary,<br><br>Defendant. | No. 1:20-cv-00736-MN-JLH |

**COLUMBUS LIFE INSURANCE COMPANY'S SUPPLEMENTAL**
**BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ............................................................................................. 1

II.   ARGUMENT .................................................................................................... 2

     A.    No Rational Factfinder Could Find Wilmington Has Carried Its Burden Of Proving Viva Was Less At Fault. ............................................................................. 2

     B.    Wilmington Cannot Carry Its Burden Of Proving Its Own Less Fault Theory. ...... 5

     C.    The *Corwell* Analysis Is Persuasive Authority Here. ............................................ 11

     D.    No Rational Juror Could Conclude Wilmington Can Carry Its Burden Of Proving The Prior Owners Were Less At Fault Than Columbus. ...................................... 12

     E.    Awarding Wilmington A Refund Of The Premium Would Have The Impermissible Effect Of Allowing The Illegal Wager To Pay Off. ..................... 16

III.  CONCLUSION ............................................................................................... 16

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Altenbaugh v . Benchmark Builders*,
    2022 WL 176292, at \*2 (Del. 2022) ........................................................................ 6

*AMT Capital Holdings, S.A. v. Sun Life Assur. Co. of Can.*,
    No. 654756/2016, 77 N.Y.S.3d 18 (Ct. App. 1st Dept. 2018).................................... 6

*Chesapeake Corp. v. Shore*,
    771 A.2d 293, 301 (Del. Ch. 2000)......................................................................... 9

*Geronta Funding v. Brighthouse Life Ins. Co.*,
    284 A.3d 47, 77 (Del. 2022) ("*Seck*") ............................................................. *passim*

*Lehman Brothers v. Kee*,
    268 A.3d 178, 193-94 (Del. 2021) ........................................................................ 6

*Matthews v. Kidder Peabody*,
    260 F.3d 239, 251-52 (3d Cir. 2001) ..................................................................... 6

*McCann v. Newman Irrev. Tr.*,
    458 F.3d 281, 287 (3d Cir. 2006)........................................................................... 8

*Mentor Graphics v. Quickturn  Design*,
    No. 16584 at 505 (Del. Ch. Oct. 23, 1998)............................................................ 9

*SEC v. ABC Viatical*,
    No. 3:06-cv-2136 (N.D. Tex. Nov. 17, 2006)........................................................ 13

*Sun Life v. Paulson*,
    2008 WL 11349980 (D. Minn. Sept. 3, 2008) ....................................................... 7

*Sun Life v. Wells Fargo*,
    44 F. 4th 1024 (7th Cir. 2022) ("*Corwell*") ..................................................... 11, 12

*U.S. v. Lamonda*,
    384 F. App'x 944 (11th Cir. 2010) ....................................................................... 13

*Wal-Mart v. Crist*,
    855 F.2d 1326, 1335 (8th Cir. 1998) ................................................................... 12

*Wilmington Tr. v. Sun Life*,
    --- A.3d ---, 2023 WL 2564350 (Del. Mar. 20, 2023) ("*Frankel & De Bourbon*")........... *passim*

*Wuliger v. Manuf. Life*,
    567 F.3d 787, 797 (6th Cir. 2009) ....................................................................... 16

## I.    INTRODUCTION

The *Frankel & De Bourbon* decision marks another major loss for STOLI investors. The Delaware Supreme Court held investors cannot assert any claim or defense that would, "in effect," cause the wager to pay off. The Court declined to adopt a bright-line rule that to prove less fault all an investor needs to do is prove the insurer had inquiry notice first—confirming instead that *Seck* requires a "fact-intensive" analysis of the parties' fault in light of the relevant public policy considerations and that "whether and when" the parties were on inquiry notice is merely one of the many considerations courts must assess. The court also held that to recover premium paid by prior owners, the investor must prove the prior owners were less at fault than the insurer.

These holdings are fatal to Wilmington's claim here. When the parties' fault is considered in light of the public policy considerations set forth in *Seck*, no rational factfinder could find Viva less at fault than Columbus because Columbus conducted a far more thorough investigation and communicated far more of its concerns. Wilmington also has major, case-dispositive burden of proof problems. Wilmington's entire claim is predicated on proving Columbus was on inquiry notice first. Not only did *Frankel & De Bourbon* confirm that this is not enough to prove less fault, but Wilmington has no evidence to prove Columbus was on inquiry notice *at any time* because Wilmington has no witness to testify as to whether a prudent insurer in Columbus's position would have inquired further. Without such evidence, no rational factfinder could conclude Wilmington has carried its burden. Similarly, *Frankel & De Bourbon* makes clear that, to conduct the comparative culpability analysis, courts must assess a variety of factors relating to what the parties knew or should have known about the Policies' insurable interest issues. But unlike Columbus, Viva refused to disclose what it knew about insurable interest in this case. As the party with the burden of proof, it was incumbent upon Wilmington to produce the information the factfinder needs to actually conduct the comparison. Having elected not to do so, Wilmington cannot carry

its burden. Nor can Wilmington recover the premium paid by the Policies' prior owners because it cannot prove they were less at fault. The prior owners include: (i) the original STOLI bad guys (Kavanaugh); (ii) a criminal entity convicted of life insurance fraud by the SEC (ABC); and (iii) a family of affiliated entities (Orca) *that was told in open court in 2010 that the Cohen Policy was void STOLI*, but rather than tell Columbus, Orca continued to hold the Policies hoping to profit on them when the insureds died. And, finally, allowing Wilmington to prevail on its strategy to collect both the premium it paid and the premium its predecessors paid would, in effect, cause the wagers to pay off in violation of Delaware's Constitution and public policy because Wilmington would receive *more than* the death benefit. This would turn *Seck* upside down and encourage promoters to once again target Delaware with the next round of STOLI scams.

## II.    ARGUMENT

### A.    No Rational Factfinder Could Find Wilmington Has Carried Its Burden Of Proving Viva Was Less At Fault.

The *Frankel & De Bourbon* court confirmed that a claimant like Wilmington bears the burden of proving unjust enrichment and one of the five *Seck* exceptions to the general rule that parties to illegal agreements are usually left where they are found. *Wilmington Tr. v. Sun Life*, 2023 WL 2564350, at *10 (Del. Mar. 20, 2023) ("*Frankel & De Bourbon*"). The court further clarified that this is a holistic, "manifestly fact intensive" inquiry that requires courts to assess the "fault of the parties" in light of the relevant "public policy considerations." *Id.*

The public policy considerations identified in *Seck* are grounded in the concept of "good faith." *Geronta Funding v. Brighthouse Life Ins. Co.*, 284 A.3d 47, 77 (Del. 2022). The test is meant to "incentivize[] insurers to speak up when the circumstances suggest that a policy is void for lack of an insurable interest" while at the same time "encouraging investors to actually investigate all policies to avoid the risk of losing their premiums." *Id.* The hope is that by rewarding parties that (i) conduct "thorough investigations of life insurance policies" and (ii) raise their

insurable interest concerns with their counterparties, this will "uncover those that are void *ab initio* against public policy." *Id.* The ultimate goal, of course, is to "incentivize investors not to procure or purchase these unenforceable policies in the first instance." *Id.* Wilmington fails this test.

No rational factfinder could fail to conclude Columbus conducted a far more thorough investigation into the policies' origination than Viva. Columbus had multiple meetings with the premium funder and the insurance producer, and Columbus interviewed both insureds prior to issuance. Through these investigations, Columbus was assured (falsely, as it turns out) that legitimate policies were being taken out for legitimate purposes as part of a bona fide "estate plan"; that they would never be sold to investors; and that the program was supported by "traditional insurable interest." **Ex. EEE**. After the Policies were sold, Columbus again investigated. CL.Ans.Br. at 11, 19. Nonetheless, the STOLI promoters managed to conceal from Columbus that none of these Policies were taken out in good faith and that all were mere wagers on human life. In 2019, after Columbus learned that premium-financed policies had been successfully challenged under Delaware law and that Delaware law could be predictably applied to policies insuring the lives of residents of states other than Delaware in 2017, Columbus sent Wilmington a letter reserving its rights to challenge the Policies for lack of insurable interest and further stating: "[I]f Wilmington Trust or its principal(s) have any evidence that the above-referenced policy issued by Columbus Life is STOLI, please contact Columbus Life as soon as possible and provide it with all such evidence." **Ex. EEEE** at 4542, 4546 (citing *Malkin* and *Van de Wetering* decisions).

In contrast, no rational factfinder could find Viva conducted a "thorough investigation." Viva concedes all it did was review whatever documents the seller happened to provide, which Viva concedes were "limited." CL.Op.Br. at 21-23, 39-40. In contrast to Columbus, Viva did not even try to interview the insureds, to speak to the funder or producer, or to obtain the relevant

3

documentation. *Id.* In fact, Viva concedes it did not do anything to determine if the Policies were taken out to be sold or the insureds were financially induced—even though Viva's own trade organization's "minimum" diligence guidelines plainly state investors should try to figure these things out and refrain from buying policies created that way. *Id.*; *see also* **Ex. SS** at D-1-3.

Instead of "actually investigating" the Policies' origination, Viva tried to solve the insurable interest problems it knew the Policies had by securing representations. But the seller's agent specifically carved the Policies *out* of the representations it was giving for most of the other policies in the Portfolio. One of those representations the seller's agent refused to give was:

> To MLA's Knowledge, the Policy was issued to a Person who, under the laws of the jurisdiction in which such person resided at the time the Policy was issued, is reasonably likely to be found to have met the prima facie requirements for insurable interest in the life of the Insured at the time the Policy was issued.

**Ex. UU** at 66-67. ███████████████████████████████████████████████

███████████████████████████████████████████████████ *Id.* at 72. Another was:

> MLA has no Knowledge of any facts or circumstances that in MLA's good faith judgment, given the law of, and the preponderance of the court rulings in, the applicable jurisdiction governing the issuance of the Policy, would likely serve as a viable defense to prevent payment of the Death Benefit by the applicable Issuing Insurance Company upon the death of the applicable Insured(s).

*Id.* at 66-67. The seller's agent refused to give an alternative representation. *Id.* at 76.

████████████████████████████████████████████████████████

████████████████████████████████████████████ is a major red flag that would have caused a prudent person to investigate the Policies further. Likewise, the seller's agent's refusal to represent that it was *unaware of facts that might lead to policy unenforceability* was another major red flag that would also have caused a prudent person to investigate further.

But instead of inquiring further—and instead of offering to buy *only* the policies that did *not* have insurable interest problems—Viva simply agreed to pay less for the Polices. Nor did Viva

share its concerns with Columbus, including when Columbus expressly asked Wilmington and Viva to provide any insurable interest information they had. **Ex. EEEE**; CL.Op.Br. at 23.

Wilmington knows Viva did far less investigation and communication, which is why it ignores the broad test *Seck* actually articulated and tries to replace it with a far narrower test focusing solely on whether the insurer was on inquiry notice before the investor. This "first-in-time" argument is Wilmington's entire argument here just as it was in *Frankel & De Bourbon*. And in *Frankel & De Bourbon*, Wilmington tried very hard to get the Supreme Court to adopt this narrow test. 2023 WL 2564350, at *9. But the court did not accept that invitation and instead reiterated the broad test it articulated in *Seck* and made clear that "whether and when the parties had actual knowledge or inquiry notice of the policies' illegality" is merely one of the many "considerations that this Court identified . . . as relevant to the fault-based analysis." *Id.* at *10.

**B.    Wilmington Cannot Carry Its Burden Of Proving Its Own Less Fault Theory.**

*Frankel & De Bourbon* also made clear that claimants like Wilmington bear the burden of proving they were less at fault. *Id.* at *10-11. And Wilmington is incapable of satisfying that burden because Wilmington (i) has no evidence that a prudent insurer in Columbus's position would have done more; (ii) failed to retain an expert to opine on this specialized area; (iii) refused to produce its insurable interest analysis to allow this Court to properly compare what the parties knew or should have known; and (iv) has produced sanitized "business-related testimony" that is wholly insufficient to cure its self-imposed burden of production failure.

As noted, Wilmington's entire "less at fault" theory here is its allegation that Columbus was on inquiry notice first. "A party is deemed to have inquiry notice 'upon the discovery of facts constituting a basis for the cause of action, or [where the party] knows facts sufficient to put a person of ordinary intelligence and prudence on inquiry, which, if pursued, would lead to the discovery of such facts.' The court should consider whether there were red flags that would have

5

left a prudent person of ordinary intelligence to inquire further." *Altenbaugh v. Benchmark Builders*, 2022 WL 176292, at *2 (Del. 2022); *see Lehman Brothers v. Kee*, 268 A.3d 178, 193-94 (Del. 2021) (describing standard as "what a reasonable person in [the party's] position would have inferred"); *Matthews v. Kidder Peabody*, 260 F.3d 239, 251-52 (3d Cir. 2001) (describing standard as what "a reasonable investor" would have inferred).

Although proving Columbus was on inquiry notice first would *not* prove Wilmington was less at fault, Wilmington does not even have the evidence to prove Columbus was on inquiry notice, let alone first. To do so, Wilmington would need to prove, not just that Columbus knew certain things at certain times, but that a prudent insurer in Columbus's position would have inquired further and would have learned through that further inquiry that the Policies were void. But Wilmington does not have a single witness who can or does testify that a prudent insurer would have inquired more than Columbus or that any prior inquiry would have been fruitful.

This is fatal to Wilmington's theory. To be clear, Wilmington's *lawyers* argue that because the Policies had certain high-level indicia of potential STOLI (indicia shared with many legitimate policies), Columbus should have filed suit many years ago to figure it out. (D.I. 193 at 14:3-4). But insurers cannot challenge policies simply because they were issued on the lives of seniors or were financed or were sold after issuance. Before a prudent insurer can challenge a policy, it must conduct a complicated legal and factual analysis to determine, with a high degree of confidence, that a favorable state's law will apply and that it can marshal the evidence needed to prove STOLI under that law. Insurers who guess wrong, get sued. *See, e.g.*, Complaint, *AMT Capital v. Sun Life*, No. 654756/2016, 77 N.Y.S.3d 18 (Ct. App. 1st Dept. 2018), ECF No. 1 (insurer sued for damages for the policy's alleged reduction in value as a result of insurer's issuance of a reservation of rights

letter on an in-force potential STOLI policy); *Sun Life v. Paulson*, 2008 WL 11349980 (D. Minn. Sept. 3, 2008) (insurer targeted with Rule 11 motion due to a lack of specifics in STOLI complaint).

Here, the first reported decisions that applied, as here, Delaware STOLI law to non-residents; and found, as here, non-recourse financed policies void under Delaware law (*Malkin* and *Van de Wetering*) were not issued until 2016 and affirmed until 2017. And the Supreme Court did not set forth the test for determining whether such policies were void (*Berland*) until 2022. No prudent insurer in Columbus' position would have, as Wilmington argues, filed a STOLI suit on a hunch to "let a Court figure out whether they are, in fact, STOLI." (D.I. 193 at 14:3-4).

This Court is not expected to be an expert in the insurance industry. If Wilmington wanted to try to prove that Columbus was on inquiry at some point in time, it could have retained an expert to opine on what a prudent insurer would have done. But Wilmington made the strategic choice not to; instead, it chose to gamble that the automatic premium refund rule would be adopted. But *Seck* rejected that rule, and *Frankel & De Bourbon* squarely put the burden of proving less fault on Wilmington. Thus, Wilmington's lack of evidence as to what a prudent insurer in Columbus's position would have done means no rational factfinder could find that Columbus was on inquiry notice, let alone that Columbus was on inquiry notice first or is more to blame on grounds of inquiry notice, which is Wilmington's only "less at fault" argument here.

But Wilmington's proof problems do not end there. *Frankel & De Bourbon* reiterated *Seck*'s instruction that courts must consider whether the party (i) "knew the policy was void at purchase or later learned the policy was void"; (ii) had knowledge of facts tending to suggest that the policy is void; (iii) "procured the illegal policy"; (iv) "failed to notice red flags"; and (v) "whether the investor's expertise in the industry should have caused him to know or suspect that there was a substantial risk that the policy it purchased was void." 2023 WL 2564350, at *10. That

is, courts must compare what each party knew or should have known about the policies' insurable

interest issues. And perhaps most importantly, as the party with the burden of proof, Wilmington

also bears the burden of *producing* its insurable interest analysis so the factfinder can engage in

the necessary comparison. *McCann v. Newman*, 458 F.3d 281, 287 (3d Cir. 2006) ("There are two

distinct elements of the burden of proof—the burden of production and the burden of persuasion.").

But unlike Columbus,[1] Viva elected to withhold its *entire* insurable interest analysis. Viva

concedes "the entirety of Viva's knowledge [about the Policies' insurable interest] risks and their

implications came in the form of privileged communications with its counsel." **Ex. VV** No. 4. Viva

concedes it withheld all documents reflecting the insurable interest "evaluation," "diligence," and

"analysis" its lawyers conducted. CL.Supp.Br. at 11-13. Viva conceded in interrogatories that it

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ **Ex. VV**

No. 4. And at deposition, Viva's corporate representative (Nelson) refused to answer at least 27

questions designed to probe what Viva knew or should have known about the Policies' insurable

interest. **Ex. MM** at 39:3-21, 87:24-90:11, 115:8-117:12, 176:24-177:16, 220:2-225:3. Because

Viva had the burden of proof and elected to refuse to disclose its insurable interest analysis, it has

failed to produce evidence from which a rational factfinder could conduct a meaningful

---

[1] Although Columbus claimed privilege over certain *documents* reflecting attorney-client communications, unlike Viva, Columbus prepared its Rule 30(b)(6) witnesses with the *substance* of Columbus' insurable interest analysis—even if some of that analysis may have come from lawyers—and Columbus' litigation lawyers allowed Columbus' witnesses to fully testify as to the substance of that analysis at their depositions. In this regard, among other topics, Columbus Life (i) designated its Sr. VP, Insurance Operations, Lisa Fangman and AVP, Claims, Justin Payne, to testify on any insurable interest analysis that was conducted by, or on behalf of, Columbus, with respect to the policies; and (ii) designated Ms. Fangman to testify on Columbus' knowledge of the KDI/Concordia Program. 30(b)(6) Deposition Topics 6, 14 and 17. These witnesses fully testified on these topics. *See, e.g.*, **Ex. BBBB** at 25:15-26:10, 69:7-94:4, 102:14-105:3, 107:8-109:6, 114:8-123:11, 140:7-144:12, 156:3-160:17; Fangman Dep. at 32:14-41:23, 55:16-56:3, 120:17-157:1.

comparison of what the parties knew or should have known about the Policies' insurable interest problems, and thus Wilmington cannot carry its burden of proving Viva was less at fault. *See Chesapeake Corp. v. Shore*, 771 A.2d 293, 301 (Del. Ch. 2000) (refusing to give any weight to the party with the burden's evidence about deliberations when it refused to allow its adversary to probe the content of those deliberations); *id.* at n.8 (quoting *Mentor Graphics v. Quickturn*, No. 16584 at 505 (Del. Ch. Oct. 23, 1998) ("The defendants are the masters of the evidence they will present in their defense, but they must accept the consequences of their tactical choice.")).

Wilmington tries to wiggle out of this problem by arguing that it is supposedly not relying on advice of counsel. But it is hard to fathom how this could possibly be true since Viva concedes its "entire" insurable interest analysis came from its attorneys; refuses to allow its witnesses to answer any question calling for information received from attorneys; and then routinely makes statements like "Viva and Preston did not know the Policies were invalid, they never learned the Policies were invalid, they did not learn facts tending to suggest the Policies were invalid, they did not fail to notice red flags, and their diligence revealed nothing that should have caused them to know or suspect that there was a substantial risk the Policies were void." WT.Supp.Br. at 9-10.

In short, just as a personal injury plaintiff puts their medical records at issue, Viva – by seeking a premium refund – has put its insurable interest analysis at issue. And just like a personal injury plaintiff who loses his or her case because they failed to share their relevant medical records, Viva loses its premium refund claim because it has failed to provide its due diligence evidence. If the result is any different, Columbus is robbed of the opportunity to fairly probe what Viva knew about insurable interest, and the factfinder is robbed of any rational basis for comparing fault.

Wilmington tries to suggest none of this matters because Viva supposedly determined that the insurable interest risk was "de minimis" because Nelson testified that he supposedly only

applied a 0.43% insurable interest discount to the valuation and because Nelson supposedly "can provide a lot of non-privileged, business-related testimony that bears upon that calculation without going into the advice of attorneys." (D.I. 193 at 21:3-8, 32:1-13). But focusing on Nelson's testimony just further highlights the fatal flaws in Wilmington's position on this issue.

Nelson's so-called "business-related testimony" doesn't cure the problem because, as noted, Viva (and Nelson) conceded that "the entirety" of Viva's insurable interest knowledge came from its attorneys and then refused to disclose any document, or answer any question, that reflected any of the insurable interest advice Viva's attorneys provided. CL.Supp.Br. at 11-13. Indeed, at his deposition, Nelson explained that, █████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

███████████

**Ex. MM** at 97:11-98:10; *see id.* at 43:14-44:5, 47:3-6, 88:24-91:22, 92:2-93:14, 115:4-117:12, 172:19-177:16; 219:11-225:3. ███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████ **Id.** at 172:19-177:16. By Viva's own admission, ███████████████████████████████████

███████████████████████████████ Viva concedes Nelson's "business related testimony" is ████████████████████████████████ and any testimony Nelson gave is completely inadmissible because he █████████████████████

**C.    The *Corwell* Analysis Is Persuasive Authority Here.**

*Frankel & De Bourbon* also noted that *Sun Life v. Wells Fargo*, 44 F. 4th 1024 (7th Cir. 2022) ("*Corwell*") is available for a court to rely upon at its discretion. 2023 WL 2564350, at *11.

In *Corwell*, an insurer issued a policy that was, unbeknownst to it, funded through a non-recourse loan. 44 F. 4th at 1029-30. A little over two years later, the policy was sold, and the insured applied for another policy; during underwriting for the second policy, the insurer learned the first one had been funded by a non-recourse loan; the insurer, which had a policy against non-recourse loans, declined to issue the new policy. *Id.* at 1039 n.5; Br. of Wells Fargo, *Corwell*, 20-2339, Doc. 26 at 19. When the insured died, the owner made a claim for the policy's death benefit, and the insurer sought a declaration that it lacked insurable interest. *Corwell*, 44 F. 4th at 1030-31. The trial court declared the policy void, but refunded the owner (Vida) the premium it paid. *Id.*

The Seventh Circuit affirmed the policy's invalidity, but reversed the refund, allowing the insurer to retain *all* premium. The court reasoned: ***"[I]n a case of a void contract like this, the issue of in pari delicto calls for a comparison of the fault of the claimant to the fault of the party from whom restitution is sought***." *Id.* at 1040 (emphasis added). Under this analysis—which is substantially the same as the *Seck* test—the court found the insurer was not "substantially at greater fault than Vida," rejecting the argument that the insurer was more at fault for failing to do more when it learned of the loan. *Id.* at 1039 n.5. As the court explained, the use of premium financing may be a "red flag," but "does not necessarily make a policy illegal as a matter of law." *Id.* Indeed, the policy was not invalidated merely because it used a non-recourse loan, and the court found it significant that "the 2009 discovery of the non-recourse premium financing in 2006 came after the policy's two-year contestability period had expired." *Id.* By contrast, the court found Vida was not an "innocent purchaser" and was instead a "highly sophisticated buyer fully aware of all the material facts and significant risk," and despite the "red flags that came up during its review

process," "took a calculated risk to try to profit from it." *Id.* at 1041. In a nutshell, the court held that where two sophisticated parties both knew or should have known some things about a policy's lack of insurable interest, neither is less at fault than the other, and there is no basis to find an exception to the general rule that parties to illegal contracts are ordinarily left where they are found.

The same analysis applies here. Viva is a sophisticated life insurance investor. ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ As in *Corwell*, this Court should conclude that Viva—a sophisticated investor that walked into this transaction with eyes wide open to its risks—simply cannot prove it was less at fault. *See Seck*, 284 A.3d at 67 n.192 (quoting *Wal-Mart v. Crist*, 855 F.2d 1326, 1335 (8th Cir. 1998) ("'The general rule with respect to illegal contracts is that neither courts of law nor of equity will interpose to grant relief to the parties, if they have been equally cognizant of the illegality.' The level of culpability of the parties was best put, we think, by the district court when it said, 'there is more than enough fault to go around in this case.' Accordingly, we find that the district court should have found the parties in pari delicto and refused to grant relief of any sort.")).

### D.     No Rational Juror Could Conclude Wilmington Can Carry Its Burden Of Proving The Prior Owners Were Less At Fault Than Columbus.

*Frankel & De Bourbon* explained that to recover premium paid by prior owners an investor must "prove that all or some of the former owners were less at fault than" the insurer. 2023 WL 2564350, at *11. No rational factfinder could find the prior owners less at fault than Columbus.

The first entity that paid premium was the Kavanaugh Organization through the sham Trusts it created and controlled. Not only was the Kavanaugh Organization the original STOLI

bad actor that cooked up the human life wagers here, but it knew the Policies were originated by financially inducing seniors into allowing investors to use them as instruments to create policies for investors and then concealed the scam by telling Columbus the policies were supported by traditional insurable interest, would never be sold, and existed to serve bona fide estate planning needs. No rational factfinder could find the STOLI fraudster less at fault than its victim.

The second entity that paid premium was a STOLI investor called ABC that bought the Policies directly from Kavanaugh. Wilmington has put no evidence in the record that ABC did anything to investigate the Policies' origination or showing ABC did not learn from Kavanaugh how the Policies were procured. ABC was a criminal enterprise. A year after acquiring the Policies, the SEC placed ABC into receivership for defrauding investors. *See SEC v. ABC Viatical*, No. 3:06-cv-2136 (N.D. Tex. Nov. 17, 2006), ECF No. 1. ABC's principals were thrown in jail for knowingly acquiring policies acquired by fraud, "l[ying] to investors who purchased fraud-tainted" policies, and misappropriating funds. *U.S. v. Lamonda*, 384 F. App'x 944, 944-45 (11th Cir. 2010).

Wilmington, the party with the burden of proof, has the burden of proving that this criminal enterprise was less at fault than Columbus. But Wilmington has no evidence at all on this topic. Wilmington did not issue subpoenas to ABC or its principals. Nor did Wilmington try to depose anyone connected with ABC. Because Wilmington has not produced any evidence bearing on the relative culpability of ABC, Wilmington cannot possibly prove that ABC conducted a "thorough investigation" into the Policies' origination; that ABC did not know or suspect the Policies were void; that ABC did not ignore red flags; that ABC did not have knowledge of facts tending to suggest the Policies were void; that ABC's expertise in the industry should have caused it to know or suspect substantial STOLI problems; or that ABC was not on inquiry notice of the Policies' invalidity. In comparison, around the same time that ABC was defrauding its investors and

13

committing federal crimes, Columbus attempted to learn as much as it could about the Concordia program. But like ABC's investors, Columbus was also lied to. When the truth about ABC and its criminal insurance fraud is juxtaposed with Columbus's thorough investigation into the Policies, no rational factfinder could determine ABC was less at fault than Columbus.

The third entity that paid premium was a family of affiliated funds called Orca. In 2008, just two years after ABC was put into receivership, the portfolio containing the Policies was acquired by Orca LSI Trust. And prior to ending up in Viva's possession, the portfolio was shuffled between several different Orca-related entities, including Orca Halley Trust, Halley Trust, and Orca Trust (collectively, with Orca LSI Trust, "Orca"). In 2009, however, long before Orca lost possession of the portfolio and Viva ultimately bought it at auction, Orca attempted to sell several of the policies, ***including the Cohen Policy***, to another investor known as Financial Life Services, LLC ("FLS"). But after making an offer to buy the Cohen Policy and executing a sales agreement, FLS backed out of the deal and never bought the Cohen Policy. **Exhibit LLLL**, Orca Complaint ¶¶ 17, 27. This caused Orca to sue FLS and its principal, Michael Krasnerman, seeking to enforce the sale or an award of damages for breach of contract and other claims. ***Id.*** at 10-16.

FLS retained the law firm of Locke Lord Bissell & Liddell, a prominent firm commonly hired by STOLI investors. **Exhibit MMMM**, Answer. On April 21, 2010, Locke Lord, on behalf of FLS, filed an answer with affirmative defenses and counterclaims. ***Id.*** FLS's affirmative defenses alleged that Orca's claims (i) "are barred as against [FLS] because the insurance policy(ies) that are the subject of the relevant agreement(s) were procured illegally, and thus the relevant agreement(s) are void as of inception"; and (ii) "are barred as against [FLS] because the insurance policy(ies) that are the subject of the relevant agreement(s) were void." ***Id.*** ¶¶ 82-103.

To support FLS's claims that the Cohen Policy was STOLI, Locke Lord alleged that it was transferred just 16 months after it was issued, ***which "is known in the settlement industry as a 'wet paper' transaction . . . [and such] transactions are widely considered an indicia of fraud in the procurement of the policy [and] are themselves illegal in a number of states." Id.*** at Cntrcls ¶¶ 17-18 (emphasis added). Locke Lord also asserted that had FLS known the Cohen Policy was part of a wet paper transaction, "it would not have entered into the Sales Agreements" for the Cohen Policy. ***Id.*** ¶ 19. Locke Lord also said the Cohen Policy and the two other policies were procured on about the same date, ***which "is an indicia that the three Policies constitute 'stranger owned life insurance' (known in the life insurance and life settlement industries as 'STOLI'), which violates state insurable interest laws, and which creates a risk that the Policies could be voided by the insurers per applicable state law." Id.*** ¶¶ 20-21 (emphasis added).

FLS also asserted counterclaims for (i) breach of contract; (ii) fraud; and (iii) negligent misrepresentation, alleging Orca (i) breached the sales agreements by falsely representing "there has been no direct or indirect premium financing, transfer of an interest in the Policies, and/or transfer of a beneficial interest in an entity that has or had an economic interest in the Policies"; and (ii) knowingly or recklessly made false representations and material omissions concerning the fact that "the Cohen and Davis Policies constitute 'stranger-owned life insurance.'" ***Id.*** ¶¶ 26-46.

Orca was on inquiry notice of the Policies' invalidity in 2010 when its adversary alleged in a formal judicial proceeding that the Cohen Policy (which has identical characteristics to the Romano Policy) was void STOLI because a prudent person would have inquired further. And we don't know what, if anything, Orca did because Wilmington, the party with the burden, did not bother to collect Orca's documents or to subpoena any person affiliated with it. Thus, the record lacks any evidence from which a rational factfinder could conclude Orca was less at fault.

### E.    Awarding Wilmington A Refund Of The Premium Would Have The Impermissible Effect Of Allowing The Illegal Wager To Pay Off.

In *Frankel & De Bourbon*, the investor argued that, even if the policies were deemed void, it could estop the insurer from challenging them through affirmative defenses or obtain damages equivalent to the death benefit through counterclaims. The Supreme Court rejected this argument:

> But a court order requiring [the insurer] to pay the policies' death benefits to Wilmington Trust would, in effect, enforce the illegal STOLI policies in violation of Article II, Section 17 of the Delaware Constitution and the State's strong public policy against human-life wagering. Such a remedy would fly in the face of our repeated avowals that enforcement of a STOLI policy is not an option.

*Id.* at *7. Here, the Policies' death benefit was $10 million. After the Policies were challenged— and after Wilmington sat idly by for 1.5 years as Columbus went to considerable effort to prove the Policies were void never intending to genuinely contest that—Viva then conceded they were invalid and sought a "refund" of over $10 million, about half of which consists of premium Viva did not pay. If Wilmington receives this windfall, it "would, in effect, enforce the illegal STOLI policies" because Viva will receive *more than the death benefit* and thus more than it would have recovered had it not been caught investing illegally. *Id.*; *see Wuliger v. Manuf. Life*, 567 F.3d 787, 797 (6th Cir. 2009) (explaining that it is unfair to allow a STOLI investor to be able to announce its fraud if and when paying premium is no longer economically positive and receive a refund; whereas, an ordinary policyholder has no such option). This would not further *Seck*'s policy goals—the most important of which is "discourag[ing] these policies from coming into existence"—because it would make downstream STOLI investing profitable, which would incent upstream actors to create more STOLI to satisfy that demand. *Seck*, 284 A.3d at 72.

## III.    CONCLUSION

Columbus respectfully requests the Court enter summary judgment in its favor.

Dated: May 19, 2023

Respectfully submitted,

*/s/ Donald L. Gouge, Jr.*
Donald L. Gouge, Jr. (#2234)
DONALD L. GOUGE, JR., LLC
800 N. King Street, Suite 303
Wilmington, Delaware 19801
(302) 658-1800, Ext. 1

COZEN O'CONNOR
Michael J. Miller (*pro hac vice*)
Joseph M. Kelleher (*pro hac vice*)
Charles J. Vinicombe (*pro hac vice*)
Philip J. Farinella (*pro hac vice*)
1650 Market St., Suite 2800
Philadelphia, PA 19103
*Attorneys for Plaintiff,*
*Columbus Life Insurance Company*

17

## CERTIFICATE OF SERVICE

I, Donald L. Gouge, Jr., do hereby certify that on this 19th day of May, 2023, a copy of the

within Plaintiff Columbus Life Insurance Company's Supplemental Brief in Support of its Motion

for Summary Judgment was filed via CM/ECF and served on all counsel of record.


Dated: May 19, 2023                    */s/ Donald L. Gouge, Jr.*
                                       Donald L. Gouge, Jr. (#2234)